1   ROBBINS GELLER RUDMAN
     & DOWD LLP
2   SHAWN A. WILLIAMS (213113)
  Post Montgomery Center
3   One Montgomery Street, Suite 1800
  San Francisco, CA 94104
4   Telephone: 415/288-4545
  415/288-4534 (fax)
5   shawnw@rgrdlaw.com
     – and –
6   TRAVIS E. DOWNS III (148274)
  BENNY C. GOODMAN III (211302)
7   ERIK W. LUEDEKE (249211)
  655 West Broadway, Suite 1900
8   San Diego, CA 92101-3301
  Telephone: 619/231-1058
9   619/231-7423 (fax)
  travisd@rgrdlaw.com
10   bennyg@rgrdlaw.com
  eluedeke@rgrdlaw.com
11

POMERANTZ HAUDEK GROSSMAN
  & GROSS LLP
MARC I. GROSS
JEREMY A. LIEBERMAN
FEI-LU QIAN
100 Park Avenue
New York, NY 10017-5516
Telephone: 212/661-1100
212/661-8665 (fax)
migross@pomlaw.com
jalieberman@pomlaw.com
flqian@pomlaw.com

12   Co-Lead Counsel for Plaintiffs

13               UNITED STATES DISTRICT COURT

14             NORTHERN DISTRICT OF CALIFORNIA

15                 OAKLAND DIVISION

16   In re GOOGLE INC. SHAREHOLDER   )   Master File No. CV-11-04248-PJH
    DERIVATIVE LITIGATION          )
17   _____ )   VERIFIED CONSOLIDATED
                            )   SHAREHOLDER DERIVATIVE
18   This Document Relates To:       )   COMPLAINT
                            )
19      ALL ACTIONS.           )
                            )
20   _____ )

21

22

23

24

25

26

27

28

1

**OVERVIEW OF THE ACTION**

2

1.      By this shareholder derivative action, plaintiffs seek to recover damages and other

3

relief for nominal party Google Inc. ("Google" or the "Company") against defendants for breach of

4

fiduciary duties (including loyalty, candor and good faith), abuse of control, corporate waste and

5

unjust enrichment.

6

2.      Defendants are members of Google's Board of Directors – Larry Page ("Page"),

7

Sergey Brin ("Brin"), Eric E. Schmidt ("Schmidt"), L. John Doerr ("Doerr"), John L. Hennessy

8

("Hennessy"), Paul S. Otellini ("Otellini"), K. Ram Shriram ("Shriram") and Shirley M. Tilghman

9

("Tilghman") (together, the "Individual Defendants" or the "Google Board"); and Google's top

10

officers – Nikesh Arora ("Arora") and Patrick Pichette ("Pichette").

11

3.      Defendants breached their fiduciary duty of loyalty by allowing certain foreign

12

pharmacies to advertise with Google the sale of prescription medications for importation to United

13

States citizens in violation of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §331(a) and (d)

14

(Introduction into Interstate Commerce of Misbranded or Unapproved Drugs), and the Controlled

15

Substances Act, 21 U.S.C. §952 (Importation of Controlled Substances) (together, "the Acts").

16

Despite knowing that such advertisements were in violation of the Acts, defendants caused the

17

Company to continue to accept and promote these illegal advertisements for over five years.

18

4.      It is well established that causing a company to operate in violation of the law is a

19

breach of a fiduciary's duty of loyalty.  Yet, in total disregard for their fiduciary duties, that is

20

precisely what the Individual Defendants caused Google to do here.  Defendants' faithless acts came

21

to a head on August 24, 2011 when the United States Department of Justice ("DOJ") announced that

22

Google had entered into a non-prosecution agreement and paid a massive $500 million fine due to

23

these improper and illegal advertisements.  Defendants' breaches of their fiduciary duties have

24

damaged Google and raised serious questions about defendants' commitment to the Company motto

25

– Don't be evil.  Accordingly, plaintiffs now bring this action to hold these disloyal fiduciaries

26

accountable for the harm they caused Google.

27

28

**SUMMARY OF THE ALLEGATIONS**

5.     Google is best known for its widely used internet search engine.  One of its primary revenue drivers is advertising.  Google's advertising services are closely linked to its search technology in that customers submit their advertisements and relevant contact information (like a link to their website) to Google and Google displays those advertisements above and next to search results that are based on queries relevant to the advertiser.  Displaying the ads near search results relevant to the advertiser provides the Company with an effective way to target consumers who are likely to be interested in the products being advertised.  Of course, advertisers pay fees to Google for each advertisement they place.

6.     The Federal Food, Drug, and Cosmetic Act was enacted in 1938 and gives authority to the U.S. Food and Drug Administration (the "FDA") to oversee the safety of food, drugs, and cosmetics.  Among other things, §331 prohibits pharmacies outside the United States from introducing or delivering for introduction any prescription drug into interstate commerce, or from causing thereof.  Similarly, the Controlled Substances Act enacted by U.S. Congress in 1970, prohibits such conduct with regard to controlled substances.  Compliance with these Acts is mandatory.  Further, compliance with the Acts is a legal duty known and readily knowable by sophisticated executives of U.S. companies that conduct business internationally.

7.     As corporate directors and officers, defendants owe Google fiduciary duties – the highest duties known to the law.  These duties include a fiduciary duty of loyalty (and its subsidiary duties of candor and good faith).  As one court cogently explained recently:

> The affairs of Delaware corporations are managed by their board of directors, who owe to shareholders duties of ***unremitting*** loyalty.  This means that their actions must be taken in the good faith belief that they are in the best interests of the corporation and its stockholders, especially where conflicts with the individual interests of directors are concerned. . . .  When those same directors communicate with shareholders, they also must do so with ***complete candor***.  Loyalty.  Good faith. Independence.  Candor.  These are words pregnant with obligation.  The Supreme Court did not adorn them with half-hearted adjectives.  Directors should not take a seat at the board table prepared to offer only conditional loyalty, tolerable good faith, reasonable disinterest or formalistic candor.

*In re Tyson Foods, Inc. Consol. S'holder Litig.*, No. 1106-CC, 2007 Del. Ch. LEXIS 120, at *10-*11 (Del. Ch. Aug. 15, 2007) (emphasis in original, footnotes omitted).

8.      Despite knowing that they must comply with the law, including the Acts, Google's directors and officers caused Google to facilitate the illegal importation of prescription drugs by Canadian pharmacies for at least six years, until it became aware of an investigation by the DOJ. Although facilitating improper advertisements temporarily helped Google secure millions in profits, the Company violated the Acts by doing so and has now been exposed to significant damages.

9.      On August 24, 2011, it was announced that Google had settled with the DOJ and entered into a non-prosecution agreement in which the Company agreed to forfeit $500 million for facilitating the placement of advertisements from online Canadian pharmacies that resulted in the unlawful importation of controlled and non-controlled prescription drugs into the United States. Pursuant to the non-prosecution agreement, the Company also agreed to maintain policies that forbid accepting advertisements from Canadian pharmacies.   The incredible size of the $500 million forfeiture is a function of the egregiousness by which defendants caused Google to engage in the illegal advertising.   In fact, this forfeiture is one of the largest fines ever levied against a United States company.

10.      Had defendants complied with the Acts, as their fiduciary duty of loyalty required, these improper advertisements would not have occurred in the first place and the unlawful activity would not have continued for the better part of a decade.   The Google Board's complicity in the improprieties alleged herein breached their fiduciary duties of loyalty (and good faith) owed to Google.   As a result, these defendants are personally liable to Google for the damages resulting from their misconduct.

11.      Although the facilitation of the illegal advertising increased Google's total revenues, defendants' acquiescence ultimately damaged Google in a far greater amount.   In addition to including the illicit profit Google received from the Canadian pharmacies, the $500 million settlement includes the *revenue the pharmacies gained* from their sales through Google.   Further still, Google has been exposed to millions of dollars in investigative costs and expenses, and will likely incur additional legal and professional fees and expenses related to implementation of remedial measures designed to correct the problems arising from the Google Board's failure to prohibit illegal advertising by Canadian pharmacies.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT - CV-11-04248-PJH      - 3 -

12.     Although Google has been severely injured, defendants have not fared nearly so badly.  During the Relevant Time Period, defendants collectively pocketed millions in salary, fees, stock options, and other payments that were not justified in light of the violations of federal law at Google that occurred during their watch.  These payments wasted valuable corporate assets and unjustly enriched defendants to the detriment of Google.

13.     Notwithstanding the enormous damage to Google arising from the violations of federal law, the Google Board has not commenced, and will not commence, suit against defendants for breach of fiduciary duties (including loyalty, candor and good faith), abuse of control, corporate waste and/or unjust enrichment, let alone vigorously prosecute any such claims.  By this action, plaintiffs seek to vindicate Google's rights against its wayward fiduciaries.

**INTRADISTRICT ASSIGNMENT**

14.     A substantial part of the events or omissions which give rise to the claims in this action occurred in the county of Santa Clara, and as such this action is properly assigned to the San Jose division of this Court.  Pursuant to the Related Case Order dated September 19, 2011, this case was transferred to the Oakland Division.

**JURISDICTION AND VENUE**

15.     This Court has jurisdiction over the consolidated actions brought by plaintiffs Patricia H. McKenna ("McKenna") (Case No. CV-11-04248-PJH) and Avrohom Gallis ("Gallis") (Case No. CV-11-04270-LHK) pursuant to 28 U.S.C. §1332(a)(1), because plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  These actions are not collusive actions designed to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     This Court has jurisdiction over the consolidated action brought by plaintiff James Clem ("Clem") (Case No. CV-11-04249-RMW) pursuant to Article III of the United States Constitution and 28 U.S.C. §1331 because the underlying wrongdoing results from violations of the Acts.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This action is not a

1  collusive action designed to confer jurisdiction on a court of the United States that it would not

2  otherwise have.

3       17.    This Court has jurisdiction over each defendant named herein because each defendant

4  is either a corporation that conducts business in and maintains operations in this District, or is an

5  individual who has sufficient minimum contacts with this District so as to render the exercise of

6  jurisdiction by the courts of this District permissible under traditional notions of fair play and

7  substantial justice.

8       18.    Venue is proper in this Court under 28 U.S.C. §1391(a) because: (i) Google maintains

9  its executive offices and principal place of business in this District; (ii) one or more of the defendants

10  either resides in or maintains offices in this District; (iii) a substantial portion of the transactions and

11  wrongs complained of herein, including the defendants' primary participation in the wrongful acts

12  detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to

13  Google, occurred in this District; and (iv) defendants have received substantial compensation in this

14  District by doing business here and engaging in numerous activities that had an effect in this District.

15                                    **THE PARTIES**

16       19.    Plaintiffs McKenna, Gallis and Clem are Google shareholders and have been

17  continuously since 2005, 2005 and 2007, respectively.  Plaintiffs are citizens of the States of

18  Pennsylvania, New York and California.

19       20.    Nominal party Google is a Delaware corporation, with its executive offices located at

20  1600 Amphitheatre Parkway, Mountain View, CA 94043.  Google is the world's largest Internet

21  search engine that generates revenue primarily by delivering relevant, cost-effective online

22  advertising.  Google is a citizen of the State of California.  The Company's shares are traded on

23  NASDAQ Stock Market ("Nasdaq") under the symbol "GOOG."

24       21.    Defendant Page, a Google founder, has been a Google director since the Company's

25  inception in September 1998.  He has also served as the Company's Chief Executive Officer

26  ("CEO") since April 4, 2011.  Page  previously served as Google's President, Products, from 2001 to

27  April 3, 2011, CEO from 1998 to 2001, and Chief Financial Officer ("CFO") from 1998 to 2002.  As

28  an experienced business professional, Page knew or recklessly disregarded that it was illegal under

1   the Acts for pharmacies outside the United States to ship prescription drugs into the United States.

2   Nonetheless, Page approved of internal controls that allowed pharmacies which were violating

3   federal law to advertise using AdWords. This breached Page's fiduciary duty of loyalty (and good

4   faith), and exposed Google to significant damages and risks of loss. Page is a citizen of the State of

5   California.

6          22.    Defendant Brin, a Google founder, has been a Google director since the Company's

7   inception in September 1998. Brin previously served as Google's President, Technology, from 2001

8   to April 3, 2011, and as the Company's President and Chairman from 1998 to 2001. As an

9   experienced business professional, Brin knew or recklessly disregarded that it was illegal under the

10  Acts for pharmacies outside the United States to ship prescription drugs into the United States.

11  Nonetheless, Brin approved of internal controls that allowed pharmacies which were violating

12  federal law to advertise using AdWords. This breached Brin's fiduciary duty of loyalty (and good

13  faith), and exposed Google to significant damages and risks of loss. Brin is a citizen of the State of

14  California.

15         23.    Defendant Schmidt has been a Google director since 2001. He has also been the

16  Executive Chairman of the Google Board since April 4, 2011. Schmidt previously served as

17  Google's CEO from 2001 to 2011, and Chairman of the Google Board from 2001 to 2004 and 2007

18  to April 2011. Schmidt also serves or served as an executive or on the board of directors of Novell

19  and Sun Microsystems, Inc. As an experienced business professional, Schmidt knew or recklessly

20  disregarded that it was illegal under the Acts for pharmacies outside the United States to ship

21  prescription drugs into the United States. Nonetheless, Schmidt approved of internal controls that

22  allowed pharmacies which were violating federal law to advertise using AdWords. This breached

23  Schmidt's fiduciary duty of loyalty (and good faith), and exposed Google to significant damages and

24  risks of loss. Schmidt is a citizen of the State of California.

25         24.    Defendant Doerr has been a Google director since 1999. Doerr also serves or served

26  as an executive or on the board of directors of Amyris, Inc., Amazon.com, Inc., Move, Inc. and Sun

27  Microsystems, Inc. As an experienced business professional, Doerr knew or recklessly disregarded

28  that it was illegal under the Acts for pharmacies outside the United States to ship prescription drugs

1  into the United States.  Nonetheless, Doerr approved of internal controls that allowed pharmacies

2  which were violating federal law to advertise using AdWords.  This breached Doerr's fiduciary duty

3  of loyalty (and good faith), and exposed Google to significant damages and risks of loss.  Doerr is a

4  citizen of the State of California.

5     25.    Defendant Hennessy has been a Google director since 2004.  He has also been the

6  Lead Independent Director of the Google Board since April 2007.  Hennessy also serves or served as

7  the President of Stanford University and as an executive or on the board of directors of Cisco

8  Systems, Inc. and Atheros Communications, Inc.  As an experienced business professional,

9  Hennessy knew or recklessly disregarded that it was illegal under the Acts for pharmacies outside

10 the United States to ship prescription drugs into the United States.  Nonetheless, Hennessy approved

11 of internal controls that allowed pharmacies which were violating federal law to advertise using

12 AdWords.  This breached Hennessy's fiduciary duty of loyalty (and good faith), and exposed Google

13 to significant damages and risks of loss.  Hennessy is a citizen of the State of California.

14    26.    Defendant Otellini has been a Google director since 2004.  Otellini also serves or

15 served as an executive or on the board of directors of Intel Corporation.  As an experienced business

16 professional, Otellini knew or recklessly disregarded that it was illegal under the Acts for pharmacies

17 outside the United States to ship prescription drugs into the United States.  Nonetheless, Otellini

18 approved of internal controls that allowed pharmacies which were violating federal law to advertise

19 using AdWords.  This breached Otellini's fiduciary duty of loyalty (and good faith), and exposed

20 Google to significant damages and risks of loss.  Otellini is a citizen of the State of California.

21    27.    Defendant Shriram has been a Google director since 1998.  Shriram also is on the

22 Stanford University board of trustees and serves or served as an executive or on the board of

23 directors of Amazon.com, Inc., Junglee Corporation and Netscape Communications Corporation.  As

24 an experienced business professional, Shriram knew or recklessly disregarded that it was illegal

25 under the Acts for pharmacies outside the United States to ship prescription drugs into the United

26 States.  Nonetheless, Shriram approved of internal controls that allowed pharmacies which were

27 violating federal law to advertise using AdWords.  This breached Shriram's fiduciary duty of loyalty

28

1   (and good faith), and exposed Google to significant damages and risks of loss.  Shriram is a citizen

2   of the State of California.

3          28.     Defendant Tilghman has been a Google director since 2005.  Tilghman also serves or

4   served as the President of Princeton University.  As an experienced business professional, Tilghman

5   knew or recklessly disregarded that it was illegal under the Acts for pharmacies outside the United

6   States to ship prescription drugs into the United States.  Nonetheless, Tilghman approved of internal

7   controls that allowed pharmacies which were violating federal law to advertise using AdWords.

8   This breached Tilghman's fiduciary duty of loyalty (and good faith), and exposed Google to

9   significant damages and risks of loss.  Tilghman is a citizen of the State of New Jersey.

10         29.     Defendant Arora has been Google's Senior Vice President and Chief Business Officer

11  since January 2011.  Arora previously served as Google's President, Global Sales Operations &

12  Business Development from April 2009 to December 2010 and as President, International

13  Operations prior to that.  As an experienced business professional, Arora knew or recklessly

14  disregarded that it was illegal under the Acts for pharmacies outside the United States to ship

15  prescription drugs into the United States.  Nonetheless, Arora approved of internal controls that

16  allowed pharmacies which were violating federal law to advertise using AdWords.  This breached

17  Arora's fiduciary duty of loyalty (and good faith), and exposed Google to significant damages and

18  risks of loss.  Arora is a citizen of the State of California.

19         30.     Defendant Pichette has been Google's Senior Vice President and CFO since 2008.

20  As an experienced business professional, Pichette knew or recklessly disregarded that it was illegal

21  under the Acts for pharmacies outside the United States to ship prescription drugs into the United

22  States.  Nonetheless, Pichette approved of internal controls that allowed pharmacies which were

23  violating federal law to advertise using AdWords.  This breached Pichette's fiduciary duty of loyalty

24  (and good faith), and exposed Google to significant damages and risks of loss.  Pichette is a citizen

25  of the State of California.

26          **AIDING AND ABETTING AND CONCERTED ACTION**

27         31.     In committing the wrongful acts particularized herein, defendants have pursued or

28  joined in the pursuit of a common course of conduct, and have acted in concert with one another in

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT - CV-11-04248-PJH    - 8 -

1  furtherance of their common plan or design.  In addition to the wrongful conduct particularized

2  herein as giving rise to primary liability, defendants further aided and abetted and/or assisted each

3  other in breach of their respective duties.

4        32.    Each of the defendants aided and abetted and rendered substantial assistance in the

5  wrongs detailed herein.  In taking such actions to substantially assist the commission of the

6  wrongdoing detailed herein, each defendant acted with knowledge of the primary wrongdoing,

7  substantially assisted the accomplishment of that wrongdoing, and was aware of his, her, or its

8  overall contribution to and furtherance of the wrongdoing.

9                              **FACTUAL ALLEGATIONS**

10  **The Individual Defendants Fostered a Business Strategy Designed**
   **to Increase Google's Advertising Revenues at the Expense of the**
11  **Company's Compliance With Federal Laws**

12       33.    Google, a publicly traded company, is the world's largest Internet search and

13  technology corporation.  The Company offers various advertising services that permit advertisers,

14  including Canadian online pharmacies, to post their advertising message and a link to their website

15  above and next to search results in response to search queries relevant to the advertiser.

16       34.    Online pharmacies advertise through various Google services including the

17  Company's largest advertising program, AdWords.  AdWords displays sponsored advertisements in

18  response to queries by the Company's search engine users.  In addition, advertisers are able to "geo-

19  target" their advertising campaigns by selecting the countries where the advertisements will display.

20  In return for these services, advertisers pay fees to Google for each advertisement.  Most advertisers

21  pay Google on a cost-per-click basis, meaning the more a person (or people) clicks on an ad, the

22  more Google is paid.  Google does, however, also offer a cost-per-impression basis, where an

23  advertiser will pay Google based on the number of times its ads appear on Google's websites.  In

24  order to place an ad with Google, advertisers bid, in an auction-like format, on keywords in order to

25  have their advertisements appear when the user enters the selected keywords into the Company's

26  search engine.  A keyword is a specific word or phrase selected by the advertiser that the Company

27  uses to trigger the display of advertisements in response to a user's query.  When Google first began

28  accepting advertising, the Company prohibited certain ads – such as ads for tobacco products or ads

1    that contain potentially misleading content – but did not attempt to stop advertising for controlled

2    prescription drugs, or filter out ads by "rogue" pharmacies that engaged in illegal practices.

3    **Federal Laws Prohibit the Importation of Prescription Drugs from Overseas Pharmacies**

4        35.    Because it is a U.S. company, Google is subject to the Federal Food, Drug, and

5    Cosmetic Act.  Congress enacted the Federal Food, Drug, and Cosmetic Act in 1938, giving

6    authority to the FDA to oversee the safety of food, drugs, and cosmetics.  The Federal Food, Drug,

7    and Cosmetic Act prohibits foreign pharmacies from introducing or delivering prescription drugs

8    into interstate commerce.  In almost all circumstances, the shipment of prescription drugs from

9    pharmacies outside the United States violates the Federal Food, Drug, and Cosmetic Act.

10       36.    Congress also enacted the Controlled Substances Act in 1970, which prohibits the

11   importation of controlled substances.  In the case of controlled prescription drugs,[1] it is also a

12   violation of the Controlled Substances Act to ship these drugs from overseas pharmacies.

13       37.    The U.S. government uses these laws to ensure the safety of drugs that are sold in the

14   United States.  If the drugs do not come from U.S. pharmacies, the FDA has no way to ensure they

15   meet its labeling, manufacturing, storage, and distribution requirements.  Often, drugs originating

16   from foreign sources are not dispensed to patients pursuant to a valid prescription.  Instead, many

17   times an online user does not even need to see a doctor, and instead simply has to fill out an online

18   form.  This allows dangerous and addictive drugs to get into the hands of users without proper

19   oversight by the FDA or a healthcare provider.  Although Canada has its own regulatory regime for

20   prescription drugs, Canadian pharmacies that ship prescription drugs to U.S. residents are not subject

21   to Canadian regulatory authority.  Further, many online Canadian pharmacies sell drugs obtained

22   from countries other than Canada, where pharmacy regulations are lacking.

23   _____

24   [1]    Not all prescription drugs are listed as controlled prescription drugs in the Controlled
25   Substances Act.  Many prescription drugs are listed in Schedules II through V of the Controlled
     Substances Act because of their high potential for abuse or addiction.  Schedule II through V
26   prescription drugs primarily are narcotic pain relievers and central nervous system depressants and
     stimulants. A complete list of controlled prescription drugs, by schedule, is available on the DEA
27   Office of Diversion Control Internet site (http://www.deadiversion.usdoj.gov/schedules/
     index.html).

28

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT - CV-11-04248-PJH    

1    38.    Defendants knew that Google is liable for hosting ads that violate federal laws.  For

2    example, on December 19, 2007, Google, along with Microsoft Corporation ("Microsoft") and

3    Yahoo! Inc. ("Yahoo") entered into settlements with the United States to resolve claims that they

4    promoted illegal gambling.  The total amount of the three settlements was $31.5 million.  Google

5    paid $3 million as part of its settlement because the Company received payment from on-line

6    gambling businesses for advertising on-line gambling between 1997 and June 2007.  Defendants

7    Page, Brin, Schmidt, Doerr, Hennessy, Otellini, Shriram and Tilghman were on the Google Board at

8    the time the Company settled these online gambling claims.

9    **The Individual Defendants Knew that Online Canadian**
     **Pharmacies Were Advertising Their Illegal Services**
10   **Through Google's AdWords**

11   39.    As early as 2003, Google knew about the risks of sponsoring ads by pharmacies

12   outside the United States, yet it refused to take any precautions to prevent liability for the ads.

13   40.    Sometime prior to March 13, 2003, Google contacted the National Association of

14   Boards of Pharmacy ("NABP"), the preeminent professional organization in the United States that

15   supports the state boards of pharmacy in protecting public health, regarding "the ability of rogue

16   pharmacy-related Web sites to advertise their services on Internet search engines."  The NABP

17   responded by warning Google's Healthcare Vertical Market Manager, Mary Ann Belliveau, about

18   the dangers of illegal online pharmacies, the misleading nature of Google's "sponsored links" for

19   these sites, and the U.S. federal laws which Google may be violating.  The NABP went on to say that

20   it was "deeply concerned that these rogue Internet [pharmacy] sites could be a front for criminals

21   seeking to introduce adulterated medications, counterfeit drugs, or worse, to the American market."

22   41.    The NABP recommended to Google that it limit sponsored links to only pharmacies

23   certified by the Verified Internet Pharmacy Practices Sites ("VIPPS") program.  VIPPS is the leading

24   pharmacy accreditation service in the country.  It was created by a coalition of state and federal

25   regulatory associations, professional associations, and consumer advocacy groups who developed

26   the criteria which VIPPS uses to accredit pharmacies.  VIPPS conducts on-site inspections of

27   pharmacies, has a stringent standard against the issuance of prescriptions based on an online

28

1  consultation without a physical examination and, importantly, does not certify Canadian online

2  pharmacies that ship to U.S. patients.

3      42.    Google rejected the conclusions in the NABP's letter.  Moreover, defendants already

4  knew that accepting ads from illegal online pharmacies was illegal as reflected by the fact that

5  beginning in 2004, Google began to actively block pharmacies in countries other than Canada from

6  peddling prescription drugs online in the United States.  Even though defendants caused Google to

7  block advertisements from pharmacies in foreign countries, they inexplicably allowed Canadian

8  pharmacies to advertise prescription drugs to Google users in the United States.  The DOJ non-

9  prosecution agreement later confirmed this fact, stating, "[a]lthough the Company took steps to

10  block pharmacies in countries other than Canada from advertising in the United States through

11  AdWords, the Company continued to allow Canadian pharmacy advertisers to geo-target the United

12  States in their AdWords advertising campaigns."  Furthermore, in spite of the known risks, Google

13  did not employ VIPPS until 2009 – only after the Company became aware of an investigation by the

14  Rhode Island U.S. Attorney's Office and the FDA's Office of Criminal Investigations (the

15  "FDA/OCI"), discussed *infra*.

16      43.    The investigation by the U.S. Attorney's Office in Rhode Island and the FDA/OCI

17  Rhode Island Task Force confirmed that Google knew in 2003 that online Canadian pharmacies

18  were advertising prescription drugs to Google users in the United States through Google's AdWords

19  advertising program in violation of the Acts.

20      44.    In fact, employees at all levels of the Company knew that U.S. consumers were

21  making online purchases of prescription drugs from Canadian pharmacies.  For example, in a

22  November 18, 2003 e-mail, a Google employee discussed the advertising budgets of several

23  Canadian online pharmacy advertisers and noted that "[a]ll ship from Canada into the US via

24  Express Mail." On July 22, 2004, Sheryl Sandberg ("Sandberg"), Google's Vice President of Global

25  Online Sales and Operations, testified before the United States Senate's Permanent Subcommittee on

26  Investigations of the Committee on Governmental Affairs about online pharmaceutical advertising.

27  In her testimony, Sandberg admitted that Google "recognize[s] that there are bad actors on the

28  Internet, including unlicensed online pharmacies that peddle unsafe and counterfeit products." In an

1  August 23, 2005 e-mail, an employee in Google's policy group stated that "the majority of Canadian

2  Pharmacies are in business to drive pharmacy traffic from the United States to Canada" and "target

3  the US in their geo-targeting."

4       45.    In fact, the Company received repeated warnings from numerous sources concerning

5  the likelihood that rogue pharmacies targeted their advertising toward Google users in the United

6  States.  For example, on approximately December 1, 2003, Peter J. Pitts, the FDA's Associate

7  Commissioner for External Affairs, stated that the FDA was "literally placing calls to the search

8  engines trying to get a meeting going" concerning their business dealings with online pharmacies.

9  Around the same time, Google was also contacted by the father of a teenage boy who was

10  hospitalized after he used the Company's search engine to locate and order Vicodin[2], which the

11  Company said it took "very seriously."

12       46.    Mounting public and private pressure forced defendants to make minor improvements

13  to Google's advertising policy but they refused to use a robust system like the one offered by VIPPS.

14  On December 1, 2003, Google announced it would use a third-party company to screen out ads from

15  rogue pharmacies that do not require prescriptions.  The release never mentioned how Google would

16  treat Canadian pharmacies in the new plan.  Google's decision only came several weeks after rival

17  companies, Yahoo and Microsoft, began banning similar advertising.  Furthermore, the FDA began

18  publicly pressuring search engines to accept drug ads from only licensed Internet pharmacies, and

19  the Senate Permanent Subcommittee on Investigations began probing the role of companies that

20  advertise illegal prescription drugs – before which Google's Vice President of Global Online Sales

21  and Operations, Sandberg, soon testified.  *See infra*.

22  **Defendants Permitted Company Employees to Assist Canadian**
   **Online Pharmacies in Evading Google's Controls**

23

24       47.    Despite knowing that it was illegal for pharmacies to ship prescription drugs to the

25  United States from Canada, and that U.S. consumers were purchasing prescription drugs online that

26  _____

27  [2]      Vicodin is a trademark name for commercially available hydrocodone, a controlled substance
   and a synthetic opiate.

28

1   were advertised through Google's AdWords, defendants consciously endorsed the Company's

2   improper business strategy of permitting Canadian pharmacies to advertise through AdWords and

3   direct their advertisements at U.S. customers.  Specifically, defendants permitted Google employees

4   to assist Canadian online pharmacy advertisers in creating advertisements that were designed to

5   evade the internal controls put in place to detect and prevent foreign pharmaceutical companies from

6   advertising on Google.  It is well established that causing a company to operate in violation of the

7   law is a breach of a fiduciary's duty of loyalty.  The Individual Defendants' instruction that the

8   Company break the law in order to maximize short term profits is a breach of their duty of loyalty.

9       48.    In 2004, despite the NABP's warnings and widespread criticisms, Google announced

10  that it would actively block ads from pharmacies in other countries, but it would still continue

11  permitting online Canadian pharmacies to advertise through AdWords.  Google put this policy into

12  practice through its retention of a third-party verification service, SquareTrade, Inc.

13  ("SquareTrade"), to verify that online pharmacy advertisers were licensed in at least one state in the

14  United States or Canada.  SquareTrade, which offers its seal of approval for a wide range of online

15  businesses ranging from cars to realtors, had a very low standard for approval of pharmacies.  But

16  SquareTrade was nothing more than window dressing.

17      49.    Unlike VIPPS, SquareTrade did not conduct on-site inspections and simply required

18  pharmacies seeking to advertise through AdWords to self-certify that they would act in accordance

19  with applicable U.S. laws and regulations.  Moreover, SquareTrade certified online pharmacies as

20  long as they were licensed in one state in the United States *or in Canada*.  Consequently, Canadian

21  online pharmacies could advertise prescriptions through AdWords to U.S. customers.  The use of

22  SquareTrade's ineffective verification further highlights defendants' conscious decision to allow

23  Canadian pharmacies to advertise to U.S. citizens even while the Company was actively blocking

24  most other countries from peddling prescription drugs online to consumers in the United States.

25  These duplicitous decisions reflect defendants' knowledge that it was illegal for pharmacies to ship

26  prescription drugs to the United States from outside the country.

27      50.    Google's sponsorship of Canadian pharmacy ads brought widespread criticism.  On

28  June 9, 2004, the *Wall Street Journal* ("WSJ") reported that Google's decision to continue to carry

1   Canadian ads drew criticism from U.S. regulators and angered U.S. druggists.  Peter J. Pitts, an FDA

2   official, explained he was "disappointed" in Google's decision, criticizing its pursuit of illegal profit:

3   "You can't make value judgments based on what is or is not in your financial interests . . . ."

4   Likewise, state pharmacy boards disapproved of the Company's decision, calling on Google and

5   other search providers to use VIPPS to screen out Canadian pharmacies – just as the NABP advised

6   Google to do in March 2003, described *supra*.

7        51.     The need to resist sponsoring ads by rogue pharmacies was well-known to the

8   Company and defendants.  Not just one, but two high-level Google officials appeared before

9   congressional committees claiming that Google guarded against such advertisements.  Sandberg,

10  then Google's Vice President of Global Online Sales and Operations, attempted to tout Google's

11  "proactive" use of SquareTrade in her testimony to the Senate's Permanent Subcommittee on

12  Investigations on July 22, 2004.  Despite Sandberg's characterization of SquareTrade as using a

13  "rigorous" verification process, SquareTrade's self-certification paled in comparison to VIPPS's

14  stringent standards.  On December 13, 2005, a second high-ranking Company official, Andrew

15  McLaughlin, then Google's Director of Global Public Policy, again hyped SquareTrade's

16  verification process in similar testimony to the House Subcommittee on Oversight and

17  Investigations.

18       52.     Although SquareTrade-certified pharmacies were supposedly in compliance with

19  pharmacy laws and practices, the Company knew that many Canadian online pharmacies were

20  committing rampant violations.  Many of these pharmacies distributed prescription drugs, including

21  controlled prescription drugs, based on an online consultation, rather than a valid prescription from a

22  treating medical practitioner despite SquareTrade's purported dispensing requirements.  As the DOJ

23  non-prosecution agreement makes clear, the Company was also on notice that many of these

24  pharmacies charged a premium for doing so, because individuals seeking to obtain prescription

25  drugs without a valid prescription were willing to pay higher prices for the drugs.

26       53.     For example, in July 2004, Defendants learned that online pharmacies were

27  circumventing SquareTrade's certification process by intentionally avoiding the use of

28  pharmaceutical terms in the text of their AdWords advertisements, while using the same terms as

1  advertising "keyword" terms.  A keyword is a specific word or phrase used by an advertiser that

2  Google uses to trigger the display of advertisements in response to a user's query.  Advertisers bid,

3  in an auction-like format, on keywords in order to have their advertisements appear when the user

4  enters the selected keywords into the Company's search engine.  Once Google began using

5  SquareTrade, it conducted a manual review of non-certified online pharmacy advertisements only if

6  a pharmaceutical term appeared in the text of the advertisement.  Defendants knew, however, that

7  some pharmacy advertisers, including some from Canada, avoided this review by using the

8  prescription drug terms as keywords only and not in advertising text.

9       54.    Google also knew that SquareTrade-certified Canadian pharmacies broke their

10  "promise" not to target U.S. consumers.  From 2003 through 2009, Google provided customer

11  support to a number of these Canadian online pharmacy advertisers, including assisting them in

12  placing and optimizing their AdWords advertisements, despite knowing that these advertisers were

13  attempting to actively violate U.S. federal drug laws.  For example, on or about April 23, 2004, a

14  Google employee based in Canada stated that, in connection with the advertisements of a large

15  Canadian pharmacy, "the Google team is proactively adjusting creative and optimizing with Square

16  Trade policy in mind."  About a month later, on or about June 4, 2004, the same employee emailed a

17  member of the Company's policy group and stated "[t]he Max team and [customer support] are sort

18  of furiously working on creative to appease our new policy before approvals gets to them and

19  disapproves."

20      55.    Moreover, Google permitted Canadian pharmacy advertisers to intentionally geo-

21  target the United States in their AdWords campaigns.  Google was aware of this practice, according

22  to an August 23, 2005 e-mail by an employee in the Company's policy group that stated "the

23  majority of Canadian Pharmacies are in business to drive pharmacy traffic from the United States to

24  Canada" and "target the US in their geo-targeting."

25      56.    When Google changed third-party verification providers in 2006, the Company

26  continued to receive reports that online Canadian pharmacies were breaking U.S. law with Google's

27  assistance.   PharmacyChecker.com LLC ("PharmacyChecker"), Google's new third-party

28  verification provider, purportedly certified advertisers of non-controlled prescription drugs,

1   including distributors located in Canada.  Defendants, however, knew that PharmacyChecker was

2   not effective, and that VIPPS was still a viable option.

3        57.    On July 7, 2008, Joseph A. Califano, Jr. ("Califano"), head of the National Center on

4   Addiction and Substance Abuse at Columbia University ("CASA"), described PharmacyChecker's

5   faults and warned defendant Schmidt, then Google's Chairman and CEO, about Google's illicit

6   revenue:

7              Although Google reports using a company called PharmacyChecker to screen
               out rogue pharmacies, CASA was able to find prominent displays of ads for rogue
8              Internet pharmacies in a Google search for controlled drugs included in our analysis.
               This suggests that Google is profiting from advertisements for illegal sales of
9              controlled prescription drugs online.

10  Califano, a former U.S. Secretary of Health, Education, and Welfare, advised Google to take

11  immediate action to "[b]lock all advertisements . . . that do not come from licensed or certified

12  online pharmacies;" "[s]creen such sites from Internet searches;" and "[p]rovide warnings that sale

13  and purchase of controlled drugs over the Internet from unlicensed pharmacies and physicians

14  without valid prescriptions are illegal."  Califano enclosed CASA's 2008 report entitled "You've

15  Got Drugs! V: Prescription Drug Pushers on the Internet," which highlighted the fact that

16  approximately 85% of websites selling controlled prescription drugs did not require a legitimate

17  prescription in 2007 and 2008.  The CASA report also mentioned various verification programs:

18  VIPPS employed a "rigorous" program, whereas PharmacyChecker's process was "far from

19  perfect."

20       58.    Likewise, in a December 23, 2008 letter to defendant Schmidt, the NABP again

21  recommended replacing Google's third-party verification service with one that actually adheres to

22  pharmacy laws and practice standards.  Principal among PharmacyChecker's flaws were that it

23  certified sites that did not require a valid prescription and sourced their prescriptions from outside

24  the U.S in contravention of U.S. law.  Moreover, the NABP warned defendant Schmidt that "your

25  sponsorship of these search results, and your third-party verification service's certification of these

26  Web sites, aids in a business practice that is contrary to US law, unsafe, and deceptive to US

27  patients."

28

59.     The NABP explained that Canadian pharmacists selling drugs to the United States online can skirt Canadian regulation.  Furthermore, the NABP also explained that many of the prescription drugs originate in third-world countries, "a practice that would not be considered lawful or safe were the final customer within Canada, or if a US pharmacy were dispensing prescription drugs to a US resident."

60.     A report published in 2009 by Bryan A. Liang, a California Western School of Law Professor, roundly criticized PharmacyChecker, finding that although PharmacyChecker purportedly "verifies" the legitimacy of online pharmacies, "little verification of potential advertisers actually takes place."  As a result, Google and other search engines were profiting from the online ads of illegal drug sellers, while at the same time "exert[ing] very little effort to ensure that online drug sellers from which they obtain advertisement revenue are legitimate."  Professor Liang stated in the WSJ on May 21, 2011 that "[o]n the basis of our analysis, I think [Google and other search providers] were turning a blind-eye . . . .  They were making a lot of money on this."

**Google Sponsors Rogue Sites that Circumvent Verification**

61.     As early as July 2004, the Company was on notice that online pharmacies were circumventing the SquareTrade and PharmacyChecker certification process by intentionally avoiding the use of certain pharmaceutical terms in the text of their AdWords advertisements, while using these same terms as advertising "keyword" terms, explained *supra*.  Once the Company began using SquareTrade, and continuing throughout the period during which the Company used PharmacyChecker, the Company conducted manual review of non-certified online pharmacy advertisements only if a pharmaceutical term appeared in the text of the advertisement.

62.     Additionally, defendants knew or recklessly disregarded that the Canadian online pharmacies, with the assistance of Google employees, were continuing to employ the same tricks to circumvent PharmacyChecker's certification process as they had when the Company used SquareTrade's services, including avoiding manual review of the advertisements by using pharmaceutical terms as keywords only and not in advertising text.  For example, in a February 13, 2008 e-mail, a member of the Company's policy group stated, "[t]he only ads that are getting blocked are those with explicit pharma terms in the ad texts; the shady, fraudulent advertisers know

1   not to do this." After it became aware of the Government's investigation, the Company made

2   changes to its systems in order to flag for review all ads that had prescription drug terms as

3   keywords.

4          63.     Some pharmacy advertisers that did not qualify for certification were also able to

5   advertise through AdWords by changing their geographic targets and avoiding the certification

6   process altogether.   These online pharmacy advertisers initially prevented their AdWords

7   advertisements from being run in the United States, so that they would not be required to obtain a

8   SquareTrade or PharmacyChecker certification.   Once the advertisements began to run on the

9   Company's search engine, however, the pharmacies would change the geo-targeting of the

10  advertisements so that they would appear in the United States in response to queries by U.S. users of

11  the Company's search engine.   Although defendants knew that some online pharmacies later

12  changed the geo-targeting of their AdWords advertising in order to avoid the certification

13  requirements, defendants did nothing to prevent or monitor any changes to the online pharmacies'

14  geo-targeting practices until after becoming aware of the DOJ's investigation.

15         64.     In 2008, the National Center on Addiction and Substance Abuse at Columbia

16  University published a report that found that 85% of the online pharmacies advertising controlled

17  drugs on search engines did not require a valid prescription. Also in 2008, a NABP study estimated

18  that 96% of internet drug outlets appeared to be in violation of pharmacy-related laws or standards.

19  In December 2008, the NABP wrote a letter to Google urging it to drop PharmacyChecker as its

20  third-party verification service, noting that the Company had let through several advertisers "that

21  source their prescription drugs from various locations outside of the United States . . . which is

22  contrary to US law."   The NABP also specifically advised Google that the importation of

23  prescription drugs from foreign countries is illegal.

24         65.     Despite these multiple warnings, defendants continued to allow Canadian online

25  pharmacies to use AdWords until 2009.   Defendants also permitted Google to continue using

26  PharmacyChecker until 2009, despite the existence of superior VIPPS service.

27         66.     The U.S. Government and Google estimate that the total proceeds to the Company

28  and Canadian online pharmacy advertisers generated from the advertising and sale of controlled

prescription drugs by Canadian online pharmacies that advertised through the Company's AdWords program was approximately $500 million.

**Google Belatedly Changes Its Advertising Policies After Various Government Entities Begin Investigating Google**

67.     It was only after defendants learned in 2009 that the DOJ, the Rhode Island U.S. Attorney's Office, and the FDA/OCI, were investigating Google that the Company took any significant steps to prevent the unlawful sale of prescription drugs by online Canadian pharmacies to U.S. consumers.   Google's quick response after learning about the investigation shows that defendants could have, at any time of the six-year long scheme, stopped the Company from assisting online pharmacies in violating U.S. federal law.

68.     Among other things, on February 9, 2010, Google finally updated its Pharmacy Policy in the United States and Canada to require online pharmacy advertisers to be certified by VIPPS.  The updated Pharmacy Policy went into effect on February 23, 2010.  The updated Pharmacy Policy stated the following, in relevant part:

> **Only VIPPS and CIPA certified pharmacies will be allowed to advertise**
> We've made the decision to further restrict the ads we accept for online pharmacy sites in the U.S. and Canada.  Starting at the end of this month, Google AdWords will only accept ads from online pharmacies in the U.S. that are accredited by the National Association Boards of Pharmacy VIPPS program, and from online pharmacies in Canada that are accredited by the Canadian International Pharmacy Association (CIPA).
>
> **Pharmacies can only target ads within their country**
> These pharmacies may only target ads to users in the country in which they are accredited.  This policy change does not affect our online pharmacy policy for countries outside the U.S. and Canada.
>
> Accordingly, we'll no longer be using any 3rd party verifier of online pharmacies other than VIPPS and CIPA.  AdWords advertisers who aren't accredited by VIPPS and CIPA will no longer see their online pharmacy ads displayed once this policy change comes into effect.

69.     In addition, Google retained an independent company to enhance its back-end sweeps, which were designed to detect pharmacy advertisers exploiting flaws in the Company's screening systems.  Finally, Google began suing pharmacy advertisers that violated the Company's terms of use and reporting suspected illegal pharmacies to the FDA.

**Google's Changed Policies Are Too Little, Too Late**

70.     On May 10, 2011, in its first quarter 2011 Quarterly Report on Form 10-Q, the Company revealed that it had set aside $500 million for a possible resolution of a DOJ investigation. Specifically, the Company provided:

> In May 2011, in connection with a potential resolution of an investigation by the United States Department of Justice into the use of Google advertising by certain advertisers, we accrued $500 million for the three month period ended March 31, 2011. Although we cannot predict the ultimate outcome of this matter, we believe it will not have a material adverse effect on our business, consolidated financial position, results of operations, or cash flows.

71.     On May 13, 2011, the WSJ published an article stating that Google was "close to settling a U.S. criminal investigation into allegations it made hundreds of million of dollars by accepting ads from online pharmacies that break U.S. laws." The article stated in relevant part:

> The federal investigation has examined whether Google knowingly accepted ads from online pharmacies, based in Canada and elsewhere, that violated U.S. laws, according to the people familiar with the matter.

> A Google spokesman declined to comment, as did a Justice Department spokeswoman.

> Search engines can be liable if they are found to be profiting from illegal activity.

> In December 2007, the three largest Internet companies, Google, Microsoft Corp. and Yahoo Inc. agreed to pay a combined $31.5 million fine to settle civil allegations brought by the Justice Department that they had accepted ads from illegal gambling sites.

> Prosecutors can charge such acts under a number of different statutes. From a legal standpoint, a key distinction for Google would be that the illegal activity allegedly took place through its paid advertising service, not just the results that its search engine produces.

> There are scores of websites that offer to sell prescription drugs. Some violate U.S. laws by selling counterfeit or expired medicines or dispensing without a valid doctor's prescription.

> One question under investigation is the extent to which Google knowingly turned a blind eye to the alleged illicit activities of some of its advertisers – and how much executives knew, the people familiar with the matter said.

> The probe has been conducted by the U.S. Attorney's Office in Rhode Island and the Food and Drug Administration, among other agencies, according to these people. A spokesman for Rhode Island U.S. Attorney Peter Neronha declined to comment. A spokeswoman for the FDA said the investigation was ongoing and declined to comment further.

Google generated nearly $30 billion in total ad revenue in 2010, largely from its AdWords system. AdWords helped revolutionize online advertising, offering marketers the chance to bid to display their ads when people searched for certain keywords on the Google search engine. An advertiser only pays when a user clicks on the ad.

Google, like other Internet companies, has struggled for years to deal with what it calls "rogue online pharmacies." In 2003, for instance, Google said it banned ads from U.S. companies that offer drugs like Vicodin and Viagra without a prescription.

Google acted after rivals, including Yahoo and Microsoft, made similar moves as the FDA began publicly pressuring sites to accept only drug ads from licensed Internet pharmacies.

But Google said in 2004 it would continue carrying ads for Canadian pharmacies that send medicines to U.S. customers. The decision riled some U.S. druggists and drew criticism from regulators.

72.     On August 19, 2011, Google entered into a non-prosecution agreement with the DOJ resulting from its "investigation into the Company's acceptance of advertisements placed by online pharmacy advertisers that did not comply with United States law regarding the importation and dispensation of prescription drugs." The Company and federal authorities, as set forth in the non-prosecution agreement, explained what defendants knew all along, namely that Google was aware of the illegality associated with the importation of prescription drugs into the United States. In fact, the parties to the non-prosecution agreement agreed upon the following:

(f)     As early as 2003, the Company was aware that in most circumstances it was illegal for pharmacies to ship controlled and non-controlled prescription drugs into the United States from Canada. For example, in March 2003 and again in December 2008, the National Association of Boards of Pharmacy advised the Company that the importation of prescription drugs from foreign countries is illegal.

(g)     The Company was aware that importation of prescription drugs to consumers in the United States is almost always unlawful because the United States Food and Drug Administration ("FDA") cannot ensure the safety and effectiveness of foreign prescription drugs that are not FDA-approved and because the drugs may not meet FDA's labeling requirements, may not have been manufactured, stored, and distributed under proper conditions, and may not have been dispensed pursuant to a valid prescription. While Canada had its own regulatory regime for prescription drugs, Canadian pharmacies that ship prescription drugs to U.S. residents are not subject to Canadian regulatory authority, and many sell drugs obtained from countries other than Canada, which lack adequate pharmacy regulations.

73.     Despite defendants' knowledge of the federal mandates regulating the importation of prescription drugs, defendants caused Google to admit that between 2003 and 2009, Google repeatedly accepted and/or assisted in optimizing advertisements placed by online Canadian

1   pharmacy advertisers that did not comply with the Acts. As the non-prosecution agreement

2   provides:

> (h)      As early as 2003, the Company was on notice that online Canadian
> pharmacies were advertising prescription drugs to the Company's users in the United
> States through the Company's AdWords advertising program. Although the
> Company took steps to block pharmacies in countries other than Canada from
> advertising in the United States through AdWords, the Company continued to allow
> Canadian pharmacy advertisers to geo-target the United States in their AdWords
> advertising campaigns. The Company knew that U.S. consumers were making
> online purchases of prescription drugs from these Canadian online pharmacies. For
> example, in a November 18, 2003 email, a Company employee discussed the
> advertising budgets of several Canadian online pharmacy advertisers and noted that
> "[a]ll ship from Canada into the US via Express Mail." In an August 23, 2005 email,
> an employee in the Company's policy group stated, "the majority of Canadian
> Pharmacies are in business to drive pharmacy traffic from the United States to
> Canada" and "target the US in their geo-targeting."

>                    *      *      *

> (k)      From 2003 through 2009, the Company provided customer support to
> some of these Canadian online pharmacy advertisers to assist them in placing and
> optimizing their AdWords advertisements and in improving the effectiveness of their
> websites. For example, on or about April 23, 2004, a Google employee based in
> Canada reported in an email concerning the advertisements of a large Canadian
> pharmacy advertiser that "the Google team is proactively adjusting creative and
> optimizing with Square Trade policy in mind." On or about June 4, 2004, the same
> employee emailed a member of the Company's policy group and stated, "The Max
> team and [customer support] are sort of furiously working on creative to appease our
> new policy before approvals gets to them and disapproves."

17          74.     On August 24, 2011, the DOJ publicly announced that Google had agreed to forfeit

18   half a billion dollars' worth of gross revenue generated by online ads and prescription drug sales by

19   Canadian online pharmacies. Defendants' belated actions were too little to insulate Google from

20   DOJ scrutiny. After a multi-year investigation, the DOJ announced that it had entered into the non-

21   prosecution agreement with Google, pursuant to which the Company agreed to forfeit half a billion

22   dollars. In particular, the DOJ press release stated:

> **Google Forfeits $500 Million Generated by Online Ads & Prescription Drug
> Sales by Canadian Online Pharmacies**
>
> *Internet Search Engine Accepted Advertisements from Online Canadian
> Pharmacies that Targeted U.S. Consumers and Illegally Imported Controlled and
> Non-Controlled Prescription Drugs into the United States*
>
> Online search engine Google Inc. has agreed to forfeit $500 million for allowing
> online Canadian pharmacies to place advertisements through its AdWords program
> targeting consumers in the United States, resulting in the unlawful importation of
> controlled and non-controlled prescription drugs into the United States, announced

Deputy Attorney General James M. Cole; Peter F. Neronha, U.S. Attorney for the District of Rhode Island; and  Kathleen Martin-Weis, Acting Director of the U.S. Food and Drug Administration's Office of Criminal Investigations (FDA/OCI).  The forfeiture, one of the largest ever in the United States, represents the gross revenue received by Google as a result of Canadian pharmacies advertising through Google's AdWords program, plus gross revenue made by Canadian pharmacies from their sales to U.S. consumers.

The shipment of prescription drugs from pharmacies outside the United States to customers in the United States typically violates the Federal Food, Drug and Cosmetic Act and in the case of controlled prescription drugs, the Controlled Substances Act.  Google was aware as early as 2003, that generally, it was illegal for pharmacies to ship controlled and non-controlled prescription drugs into the United States from Canada.

The importation of prescription drugs to consumers in the United States is almost always unlawful because the FDA cannot ensure the safety and effectiveness of foreign prescription drugs that are not FDA-approved because the drugs may not meet FDA's labeling requirements; may not have been manufactured, stored and distributed under proper conditions; and may not have been dispensed in accordance with a valid prescription.  While Canada has its own regulatory rules for prescription drugs, Canadian pharmacies that ship prescription drugs to U.S. residents are not subject to Canadian regulatory authority, and many sell drugs obtained from countries other than Canada which lack adequate pharmacy regulations.

"The Department of Justice will continue to hold accountable companies who in their bid for profits violate federal law and put at risk the health and safety of American consumers," said Deputy Attorney General Cole.  "This settlement ensures that Google will reform its improper advertising practices with regard to these pharmacies while paying one of the largest financial forfeiture penalties in history."

"This investigation is about the patently unsafe, unlawful, importation of prescription drugs by Canadian on-line pharmacies, with Google's knowledge and assistance, into the United States, directly to U.S. consumers," said U.S. Attorney Neronha. "It is about taking a significant step forward in limiting the ability of rogue on-line pharmacies from reaching U.S. consumers, by compelling Google to change its behavior.  It is about holding Google responsible for its conduct by imposing a $500 million forfeiture, the kind of forfeiture that will not only get Google's attention, but the attention of all those who contribute to America's pill problem."

"Today's agreement demonstrates the commitment of the Food and Drug Administration to protect the US consumer and hold all contributing parties accountable for conduct that results in vast profits at the expense of the public health," said FDA/OCI Acting Director Martin-Weis.  "The result of this investigation has been a fundamental transformation of Internet pharmacy advertising practices, significantly limiting promotion to US consumers by rogue online pharmacies.  This accomplishment could not have been possible without the resourceful commitment of the Rhode Island United States Attorney's Office, as well as the tireless efforts of our law enforcement partners detailed to the OCI Rhode Island Task Force."

An investigation by the U.S. Attorney's Office in Rhode Island and the FDA/OCI Rhode Island Task Force revealed that as early as 2003, Google was on notice that online Canadian pharmacies were advertising prescription drugs to Google users in the United States through Google's AdWords advertising program.

Although Google took steps to block pharmacies in countries other than Canada from advertising in the U.S. through AdWords, they continued to allow Canadian pharmacy advertisers to target consumers in the United States. Google was aware that U.S. consumers were making online purchases of prescription drugs from these Canadian online pharmacies, and that many of the pharmacies distributed prescription drugs, including controlled prescription drugs, based on an online consultation rather than a valid prescription from a treating medical practitioner. Google was also on notice that many pharmacies accepting an online consultation rather than a prescription charged a premium for doing so because individuals seeking to obtain prescription drugs without a valid prescription were willing to pay higher prices for the drugs.

Further, from 2003 through 2009, Google provided customer support to some of these Canadian online pharmacy advertisers to assist them in placing and optimizing their AdWords advertisements, and in improving the effectiveness of their websites.

In 2009, after Google became aware of the investigation by the Rhode Island U.S. Attorney's Office and the FDA/OCI Rhode Island Task Force of its advertising practices in the online pharmacy area, and as a result of that investigation, Google took a number of steps to prevent the unlawful sale of prescription drugs by online pharmacies to U.S. consumers. Among other things, Google began requiring online pharmacy advertisers to be certified by the National Association of Boards of Pharmacy's *Verified Internet Pharmacy Practices Sites* program, which conducts site visits; has a stringent standard against the issuance of prescriptions based on online consultations; and, most significantly, does not certify Canadian online pharmacies. In addition, Google retained an independent company to enhance detection of pharmacy advertisers exploiting flaws in the Google's screening systems.

Under the terms of an agreement signed by Google and the government, Google acknowledges that it improperly assisted Canadian online pharmacy advertisers to run advertisements that targeted the United States through AdWords, and the company accepts responsibility for this conduct. In addition to requiring Google to forfeit $500 million, the agreement also sets forth a number of compliance and reporting measures which must be taken by Google in order to insure that the conduct described in the agreement does not occur in the future.

The investigation of Google had its origins in a separate, multimillion dollar financial fraud investigation unrelated to Google, the main target of which fled to Mexico. While a fugitive, he began to advertise the unlawful sale of drugs through Google's AdWords program. After being apprehended in Mexico and returned to the United States by the U.S. Secret Service, he began cooperating with law enforcement and provided information about his use of the AdWords program. During the ensuing investigation of Google, the government established a number of undercover websites for the purpose of advertising the unlawful sale of controlled and non-controlled substances through Google's AdWords program.

75. Notably, the DOJ press release explicitly stated that the forfeiture included gross revenue made by Canadian pharmacies from their sales to U.S. consumers. Therefore, the forfeiture is significantly higher than the amount of money Google profited from working with the pharmaceutical advertisers.

76.     That same day, the Company acknowledged in an e-mail statement that:

We banned the advertising of prescription drugs in the U.S. by Canadian pharmacies some time ago.  However, it's obvious with hindsight that we shouldn't have allowed these ads on Google in the first place.  Given the extensive coverage this settlement has already received, we won't be commenting further.

77.     Jason Helfstein, an Internet research analyst at Oppenheimer & Co., said that while the penalty imposed by the DOJ was large, what is more distressing for Google is the blow to its reputation.  "The most surprising thing isn't the amount of money, it is that Google made a mistake with its ads, and Google doesn't usually make mistakes," he said.

78.     According to an article by the Associated Press entitled, "Google settles Pharmacy ad probe for $500 million," the settlement "delivered a stinging rebuke for Google, whose motto is 'don't be evil.'"  The article further stated the following:

In announcing the settlement, authorities left little doubt that Google had misbehaved.  From its vantage point, Google crossed into a shady area of prescription-drug advertising in pursuit of higher profits, which have boosted its stock price and enriched its employees since the company's initial public offering in 2004.

In that sense, the potential damage to Google's reputation may be more troubling to the company than the amount of money it's paying to sweep the problem under the rug. The $500 million is a sum Google can easily afford; it had $39 billion in cash at the end of June.

*          *          *

A separate U.S. Food and Drug Administration investigation into drugs that claimed to be manufactured in Canada found that 85 percent of the drugs examined came from 27 different countries, including some that were found to be counterfeit, said Kathleen Martin-Weis, acting director of the FDA's Office of Criminal Investigations.

Investigators noted that Google did not allow online pharmacies from any other country aside from Canada to advertise to American consumers.

The probe did not touch the overseas online pharmacies, Neronha said, because American officials did not have the authority to bring charges. He said the case raised some "novel legal theories," given that if it had gone to trial, prosecutors would have to prove an Internet search engine helped pharmacies violate federal law.

Investigators snared Google's ad system by creating seven undercover websites offering prescription drugs to be sold without a prescription or the completion of an online medical questionnaire, Martin-Weis said. An undercover investigator informed Google employees creating the advertising for the products that they were manufactured overseas and did not require customers to have a valid prescription, she said.

"In each instance, despite this knowledge, Google employees created a full advertising campaign for each of the undercover websites," Martin-Weis said.

Investigators said they quickly spent the money they had set aside for the ad buys and then pored over 4 million pages of e-mails and financial records to make their case. The undercover websites were live for four months, investigators said.

79.     On August 27, 2011, the WSJ published an article entitled, *New Heat for Google CEO*. The article emphasized that defendant Page, as the "public face of Google" "knew of, and allowed, the ads for years." Further, the article stated, in relevant part:

Sorting through more than four million documents, prosecutors found internal emails and documents that, they say, show Mr. Page was aware of the allegedly illicit ad sales. Under this week's $500 million settlement, those emails won't be released, avoiding the possibility of disclosure at trial.

"Larry Page knew what was going on," Peter Neronha, the Rhode Island U.S. Attorney who led the probe, said in an interview. "We know it from the investigation. We simply know it from the documents we reviewed, witnesses that we interviewed, that Larry Page knew what was going on."

*       *       *

Mr. Neronha didn't say when the Justice Department believes Mr. Page learned of the matter, though people familiar with the investigation allege it was several years ago. He declined to discuss the content of the emails, citing grand jury secrecy.

*       *       *

Mr. Page, 38 years old, five months ago assumed direct leadership of Google as chief executive. Mr. Page has increasingly become the public face of Google as it navigates a thicket of government investigations.

The Justice Department contends that Google knew it was potentially violating U.S. law since at least 2003, but didn't take effective action to ban the ads until it mounted an undercover sting operation against the Internet search giant in 2009.

In the years leading up to the investigation, senior Google executives testified repeatedly in Congress that the company had "rigorous" controls to stop unlawful advertisements. Those included retaining a series of third-party services to screen out sites that didn't comply with U.S. law.

But Mr. Neronha said those efforts amounted to "window-dressing," allowing Google to continue earning revenues from the allegedly illicit ad sales even as it professed to be taking action against them.

Google employees helped undercover Justice Department agents in the sting operation evade controls designed to stop companies from advertising illegally, he said.

"Suffice it to say that this is not two or three rogue employees at the customer service level doing this on their own," Mr. Neronha said in an interview. "This was a corporate decision to engage in this conduct."

U.S. state pharmacy regulators warned Google in 2003 and 2008 that the importation of drugs from abroad was illegal, according to letters reviewed by The Wall Street Journal. Google allowed ads from Canadian online pharmacies to target U.S. consumers until 2009, when it became aware of the government investigation, the Justice Department contends.

### DUTIES OF THE DEFENDANTS

80.     As directors and officers of Google, defendants owed Google a fiduciary duty to ensure the Company complies with applicable laws, including the Acts.  This is because compliance with the statutes, laws, rules and regulations applicable to Google's business and affairs is not an option for the Google Board.

81.     Moreover, defendants were fully aware that the advertising done by Canadian pharmacies on AdWords triggered compliance obligations under the Acts.  Defendants knew this because they are seasoned business professionals with extensive experience overseeing the business and affairs of U.S. companies.  In addition, as the non-prosecution agreement makes clear, the Company was aware as early as 2003 that: (i) the importation of prescription drugs to consumers in the United States is almost always illegal; that (ii) Canadian pharmacies were advertising prescription drugs to the Company's users in the United States; and that (iii) many of these Canadian pharmacies distributed prescription drugs to consumers without a prescription and at a premium.

82.     Because defendants knew that advertising done by Canadian pharmacies on AdWords triggered compliance obligations under the Acts, they knew that they faced a duty to act, *i.e.*, to ensure compliance with federal laws regarding the import of prescription drugs into the United States.  However, defendants did not proactively manage Google's risk and/or compliance associated with the importation of prescription drugs.  As a result, Google has been severely injured by the violations of the Acts that arose as a result of defendants' breaches of fiduciary duties.  To date, Google has incurred more than $500 million in damages due to defendants' fiduciary failures.

83.     To discharge their duties, the directors and officers of Google were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls

of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Google were required to, among other things:

(a)  ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)  conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)  remain informed as to how Google conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions and practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices, and make such disclosures as necessary to comply with securities laws; and

(d)  ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules and regulations.

84.  Under the Company's Code of Conduct ("Code"), each member of the Board and each Google employee is required "to know and follow the Code" and "[f]ailure to do so can result in disciplinary action, including termination of employment." The Code tells Google's employees, or Googlers, "'Don't be evil,'" meaning that its employees should do "the right thing more generally – following the law, acting honorably and treating each other with respect." The Code also states that Google holds itself "to a higher standard in how" users are treated and obeys the law.  The Code emphasizes the following, in relevant parts:

a.  Integrity

Our reputation as a company that our users can trust is our most valuable asset, and it is up to all of us to make sure that we continually earn that trust. All of our communications and other interactions with our users should increase their trust in us.

\*        \*        \*

e.  Take Action

Any time you feel our users aren't being well-served, don't be bashful – let someone in the company know about it. Continually improving our products and

services takes all of us, and we're proud that Googlers champion our users and take the initiative to step forward when the interests of our users are at stake.

\*     \*     \*

VII.    Obey the Law

Google takes its responsibilities to comply with laws and regulations very seriously and each of us is expected to comply with applicable legal requirements and prohibitions. While it's impossible for anyone to know all aspects of every applicable law, you should understand the major laws and regulations that apply to your work.

85.    Similarly, Google's Corporate Governance Guidelines ("CGG") "established by the [Google Board] provide a structure within which our directors and management can effectively pursue Google's objectives for the benefit of its stockholders." Google's CGG states the following in relevant part:

1.    To Oversee Management and Evaluate Strategy. The fundamental responsibility of the directors is to exercise their business judgment to act in what they reasonably believe to be the best interests of Google and its stockholders. It is the duty of the Board to oversee management's performance to ensure that Google operates in an effective, efficient and ethical manner in order to produce value for Google's stockholders. The Board also evaluates Google's overall strategy and monitors Google's performance against its operating plan and against the performance of its peers.

Additionally, the Board has responsibility for risk oversight, with reviews of certain areas being conducted by the relevant board committees. The Board is responsible for oversight of strategic, financial and execution risks and exposures associated with Google's business strategy, product innovation and sales road map, policy matters, significant litigation and regulatory exposures, and other current matters that may present material risk to Google's financial performance, operations, infrastructure, plans, prospects or reputation, acquisitions and divestitures.

Directors are expected to invest the time and effort necessary to understand Google's business and financial strategies and challenges. The basic duties of the directors include attending Board meetings and actively participating in Board discussions. Directors are also expected to make themselves available outside of board meetings for advice and consultation.

2.    To Select the Chair and Chief Executive Officer. The Board will select the chairman of the Board and the chief executive officer in compliance with Google's Certificate of Incorporation and Bylaws, which provides that the chairman of the board will not be a current employee of Google, or someone employed by Google any time within the prior three years, unless the appointment is approved by two-thirds of the disinterested directors.

3.    To Evaluate Management Performance and Compensation. At least annually, the Leadership Development and Compensation Committee will evaluate the performance of the chief executive officer and the other officers. It will review and approve the compensation plans, policies and arrangements for executive

officers and other officers. It will also evaluate the compensation plans, policies and programs for officers and employees to ensure they are appropriate, competitive and properly reflect Google's objectives and performance.

86.     Defendants' failures as fiduciaries are not in serious doubt.  First, the government and Google entered into a non-prosecution agreement under which Google acknowledged that it improperly assisted Canadian online pharmacy advertisers in running advertisements that geo-targeted the United States through AdWords and the Company accepted responsibility for the Company's conduct.  Moreover, "Company policy now forbids accepting advertisements from pharmacies located in Canada, or elsewhere outside the United States, to run in the United States on AdWords."   These admissions and remediation measures would not have existed if, after investigating, federal authorities had found evidence showing that Google had, in fact, complied with their duty to prevent violations of federal law.  Taken together, they present *prima facie* evidence that defendants ignored their fiduciary responsibilities at Google during the time period involved in this case.

87.     Corporate directors may be held personally liable to the corporation for damages arising from their failure to timely act when faced with a known duty to act, such as the corporation's obligation to comply with the statutes, laws, rules and regulations applicable to its business and affairs.  The duty to comply with the Acts fell squarely upon the Google Board; yet, it failed to act.  Accordingly, defendants breached their duty of loyalty to Google and are liable for the resulting damages.

## DAMAGE TO GOOGLE

88.     Google has been, and will continue to be, severely damaged and injured by defendants' misconduct.  Further, as a direct and proximate result of defendants' breach of loyalty, Google has expended and will continue to expend significant sums of money.  These expenditures include, but are not limited to: (i) costs incurred from the investigations into the Company's acceptance of advertisements placed by online pharmacy advertisers that violated federal law; (ii) costs incurred from the compensation and benefits paid to the defendants that breached their fiduciary duties to the Company; (iii) the $500 million revenue forfeiture, fines, penalties and

1   disgorgement resulting from the Company's violations of the federal law; and (iv) the cost of

2   implementing the settlement with the DOJ.

3          89.    In addition, Google's business, goodwill, and reputation with its business partners,

4   regulators, and shareholders have been gravely impaired. Moreover, these actions have irreparably

5   damaged Google's corporate image and goodwill. Google's corporate motto, "Don't be evil," is

6   now in question and the Company's hard earned reputation as a good corporate citizen has been

7   rendered meaningless by defendants' fiduciary breaches. For at least the foreseeable future, Google

8   will suffer from what is known as the "liar's discount," a term applied to the stocks of companies

9   who have been implicated in improper behavior and have misled the investing public, such that

10   Google's ability to raise equity capital or debt on favorable terms in the future is now impaired.

11          90.    Nevertheless, the Google Board has taken no action against the directors and officers

12   responsible for the damage and injury to the Company, including themselves. By this action,

13   plaintiffs seek redress for and vindication of Google's rights against its wayward fiduciaries.

14                  **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

15          91.    Plaintiffs incorporate ¶¶1-90.

16          92.    Pursuant to Rule 23.1 of the Federal Rules of Civil Procedures, plaintiffs bring this

17   action for the benefit of Google to redress injuries suffered, and to be suffered, by Google as a result

18   of the defendants' breaches of fiduciary duty, abuse of control, corporate waste and unjust

19   enrichment. Google is named as a nominal party in this action solely in a derivative capacity. This

20   is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

21          93.    Plaintiffs will adequately and fairly represent the interests of Google and its

22   shareholders in enforcing and prosecuting its rights. Plaintiffs are owners of Google stock and were

23   owners of Google stock during times relevant to defendants' illegal and wrongful course of conduct

24   alleged herein.

25          94.    At the time of the filing of this complaint the Google Board consists of the following

26   nine individuals: Page, Brin, Schmidt, Doerr, Hennessy, Otellini, Shriram, Tilghman and non-

27   defendant Ann Mather.

28

95.     Based upon the facts set forth throughout this complaint, applicable law and the longstanding rule that equity does not compel a useless act, a pre-filing demand upon the Google Board to institute this action against the officers and members of the Google Board is excused as futile for the reasons that follow.

**Demand Is Excused Because the Conduct of Page, Brin, Schmidt, Doerr, Hennessy, Otellini, Shriram and Tilghman Is Not a Valid Exercise of Business Judgment**

96.     The wrongs alleged herein constitute violations of the Company's internal policies and charters and cannot be considered a valid exercise of business judgment.

97.     Defendants' wrongful conduct was continuous and occurred both before and throughout the Relevant Time Period and resulted in ongoing and continuous harm to the Company. Defendants participated in and/or failed to adequately address, correct and/or disclose such conduct.

98.     Defendants Page, Brin, Schmidt, Doerr, Hennessy, Otellini, Shriram and Tilghman's challenged misconduct at the heart of this case constitutes an ongoing and continuous scheme to break the law.  As the ultimate decision-making body of the Company, the Board affirmatively adopted, implemented and condoned a business strategy based on deliberate and widespread illegal activities lasting over six years.  As the Company admits in its public filings, it generates revenue primarily by delivering online advertising.  Because online advertising is the Company's primary source of revenue, the members of the Board have a duty to understand how the Company's revenue is created and that it complies with applicable law.  Moreover, as explained herein, defendants knew that the sale of prescription drugs from online Canadian Pharmacies violated applicable federal law.  For example, defendant Schmidt knew the prescription drug sales violated federal law because he received letters from the NABP and CASA explaining so.  Additionally, defendants Page, Brin, Schmidt, Doerr, Hennessy, Otellini, Shriram and Tilghman were on the Board when Google settled claims with the federal government regarding illegal gambling advertisements.  Thus, they knew that the Company must comply with federal laws regarding revenues Google receives for advertising illegal activities.

99.     Moreover, in light of the gambling settlement and the Company's internal control systems, which funneled information to the Board (*see* ¶¶38, 71, 98, *supra*), it is reasonable to infer

1   that the Board learned of the problems with the Canadian pharmacy ads.  It is also reasonable to infer

2   that defendant Schmidt, as CEO and Chairman of the Board, would have told the entire Board about

3   the problems related to prescription drugs from Canadian pharmacies when he received the letters

4   and communications described herein.  Additionally, according to Rhode Island U.S. Attorney Peter

5   Neronha, defendant Page knew of the illicit ad sales and it is also reasonable to infer that defendant

6   Page would have informed the Board about the Canadian pharmacy problem.  Nevertheless, the

7   defendants allowed pharmacies which were violating federal law to advertise using AdWords.  As

8   Peter Neronha, the Rhode Island U.S. Attorney who led the probe into Google stated in an interview,

9   the third-party certifiers, SquareTrade and PharmacyChecker, were merely "window dressing."

10  Both companies verified that online Canadian pharmacies directed advertisements at U.S. consumers

11  using AdWords.  Worse, to the extent that SquareTrade and PharmacyChecker provided any check

12  on the illicit business practices, Google employees helped advertisers around these protections.  The

13  DOJ states that its undercover agents worked directly with Google employees to evade the controls

14  set up to prevent illegal advertising.  Mr. Neronha explained "this is not two or three rogue

15  employees at the customer service level . . . [t]his was a corporate decision."  Causing the Company

16  to engage in the improper tactics that are at the core of how the Company operates is not a protected

17  business decision and such conduct can in no way be considered a valid exercise of business

18  judgment.  Accordingly, demand on the Board is excused.

19  **Demand Is Excused Because Page, Brin, Schmidt, Doerr, Hennessy,
    Otellini, Shriram, and Tilghman Each Face a Substantial Likelihood**

20  **of Liability Resulting from Their Misconduct**

21          100.    Defendants Page, Brin and Schmidt were each key executives at Google during the

22  Relevant Time Period.  Considering the significant source of revenue Google received from the

23  illegal advertisements, and that they were blatantly being accomplished with the aid of Google

24  employees, Page, Brin and Schmidt were at least reckless in not knowing about the illegal online

25  pharmaceutical advertising occurring using Google. In fact, Mr. Neronha explicitly identified

26  defendant Page as knowing about the wrongdoing, stating "Larry Page knew what was going on."

27  Mr. Neronha continued "[w]e know it from the investigation.  We simply know it from the

28  documents we reviewed, witnesses that we interviewed, that Larry Page knew what was going on."

1    Further, as the three top level executives at Google, defendants Page, Brin and Schmidt necessarily

2    played an active role in approving the third-party verification provider the Company used and the

3    policies those third-parties chose to follow.    Nevertheless, they chose SquareTrade and

4    PharmacyChecker to institute policies that verified online Canadian pharmacies were violating

5    federal law, while simultaneously permitting the Canadian pharmacies to advertise using AdWords.

6    Accordingly, defendants Page, Brin and Schmidt breached their fiduciary duties of care and loyalty,

7    and therefore, cannot impartially consider a demand.

8         101.    Defendants Page, Brin, Schmidt, Doerr, Hennessy, Otellini, Shriram and Tilghman all

9    face a substantial likelihood of liability for failing to act on the information supplied to them from

10   the Company's system of internal controls which were purportedly designed to allow Google to

11   comply with its legal obligations under federal law.  Each of these defendants served on Google's

12   Board for at least part of the Relevant Time Period when the Board chose to allow Google

13   employees to engage in illegal advertising activities and recklessly disregarded the information

14   provided to them, via Google's internal controls, and specifically the Company's "management

15   reporting process," that the Company was receiving substantial revenues from illegal online

16   pharmaceutical advertising.  According to the Company's 2011 Proxy Statement:

17          The oversight responsibility of the board and its committees is enabled by
            management reporting processes that are designed to provide visibility to the board
18          of about the identification, assessment, and management of critical risks and
            management's risk mitigation strategies.  These areas of focus include strategic,
19          operational, financial and reporting, succession and compensation, compliance, and
            other risks.
20

21   As Google now admits, it knowingly assisted the sale of drugs online to U.S. customers by Canadian

22   pharmacies.  Moreover, even without the Company's internal controls, and reporting processes, there

23   were numerous additional facts that did or would have had alerted the Board to the wrongdoing

24   occurring at Google if these defendants had not recklessly been performing their duties, including:

25          (a)    On March 13, 2003, the NABP warned Google about the dangers of illegal

26   online pharmacies, the misleading nature of Google's "sponsored links" for these sites, and the U.S.

27   federal laws of which Google may be in violation. But, in 2004, Google announced that it would

28   continue carrying ads for Canadian pharmacies that send medicine to U.S. customers.

1            (b)      On or around December 1, 2003, Peter J. Pitts, then the FDA's Associate

2    Commissioner for External Affairs, indicated that "[w]e're literally placing calls to the search

3    engines trying to get a meeting going" with regards to getting the search engines and other

4    businesses to deal only with legitimate pharmacies.

5            (c)      On July 22, 2004, Sandberg, then Google's Vice President, Global Online

6    Sales and Operations, testified before the U.S. Senate's Permanent Subcommittee on Investigations

7    of the Committee on Governmental Affairs about online pharmaceutical advertising.  During this

8    testimony, Sandberg admitted that Google "recognize[s] that there are bad actors on the Internet,

9    including unlicensed online pharmacies that peddle unsafe and counterfeit products."

10           (d)      A 2008 study from the NABP estimated that about 96% of internet drug

11   outlets appear to be in violation of pharmacy-related laws or standards.

12           (e)      On July 7, 2008, Califano, Chairman and President of CASA, warned

13   defendant Schmidt, then the Chairman and CEO of Google, in a letter that "[a]lthough Google

14   reports using a company called PharmacyChecker to screen out rogue pharmacies, CASA was able

15   to find prominent displays of ads for rogue Internet pharmacies in a Google search for controlled

16   drugs . . . .  This suggests that Google is profiting from advertisements for illegal sales of controlled

17   prescription drugs online."  Califano, the U.S. Secretary of Health, Education, and Welfare under

18   President Carter, advised Google to take immediate action to block all advertisements from

19   unlicensed or uncertified online pharmacies, screen such sites out of web searches, and "[p]rovide

20   warnings that sale and purchase of controlled drugs over the Internet from unlicensed pharmacies

21   and physicians and without valid prescriptions are illegal."

22           (f)      According to the NABP, Canadian pharmacists selling drugs to U.S. residents

23   online can skirt Canadian regulation and many of the prescription drugs originate in third-world

24   countries, "a practice that would not be considered lawful or safe were the final customer within

25   Canada, or if a US pharmacy were dispensing prescription drugs to a US resident."  Accordingly, on

26   December 23, 2008, the NABP sent defendant Schmidt a letter stating that "a third-party verification

27   service Google uses to screen prescription drug Web sites has certified several pharmacy Web sites

28   that source their prescription drugs from various locations outside of the United States (Canada and

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT - CV-11-04248-PJH    - 36 -

1   elsewhere), which is contrary to U.S. law and puts patient safety at risk." Further, the NABP warned

2   Google that "your sponsorship of these search results, and your third-party verification service's

3   certification of these Web sites, aids in a business practice that is contrary to US law, unsafe, and

4   deceptive to US patients." In an emailed response, a Google director of policy at the time, Alana

5   Karen, requested NABP's list of hundreds of problematic pharmacy advertisers. She later wrote that

6   Google found the list "helpful" and the Company was "using your list to augment our filters for sites

7   that violate our policies."

8           (g)     In 2009, Bryan A. Liang, a California Western School of Law Professor

9   published a report that found Google and others were profiting from the online ads of illegal drug

10  sellers. Liang later stated that "[o]n the basis of our analysis, I think [Google and other search

11  providers] were turning a blind-eye . . . . They were making a lot of money on this."

12          102.    Despite knowing the illegality of online Canadian pharmacies selling prescription

13  drugs to U.S. customers, defendants Page, Brin, Schmidt, Doerr, Hennessy, Otellini, Shriram and

14  Tilghman approved of the use of SquareTrade and PharmacyChecker and those companies' policies

15  that allowed pharmacies violating the law to advertise using AdWords. Accordingly, defendants

16  Page, Brin, Schmidt, Doerr, Hennessy, Otellini, Shriram and Tilghman, all face a substantial

17  likelihood of liability and cannot impartially consider a demand.

18          103.    In addition, defendants Doerr and Shriram are, or were at times relevant hereto,

19  members of Google's Audit Committee. Members of the Audit Committee, because of their position

20  of control and authority over Google, were able to and did, directly or indirectly, control the

21  wrongful acts complained of herein. Specifically, the Audit Committee's Charter provides that it is

22  responsible for "[o]verse[ing] Google's accounting and financial reporting processes, including

23  Google's disclosure controls and procedures and system of internal controls and audits of Google's

24  consolidated financial statements." In addition, "[t]he Audit Committee will discuss with

25  management and the independent auditors the design, implementation, adequacy and effectiveness of

26  Google's internal controls . . . . The Audit Committee will provide oversight over the system of

27  internal controls. . . . The Audit Committee will review any required disclosures regarding Google's

28  internal controls. . . . The Audit Committee has responsibility for oversight of risks and exposures

1   associated with . . . Google's programs and policies relating to legal compliance and strategy . . . ."

2   Despite knowing the illegality associated with online Canadian pharmacies selling prescription drugs

3   to U.S. customers and their oversight responsibilities with regards to internal controls, defendants

4   Doerr and Shriram failed to act on the information supplied to them from the Company's system of

5   internal controls which were purportedly designed to allow Google to comply with its legal

6   obligations under federal law.  Thus, defendants Doerr and Shriram face a substantial likelihood of

7   liability for their breach of fiduciary duties.  Therefore, any demand upon defendants Doerr and

8   Shriram would be futile.

9   **Demand Is Excused Because a Majority of the Board Is Not Independent**

10       104.    The directors of Google cannot be relied upon to reach a truly independent decision

11   as to whether to commence the demanded action against themselves and the officers responsible for

12   the misconduct alleged in this complaint in that, *inter alia*, the Board was dominated by defendants

13   Page and Brin, co-founders of Google, and defendant Schmidt, the Company's long time CEO,  who

14   were personally and directly involved in the acts of mismanagement alleged herein, and who

15   approved the actions which are complained of and to whose directives and views the Board has

16   consistently acceded and will continue to accede.   In fact, the Company's April 2011 proxy

17   statement concedes that Page, Brin and Schmidt are not independent, stating "[e]ach of the directors

18   other than Larry, Sergey, and Eric is independent."  This domination of the Board's ability to validly

19   exercise its business judgment renders it incapable of reaching an independent decision as to whether

20   to accept any demand by plaintiffs.

21       105.    Page, Brin and Schmidt additionally dominate and control the Board by way of

22   majority shareholder voting power.  Page controls 28.7% of shareholder voting power, Brin controls

23   28.2% of shareholder voting power, and Schmidt controls 9.7% of shareholder voting power.

24   Combined, Page, Brin and Schmidt control two-thirds of the shareholder vote.  Since Page and Brin

25   founded Google in 1998, they exercised complete control over the Company, allowing only Schmidt,

26   who joined the Company in 2001, any measure of control.  This domination allows them to use the

27   Company's coffers for their own desires. Some of these self-dealing transactions include:

28

1         (a)     Schmidt causes Google to use his personal aircraft when he and other

2 executives fly.  Since 2005, Google has paid Schmidt $ 2.9 million to use his aircraft;

3         (b)     Google has invested over $10 million into the company 23andMe, Inc.

4 ("23andMe") since 2007.  23andMe was co-founded by Anne Wojcicki, defendant Brin's wife.  Ms.

5 Wojcicki remains 23andMe's President and CEO; and

6         (c)     Google agreed to sponsor a $30 million competition to safely land a robot on

7 the moon.  The competition is administered through the X PRIZE Foundation.  In addition, since

8 2009, Google has donated $2.56 million to the X PRIZE Foundation.  Defendant Page is on the

9 Board of Trustees of the X PRIZE Foundation.

10      106.    The defendants, because of their interrelated business, professional and personal

11 relationships, have developed debilitating conflicts of interest that prevent the Google Board from

12 taking the necessary and proper action on behalf of the Company as requested herein.  For example,

13 demand upon the entire Google Board is futile and thus excused because defendants Doerr,

14 Tilghman, Shriram and Hennessy are not independent of Page, Brin and Schmidt:

15         (a)     Defendant Hennessy is the President of Stanford University and defendant

16 Shriram serves on the Stanford board of trustees.  Google, at the direction of defendants Page and

17 Brin, Stanford graduates, donates millions of dollars every year to Stanford University.  Since 2006,

18 Google has donated over $14.4 million to Stanford University.  If Hennessy or Shriram voted to

19 initiate litigation against Page and Brin, they would effectively cause Google to stop making its

20 multi-million dollar yearly donation to Stanford University.  This outcome would be particularly

21 disastrous to defendant Hennessy, because one of his principle duties as President of Stanford

22 University is ensure continued alumni support.  Hennessy and Shriram will not risk their prestigious

23 positions at Stanford University or Google's continued support of the University by voting to initiate

24 litigation against Page or Brin.  Accordingly, demand upon Hennessy and Shriram is futile.

25         (b)     Defendant Tilghman is the President of Princeton University.  Prior to

26 becoming President, Tilghman was a Professor of Life Sciences at Princeton.  Defendant Schmidt has

27 donated tens of millions of dollars to Princeton University.  For instance, on October 13, 2009,

28 Princeton University announced that Schmidt created a $25 million endowment fund at Princeton

1   University. Tilghman heaped praise on Schmidt for providing Princeton University with this

2   generous gift, stating "This fund will allow Princeton's scientists and engineers to explore truly

3   innovative ideas that need the creation or application of new technologies, including the kinds of

4   technological breakthroughs that most funding sources are too risk-averse to support." Tilghman

5   continued, "We are deeply grateful to Eric and Wendy [defendant Schmidt's wife] not only for

6   providing this support, but for providing the capacity and flexibility to make investments that are

7   likely to have the broadest and most transformative impact." Schmidt is a graduate of Princeton

8   University and served as a trustee of the university from 2004 to 2008, at the same time as Tilghman

9   served as a trustee of the university. During that time, Schmidt, as a trustee, exercised substantial

10   control over Tilghman's compensation and continued employment. Tilghman will not vote to

11   initiate litigation against Schmidt out of loyalty for his past acts to her and Princeton University and

12   because it would all but ensure that Schmidt would not provide any future donations to Princeton

13   University. Accordingly, a demand upon Tilghman is futile.

14             (c)     Defendant Doerr is a general partner at Kleiner Perkins Caufield & Byers, a

15   venture capital firm. Doerr has sought and obtained substantial investments from Google in private

16   companies that Kleiner Perkins Caufield & Byers is a major investor in through certain of its funds.

17   Doerr is the managing director of these investment funds. In 2007, Google bought Peakstream, Inc.

18   for $20.3 million. Kleiner Perkins Caufield & Byers, as part owner of Peakstream, received 24.5%

19   of that amount (approximately $5 million). Since that time, Google has continued to invest in

20   companies in which Kleiner Perkins Caufield & Byers also had major investments. Since 2008,

21   Google has invested $47.5 million in companies Kleiner Perkins Caufield & Byers also invested in.

22   In 2010 alone, Google, at the direction of defendants Page, Brin and Schmidt, invested over $21

23   million in companies in which Kleiner Perkins Caufield & Byers has a substantial interest. If Doerr

24   voted in favor of initiating litigation against Page, Brin or Schmidt, he would risk Google's

25   continued financial support in companies he has as major investments. Doerr will not take such a

26   risk. Accordingly, a demand upon Doerr is futile.

27

28

1    **Demand Is Futile for the Following Additional Reasons**

2    107.    Demand is excused because all of the members of the Google Board are interested in

3    the decision to investigate and prosecute claims relating to the Company's violations of the Acts.

4    All of the members of the Board served for at least part of the Relevant Time Period when the Board

5    was aware of the illegal advertising activities at the Company, but chose to allow those activities to

6    continue.  Because the Board knew that Google employees were allowing Canadian pharmacy

7    advertisers to target consumers in the United States and had control over those employees, they may

8    be subject to personal liability for causing the unlawful importation of controlled and non-controlled

9    prescription drugs into the United States.  Google's $500 million forfeiture settlement with the DOJ

10   is one of the largest ever in the United States and "represents the gross revenue received by Google

11   as a result of Canadian pharmacies advertising through Google's AdWords program, plus gross

12   revenue made by Canadian pharmacies from their sales to U.S. consumers."  Because the entire

13   Board is interested in the decision, demand is futile.

14   108.    The members of Google's Board have demonstrated their unwillingness and/or

15   inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their

16   fellow directors and allies in the top ranks of the corporation for the violations of law complained of

17   herein. These are people they have developed professional relationships with, who are their friends

18   and with whom they have entangling financial alliances, interests and dependencies, and therefore,

19   they are not able to and will not vigorously prosecute any such action.

20   109.    The acts complained of herein constitute violations of the fiduciary duties and

21   violations of law and are incapable of ratification.

22   110.    Google has been and will continue to be exposed to significant losses due to the

23   wrongdoing complained of herein, yet the current Google Board has not filed any lawsuits against

24   the defendants or others who were responsible for that wrongful conduct to attempt to recover for

25   Google any part of the damages Google suffered and will suffer thereby.

26   111.    Any suit by the current directors of Google to remedy these wrongs would likely

27   expose the defendants and Google to further violations of federal laws that would result in civil

28

1  actions being filed against one or more of the defendants, thus, they are hopelessly conflicted in

2  making any supposedly independent determination whether to sue themselves.

3      112.   If Google's officers and directors are protected against personal liability for their acts

4  of mismanagement and breach of fiduciary duty alleged in this complaint by directors and officers'

5  liability insurance policies, they caused the Company to purchase that insurance for their protection

6  with corporate funds, *i.e.*, monies belonging to the stockholders of Google.   However, if the

7  directors' and officers' liability insurance policies cover defendants in this case, these polices likely

8  contain provisions that eliminate coverage for any action brought directly by Google against these

9  defendants, known as, *inter alia*, the "insured versus insured" exclusion.   As a result, if these

10 directors were to cause Google to sue themselves or certain of the officers of Google, there would be

11 no directors and officers' insurance protection for the derivative claims.   Thus, this is a further

12 reason why they will not bring such a suit, for to do so would subject them and their colleagues

13 and/or friends to a judgment of millions that would be payable from their individual assets alone.

14 On the other hand, if the claims are brought derivatively, as this action is brought, such insurance

15 coverage exists and will provide a basis for the Company to effectuate a recovery.   If there is no

16 directors and officers' liability insurance, then the current directors will not cause Google to sue the

17 defendants named herein, since they will face a large uninsured liability and lose the ability to

18 recover for the Company from the insurance.

19     113.   As a result of their access to and review of internal corporate documents,

20 conversations and connections with other corporate officers, employees and directors, and

21 attendance at management and/or board meetings, each of the defendants knew of the wrongful acts

22 or omissions complained of herein.   While in possession of this material adverse non-public

23 information regarding the Company, defendants each profited in terms of salaries, stock options

24 and/or sale of personal stock at peak trading prices during the Relevant Time Period.   Because

25 defendants received personal financial benefits from such transactions, they are interested and any

26 demand upon them is futile.

27     114.   The Company has been directly and substantially injured by reason of defendants'

28 fiduciary breaches and/or reckless disregard for their fiduciary duties, including the $500 million

forfeiture by Google to the U.S. government and money that Google is entitled to recover from its disloyal Board.  Plaintiffs, as shareholders of the Company, seek damages and other relief on behalf of Google, in an amount to be proven at trial.

115.    Plaintiffs have not made any demand on shareholders of Google to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    Google is a publicly traded Company with approximately 323 million shares outstanding, and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiffs who have no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

**COUNT I**

**Against All Defendants for Breach of Fiduciary Duty of Loyalty
(and Candor and Good Faith)**

116.    Plaintiffs incorporate ¶¶1-115.

117.    Defendants owed Google and its shareholders a fiduciary duty of loyalty (and candor and good faith).  Under this duty, defendants, when faced with a known duty to act, here Google's legal duty to comply with the federal laws related to the importation of prescription drugs, were duty bound to proactively maintain controls and policies designed to ensure Google's compliance with these laws.

118.    However, defendants breached their duty of loyalty by consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

119.    As a result of defendants' disloyalty, Google has been injured.  Accordingly, Google is entitled to damages.

**COUNT II**

**Against All Defendants for Abuse of Control**

120.    Plaintiffs incorporate ¶¶1-115.

121.   Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Google, for which they are legally responsible.

122.   As a direct and proximate result of defendants' abuse of control, Google has sustained and continues to sustain significant damages.   As a result of the misconduct alleged herein, defendants are liable to the Company.

### COUNT III

#### Against All Defendants for Corporate Waste

123.   Plaintiffs incorporate ¶¶1-115.

124.   As a result of the foregoing misconduct, defendants have caused Google to waste valuable corporate assets.

125.   As a direct and proximate result of defendants' corporate waste, Google has sustained and continues to sustain significant damages.   As a result of the misconduct alleged herein, defendants are liable to the Company.

### COUNT IV

#### Against All Defendants for Unjust Enrichment

126.   Plaintiffs incorporate ¶¶1-115.

127.   By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Google.   Defendants were unjustly enriched as a result of the salary, fees, stock options and other payments they received while breaching their fiduciary duty owed to Google.

128.   Plaintiffs, as shareholders of Google, seek restitution from defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other improper payments obtained by defendants, and each of them, from their wrongful conduct and fiduciary breaches.

129.   As a result of defendants' unjust enrichment, Google has been injured and is entitled to damages.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment in the Company's favor against all defendants as follows:

1       A.     Declaring that plaintiffs may maintain this action on behalf of Google and that

2 plaintiffs are adequate representatives of the Company;

3       B.     Declaring that the defendants have breached and/or aided and abetted the breach of

4 their fiduciary duties to Google;

5       C.     Determining and awarding to Google the damages sustained by it as a result of the

6 violations set forth above from each of the defendants, jointly and severally, together with interest

7 thereon;

8       D.     Determining and awarding to Google exemplary damages in an amount necessary to

9 punish defendants and to make an example of defendants to the community according to proof at

10 trial;

11       E.     Awarding Google restitution from defendants, and each of them;

12       F.     Awarding plaintiffs the costs and disbursements of this action, including reasonable

13 attorneys' and experts' fees, costs and expenses; and

14       G.     Granting such other and further equitable relief as this Court may deem just and

15 proper.

16                                    **JURY DEMAND**

17       Plaintiffs demand a trial by jury.

18 DATED:  October 24, 2011        ROBBINS GELLER RUDMAN
                                      & DOWD LLP

19                                  TRAVIS E. DOWNS III
                                  BENNY C. GOODMAN III

20                                  ERIK W. LUEDEKE

21

22                                     _____s/ Benny C. Goodman III_____
                                        BENNY C. GOODMAN III

23

24                                  655 West Broadway, Suite 1900
                                  San Diego, CA  92101-3301

25                                  Telephone:  619/231-1058
                                  619/231-7423 (fax)

26                                  ROBBINS GELLER RUDMAN
                                  & DOWD LLP

27                                  SHAWN A. WILLIAMS
                                  Post Montgomery Center

28                                  One Montgomery Street, Suite 1800

1           San Francisco, CA  94104
Telephone:  415/288-4545

2           415/288-4534 (fax)

3           POMERANTZ HAUDEK GROSSMAN
               & GROSS LLP

4           MARC I. GROSS
JEREMY A. LIEBERMAN

5           FEI-LU QIAN
100 Park Avenue

6           New York, NY  10017-5516
Telephone:  212/661-1100

7           212/661-8665 (fax)

8           ROBBINS UMEDA LLP
BRIAN J. ROBBINS

9           FELIPE J. ARROYO
SHANE P. SANDERS

10         GINA STASSI
600 B Street, Suite 1900

11         San Diego, CA  92101
Telephone:  619/525-3990

12         619/525-3991 (fax)

13         Co-Lead Counsel for Plaintiffs

14         LAW OFFICE OF ALFRED G.
               YATES, JR., P.C.

15         ALFRED G. YATES, JR.
GERALD L. RUTLEDGE

16         519 Allegheny Building
429 Forbes Avenue

17         Pittsburgh, PA  15219
Telephone:  412/391-5164

18         412/471-1033 (fax)

19         Counsel for Plaintiffs

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 24, 2011, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 24, 2011.

 s/ Benny C. Goodman III
BENNY C. GOODMAN III

ROBBINS GELLER RUDMAN
      & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:bennyg@rgrdlaw.com

**VERIFICATION**

I, Patricia H. McKenna, hereby declare as follows:

I am a shareholder of Google Inc.  I was a shareholder at the time of the wrongdoing complained of and I remain a shareholder.  I have retained competent counsel and I am ready, willing and able to pursue this action vigorously on behalf of Google Inc.  I have reviewed the Verified Consolidated Shareholder Derivative Complaint.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: October 20, 2011                    _Patricia H. McKenna_
                                                              Patricia H. McKenna

**VERIFICATION**

I, Avrohom Gallis, hereby declare as follows:

I am a shareholder of Google Inc.  I was a shareholder at the time of the wrongdoing complained of and I remain a shareholder.  I have retained competent counsel and I am ready, willing and able to pursue this action vigorously on behalf of Google Inc.  I have reviewed the Verified Consolidated Shareholder Derivative Complaint.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: _10/18/11_____          _____
                                                              Avrohom Gallis

**VERIFICATION**

I, James Clem, hereby declare as follows:

I am a shareholder of Google Inc.  I was a shareholder at the time of the wrongdoing complained of and I remain a shareholder.  I have retained competent counsel and I am ready, willing and able to pursue this action vigorously on behalf of Google Inc.  I have reviewed the Verified Consolidated Shareholder Derivative Complaint.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: _____10/20/11_____          _____
                                                                          James Clem

[TITLE] - 4:11-cv-04248-PJH                                                                    - 1 -

# Mailing Information for a Case 4:11-cv-04248-PJH

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Travis E. Downs , III**
  travisd@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Benny Copeline Goodman , III**
  bennyg@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Elizabeth Catherine Peterson**
  epeterson@wsgr.com,bbahns@wsgr.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **Bryson Scott Santaguida**
  bsantaguida@wsgr.com

- **Diane Marie Walters**
  dwalters@wsgr.com,smills@wsgr.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,khuang@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Boris Feldman
Wilson Sonsini Goodrich & Rosati
A  Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050

Erik W Luedeke
Robbins geller Rudman & Dowd LLP
655 West Broadway
Suite 1900
San Diego, CA 92101-3301
```