BORIS FELDMAN, State Bar No. 128838
Email:  boris.feldman@wsgr.com
ELIZABETH C. PETERSON, State Bar No. 194561
Email:  epeterson@wsgr.com
CHERYL W. FOUNG, State Bar No. 108868
Email:  cfoung@wsgr.com
DIANE M. WALTERS, State Bar No. 148136
Email:  dwalters@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:  (650) 493-9300
Facsimile:   (650) 565-5100

Attorneys for Defendants
Larry Page, Sergey Brin,
Eric E. Schmidt, L. John Doerr, John L.
Hennessy, Paul S. Otellini, K. Ram Shriram,
Shirley M. Tilghman, Nikesh Arora, Patrick
Pichette, and Nominal Party Google Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| In re GOOGLE INC. SHAREHOLDER DERIVATIVE LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Master File No. CV-11-04248-PJH<br><br>DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT<br><br>DATE:      March 21, 2012<br>TIME:      9:00 a.m.<br>JUDGE:    Hon. Phyllis J. Hamilton |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ...............................................................................1

ISSUES TO BE DECIDED (Local Rule 7-4(a)(3))...........................................................1

MEMORANDUM OF POINTS AND AUTHORITIES...........................................................2

INTRODUCTION ................................................................................................................2

FACTUAL BACKGROUND ...............................................................................................4

        Google's Business and the Non-Prosecution Agreement..............................4

        The Complaint's Allegations.........................................................................5

        Google's Board of Directors .........................................................................5

ARGUMENT ........................................................................................................................6

I.      THE COMPLAINT SHOULD BE DISMISSED BECAUSE DEMAND IS NOT
       EXCUSED ................................................................................................................6

     A.    The Applicable Standards ................................................................................6

     B.    The Complaint Fails to Raise a Reasonable Doubt That a Majority is
          Disinterested ...................................................................................................8

          1.    There Is No Substantial Likelihood of Liability Based on Conclusory
              Assertions of Board Participation....................................................8

          2.    There Is No Substantial Likelihood of Liability Based on an Alleged
              Failure of Oversight ........................................................................9

              The Red Flags Standard Is Not Met..............................................10

              Failure to Plead Any Board Knowledge of Alleged Internal
                  Misconduct .......................................................................13

          3.    The Business Judgment Rule is Inapplicable.................................17

          4.    Google's Directors Do Not Face a Serious Threat of Liability Where
              Plaintiffs Have Not Pleaded a Non-Exculpated Claim...................18

     C.    The Complaint Fails to Raise a Reasonable Doubt that a Majority is
          Independent ...................................................................................................19

           Google's Investments with Kleiner Perkins ................................19

           University Donations...................................................................20

           Control by Voting Power..............................................................22

D.      Generic Allegations Fail to Excuse Demand ...................................22

II.     PLAINTIFFS DO NOT MEET THE STRINGENT STANDARD FOR
        ESTABLISHING THEIR STANDING ...................................................23

III.    THE COMPLAINT FAILS TO STATE A CLAIM ...........................................24

        A.      Applicable Standards .................................................................24

        B.      Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty ................................25

                1.      Plaintiffs Fail to State a Claim Against the Outside Director
                        Defendants. ...................................................................27

                2.      Plaintiffs Fail to State a Claim Against the Director/Officer
                        Defendants. ...................................................................29

                3.      Plaintiffs Fail to State a Claim Against the Officer Defendants. .................30

        C.      The Waste Claim Should Be Dismissed....................................................30

        D.      The Unjust Enrichment Claim Should Be Dismissed................................32

CONCLUSION .................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aronson v. Lewis,*
    473 A.2d 805 (Del. 1984), *overruled on other grounds by*
    *Brehm v. Eisner,* 746 A.2d 244 (Del. 2000) ..................................................*passim*

*Ash v. McCall,*
    No. 17132, 2000 WL 1370341 (Del. Ch. Sept. 15, 2000)...................................... 15

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009).......................................................................................... 25

*Baca ex rel. Insight Enters., Inc. v. Crown,*
    No. 09-1283-PHX, 2010 WL 2812697 (D. Ariz. Jan. 8, 2010) ....................... 6, 18

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,*
    845 A.2d 1040 (Del. 2004)........................................................7, 19, 20, 22

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)....................................................................................24, 25

*Brehm v. Eisner,*
    746 A.2d 244 (Del. 2000).............................................................................30, 31

*Citron ex rel. United Techs. Corp. v. Daniell,*
    796 F. Supp. 649 (D. Conn. 1992) ............................................................................ 7

*Clark v. Lacy,*
    376 F.3d 682 (7th Cir. 2004) .................................................................................. 26

*David B. Shaev Profit Sharing Account v. Armstrong,*
    No. 1449-N, 2006 WL 391931 (Del. Ch. Feb. 13, 2006), *aff'd,*
    911 A.2d 802 (Del. 2006)........................................................7, 10, 15, 18

*Desimone v. Barrows,*
    924 A.2d 908 (Del. Ch. 2007) .........................................................................16, 27

*DiLorenzo v. Norton,*
    No. 07-144-RJL, 2009 WL 2381327 (D.D.C. July 31, 2009).............................. 24

*Fleer Corp. v. Topps Chewing Gum, Inc.,*
    539 A.2d 1060 (Del. 1988)..................................................................................... 32

*Glazer v. Zapata Corp.,*
    658 A.2d 176 (Del. Ch. 1993) ............................................................................... 31

*Grobow v. Perot,*
    539 A.2d 180 (Del. 1988), *overruled on other grounds by*
    *Brehm v. Eisner,* 746 A.2d 244 (Del. 2000) ....................................................... 23

*Guitierrez v. Logan*,
        No. 02-1812-STL, 2005 WL 2121554 (S.D. Tex. Aug. 31, 2005) .....................................20

*Guttman v. Huang*,
        823 A.2d 492 (Del. Ch. 2003) .............................................................8, 15, 18, 28

*In re 3COM Corp. S'holders Litig.*,
        No. 16721, 1999 WL 1009210 (Del. Ch. Oct. 25, 1999) .....................................30

*In re Accuray, Inc. S'holder Deriv. Litig.*,
        757 F. Supp. 2d 919 (N.D. Cal. 2010) ...........................................................*passim*

*In re Allergan, Inc., S'holder Deriv. Litig.*,
        No. 10-01352-DOC, 2011 WL 1429626 (C.D. Cal. Apr. 12, 2011) ...........................*passim*

*In re Autodesk, Inc., S'holder Deriv. Litig.*,
        No. C-06-7185-PJH, 2008 WL 5234264 (N.D. Cal. Dec. 15, 2008) ...........................*passim*

*In re Baxter Int'l, Inc. S'holders Litig.*,
        654 A.2d 1268 (Del. Ch. 1995) ..................................................................8, 15

*In re Bidz.com, Inc. Deriv. Litig.*,
        773 F. Supp. 2d 844 (C.D. Cal. 2011) ............................................................*passim*

*In re Caremark Int'l, Inc. Deriv. Litig.*,
        698 A.2d 959 (Del. Ch. 1996) .....................................................................*passim*

*In re Citigroup Inc. S'holder Deriv. Litig.*,
        964 A.2d 106 (Del. Ch. 2009) ...........................................................10, 18, 26, 28

*In re Coinstar Inc. S'holder Deriv. Litig.*,
        No. C11-133-MJP, 2011 WL 5553778 (W.D. Wash. Nov. 14, 2011) ...............................28

*In re Computer Sciences Corp. Deriv. Litig.*,
        No. 06-05288-MRP, 2007 WL 1321715 (C.D. Cal. Mar. 26, 2007), *aff'd
        sub nom. Laborers Int'l Union of N. Am. v. Bailey*, 310 Fed. Appx. 128 (9th
        Cir. 2009) ....................................................................................6, 9, 12, 24

*In re Dow Chem. Co. Deriv. Litig.*,
        No. 4349-CC, 2010 WL 66769 (Del. Ch. Jan. 11, 2010)...........................................8, 10, 16

*In re Fed. Nat'l Mortg. Ass'n Sec., Deriv. & ERISA Litig.*,
        503 F. Supp. 2d 9 (D.D.C. 2007), *aff'd*, 534 F.3d 779 (D.C. Cir. 2008) ...........................21

*In re Intel Corp. Deriv. Litig.*,
        621 F. Supp. 2d 165 (D. Del. 2009) .........................................................10, 12, 13, 18

*In re J.P. Morgan Chase Co. S'holder Litig.*,
        906 A.2d 808 (Del. Ch. 2006) ......................................................................20, 21

*In re Sagent Tech., Inc. Deriv. Litig.*,
        278 F. Supp. 2d 1079 (N.D. Cal. 2003) ............................................................*passim*

*In re Silicon Graphics Inc. Sec. Litig.*,
        183 F.3d 970 (9th Cir. 1999) ......................................................................6, 7, 8, 9

*In re VeriFone Holdings, Inc. S'holder Deriv. Litig.,*
        No. 07-6347-MHP, 2010 WL 3385055 (N.D. Cal. Aug. 26, 2010), *aff'd,*
        No. 10-16932 (9th Cir. Nov. 28, 2011)............................................................*passim*

*In re VeriSign, Inc., Deriv. Litig.,*
        531 F. Supp. 2d 1173 (N.D. Cal. 2007) ...........................................................*passim*

*Jacobs v. Yang,*
        No. 206-N, 2004 WL 1728521 (Del. Ch. Aug. 2, 2004), *aff'd,* 876 A.2d
        902 (Del. 2005) .................................................................................................. 19, 21

*Jones ex rel. CSK Auto Corp. v. Jenkins,*
        503 F. Supp. 2d 1325 (D. Ariz. 2007).............................................................*passim*

*Kamen v. Kemper Fin. Servs., Inc.,*
        500 U.S. 90 (1991).................................................................................................. 6

*King v. Baldino,*
        648 F. Supp. 2d 609 (D. Del. 2009), *aff'd,* 409 Fed. Appx. 535 (3d Cir.
        2010) .....................................................................................................7, 12, 15, 32

*Laties v. Wise,*
        No. 1280-N, 2005 WL 3501709 (Del. Ch. Dec. 14, 2005) ................................ 32

*Lewis v. Chiles,*
        719 F.2d 1044 (9th Cir. 1983)............................................................................. 23

*Malpiede v. Townson,*
        780 A.2d 1075 (Del. 2001)................................................................................... 30

*Mitzner v. Hastings,*
        No. 04-3310-FMS, 2005 WL 88966 (N.D. Cal. Jan. 14, 2005).......................... 20

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Raines,*
        534 F.3d 779 (D.C. Cir. 2008) ............................................................................ 31

*Potter v. Hughes,*
        546 F.3d 1051 (9th Cir. 2008) ............................................................................... 6

*Rales v. Blasband,*
        634 A.2d 927 (Del. 1993)..................................................................................*passim*

*Rattner v. Bidzos,*
        No. 19700, 2003 WL 22284323 (Del. Ch. Sept. 30, 2003)......................14, 15, 18

*Sachs v. Sprague,*
        401 F. Supp. 2d 159 (D. Mass. 2005) ................................................................. 25

*Stone ex rel. AmSouth Bancorp. v. Ritter,*
        911 A.2d 362 (Del. 2006)..................................................................................*passim*

*Vess v. Ciba-Geigy Corp. USA,*
        317 F.3d 1097 (9th Cir. 2003).............................................................................. 25

*White v. Panic,*
    783 A.2d 543 (Del. 2001)..............................................................................................31

*Wood v. Baum,*
    953 A.2d 136 (Del. 2008)..............................................................10, 13, 18, 28

## STATUTES, RULES, AND REGULATIONS

Del. Code Ann. tit. 8, §102(b)(7)..............................................................10, 18, 26

FED. R. CIV. P. 8 ..........................................................................................*passim*

FED. R. CIV. P. 9(b)......................................................................................*passim*

FED. R. CIV. P. 12(b)(6)..............................................................................6, 24

FED. R. CIV. P. 23.1 ....................................................................................6, 23, 24

FED. R. CIV. P. 23.1(b)(1)..........................................................................23

1

**NOTICE OF MOTION AND MOTION**

2      NOTICE IS HEREBY GIVEN that on March 21, 2012 at 9:00 a.m., before the Honorable

3  Phyllis J. Hamilton, located at the United States District Court, 1301 Clay Street, Oakland,

4  California, Nominal Party Google Inc. ("Google" or the "Company") and Individual Defendants

5  Larry Page, Sergey Brin, Eric E. Schmidt, L. John Doerr, John L. Hennessy, Paul S. Otellini, K.

6  Ram Shriram, Shirley M. Tilghman, Nikesh Arora, and Patrick Pichette (collectively "defendants")

7  move to dismiss the Verified Consolidated Shareholder Derivative Complaint ("Complaint") with

8  prejudice under Federal Rules of Civil Procedure 12(b)(6), 9(b), 8, and 23.1, and applicable state

9  law.  This Motion is based on plaintiffs' failure to make demand on Google's Board of Directors or

10  plead particularized facts showing why such demand is excused; failure to establish their standing

11  to maintain this derivative action; and their failure to properly plead any claims upon which relief

12  may be granted.  This Motion is based on this Notice and Motion; the Memorandum of Points and

13  Authorities; the Declaration of Cheryl W. Foung ("Foung Dec.") and exhibits; the Request for

14  Judicial Notice; all papers filed herein; oral argument of counsel; and the record in this action.

15

**ISSUES TO BE DECIDED (Local Rule 7-4(a)(3))**

16      Whether plaintiffs have alleged demand futility with sufficient particularity?

17      Whether plaintiffs have satisfied the ownership requirements of Rule 23.1?

18      Whether plaintiffs have adequately pleaded their state law claims?[1]

19

20

21

22

23

24

25

26

27

---

28    [1] The Court need not reach this issue if it grants the Motion to Dismiss for failure to plead demand excusal or failure to establish standing.

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## INTRODUCTION

3       Google is a phenomenally successful company.  Google's very name is included in the

4   Oxford English Dictionary and is recognizable throughout the world.  Google's net worth is nearly

5   $70 billion and the Company continues to be supremely profitable.  These facts are still true,

6   notwithstanding that the Company entered into a settlement agreement with the government this

7   summer.  The settlement involved Google's acceptance of advertisements placed by Canadian

8   online pharmacy advertisers who were not in compliance "with United States law regarding the

9   importation and dispensation of prescription drugs."  Ex. A¶1.[2]

10      Plaintiffs are three individual shareholders of Google who have brought an action on

11  Google's behalf.  There are three fundamental problems with plaintiffs' action.  First, the

12  investigation of a matter and the decision to sue is a role that belongs to Google's Board.

13  Corporate law thus recognizes the basic requirement that a shareholder wishing to sue on the

14  Company's behalf must first make demand on Google's Board of Directors to investigate potential

15  wrongdoers and then determine whether and how to pursue legal claims.  Plaintiffs have not made

16  a demand nor sufficiently excused their failure to do so.  Second, the Complaint is primarily based

17  upon the settlement, or non-prosecution, agreement.  The only party to that agreement is the

18  Company itself.  Plaintiffs have sued ten defendants – eight directors and two officers – *none* of

19  whom is even individually *mentioned* in the agreement.  As shown herein, there is no basis to sue

20  these defendants.  Third, plaintiffs have taken these extreme actions even though they were not

21  even shareholders of Google at the time the actions complained of first occurred.

22      This Court has recognized that in shareholder derivative suits where plaintiffs must excuse

23  their failure to make demand on the board of directors, the task is not to address or resolve the

24  merits of the alleged underlying misconduct.[3]  The only issue is whether plaintiffs have shown that

25  _____

26      [2] All exhibits are attached to the Declaration of Cheryl W. Foung and are supported by the
Defendants' Request for Judicial Notice.

27      [3] *In re Autodesk, Inc., S'holder Deriv. Litig.*, No. C-06-7185-PJH, 2008 WL 5234264, at *7
28  (N.D. Cal. Dec. 15, 2008); *In re VeriSign, Inc., Deriv. Litig.*, 531 F. Supp. 2d 1173, 1189 (N.D.
Cal. 2007).

1   the Board has lost its right to determine what action to take against potential wrongdoers.  That

2   some at Google – a company with thousands of employees – may not have properly policed

3   Canadian online pharmacy advertisers does not mean plaintiffs may usurp decision-making

4   authority from Google's Board.

5         Plaintiffs' burden here is particularly stringent.  Directors are *presumed* at the pleading

6   stage to be independent and capable of acting in good faith.  Notably, Google's Board is composed

7   of nine highly respected individuals who are leaders in their respective fields of education,

8   technology, and finance.  To excuse the failure to make demand, plaintiffs must show that five

9   directors – a Board majority – face a substantial likelihood of liability.  There is not a single fact

10  alleged in the Complaint suggesting that a majority of the directors had anything to do with

11  advertisements by online Canadian pharmacies.  Plaintiffs necessarily resort to a theory of liability

12  based on a failure of board oversight – a *Caremark* theory – but this is "possibly the most difficult

13  theory in corporation law upon which a plaintiff might hope to win a judgment."[4]  *Caremark*

14  requires a particularized showing that a Board majority acted with *intentional bad faith*.  There is

15  not a single fact alleged in the Complaint to support this contention, either.  Plaintiffs do not plead

16  that a Board majority knew about issues with advertisements by online Canadian pharmacies but

17  chose to ignore the problem.

18        Plaintiffs' efforts to compensate for their pleading deficiencies are transparent.  They have

19  tried to avoid *Caremark*, deleting "red flag" verbiage from predecessor complaints.  Those tactical

20  changes are not effective.  Their claim of liability is based on *Caremark*, pure and simple.

21  Similarly, they ask the Court to make inference upon inference of Board knowledge of

22  wrongdoing.  But plaintiffs are required to plead specific facts of each director's knowledge of

23  wrongdoing.  The Court may not *presume* that knowledge exists.  Having failed to show

24  interestedness, plaintiffs resort to attacking the Board's independence on the basis of mundane

25  business relationships with Google.  Courts routinely reject similar efforts to disqualify directors as

26  incapable of considering demand.

27

28       [4] *In re Caremark Int'l, Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

1   Google's settlement with the government cannot be the basis for directorial liability in the

2   absence of well-pleaded facts that a Board majority knew that it was intentionally failing to

3   discharge its fiduciary obligations.  Because plaintiffs do not meet their pleading burden of

4   demonstrating that demand is futile, the Complaint must be dismissed.

5   **FACTUAL BACKGROUND**

6   **Google's Business and the Non-Prosecution Agreement**.  Google is a Delaware

7   corporation with its principal executive offices in Mountain View, California.  ¶20.[5]  Google is the

8   world's leading Internet search engine.  *Id.*  The Company generates revenue primarily by

9   delivering relevant, cost-effective online advertising.  *Id.*  Google's largest advertising program,

10  AdWords, displays sponsored advertisements in response to queries by Google's search engine

11  users.  ¶34.  Advertisers pay fees to Google for each advertisement.  *Id.*  Advertisers bid on

12  keywords to have any advertisements appear when the user enters the selected keywords.  *Id.*

13  Advertisers can "'geo-target' their advertising campaigns by selecting the countries where the

14  advertisements will display."  *Id.*

15  This action was filed in response to an August 24, 2011 announcement that Google had

16  entered into a settlement with the Department of Justice on August 19, 2011.  ¶¶9, 72.  Pursuant to

17  the terms of that settlement, as set forth in a non-prosecution agreement ("NPA"), Google agreed

18  to forfeit $500 million following the government's investigation of Google's acceptance of

19  advertisements placed by online Canadian pharmacy advertisers that did not comply with U.S. law

20  regarding the importation and dispensation of prescription drugs.  ¶9; Ex. A ¶1.  According to the

21  NPA, upon which the Complaint is primarily based, Google acknowledged that as early as 2003, it

22  "was aware that in most circumstances it was illegal for pharmacies to ship controlled and non-

23  controlled prescription drugs into the United States from Canada," and that "online Canadian

24  pharmacies were advertising prescription drugs to the Company's users in the United States

25  through the Company's AdWords advertising program."  Ex. A¶2(f, h).  The Company retained

26  third-party verification services, SquareTrade, Inc. in 2004 and PharmacyChecker.com LLC in

27  2006; "as early as July 2004, the Company was on notice that online pharmacies were

28  ───────────────
    [5] All references to "¶" are to the Complaint unless otherwise indicated.

1   circumventing the SquareTrade and PharmacyChecker certification process."  *Id.* ¶2(j, l, n).  *See*

2   *also* ¶¶53, 61, 72-73.

3        The NPA was entered with Google alone; the NPA does not mention or refer to any of the

4   defendants in this action.

5        **The Complaint's Allegations**.  The Complaint names as defendants eight of the nine

6   directors on Google's current Board.  ¶¶21-28.  The Complaint also names as defendants Nikesh

7   Arora, currently Google's Senior Vice President and Chief Business Officer (¶29), and Patrick

8   Pichette, Google's Senior Vice President and CFO since 2008.  ¶30.  Plaintiffs allege that all

9   "defendants caused the Company to . . . accept and promote . . . illegal advertisements" and

10  "facilitate the illegal importation of prescription drugs by Canadian pharmacies" for five or six

11  years.  ¶¶3, 8.  All defendants allegedly "knew that the sale of prescription drugs from online

12  Canadian pharmacies violated applicable federal law."  ¶98.  All defendants allegedly "approved of

13  internal controls that allowed pharmacies which were violating federal law to advertise using

14  AdWords."  ¶¶21-30.  The Complaint asserts claims for breach of fiduciary duty (¶¶116-119),

15  abuse of control (¶¶120-122), corporate waste (¶¶123-125) and unjust enrichment (¶¶126-129).

16       **Google's Board of Directors**.  Google's Board of Directors consists of nine distinguished

17  members representing a virtual "who's who" in academia and technology, including senior

18  executives from Fortune 500 companies.  Six directors have always been outside directors.  They

19  include: John L. Hennessy, the President of Stanford University, who is also a director of Cisco

20  Systems, Inc.; Shirley M. Tilghman, President of Princeton University, and formerly an

21  Investigator at Howard Hughes Medical Institute; Paul S. Otellini, the CEO and President of Intel

22  Corporation; L. John Doerr, a General Partner of Kleiner Perkins Caufield & Byers, and a former

23  director of Intuit, Inc. and Sun Microsystems, Inc.; K. Ram Shriram, the managing partner of

24  Sherpalo Ventures, LLC, a Trustee of Stanford University, and the former Vice President of

25  Business Development at Amazon.com, Inc.; and non-defendant Ann Mather, the Former EVP and

26  CFO of Pixar and a director of MGM Holdings Inc. and Netflix, Inc.  *See* ¶¶24-28; Ex. G at 11-12.

27  The three directors who are or have been officers at Google are Sergey Brin, Google founder and

28  former President of Technology; Larry Page, Google founder and current CEO; and Eric E.

1   Schmidt, Executive Chairman of Google's Board since April 4, 2011, and former CEO.  Mr.

2   Schmidt previously served as CEO of Novell, Inc. and Chief Technology Officer at Sun

3   Microsystems, and was a director of Apple Inc. and Siebel Systems, Inc.  *See* ¶¶21-23; Ex. G at 11.

### ARGUMENT

## I.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE DEMAND IS NOT EXCUSED

### A.   The Applicable Standards

Because Google is a Delaware corporation, Delaware's substantive law governs whether demand is excused.  *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 989-90 (9th Cir. 1999) ("*SGI*") (citing *Kamen v. Kemper Fin. Servs.*, *Inc.*, 500 U.S. 90, 96 (1991)).  Federal law determines the procedural rules which apply to shareholder derivative complaints filed in federal court.  *VeriSign*, 531 F. Supp. 2d at 1188.  Where demand on the board is not made, a plaintiff must plead particularized facts showing why demand would have been futile.  FED. R. CIV. P. 23.1.  *See SGI*, 183 F.3d at 989; *VeriSign*, 531 F. Supp. 2d at 1188.  Rule 23.1 "is not satisfied by conclusory statements or mere notice pleading."  *In re Allergan, Inc., S'holder Deriv. Litig.*, No. 10-01352-DOC, 2011 WL 1429626, at *2 (C.D. Cal. Apr. 12, 2011).  As the Ninth Circuit has held, "strict compliance with Rule 23.1 and the applicable substantive law is necessary before a derivative suit can wrest control of an issue from the board of directors."  *Potter v. Hughes*, 546 F.3d 1051, 1058 (9th Cir. 2008).  The pleading requirements for demand futility are "'more onerous than that required to withstand a Rule 12(b)(6) motion.'"  *Baca ex rel. Insight Enters. Inc. v. Crown*, No. 09-1283-PHX, 2010 WL 2812697, at *5 (D. Ariz. Jan. 8, 2010) (citation omitted).[6]

The Complaint alleges that the Board failed to monitor and oversee Company practices.  ¶¶63, 85, 101.  Where the challenged act is not a board decision, the analysis is whether under the particular facts alleged, there is a reasonable doubt that, as of the time the complaint was filed, a majority of the board could have properly exercised its independent and disinterested business judgment in responding to a demand.  *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).  *See*

---

[6] *See In re Computer Sciences Corp. Deriv. Litig.*, No. 06-05288-MRP, 2007 WL 1321715, at *4 (C.D. Cal. Mar. 26, 2007) (same; noting Nevada law follows Delaware law), *aff'd sub nom. Laborers Int'l Union of N. Am. v. Bailey*, 310 Fed. Appx. 128 (9th Cir. 2009).

1    *VeriSign*, 531 F. Supp. 2d at 1188-89 (applying *Rales* where no board decision is implicated); *In re*

2    *Sagent Tech., Inc. Deriv. Litig.*, 278 F. Supp. 2d 1079, 1087 (N.D. Cal. 2003) (same).  Thus,

3    plaintiffs must show that a majority of Google's Board, or five directors, are not disinterested or

4    independent.  *See VeriSign*, 531 F. Supp. 2d at 1189.  Significantly, independence and good faith

5    are *presumed* at the pleading stage.  *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984), *overruled*

6    *on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *SGI*, 183 F.3d at 990.[7]

7            This Court has twice made clear that to determine whether plaintiff has pleaded demand

8    futility, the issue is not the propriety or legality of the underlying alleged wrongdoing.  Rather, the

9    issue is whether the particularized facts alleged "overcome the presumption of good faith afforded

10   to directors."  *VeriSign*, 531 F. Supp. 2d at 1189; *Autodesk,* 2008 WL 5234264, at *7 ("There is no

11   dispute that backdating occurred . . . . the question here is whether a majority . . . would have been

12   incapable of impartially considering a demand").  Thus, courts have rejected allegations of demand

13   futility in cases where underlying wrongdoing occurred.  This includes instances where guilty pleas

14   and payments of fines have been made for violation of federal drug laws;[8] violation of the Bank

15   Secrecy Act,[9] bribery and government procurement violations,[10] the backdating of stock option

---

[7] *See also Autodesk*, 2008 WL 5234264, at *6 ("directors are presumed to be faithful to the corporation and able objectively to consider a demand") (citing *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048, 1055 (Del. 2004)); *VeriSign*, 531 F. Supp. 2d at 1189.

[8] *See Allergan*, 2011 WL 1429626, at *1 ($600 million sanction to resolve civil and criminal cases with the FDA, including the entry of a guilty plea and payment of a criminal fine of $375 million, for illegal marketing and promotion scheme of Botox); *King v. Baldino*, 648 F. Supp. 2d 609, 614 (D. Del. 2009) (federal misdemeanor violation of Federal Food, Drug and Cosmetic Act, payment of $425 million for off-label marketing practices ), *aff'd*, 409 Fed. Appx. 535 (3d Cir. 2010).

[9] *See Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 365-66 (Del. 2006) (criminal investigation of bank resulted in entry of deferred prosecution agreement with United States Attorney's Office requiring payment of $40 million in fines; one count information filed against bank for failure to file Suspicious Activity Reports; issuance of cease and desist order by Federal Reserve under Bank Secrecy Act; $10 million paid to Federal Reserve and FinCEN for violation of money-laundering program requirements of Bank Secrecy Act); *David B. Shaev Profit Sharing Account v. Armstrong*, No. 1449-N, 2006 WL 391931, at *2-3 (Del. Ch. Feb. 13, 2006) (Citigroup paid $5 billion in civil settlements and fines to SEC and New York State arising from helping structure Enron's special purpose entities and issuing falsely positive reports on Enron and WorldCom), *aff'd*, 911 A.2d 802 (Del. 2006).

[10] *See Citron ex rel. United Techs. Corp. v. Daniell*, 796 F. Supp. 649, 651 (D. Conn. 1992) (overcharging government on defense related contracts resulting in government investigations and conviction of company executives for role in obtaining classified information during bid for

(continued...)

1   grants,[11] and the issuance of financial restatements, among other things.[12]

2   **B.    The Complaint Fails to Raise a Reasonable Doubt That a Majority is Disinterested**

3   A director is interested "'whenever divided loyalties are present, or a director has received,

4   or is entitled to receive, a personal financial benefit from the challenged transaction which is not

5   equally shared by the stockholders,'" or where a "corporate decision will have a materially

6   detrimental impact on a director, but not on the corporation and the shareholders." *Rales*, 634 A.2d

7   at 933, 936 (citation omitted); *see VeriSign*, 531 F. Supp. 2d at 1189. Plaintiffs allege that all

8   directors face "a [s]ubstantial [l]ikelihood of [l]iability [r]esulting from [t]heir [m]isconduct."

9   ¶100. The "mere threat of personal liability" is "insufficient to challenge the disinterestedness of

10  directors." *VeriSign*, 531 F. Supp. 2d at 1192 (citation omitted). Interestedness can be shown only

11  in those "rare case[s] . . . where defendants' actions were so egregious that a substantial likelihood

12  of director liability exists." *Aronson*, 473 A.2d at 815; *see SGI*, 183 F.3d at 990. To make this

13  showing, a plaintiff must plead particularized facts "'detailing the precise roles that these directors

14  played at the company, the information that would have come to their attention in these roles, and

15  indication as to why they would have perceived the [wrongdoing].'" *VeriSign*, 531 F. Supp. 2d at

16  1192 (citing *Guttman*, 823 A.2d at 503).

17          **1.    There Is No Substantial Likelihood of Liability Based on Conclusory
                    Assertions of Board Participation**
18

19  Plaintiffs make a feeble attempt to allege that the Board directly engaged in misconduct in

20  a transparent attempt to avoid the daunting requirements of a *Caremark* claim, discussed below.

21  _____

22          (...continued from previous page)
    government contract); *In re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2d 1268, 1269 (Del. Ch.
    1995) (scheme to systematically overcharge the Veterans Administration resulting in government
23  investigation, proposed suspension of company from eligibility to receive government contracts,
    and debarment of two defendant-officers from being awarded government contracts); *In re Dow
24  Chem. Co. Deriv. Litig.*, No. 4349-CC, 2010 WL 66769, at *12 (Del. Ch. Jan. 11, 2010) (member
    of Kuwaiti Parliament charging joint venture with bribery).

25          [11] *See VeriSign*, 531 F. Supp. 2d at 1181, 1205 (backdated stock option grants, financial
    restatement, grand jury subpoena; SEC investigation and internal investigation); *Autodesk,* 2008
26  WL 5234264, at *2-3 (internal investigation revealing backdated stock option grants, financial
    restatement).

27          [12] *See Sagent*, 278 F. Supp. 2d at 1084-85 (restatement arising from forgery by former
    salesman who was indicted, pleaded guilty and imprisoned); *Guttman v. Huang*, 823 A.2d 492,
28  495, 498 (Del. Ch. 2003) (restatements and SEC investigation).

1   Their effort fails.  Plaintiffs' factual allegations are inherently contradictory and inconsistent.  They

2   allege on the one hand that defendants "fail[ed] to act on the information supplied to them from the

3   Company's system of internal controls."  ¶101.  On the other hand, plaintiffs allege that

4   "defendants consciously endorsed the Company's improper business strategy."  ¶47; *see* ¶98.[13]

5   The one allegation that specifically mentions participation contradicts that term.  ¶97 ("Defendants

6   participated in *and/or failed to adequately address*, *correct and/or disclose such conduct*")

7   (emphasis added); ¶¶101, 103 (defendants "fail[ed] to act").  Conclusory or contradictory

8   allegations that the board participated in misconduct are insufficient to plead a substantial

9   likelihood of personal liability.  *SGI*, 183 F.3d at 990; *Sagent*, 278 F. Supp. 2d at 1089.  Google's

10  Board had no alleged role, direct or otherwise, in the advertising by online Canadian pharmacies.

11  This case is in contrast to stock option cases, for example, where directors are alleged to have

12  "authorized, approved, [or] ratified" stock option grants, *VeriSign*, 531 F. Supp. 2d at 1192-93, and

13  directly participated "as the primary gatekeepers for . . . [the] options grant process."  *Computer*

14  *Sciences*, 2007 WL 1321715, at *8.[14]

15          **2.      There Is No Substantial Likelihood of Liability Based on an Alleged Failure of Oversight**

16

17          Because plaintiffs cannot plead any directorial participation in the advertising by Canadian

18  pharmacies, they resort to a claim under *Caremark*.  The Complaint predicates liability on the

19  Board's alleged failure to prevent employee misconduct or violations of law.  *See* ¶11 (defendants

20  "failure to prohibit illegal advertising"); ¶118 (defendants failed "to prevent the Company from

21  engaging in the unlawful acts"); ¶¶99, 101, 103 (defendants "failed to act on the information

22  supplied to them from the Company's system of internal controls").[15]  As courts have noted,

23  _____

24          [13] *See VeriSign*, 531 F. Supp. 2d at 1195 (noting pleading contradictions that board took no action while also alleging that the board authorized an independent review of stock option grants).

25          [14] Even if plaintiffs had alleged a participatory role, which they do not, pleading with specificity is required.  *See VeriSign*, 531 F. Supp. 2d at 1193-94 (no allegations indicating "which

26  director or directors approved which grant, or when such grant was approved and how it was backdated" or facts showing "how or why a particular director would know that the options were

27  backdated").

28          [15] *See also* ¶63 ("defendants did nothing to prevent or monitor any changes to the online pharmacies' geo-targeting practices"); ¶82 ("defendants did not proactively manage Google's risk

                                                                                (continued...)

1    allegations of a failure to act despite awareness of violations are "*Caremark*-type claims"

2    "[w]hether acknowledged by Plaintiff or not."  *Jones ex rel. CSK Auto Corp. v. Jenkins*, 503 F.

3    Supp. 2d 1325, 1335 (D. Ariz. 2007) (citation omitted).  This theory is "*possibly the most difficult*

4    *theory in corporation law upon which a plaintiff might hope to win a judgment*.'"  *Caremark*, 698

5    A.2d at 967 (emphasis added); *Stone*, 911 A.2d at 372.[16]

6         The claim here "requires a showing . . . that the board or a committee had clear notice of

7    wrongdoing and simply chose to ignore that evidence."  *VeriSign*, 531 F. Supp. 2d at 1195.  A

8    director's bad faith conduct, *i.e*., an "intentional[] fail[ure] to act in the face of a known duty to act,

9    demonstrating a conscious disregard for [one's] duties," is necessary for oversight liability.  *Stone*,

10   911 A.2d at 369-70.[17]  A plaintiff must plead particular facts that, having implemented a reporting

11   or information system, defendants "consciously failed to monitor . . . its operations thus disabling

12   themselves from being informed of risks . . . . [L]iability *requires a showing that the directors*

13   *knew that they were not discharging their fiduciary obligations*."  *Id*. at 370 (emphasis added).

14   This Court has recognized that this is "*a scienter-based standard*."  *See Autodesk*, 2008 WL

15   5234264, at *10 (emphasis added).[18]  Thus, "liability is foreclosed for all but the most egregious

16   breaches of duty," *i.e*., self-dealing and intentional bad faith.  *Id.*

17        **The Red Flags Standard Is Not Met.**  A plaintiff attempting to plead a *Caremark* claim

18   may allege that directors "ignored 'red flags' indicating misconduct in defiance of their duties."

19   *Shaev*, 2006 WL 391931, at *5; *see Wood v. Baum*, 953 A.2d 136, 142-43 (Del. 2008); *VeriFone*,

20                    (...continued from previous page)

21   and/or compliance"); ¶85 (noting Board's duty to oversee management).

22   [16] *See VeriSign*, 531 F. Supp. 2d at 1195 (same); *In re Accuray, Inc. S'holder Deriv. Litig*., 757
     F. Supp. 2d 919, 926 (N.D. Cal. 2010) (same); *Allergan*, 2011 WL 1429626, at *3 (same); *In re
     VeriFone Holdings, Inc. S'holder Deriv. Litig.,* No. 07-6347-MHP, 2010 WL 3385055, at *4 (N.D.

23   Cal. Aug. 26, 2010) (same), *aff'd*, No. 10-16932 (9th Cir. Nov. 28, 2011).

24   [17] *See Autodesk*, 2008 WL 5234264, at *9 (same); *Dow*, 2010 WL 66769, at *12, 13 n.85 ("'a
     showing of bad faith is a *necessary condition* to director oversight liability'"; having conceded the

25   existence of internal controls, plaintiffs must allege that the "board deliberately failed to monitor its
     ethics policy or its internal procedures") (citation omitted).

26   [18] *See In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 123 n.47, 125 (Del. Ch. 2009)
     ("a scienter-based standard applies" to *Caremark* claims); *In re Intel Corp. Deriv. Litig.*, 621 F.

27   Supp. 2d 165, 172 (D. Del. 2009) (same).  Scienter is similarly required given that Google has
     adopted an exculpatory provision under Delaware Corporations Code §102(b)(7).  *See id.*; *see*

28   Section IB.4, *infra.*

2010 WL 3385055, at *4.  The Complaint alleges that the following facts "did [sic] or would have . . . alerted the Board to the wrongdoing occurring."  ¶101.[19]

1.  Warning on March 13, 2003, by National Association of Boards of Pharmacy ("NABP") to Mary Ann Belliveau, Google's Healthcare Vertical Market Manager, about the dangers of illegal online pharmacies and "the misleading nature of Google's 'sponsored links' for these sites."  ¶101(a); *see* ¶40.  *The Complaint does not state this communication was made to any director.*

2.  Statement in Washington Post on December 1, 2003, by Peter J. Pitts, FDA Associate Commissioner for External Affairs, that "'[we]'re literally placing calls to the search engines trying to get a meeting going'" concerning online pharmacies.  ¶101(b); *see* ¶45.  *This article did not refer to Canadian online pharmacies, and the Complaint does not allege that any director or a Board majority read the article.*

3.  Testimony of Sheryl Sandberg, Google's Vice President, Global Online Sales and Operations, to a Senate subcommittee on July 22, 2004, that Google "'recognize[s] that there are bad actors on the Internet, including unlicensed online pharmacies that peddle unsafe and counterfeit products'" and relies on SquareTrade.  ¶101(c); *see* ¶¶44, 51.  *The Complaint does not state that any director was present or had knowledge of this testimony.*[20]

4.  An untitled 2008 study from NABP estimating "96% of internet drug outlets appear to be in violation of pharmacy related laws or standards."  ¶101(d); *see* ¶64.  *The Complaint does not state that Google was mentioned or allege that any director reviewed the study, and if so, when.*

5.  July 7, 2008 letter from Joseph A. Califano of Columbia University to Mr. Schmidt that Columbia's Center on Addiction and Substance Abuse "'was able to find prominent displays of ads for rogue Internet pharmacies in a Google search for controlled drugs,'" advised Google to "'block all advertisements from unlicensed or uncertified online pharmacies'" and enclosed report finding "85% of online pharmacies advertising controlled drugs on search engines did not require a valid prescription."  ¶101(e); *see* ¶¶57, 64.  *The Complaint does not state that the letter was sent to any director other than Mr. Schmidt.*

6.  December 23, 2008 letter from NABP to Mr. Schmidt that "'a third party verifications service Google uses . . . certified several pharmacy Web sites that source their prescription drugs from . . . Canada . . . which is contrary to U.S. law,'" and warned "'your sponsorship of these search results . . . aids in a business practice that is contrary to U.S. law.'"  ¶101(f); *see* ¶¶58, 64.  *The Complaint does not state that the letter was sent to any director other than Mr. Schmidt.*

---

[19] The predecessor complaints characterized these facts as "red flags."  *See* Clem complaint (Case No. 11-cv-4270-PJH, Dkt. 1) ¶55; Gallis complaint (Case No. 11-cv-4249-PJH, Dkt. 1) ¶58. The Consolidated Complaint does not, in an apparent effort to avoid this standard *Caremark* rubric.

[20] The Complaint does not allege that any director was aware of testimony of Andrew McLaughlin, Google's Director of Global Public Policy, to a House Subcommittee on December 13, 2005, "hyp[ing] SquareTrade's verification process."  ¶51.

7.   2009 report by California professor finding that Google was profiting from online ads of illegal drug sellers and that "'little verification . . . actually takes place.'"  ¶101(g); *see* ¶60.  *The Complaint does not state where the report was published, whether any director read the report, and if so, when.*

These allegations at best point only to Mr. Schmidt – one of nine directors – as having notice of ads for "rogue Internet pharmacies" and that Google's third-party verification service improperly certified pharmacy websites.  As one court recognized, "Delaware law is clear that demand will not be excused when a Complaint includes particularized allegations for just one member of the Board."  *Intel*, 621 F. Supp. 2d at 174-75.[21]

Such red flag allegations are meaningless where the complaint fails to connect them to the board members.  In *Intel*, several international trade commissions commenced investigations and made adverse findings about Intel's anti-competitive practices; a *Business Week* article also reported that the New York State Attorney General and FTC were investigating Intel.  The court described the plaintiff's approach as to "catalog the ongoing investigations" and "assert that the thickness of the catalog demonstrates that [the company's] conduct was so egregious" such that the board faced a substantial likelihood of liability for ignoring red flags.  621 F. Supp. 2d at 175.  *See In re Bidz.com, Inc. Deriv. Litig.*, 773 F. Supp. 2d 844, 849, 857 (C.D. Cal. 2011) (rejecting red flags consisting of published reports and anonymous complaints accusing the company of shill bidding in absence of facts that directors "ever saw or knew about the existence of any of these reports").[22]

The same is true here.  Plaintiffs simply list a hodgepodge of comments largely made by third parties, including some that do not even address Google's actual practices.  *None was allegedly sent to the Board.*  Plaintiffs do not plead that a Board majority knew of a single red flag

---

[21] *See VeriFone*, 2010 WL 3385055, at *6, 8 (alleged red flags did not implicate board majority); *see also Computer Sciences*, 2007 WL 1321715, at *13 (even excluding a group of interested directors, "there remains a clear . . . board majority whose disinterestedness and independence is not placed in reasonable doubt").

[22] *See Allergan*, 2011 WL 1429626, at *4 ("Plaintiffs fail to allege which, if any, Director Defendants actually received notice of Botox's alleged illegal off-label marketing through the letters from the FDA"); *King*, 648 F. Supp. 2d at 624-25 (no facts that board was privy to data reported in Wall Street Journal articles of high prescriptions for off-label use); *Accuray*, 757 F. Supp. 2d at 928 (no alleged "specific information that each director knew and ignored concerning the backlog").

1    or when.  As the Delaware Supreme Court observed, "red flags 'are only useful when they are

2    either waved in one's face or displayed so that they are visible to the careful observer.'"  *Wood*,

3    953 A.2d at 143 (citation omitted).  The alleged red flags here do not show that a Board majority

4    was aware of allegedly illegal activity.

5            Moreover, even if the Complaint alleged that a Board majority had knowledge, which it

6    does not, the Complaint does not allege how the Board responded to such knowledge.  As the court

7    held in *Intel*:

8            Plaintiff fails to identify what the Directors actually knew about the "red flags" and
        how they responded to them . . . . [T]here are no allegations regarding how often the
9           Board met, if at all, to discuss the alleged anti-competitive activity and no allegations
        that the Board approved any such "red flag" activity.  Similarly, there are no
10          allegations as to how often and by whom the Board was advised regarding the "red
        flags."

11

12   621 F. Supp. 2d at 174; *id.* at 175-76.[23]  The Complaint does not allege that Google's Board had

13   knowledge of potential violations but chose to do nothing in response, or knowingly chose a

14   response that would be inadequate.

15           **Failure to Plead Any Board Knowledge of Alleged Internal Misconduct**.  The

16   Complaint additionally alleges wrongful activity occurring within Google, but here, too, the

17   Complaint does not allege that a Board majority had knowledge of these activities.  More

18   particularly, the Complaint alleges that in late 2003 the FDA pressured search engines to accept

19   ads only from licensed Internet pharmacies.  ¶46.  Google hired SquareTrade to address this issue,

20   but SquareTrade allegedly did a poor job and was "nothing more than window dressing."  ¶48.

21   Google similarly hired PharmacyChecker in 2006, but it, too, allegedly was "not effective."  ¶56.

22   The Complaint alleges that "as the three top level executives at Google defendants Page, Brin and

23   Schmidt *necessarily played* an active role in approving the third-party verification provider the

24   Company used."  ¶100 (emphasis added); *see also* ¶113 (each defendant knew of wrongful acts as

25

26           [23] *See Bidz.com*, 773 F. Supp. at 857, 858 (plaintiffs failed to allege that directors had
     knowledge and "failed to act in light of such knowledge, and did so knowing their conduct
27   breached their fiduciary duties"; no allegation that directors "consciously decided not to act");
     *Allergan*, 2011 WL 1429626, at *4 (rejecting conclusory claim that defendants consciously
28   ignored red flags of wrongdoing); *VeriSign*, 531 F. Supp. 2d at 1195 (failure to allege that board
     "chose to ignore . . . evidence [of wrongdoing]").

a result of access to documents and attendance at management and board meetings). Plaintiffs do not, for example, explain why Mr. Brin, the President *of Technology* (¶22), would have played such a role. Plaintiffs cannot rely on the mere fact of these defendants' positions or any directors' attendance at board meetings to infer knowledge that SquareTrade and PharmacyChecker were retained to assist yet failed to perform competently.[24]

The Complaint alleges that in some instances employees were assisting with improper advertising or failing to prevent some pharmacies' circumvention of SquareTrade and PharmacyChecker's compliance efforts. ¶¶53-54, 62-63. The Complaint cites to five employee emails:

1) November 18, 2003 "employee" email discussing budgets of several Canadian online pharmacy advertisers and stating "'[a]ll ship from Canada into the U.S.'" ¶44.

2) April 23, 2004 email from "employee based in Canada" that "in connection with the advertisements of a large Canadian pharmacy, 'the Google team is proactively adjusting creative and optimizing with Square Trade policy in mind.'" ¶54.

3) June 4, 2004 email from same employee sent to "a member of the Company's policy group . . . [stating] 'the Max team and [customer support] are sort of furiously working on creative to appease our new policy before approvals gets to them and disapproves.'" ¶54.

4) August 23, 2005 email from "employee in "Company's policy group" stating the "'majority of Canadian Pharmacies are in business to drive pharmacy traffic from the United States to Canada'" and "'target the US in their geo-targeting.'" ¶¶44, 55.

5) February 13, 2008 email from "member of the Company's policy group" stating "'[t]he only ads that are getting blocked are those with explicit pharma terms in the ad texts; the shady, fraudulent advertisers know not to do this.'" ¶62.

The Complaint *does not allege that a single email was sent to any director*. The NPA, on which these allegations are based, does not either. Ex. A ¶¶1(h, k, n). The Delaware Supreme Court found a nearly identical fact most relevant: "In neither the Statement of Facts nor anywhere else did the [Deferred Prosecution Agreement] ascribe any blame to the Board or to any individual director." *Stone*, 911 A.2d at 366.[25] Even assuming that Google employees engaged in

---

[24] *See Jones*, 503 F. Supp. 2d at 1332-33 (rejecting virtually identical allegations); *Rattner v. Bidzos*, No. 19700, 2003 WL 22284323, at *10 n.53 (Del. Ch. Sept. 30, 2003) (same).

[25] *See also VeriFone*, 2010 WL 3385055, at *10 (complaint filed by SEC only addresses conduct of one inside director).

1    misconduct, the Complaint does not provide any fact that a Board majority knew anything was

2    amiss.[26]  Without more, alleged employee misconduct cannot impute knowledge to Google's

3    Board, including its six outside directors.[27]

4         The Complaint does not allege that a Board majority knew about these third-party

5    providers, their working relationship with Google's employees, or inadequacies in performance.  A

6    director's duty to be informed does not "require directors to possess detailed information about all

7    aspects of the operation of the enterprise" because that is "inconsistent with the scale and scope of

8    efficient organization size in this technological age."  *Caremark*, 698 A.2d at 971; *see Stone*, 911

9    A.2d at 368.  Notably, while plaintiffs allege that the size of Google's forfeiture was "massive"

10   (¶4), the fact is that the total $500 million represents *just 0.61% of Google's $81 billion* in

11   advertising revenues during the relevant time period from 2003-2009.  Ex. H at 74; Ex. I at 69; Ex.

12   J at 65.[28]  Under *Caremark*, "'absent cause for suspicion there is no duty upon the directors to

13   install and operate a corporate system of espionage to ferret out wrongdoing which they have no

---

[26] *See King*, 648 F. Supp. 2d at 625 (no facts that board was aware of whistleblower's intra-company audit concluding that violations of FDA mandates had occurred); *Shaev*, 2006 WL 391931, at *5 n.17 (dismissing notwithstanding Citigroup's $5 billion settlement where plaintiff never alleged that an employee's observation of misconduct was brought to the board's attention and was ignored); *Guttman*, 823 A.2d at 507 & n.37 (former employee "did not allege . . . that members of the board knew of the accounting misconduct by certain managers, much less that they were complicit in it"); *Jones*, 503 F. Supp. 2d at 1336 ("'the [Audit] Committee could not have been expected to discover the accounting irregularities . . . because discovery require[s] disclosure by management'") (citation omitted); *Baxter*, 654 A.2d at 1271 (complaint omits "what obvious danger signs were ignored or what additional measures the directors should have taken").

[27] *See Autodesk*, 2008 WL 5234264, at *10 ("plaintiffs plead no facts showing that anyone other than staff involved in the process knew how [stock options were] administered – and certainly not that any of the outside directors did"); *Ash v. McCall*, No. 17132, 2000 WL 1370341, at *4, 15 (Del. Ch. Sept. 15, 2000) (where company being acquired committed accounting errors leading to large restatement, publication of CFRA report and newspaper article criticizing accounting policies were not sufficient to impute actual knowledge of defective accounting practices to acquired company's board of directors, despite that "at some organizational level, [the company] knew of and responded to public criticism of its accounting practices"); *Bidz.com*, 773 F. Supp. 2d at 857 (refusing to make a "logical leap" in absence of particularized facts of directors' knowledge).

[28] *See Shaev*, 2006 WL 391931, at *6 (no allegation that Enron and WorldCom relationships "formed an unusually large part of Citigroup's business while the relationships were ongoing" notwithstanding that liability resulting was "'huge'"); *King*, 648 F. Supp. 2d at 624 (rejecting that 92% increase in sales of drug should have informed board that drug was being used for off-label use); *VeriFone*, 2010 WL 3385055, at *5-6 (directors are not "expected to monitor or otherwise gauge all of the factors affecting inventory valuation"); *Rattner*, 2003 WL 22284323, at *13 (no facts that directors were aware of specific financial data that was erroneous).

1   reason to suspect exists.'"  698 A.2d at 969 (citation omitted).[29]

2          Plaintiffs rely on the statement of Peter Neronha, the Rhode Island U.S. Attorney, who

3   stated that "'Larry Page knew what was going on.'"  ¶79.  Plaintiffs have, at best, singled out only

4   two of nine directors who had possible knowledge of improper business practices.  Having fallen

5   short of the necessary Board majority, the Complaint resorts to asserting that "it is reasonable to

6   infer that" Messrs. Schmidt and Page "would have informed the Board about the Canadian

7   pharmacy problem."  ¶99.  It alleges no facts to support such an inference.  "Delaware law does not

8   permit the wholesale imputation of one director's knowledge to every other for demand excusal

9   purposes."  *Desimone v. Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007) (no allegation that board

10  ever discussed stock option backdating at the time of backdating).  Instead, "a derivative complaint

11  must plead facts specific to each director, demonstrating that at least half of them could not have

12  exercised disinterested business judgment in responding to a demand."  *Id.*[30]  The Complaint does

13  not do so.

14         The Complaint also asserts that an earlier settlement involving advertisements promoting

15  illegal gambling makes it "reasonable to infer that the Board learned of the problems with the

16  Canadian pharmacy ads."  ¶¶38, 98-99.  The *Dow* court rejected a similar inference based on an

17  earlier unrelated transaction as "too attenuated to support a *Caremark* claim."  *Dow*, 2010 WL

18  66769, at *13.  The court stated, "[w]ith neither knowledge of bribery, nor any reason to suspect

19  such conduct, the defendant directors could not 'conscious[ly] disregard' their duty to supervise

20  against bribery."  *Id.*

---

22  [29] As this Court has observed, the mere fact that two outside directors served on the Audit
23  Committee (¶103, Messrs. Doerr and Shriram) does not establish knowledge of underlying
    wrongdoing.  *See Autodesk*, 2008 WL 5234264, at *9-10 ("boilerplate allegations setting forth the
    duties of Audit Committee members" does not plead liability under *Caremark*); *Jones*, 503 F.
24  Supp. 2d at 1334 (no facts showing how or when Audit Committee learned of improper accounting
    or its response); *Bidz.com*, 773 F. Supp. 2d at 858 n.7 (similar).

25  [30] *See VeriSign*, 531 F. Supp. 2d at 1193-94 (allegation that board "'should have been aware'"
26  of misdated grants was "wholly insufficient to support a claim of demand futility"); *Bidz.com*, 773
    F. Supp. 2d at 857-58 (rejecting that directors knew about shill bidding based upon allegations that
27  the online auction was Bidz's "core business," or that company policy provided for regularly
    scheduled presentations to the board from finance, sales and marketing, in absence of
28  particularized facts that the outside directors "actually knew of any shill bidding and consciously
    decided not to act").

1    In sum, plaintiffs' catalog of allegations fails to demonstrate that "the board . . . had clear

2    notice of wrongdoing and simply chose to ignore that evidence." *VeriSign*, 531 F. Supp. 2d at

3    1195.  The decision in *Stone* is instructive.  There, despite the existence of a functioning internal

4    control system, employees failed to inform the board of bank reporting violations, which led to a

5    large multi-million dollar fine.  The Delaware Supreme Court refused to "equate a bad outcome

6    with bad faith," for there was no "basis for an oversight claim seeking to hold the directors

7    personally liable for such failures by the employees."  911 A.2d at 373.

8         **3.     The Business Judgment Rule is Inapplicable**

9    Plaintiffs have tried in the Consolidated Complaint to avoid predicating liability under

10   *Caremark*, and with it the *Rales* test.  *See* Section IA, IB.1, 2 *supra*.  Plaintiffs therefore try to

11   parlay what is a standard failure of oversight claim into an affirmative failure of business judgment

12   and the *Aronson* test.  *See* ¶96 (the conduct "is Not a Valid Exercise of Business Judgment";

13   "violations of the Company's internal policies . . . cannot be . . . a valid exercise of business

14   judgment"); ¶98 (the Board's "misconduct . . . constitutes an ongoing . . . scheme to break the

15   law").  Plaintiffs allege that "the Board affirmatively adopted, implemented and condoned a

16   business strategy based on deliberate and widespread illegal activities."  ¶98.  But this purported

17   "affirmative" conduct contradic*ts* the *failure of action* alleged in the immediately preceding

18   paragraph.  *See* ¶97 (defendants "failed to adequately address, correct and/or disclose").  *See also*

19   Section IB.2, *supra*.

20   Plaintiffs do not plead a single fact to show any Board action or decision concerning

21   wrongful conduct by the online Canadian pharmacies.  That the Board is "the ultimate decision-

22   making body of the Company" (¶98) does not change this reality.  Numerous courts, including this

23   one, have found the business judgment rule inapplicable in similar contexts.  *See VeriSign*, 531 F.

24   Supp. 2d at 1188-89 (rejecting application of business judgment test despite allegation that the

25   granting of backdated options can never be the product of a good faith exercise of business

26   judgment where a majority was not shown to have granted backdated options); *Allergan*, 2011 WL

27   1429626, at *6 (failure to allege policy of illegal use of off-label marketing was a "board decision";

28   "a decision by the Company itself does not adequately plead a lack of business judgment by the

1   individual directors").[31]

2   **4.    Google's Directors Do Not Face a Serious Threat of Liability Where Plaintiffs Have Not Pleaded a Non-Exculpated Claim**

3

4   Delaware law permits corporations to adopt charter provisions that eliminate director

5   liability for breach of the duty of care.  Del. Code Ann. tit. 8, §102(b)(7).  Google has done so

6   through its Certificate of Incorporation.  Ex. K at 10, §VII.  Because Google's directors are

7   shielded from personal liability for due care claims, plaintiffs are limited to "non-exculpated

8   claims" for breaches of loyalty based on bad faith.[32]  The Delaware courts have recognized that the

9   bad faith required to overcome the exculpatory clause under Section 102(b)(7) and the breach of

10  loyalty required under *Caremark* are similar:

11          [The] presumption of the business judgment rule, the protection of an exculpatory
            §102(b)(7) provision, and the difficulty of proving a *Caremark* claim together
12          function to place an extremely high burden on a plaintiff to state a claim for personal
            director liability.

13  *Citigroup*, 964 A.2d at 125.  Plaintiffs do not meet this daunting burden.  There are no well-

14  pleaded facts that a Board majority knew of the alleged underlying wrongdoing and consciously

15  failed to oversee Google's operations.  Thus, plaintiffs do not "overcome the presumption of

16  indemnification" in the absence of a "particularized pleading" sufficient to conclude there is a

17  "substantial likelihood that their conduct falls outside that exemption" of the certificate of

18  incorporation.  *Jones*, 503 F. Supp. 2d at 1340.[33]

19

20  ───────────────

21  [31] *See Rattner*, 2003 WL 22284323, at *7 ("[t]he business judgment rule has no role in the case of inaction by the board"); *Shaev*, 2006 WL 391931, at *4 (applying *Rales* for failure to detect and stop transactions with Enron); *Intel*, 621 F. Supp. 2d 173 ("the Court is unable to identify any Delaware authority holding that the *Aronson* standard should be applied to allegations of conscious inaction").

22

23  [32] *See Guttman*, 823 A.2d at 501 ("a serious threat of liability may only be found to exist if the plaintiff pleads a *non-exculpated* claim against the directors based on particularized facts"); *Autodesk*, 2008 WL 5234264, at *10 (plaintiffs must meet "a scienter-based standard" under exculpatory clause).

24

25

26  [33] *See Baca*, 2010 WL 2812697, at *9 ("the allegations . . . do not align with the standard for a non-exculpated claim for failure of oversight" by pleading that the board "'consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention'") (citing *Stone*, 911 A.2d at 370); *Wood*, 953 A.2d at 141, 143 (there are no "particularized allegations that the defendants acted with the requisite scienter (in 'bad faith')") (citations omitted).

27

28

1

**C.     The Complaint Fails to Raise a Reasonable Doubt that a Majority is Independent**

2          The Complaint alleges an assortment of claims in an effort to question certain directors'

3   independence.  ¶¶104-106.  To excuse demand on this basis, plaintiffs must show that "the

4   directors are 'beholden'" such that they are "so under [another party's] influence that their

5   discretion would be sterilized."  *Rales*, 634 A.2d at 936; *see VeriSign*, 531 F. Supp. 2d at 1196.

6          **Google's Investments with Kleiner Perkins**.  The Complaint alleges that there is a

7   reasonable doubt of Mr. Doerr's independence because he is a general partner at Kleiner Perkins, a

8   venture capital firm, and Google has co-invested with Kleiner Perkins in some private companies.

9   ¶106(c).  Doerr is the managing director of some of these investment funds, and allegedly would

10  not risk Google's continued financial support in those companies by suing Messrs. Page, Brin, or

11  Schmidt.  *Id.*

12         Delaware courts have rejected the notion that business relationships are sufficient to

13  overcome the presumption of independence.  *Beam*, 845 A.2d at 1051.  The facts alleged are not

14  sufficient to raise a reasonable doubt of Mr. Doerr's independence.  The decision in *Jacobs v.*

15  *Yang*, No. 206-N, 2004 WL 1728521 (Del. Ch. Aug. 2, 2004), *aff'd*, 876 A.2d 902 (Del. 2005), is

16  instructive.  There, one director was managing partner of an investment firm with a majority stake

17  in a company whose media group had a licensing agreement with Yahoo!.  *Id.* at *5-6.  Another

18  director served on the board of a company with an advertising contract with Yahoo!.  *Id.*  A third

19  director was chairman and CEO of one entity and a shareholder of another, both of which had

20  business agreements with Yahoo!.  *Id.*  The court rejected the conclusory assertion that these

21  business agreements were entered into *at the behest of the inside founding officers*, even where

22  they were so prominent as to be referred to within the company as "Chief Yahoo!."  *Id.* at *6.  Nor

23  did plaintiff show that the founders had the ability to terminate these business agreements.  *Id.*  The

24  court also rejected as conclusory the assertion that an agreement is "crucial" to an outside director

25  where there were no particularized facts detailing the terms of the agreement or its materiality.  *Id.*

26  The court held that "the existence of contractual relationships with companies that directors are

27  affiliated with potentially makes the board's decision more difficult, 'but it does not sterilize the

28  board's ability to decide.'"  *Id.* (citation omitted).

The same deficiencies exist here.  The Complaint does not allege the materiality of the investments either to Google or Mr. Doerr's firm, much less to him personally.  ¶106(c).  Nor does the Complaint provide facts that Messrs. Page, Brin, or Schmidt are responsible for Google's decision to make these investments in the first place, or that they could alter or terminate Google's investments going forward.  *Id.*  The Complaint does not show that Messrs. Page, Brin, or Schmidt have sterilized Mr. Doerr's discretion.  *See In re J.P. Morgan Chase Co. S'holder Litig.*, 906 A.2d 808, 814, 822 (Del. Ch. 2006) (outside director was not disqualified where his construction company received $2 billion from a bank managed by Morgan Chase, and his company and Morgan Chase's equity firm jointly owned an investment partnership; business interests were not shown to be on account of his role as director of Morgan Chase).[34]

**University Donations**.  The Complaint similarly attacks the independence of two of the most distinguished University presidents in America (Presidents Hennessy and Tilghman) and a Stanford University trustee (Mr. Shriram) on the basis that Google made donations to Stanford and Princeton.  It used to be that recruiting highly accomplished officials from prestigious American universities made for sterling boards of directors.  Plaintiffs try to turn this laudable goal on its head by tarnishing Google's distinguished Board with supposedly conflict-creating charitable donations.  These litigation tactics are unfortunate, for they serve to dissuade preeminent candidates from serving on America's corporate boards.

The Complaint alleges that Google donated $14.4 million[35] to Stanford University since 2006.  ¶106(a).  The Complaint does not allege that this sum is material to Stanford.  The

---

[34] *See Mitzner v. Hastings*, No. 04-3310-FMS, 2005 WL 88966, at *7 (N.D. Cal. Jan. 14, 2005) (that outside director's venture capital firm provided seed money for launch of Netflix or that CEO invited another director to join the board to facilitate business partnership between their respective entities was not sufficient to overcome presumption of directors' independence); *Guitierrez v. Logan*, No. 02-1812-STL, 2005 WL 2121554, at *12 (S.D. Tex. Aug. 31, 2005) (that company entered consulting agreement with one director and paid legal fees to other director's law firm was insufficient to overcome presumption of independence where complaint failed to show directors were dominated by interested director); *VeriSign*, 531 F. Supp. 2d at 1196-97 (no showing of lack of independence where inside director and several outside directors are part owners of professional ice hockey team); *Beam*, 845 A.2d at 1051 (that directors developed business relationships before joining board is insufficient without more to rebut presumption of independence).

[35] Incredibly, plaintiffs count as a "donation" $2.3 million in license payments that Google is required by contract to pay to Stanford.  *See* Ex. C at 38; Ex. D at 28; Ex. E at 42; Ex. F at 46; Ex. G at 28.

1   Complaint alleges that if President Hennessy or one of Stanford's trustees (Mr. Shriram) initiates

2   litigation against Messrs. *Page* or *Brin*, *Google* would stop making donations.  *Id.*  The Complaint

3   does not explain why *the Company* would cease making donations if Messrs. *Page* or *Brin* are

4   sued.[36]  The Complaint further alleges that President Hennessy is supposed to "ensure continued

5   alumni support."  ¶106(a).  The Complaint provides no specific facts, however, to assert that

6   President Hennessy actually solicited the donations, or that Google's supposed termination of

7   future donations would be "disastrous" to him.  *Id.*

8        The Complaint also alleges that on October 13, 2009, Mr. Schmidt created a $25 million

9   endowment fund at Princeton.  ¶106(b).  Plaintiffs do not suggest that this sum is material to

10  Princeton.  The Complaint alleges that President Tilghman would not vote to sue Mr. Schmidt

11  because he *previously* served as a trustee at Princeton, and *previously* had some control over her

12  *former employment.*  The Complaint alleges that she would not now sue Mr. Schmidt out of loyalty

13  for those *past acts.*  There is no suggestion, however, that Mr. Schmidt has any impact on President

14  Tilghman's *current role* at Princeton.[37]  That Mr. Schmidt might not "provide any future

15  donations," ¶106(b), is nothing but speculation.

16       These facts do not raise a reasonable doubt of these three directors' independence under

17  Delaware law.  In *J.P. Morgan Chase*, the court rejected a similar allegation where J.P. Morgan

18  made donations to the American Museum of Natural History of which the outside director (Futter)

19  was president and trustee.  The complaint failed to identify the donations' percentage of the

20  museum's overall contributions, or explain what influences the donations have on Futter's role or

21  "decision-making process of the president of one of the largest museums in the nation."  906 A.2d

22  at 822.  Similarly, the court found that J.P. Morgan's donations of $18 million to the United Negro

23  College Fund did not disqualify that organization's CEO and President from considering demand,

24  where the complaint failed to allege how those donations would impact him.  *Id.* at 823-24.  As

25

26       [36] *See In re Fed. Nat'l Mortg. Ass'n Sec., Deriv. & ERISA Litig.*, 503 F. Supp. 2d 9, 19-20 &
     n.7 (D.D.C. 2007) (no facts that former CEO "controlled, unilaterally or substantially . . . grant-
27   making process" or "specific allegations concerning [CEO's] involvement in any particular
     grant"), *aff'd*, 534 F.3d 779 (D.C. Cir. 2008).

28       [37] *See Jacobs*, 2004 WL 1728521, at *4-5 (where Yahoo!'s founder does not control current
     employment of CEO, the latter's independence is not sufficiently challenged).

1   shown, the same is true here.  Plaintiffs do not meet their burden of demonstrating that "because of

2   the nature of a relationship or additional circumstances . . . the non-interested director would be

3   more willing to risk his . . . reputation than risk the relationship with the interested director."

4   *Beam*, 845 A.2d at 1052.

5          **Control by Voting Power**.  The Complaint alleges that the three inside directors together

6   control two-thirds of the shareholder vote and thus control the Board.  ¶¶104-105.  The Delaware

7   Supreme Court has explicitly rejected this proposition:

8          A stockholder's control of a corporation does not excuse presuit demand on the board
           without particularized allegations of relationships between the directors and the
9          controlling stockholder demonstrating that the directors are beholden to the
           stockholder.

10

11   *Beam*, 845 A.2d at 1054.  In *Beam*, that Martha Stewart was CEO, owned 94% of stock, and

12   developed business and social relationships before other directors joined the board was

13   "insufficient, without more, to rebut the presumption of independence" and did "not provide a

14   sufficient basis from which reasonably to infer that [outside directors] may have been beholden to"

15   her.  *Id.* at 1051.  As here, plaintiffs failed to plead facts "other than the interested director's stock

16   ownership or voting power" to create reasonable doubt about an outside director's independence."

17   *Id.* at 1052.[38]

18   **D.     Generic Allegations Fail to Excuse Demand**

19          The Complaint sets forth several additional boilerplate arguments that courts routinely

20   reject.  Plaintiffs allege that demand is futile because the directors are culpable, and accordingly,

21   would not sue themselves or each other, and have demonstrated futility by failing to bring suit

22   against wrongdoers.  ¶¶107-108, 110.  This Court has stated that such allegations are "wholly

23   generic, and thus, by definition, not 'particularized.'"  *Autodesk*, 2008 WL 5234264, at *6; *see*

24   *VeriSign*, 531 F. Supp. 2d at 1190-91, 1995 (similar allegations are "boilerplate"); *Sagent*, 278 F.

25   Supp. 2d at 1089.  Likewise, the mere fact that directors receive fees and stock options (¶113) does

26

27          [38] *See also Bidz.com*, 773 F. Supp. 2d at 853 (that CEO owned 62% held insufficient to show
       board lacked independence); *Aronson*, 473 A.2d at 815 (in "the demand context, even proof of
28     majority ownership . . . does not strip the directors of the presumptions of independence").

1   not establish a disabling interest or lack of independence.  *Grobow v. Perot*, 539 A.2d 180, 188

2   (Del. 1988), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).  Courts

3   also "have routinely rejected" allegations regarding "insured versus insured" exclusions in

4   directors' and officers' insurance policies.  ¶112; *Jones*, 503 F. Supp. 2d at 1341 (citations

5   omitted).  In sum, none of the allegations suffices singularly or collectively to excuse demand on

6   Google's Board.

7   **II.     PLAINTIFFS DO NOT MEET THE STRINGENT STANDARD FOR
            ESTABLISHING THEIR STANDING**

8

9          A shareholder plaintiff seeking to maintain a derivative action must allege "that the

10  plaintiff was a shareholder or member at the time of the transaction complained of[.]"  FED. R. CIV.

11  P. 23(b)(1).  The Ninth Circuit has interpreted Rule 23.1 to also require that derivative plaintiffs

12  "retain ownership of the stock for the duration of the lawsuit."  *Lewis v. Chiles*, 719 F.2d 1044,

13  1047 (9th Cir. 1983).  Where, as here, plaintiffs' conclusory allegations fail to satisfy the strict

14  ownership requirements of Rule 23.1, plaintiffs lack standing to pursue shareholder derivative

15  claims.  *See Accuray*, 757 F. Supp. 2d at 926 (vague ownership allegations insufficient to satisfy

16  the "strict" standards of Rule 23.1).

17         In the Complaint, plaintiffs challenge conduct commencing in 2003.  *E.g.*, ¶¶39, 54, 73.

18  Neither plaintiffs' verifications nor the Complaint, however, state that plaintiffs have continuously

19  held Google stock since 2003.[39]  Instead, plaintiffs offer an identical, generic statement in each of

20  the individual verifications: "I was a shareholder at the time of the wrongdoing complained of and

21  I remain a shareholder."  The Complaint is barely more specific.  *See* ¶19 (alleging that plaintiffs

22  McKenna, Gallis, and Clem have been shareholders "continuously since 2005, 2005 and 2007,

23  respectively").[40]  Numerous courts, including this Court, have held that a derivative plaintiff must

24  actually plead the date of the plaintiff's stock purchase in order to meet the requirements of Rule

25  23.1.  *See VeriSign*, 531 F. Supp. 2d at 1202 ("plaintiffs must unambiguously indicate" that they

26  _____

27  [39] Nor could plaintiffs make such a representation.  Google did not become a publicly traded
    company until August 19, *2004*.  Ex. H at 17.

28  [40] Curiously, the individual plaintiffs' signed verifications fail to identify the basis for the
    ownership allegations in the Complaint.

1   have owned Google stock at the time of the alleged underlying wrong by stating "the dates they

2   purchased [company] stock, and whether they have continuously owned [company] stock from the

3   time of purchase up to the present"); *Sagent*, 278 F. Supp. 2d at 1096 ("*the complaint must indicate*

4   *when plaintiffs bought stock* in Sagent, and must state that they have owned stock continuously

5   since the date of the filing of the lawsuit (if they have")) (emphasis added).[41]  Plaintiffs' allegations

6   – which fail to identify any of the individual plaintiffs' purchase dates – thus fail to satisfy the

7   requirements of Rule 23.1.

8           Moreover, through their vague assertions that the earliest stock purchase purportedly

9   occurred at an unspecified time in 2005, plaintiffs concede that *none* of the plaintiffs have standing

10  to challenge conduct that occurred prior to the (unspecified) 2005 date.  *See, e.g.*, *Autodesk*, 2008

11  WL 5234264, at *12 ("A derivative plaintiff has no standing to challenge option transactions that

12  occurred prior to the time that plaintiff owned company stock."); *Sagent*, 278 F. Supp. 2d at 1096

13  ("A derivative plaintiff has no standing to sue for misconduct that occurred prior to the time he

14  became a shareholder of the corporation.") (citation omitted).  The Court should dismiss the

15  Complaint and require plaintiffs to spell out exactly the claimed basis of their standing to bring this

16  action and to specify the alleged relevant period.  *See Accuray*, 757 F. Supp. 2d at 926 ("Plaintiffs

17  do not identify *when* they purchased Accuray shares"; standing is absent where all plaintiffs did

18  not continuously own shares "throughout the entire period of Defendants' alleged wrongdoing").

19  **III.     THE COMPLAINT FAILS TO STATE A CLAIM**

20          Even if the Court were to find that plaintiffs have standing to pursue the asserted derivative

21  claims – which defendants dispute – the Complaint separately should be dismissed for failure to

22  state a claim against the Individual Defendants.  FED. R. CIV. P. 12(b)(6).

23  **A.     Applicable Standards**

24          The Supreme Court has clarified that, even under the basic pleading standards of Federal

25  Rule of Civil Procedure 8, a plaintiff's "obligation to provide the grounds of his entitle[ment] to

26

27          [41] *See also DiLorenzo v. Norton*, No. 07-144-RJL, 2009 WL 2381327, at *3 (D.D.C. July 31,
28  2009) (vague ownership allegations insufficient to satisfy Rule 23.1); *Computer Sciences*, 2007
    WL 1321715, at *15 (similar).

1  relief requires more than labels and conclusions, and a formulaic recitation of the elements of a

2  cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in

3  original) (internal marks omitted).  Instead, plaintiffs must allege "factual content that allows the

4  court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

5  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  As this Court has recognized, a "motion to

6  dismiss should be granted if the complaint fails to proffer enough facts to state a claim for relief

7  that is plausible on its face."  *VeriSign*, 531 F. Supp. 2d at 1187 (citing *Twombly*, [550 U.S. at 557-

8  58]).

9         Where, as here, certain of plaintiffs' allegations sound in fraud,[42] such claims must also be

10  pleaded with particularity under Federal Rule of Civil Procedure 9(b).  *See Vess v. Ciba-Geigy

11  Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003).  Although the Complaint does not use the

12  word "fraud," if a plaintiff alleges "a unified course of fraudulent conduct and rel[ies] entirely on

13  that course of conduct as the basis of a claim," then "the claim is said to be 'grounded in fraud'"

14  and "that claim as a whole must satisfy" Rule 9(b).  *Id.*; *cf. Sachs v. Sprague*, 401 F. Supp. 2d 159,

15  170 n.15 (D. Mass. 2005) ("Plaintiffs' claims alleging intentional breaches of fiduciary duties are

16  subject to the heightened pleading requirements of Rule 9(b).").  Plaintiffs' conclusory allegations

17  as to the Individual Defendants – which fail to provide individualized allegations as to *each*

18  defendant – fail to satisfy Rule 8, much less Rule 9(b).  *See, e.g.*, *VeriSign*, 531 F. Supp. 2d at 1219

19  (constructive fraud claim did not meet Rule 9(b) where complaint did not plead specifics as to each

20  defendant or the alleged backdating including who approved backdated options, the dates, the

21  prices, and who had authority, among other things).

22  **B.      Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty**

23         Under Delaware law, directors and officers of a corporation are afforded significant

24

25         [42] *E.g.*, ¶3 ("Despite knowing that such advertisements were in violation of the Acts, defendants caused the Company to continue to accept and promote these illegal advertisements for over five years."); ¶47 ("defendants consciously endorsed the Company's improper business strategy"); ¶49 ("These duplicitous decisions reflect defendants' knowledge that it was illegal for pharmacies to ship prescription drugs to the United States from outside the country."); ¶98 (the "challenged misconduct at the heart of this case constitutes an ongoing and continuous scheme to break the law").

1   protections in carrying out the responsibilities associated with managing the business and affairs of

2   the corporation.[43]  As explained *supra* at Section IB.4, among these protections are both statutory

3   limitations on liability and a rebuttable presumption that their actions are made on an informed

4   basis, in good faith, and in the honest belief that the actions are in the best interests of the

5   Company.  *See Sagent*, 278 F. Supp. 2d at 1093 (citations omitted); *see also Citigroup*, 964 A.2d at

6   125.  Where, as here, companies have adopted an exculpatory provision under Section 102(b)(7),

7   plaintiffs must allege facts demonstrating that the directors breached their duty of loyalty, acted in

8   bad faith, engaged in intentional misconduct, or knowingly violated the law.  *See* Section IB.4,

9   *supra.*

10          To establish a breach of the duty of loyalty, a plaintiff must plead facts demonstrating that

11   the defendant placed his own interests ahead of those of the company and its shareholders, or failed

12   to act in good faith.  *See Stone*, 911 A.2d at 370.  An alleged failure to act in "good faith," which is

13   a "subsidiary element" of the duty of loyalty, includes conduct where:

14          the fiduciary intentionally acts with a purpose other than that of advancing the best
            interests of the corporation . . . acts with the intent to violate applicable positive
15          law, or . . . intentionally fails to act in the face of a known duty to act.

16   *Id*. at 369-70 (citation omitted).

17          Parroting buzz words typically associated with the duty of loyalty, plaintiffs allege that

18   defendants "breached their duty of loyalty by consciously failing to prevent the Company from

19   engaging in the unlawful acts complained of [in the Complaint]" in the face of a "known duty to

20   act."  ¶¶117-118.  Conclusions and "formulaic recitations," however, are not enough.  *Supra* at

21   Section IIIA.  Plaintiffs must plead facts supporting an alleged breach of the duty of loyalty as to

22   *each* Individual Defendant.  They have failed to do so.[44]

23

24          [43] Because Google is a Delaware corporation, plaintiffs' claims for breach of fiduciary duty,
     abuse of control, waste, and unjust enrichment are evaluated under Delaware law.  *See VeriSign*,
25   531 F. Supp. 2d at 1214 (finding that, because the nominal defendant company was incorporated in
     Delaware, Delaware law "applie[d] to all causes of action that implicate the Company's internal
26   affairs, including the claims for breach of fiduciary duty, accounting, unjust enrichment, rescission,
     constructive fraud, corporate waste, breach of contract, gross mismanagement, and restitution").

27          [44] Plaintiffs also assert a claim for abuse of control (Count II).  The abuse of control claim is
     merely a relabeled claim for breach of fiduciary duty and fails for the same reasons.  *Cf. Clark v.*
28   *Lacy*, 376 F.3d 682, 686 (7th Cir. 2004).

1          **1.       Plaintiffs Fail to State a Claim Against the Outside Director Defendants.**

2          As explained *supra* at Section IB.2, plaintiffs' allegations that the defendants "consciously

3  failed to prevent the Company from engaging" in unlawful acts constitutes a *Caremark* claim.[45]

4  Under *Caremark*, plaintiffs must plead facts showing that the Outside Director Defendants

5  (Messrs. Doerr, Hennessy, Otellini, Shriram, and Ms. Tilghman) acted "with the state of mind

6  traditionally used to define the mindset of a disloyal director – bad faith," that is:

7          because their indolence was so persistent that it could not be ascribed to anything
           other than a knowing decision not to even try to make sure the corporation's officers
8          had developed and were implementing a prudent approach to ensuring law
           compliance.

9

10  *Desimone*, 924 A.2d at 935.  As the Delaware Chancery Court further explained in *Desimone*:

11         in order to state a viable *Caremark* claim, . . . a plaintiff must plead the existence of
           facts suggesting that the board knew that internal controls were inadequate, that the
12         inadequacies could leave room for illegal or materially harmful behavior, and that the
           board chose to do nothing about the control deficiencies that it knew existed.

13

14  *Id.* at 940.  Plaintiffs' allegations fall far short of the exacting standards set forth by *Caremark* and

15  its progeny.

16         Instead of pleading facts showing the allegedly bad faith conduct of *each* outside director,

17  plaintiffs offer the same generic allegation as to all of them:

18         [a]s an experienced business professional, [insert director name here] knew or
           recklessly disregarded that it was illegal under the Acts for pharmacies outside the
19         United States to ship prescription drugs into the United States.  Nonetheless, [director
           name] approved of internal controls that allowed pharmacies which were violating
20         federal law to advertise using AdWords.

21  *See* ¶¶24-28.  Nowhere in the Complaint, however, do plaintiffs plead facts in support of this

22  assertion with respect to each outside director.  Specifically, plaintiffs fail to plead facts regarding:

23  (1) how *each* outside director became aware of the cited "unlawful acts"; (2) when *each* outside

24  _____

25         [45] To the extent that plaintiffs seek to avoid the rigorous standards of a *Caremark* failure of
      oversight claim (*supra* at Sections I.B.1, I.B.2) by alleging that the Individual Defendants –
26    collectively – issued an "instruction that the Company break the law" (¶47) or "consciously
      endorsed the Company's improper business strategy" (*id.*), plaintiffs' failure to plead facts
27    supporting these assertions as to each individual defendant renders the allegations insufficient
      under both Rules 8 and 9(b).  *See also e.g.*, ¶98 ("[T]he Board affirmatively adopted, implemented
      and condoned a business strategy based on deliberate and widespread illegal activities lasting over
28    six years.").

1    director became aware; or (3) the role, if any, each of the outside directors played in selecting

2    third-party verification providers during the Relevant Period.  *See Sagent*, 278 F. Supp. 2d at 1094-

3    95 (allegations that fail to identify which individual defendants allegedly were responsible for

4    which acts insufficient); *cf. Guttman*, 823 A.2d at 503 ("Entirely absent from the complaint are

5    well-pled, particularized allegations of fact detailing the precise roles that these directors played at

6    the company, the information that would have come to their attention in those roles, and any

7    indication as to why they would have perceived the accounting irregularities") (footnote omitted).

8    Nor do plaintiffs plead facts demonstrating that each of the Outside Director Defendants

9    "consciously fail[ed]" to exercise oversight or deliberately failed to act in the face of known

10   deficiencies.  Missing from the Complaint is any explanation of the specific information that each

11   outside director purportedly knew and deliberately ignored.  *See* Section IIIA, *supra* .

12          Plaintiffs' reliance on the Outside Director Defendants' alleged status as "experienced

13   business professional[s]" (¶¶24-28) and certain directors' audit committee membership (¶103) is

14   equally unavailing.  Merely alleging business experience and positions does not satisfy plaintiffs'

15   pleading burden.  *See, e.g.*, *In re Coinstar Inc. S'holder Deriv. Litig.*, No. C11-133-MJP, 2011 WL

16   5553778, at *4 (W.D. Wash. Nov. 14, 2011) ("[G]eneral allegations, based simply on a

17   defendant's membership on a board or committee, without more, do not trigger liability as a matter

18   of law."); *Accuray*, 757 F. Supp.2d at 929 (rejecting allegations based upon Audit Committee

19   Charter, noting that "'liability is not measured by the aspirational standards established'" by such

20   documents) (citation omitted); *Sagent*, 278 F. Supp. 2d at 1093-94 (allegations of Audit Committee

21   membership insufficient where plaintiffs failed to "clarify which defendants, and particularly,

22   which Audit Committee Members, are alleged to have failed to maintain proper accounting

23   controls, or when"); *cf. Citigroup*, 964 A.2d at 134 (finding conclusory allegation that defendants

24   "knew or should have known" about company problems because they were "financial experts"

25   insufficient to allege knowledge); *Wood*, 953 A.2d at 142 (audit committee membership

26   insufficient to infer knowledge).

27          In sum, plaintiffs' conclusory allegations as to the Outside Director Defendants fail to

28   satisfy the requirements of Federal Rule of Civil Procedure 8, much less Rule 9(b).  *See Sagent*,

1   278 F. Supp. 2d at 1094-95 ("[P]laintiffs do not indicate which individual defendant or defendants

2   were responsible for which alleged wrongful act.").

3            **2.**      **Plaintiffs Fail to State a Claim Against the Director/Officer Defendants.**

4         Plaintiffs allege that Messrs. Brin, Page, and Schmidt served as both officers and directors

5   of Google during the Relevant Period.  ¶¶21-23.  Plaintiffs further allege that, as "top level

6   executives" at Google, these individuals "necessarily played an active role in approving the third-

7   party verification provider the Company used and the policies those third-parties [sic] chose to

8   follow."  ¶100.  Even assuming, *arguendo*, that one or more of these individuals may have had

9   some involvement in approving a third-party verification provider, plaintiffs fail to plead facts

10   identifying the "active role" purportedly played by each of these individuals, much less facts

11   showing that Messrs. Brin, Page, and Schmidt approved "the policies those third-parties chose to

12   follow."

13         With respect to Mr. Page, plaintiffs further allege that he "knew of, and allowed, the ads for

14   years," citing statements made by Peter Neronha, the Rhode Island U.S. Attorney, in an August 27,

15   2011 Wall Street Journal article.  ¶¶79, 99.  Plaintiffs fail, however, to plead facts identifying what

16   Mr. Page knew, when he knew, or what actions he may have taken.  Moreover, plaintiffs fail to

17   plead – as they must to plead a breach of the duty of loyalty – facts showing that Mr. Page

18   "intentionally act[ed] with a purpose other than that of advancing the best interests of the

19   corporation," acted "with the intent to violate applicable positive law," or "intentionally fail[ed] to

20   act in the face of a known duty to act."  *Supra* at 26 (citing *Stone*, 911 A.2d at 369-70).

21         Likewise, plaintiffs' allegation that Mr. Schmidt knew of illegal Canadian pharmacy ads

22   because of a letter he allegedly received from the National Center on Addiction and Substance

23   Abuse at Columbia University in July 2008 and a letter he allegedly received in late December

24   2008 from the Executive Director of the National Association of Boards of Pharmacy (¶98) fails to

25   show bad faith.  The Complaint says nothing about what Mr. Schmidt may or may not have known

26   prior to that time, nor do plaintiffs offer any facts regarding any responses or actions that Mr.

27   Schmidt may have taken thereafter.

28         As with the Outside Director Defendants (*supra* at 27-28), plaintiffs fail to plead any facts

1   regarding *any* individual actions or conduct by Mr. Brin, who served as President of Technology

2   during the Relevant Period (¶22); the breach of fiduciary duty claim as to him thus fails under both

3   Rules 8 and 9(b).

4           **3.      Plaintiffs Fail to State a Claim Against the Officer Defendants.**

5           The inclusion of Messrs. Arora and Pichette (the "Officer Defendants") in the Complaint

6   appears to be an afterthought.  Other than two paragraphs in "The Parties" section of the Complaint

7   describing recent positions held by these individuals at Google (¶¶29-30), the Complaint fails to

8   include a single reference to either Mr. Arora or Mr. Pichette.  Moreover, plaintiffs' allegations

9   concede that Mr. Pichette joined Google in 2008 and thus was not even employed at Google for the

10  majority of the Relevant Period.  ¶30.  Plaintiffs likewise fail to explain how the titles held by Mr.

11  Arora *after* the Relevant Period somehow subject him to liability.  Merely alleging the positions

12  held by these officers does not plead a breach of fiduciary duty claim.[46]  *See, e.g.*, *Accuray*, 757 F.

13  Supp. 2d at 935 (dismissing certain claims as to two officer defendants where plaintiffs failed to

14  include allegations suggesting that the officers were involved in the challenged conduct at issue).

15  **C.      The Waste Claim Should Be Dismissed**

16          Plaintiffs allege in conclusory fashion that "[a]s a result of the foregoing misconduct,

17  defendants have caused Google to waste valuable corporate assets."  ¶124.  Under Delaware law, it

18  is well-settled that "[t]he standard for a waste claim is high and the test is 'extreme . . . very rarely

19  satisfied by a shareholder plaintiff.'"  *In re 3COM Corp. S'holders Litig.*, No. 16721, 1999 WL

20  1009210, at *4 (Del. Ch. Oct. 25, 1999) (alteration in original) (citation omitted).  "Most often the

21  claim is associated with a transfer of corporate assets that serves no corporate purpose; or for

22  which no consideration at all is received."  *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000)

23  (citation omitted); *see id.* (claims of waste are "confined to unconscionable case where directors

24  irrationally squander or give away corporate assets.").  To prevail on their waste claim, plaintiffs

25

26          [46] Because plaintiffs fail to allege a primary breach of fiduciary claim against any of the
    Individual Defendants, much less knowing participation in any such breach, the "aiding and
27  abetting" allegations (*e.g.*, ¶¶18, 31-32) also fail.  *See Malpiede v. Townson*, 780 A.2d 1075, 1096-
    97 (Del. 2001) (plaintiffs must establish both a "breach of the fiduciary's duty" and a "knowing
28  participation in that breach by the defendants") (citation omitted).

1   "must overcome the general presumption of good faith by showing that the board's decision was so

2   egregious or irrational that it could not have been based on a valid assessment of the corporation's

3   best interests."  *White v. Panic*, 783 A.2d 543, 554 n.36 (Del. 2001).

4          Although it is not clear from the Count III allegations in the Complaint (¶¶123-125) exactly

5   which conduct purportedly constitutes waste, it appears that plaintiffs are alleging that the salaries,

6   fees, stock options, and other unidentified payments to the defendants constituted waste.  *See* ¶12

7   ("[D]efendants collectively pocketed millions in salary, fees, stock options, and other payments

8   that were not justified in light of the violations of federal law at Google that occurred during their

9   watch.  These payments wasted valuable corporate assets and unjustly enriched defendants to the

10  detriment of Google.").  Plaintiffs fail, however, to provide *any* facts regarding the actual amounts

11  of compensation, fees, stock options or "other payments."  More importantly, plaintiffs fail to

12  plead facts showing that the unidentified salaries, fees, and stock options were devoid of a

13  legitimate corporate purpose, much less that they were an "unconscionable" waste of corporate

14  assets.  *Brehm*, 746 A.2d at 263; *see also Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust

15  v. Raines*, 534 F.3d 779, 791 (D.C. Cir. 2008) ("[C]ourts rarely second-guess directors'

16  compensation and severance decisions because the 'size and structure of executive compensation

17  are inherently matters of judgment.'") (quoting *Brehm*, 746 A.2d at 263).  Plaintiffs' "payments"

18  allegations thus fall far short of satisfying the rigorous test for pleading waste.  *See Accuray*, 757 F.

19  Supp. 2d at 935 (finding that plaintiffs had "not satisfied the rigorous test for waste" where, among

20  other things, plaintiffs failed "to allege that the bonuses and compensation packages were devoid

21  of a legitimate corporate purpose").

22         To the extent that plaintiffs may contend that the amounts paid in the DOJ settlement

23  constitute waste, such a claim is equally unavailing.  Directors may be "guilty of corporate waste,

24  *only when they authorize an exchange* that is so one-sided that no business person of ordinary,

25  sound judgment could conclude that the corporation has received adequate consideration."

26  *Glazer v. Zapata Corp.*, 658 A.2d 176, 183 (Del. Ch. 1993) (emphasis added).  Nowhere in the

27  chronology of alleged misconduct in the Complaint do plaintiffs plead facts regarding any

28  affirmative decisions by the Board, much less explain how a Board decision resulted in "waste."

1   *See, e.g., King*, 648 F. Supp. 2d at 623-24 (dismissing derivative complaint where "[t]here are no

2   facts supporting the conclusory statement that the *defendants* chose to implement the new

3   [allegedly illegal] marketing scheme."); *cf. Laties v. Wise*, No. 1280-N, 2005 WL 3501709, at *2

4   (Del. Ch. Dec. 14, 2005) (rejecting waste claim as basis for demand futility where "[t]here are no

5   allegations (let alone particularized factual allegations) that the directors made a definitive

6   decision").[47]

7   **D.      The Unjust Enrichment Claim Should Be Dismissed**

8          Plaintiffs allege that "Defendants were unjustly enriched as a result of the salary, fees,

9   stock options and other payments they received while breaching their fiduciary duty owed to

10  Google."  ¶127.  To state a claim for unjust enrichment, plaintiffs must allege facts demonstrating

11  that each Individual Defendant was enriched, the plaintiff was impoverished, a relationship existed

12  between the enrichment and the loss, and there was neither justification nor a remedy provided by

13  law.  *Accuray*, 757 F. Supp. 2d at 935 (citation omitted).  In short, plaintiffs must allege facts

14  demonstrating that these defendants were unjustly enriched at the expense of Google.  *Fleer*

15  *Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988) ("Before the court may

16  properly order restitution, it must find that the defendant was unjustly enriched *at the expense of*

17  *the plaintiff*.") (emphasis added) (footnote omitted).  Plaintiffs have failed to do so here.

18         As noted *supra* at Section IIIC, plaintiffs fail to plead any facts in support of their

19  conclusory allegations regarding "salary, fees, stock options and other payments."  ¶127.  Indeed,

20  nowhere in the Complaint do plaintiffs allege the purported amounts of the challenged

21  compensation and other payments.[48]  Nor do plaintiffs plead facts showing that any compensation

22

23  [47] Although plaintiffs include Messrs. Arora and Pichette in the waste claim, plaintiffs fail to
    allege that these officers – who were not on the Board – had any involvement in decisions

24  regarding officer or director compensation.  Nor do plaintiffs provide any facts regarding any
    decisions or conduct by these individuals that purportedly led to the settlement.  Accordingly, the

25  waste claim as to the Officer Defendants is also fatally defective and should be dismissed with
    prejudice.

26  [48] Plaintiffs' failure to allege the amounts of the annual salaries received by Messrs. Brin, Page,
    and Schmidt is hardly surprising.  From 2005 through 2010, Messrs. Brin, Page, and Schmidt

27  received – per their request – *salaries of just $1 per year.*  Ex. B at 31; Ex. C at 47; Ex. D at 49;
    Ex. E at 54; Ex. F at 59; Ex. G at 45.  Moreover, with the exception of a nominal holiday bonus,

28  Messrs. Brin, Page, and Schmidt did not receive cash bonus payments or stock awards during that
    same period.  *Id.*

1    or other benefit was wrongly paid to any Individual Defendant to the detriment of Google.

2    Plaintiffs' failure to plead the elements of an unjust enrichment claim, and in particular, their

3    failure to plead facts showing how *each* Individual Defendant purportedly was unjustly enriched at

4    the *expense of Google*, is fatal to their unjust enrichment claim. *See, e.g.*, *Accuray*, 757 F. Supp.

5    2d at 935-36 ("Plaintiffs fail to allege how each Defendant was unjustly enriched at the expense of

6    Accuray.").

7                                    **CONCLUSION**

8          For the reasons stated, the Complaint should be dismissed.

9    Dated:  December 14, 2011                Respectfully submitted,

10                                            WILSON SONSINI GOODRICH & ROSATI
                                              Professional Corporation
11                                            650 Page Mill Road
                                              Palo Alto, CA  94304-1050
12

13                                            By: /s/ Boris Feldman
                                                 Boris Feldman
14                                               Attorneys for Defendants
                                                 Larry Page, Sergey Brin,
15                                               Eric E. Schmidt, L. John Doerr, John L.
                                                 Hennessy, Paul S. Otellini, K. Ram Shriram,
16                                               Shirley M. Tilghman, Nikesh Arora, Patrick
                                                 Pichette, and Nominal Party Google Inc.
17

18

19

20

21

22

23

24

25

26

27

28