BORIS FELDMAN, State Bar No. 128838
Email: boris.feldman@wsgr.com
ELIZABETH C. PETERSON, State Bar No. 194561
Email: epeterson@wsgr.com
CHERYL W. FOUNG, State Bar No. 108868
Email: cfoung@wsgr.com
DIANE M. WALTERS, State Bar No. 148136
Email: dwalters@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100

Attorneys for Defendants
Larry Page, Sergey Brin,
Eric E. Schmidt, L. John Doerr, John L.
Hennessy, Paul S. Otellini, K. Ram Shriram,
Shirley M. Tilghman, Nikesh Arora, Patrick
Pichette, and Nominal Party Google Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| In re GOOGLE INC. SHAREHOLDER DERIVATIVE LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Master File No. CV-11-04248-PJH<br><br>DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT<br><br>DATE: April 4, 2012<br>TIME: 9:00 a.m.<br>JUDGE: Hon. Phyllis J. Hamilton |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ....................................................................................................................1

ARGUMENT ........................................................................................................................2

I.      THE COMPLAINT SHOULD BE DISMISSED BECAUSE DEMAND IS NOT
        EXCUSED ................................................................................................................2

        A.      A Majority of the Board Does Not Face a Substantial Likelihood of
                Liability Based on Knowledge, Participation, or Failure of Oversight ..................2

                        No Core Operations at Issue ...........................................................3

                        The NPA Makes No Reference to Any Individual Defendant....................3

                        The Red Flags Were Not Communicated to a Board Majority....................3

                        No Allegation that a Board Majority Knew of Alleged Deficiencies
                                by Third Party Verification Providers ...............................................4

                        No Allegation that a Board Majority Assisted in Circumventing the
                                Verification Process or Had Knowledge of Employee
                                Misconduct .................................................................................5

                        Plaintiffs' Authorities Are Inapposite ...............................................6

        B.      There Was No Decision by a Board Majority and the Business Judgment
                Rule Is Inapplicable.................................................................................9

        C.      The Complaint Fails to Raise a Reasonable Doubt that a Majority is
                Independent ..........................................................................................10

                        The Directors Do Not Lack Independence Based on Executive Roles
                                and Voting Power...........................................................................10

                        Directors Do Not Lack Independence Based on Business
                                Relationships .................................................................................11

                        Plaintiffs Do Not Show That Any Director Is Beholden Based on
                                University Donations .......................................................................12

II.     PLAINTIFFS FAIL TO ALLEGE SUFFICIENTLY THAT THEY HAVE
        STANDING ..............................................................................................................12

III.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM ...................................15

        A.      Plaintiffs' Breach of Fiduciary Duty Claim Fails .................................................15

                1.      Plaintiffs Fail to State a Claim Against the Outside Directors....................15

                2.      Plaintiffs Fail to State a Claim Against the Director/Officer
                        Defendants. .................................................................................18

        3.      Plaintiffs Concede the Failure to State a Claim Against the Officer Defendants. ..................................................................................18

   B.    Plaintiffs Fail to Satisfy the Requirements for Pleading Waste ...............................19

   C.    The Unjust Enrichment Claim Should Be Dismissed ................................................19

CONCLUSION ..................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bateson v. Magna Oil Corp.*,
        414 F.2d 128 (5th Cir. 1969) ................................................................. 14

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*,
        845 A.2d 1040 (Del. 2004) ................................................................. 11

*Bell Atl. Corp. v. Twombly*,
        550 U.S. 544 (2007) ................................................................. 15, 20

*Bilunka v. Sanders*,
        No. C 93-20737 JW, 1994 WL 447156 (N.D. Cal. Mar. 1, 1994) ................. 14

*Brambles U.S.A. Inc. v. Blocker*,
        731 F. Supp. 643 (D. Del. 1990) ........................................................ 14

*Brehm v. Eisner*,
        746 A.2d 244 (Del. 2000) ................................................................. 19

*Cadle v. Hicks*,
        272 F. App'x 676 (10th Cir. 2008) ..................................................... 14

*Desimone v. Barrows*,
        924 A.2d 908 (Del. Ch. 2007) ........................................................ 6, 14

*Fosbre v. Matthews*,
        No. 3:09-CV-0467-ECR, 2010 WL 2696615 (D. Nev. July 2, 2010) ........... 11

*Guitierrez v. Logan*,
        No. 02-1812-STL, 2005 WL 2121554 (S.D. Tex. Aug. 31, 2005) ............... 11

*Hawaii Laborers Pension Fund v. Farrell*,
        No. CV 06-06935 ODW, 2007 WL 5255035 (C.D. Cal. Aug. 23, 2007) ....... 13, 14

*In re Abbott Labs. Deriv. S'holders Litig.*,
        325 F.3d 795 (7th Cir. 2001) ........................................................ *passim*

*In re Accuray, Inc. S'holder Deriv. Litig.*,
        757 F. Supp. 2d 919 (N.D. Cal. 2010) .............................................. 3, 13

*In re Allergan, Inc., S'holder Deriv. Litig.*,
        No. 10-01352-DOC, 2011 WL 1429626 (C.D. Cal. Apr. 12, 2011) ............. 10

*In re Am. Int'l Group, Inc.*,
        965 A.2d 763 (Del. Ch. 2009),
        *aff'd sub nom. Teachers' Ret. Sys. v. PriceWaterhouseCoopers LLP*,
        11 A.3d 228 (Del. 2011) ................................................................. 6

*In re Autodesk, Inc., S'holder Deriv. Litig.*,
        No. C-06-7185-PJH, 2008 WL 5234264 (N.D. Cal. Dec. 15, 2008) .......... 6, 8

*In re Bank of New York Deriv. Litig.*,
    320 F.3d 291 (2d Cir. 2003) ................................................................... 14

*In re Bidz.com, Inc. Deriv. Litig.*,
    773 F. Supp. 2d 844 (C.D. Cal. 2011) ...................................................... 10

*In re Caremark Int'l, Inc. Deriv. Litig.*,
    698 A.2d 959 (Del. Ch. 1996) ......................................................... 3, 8, 16

*In re Citigroup Inc. S'holder Deriv. Litig.*,
    964 A.2d 106 (Del. Ch. 2009) ..................................................................... 8

*In re Coinstar Inc. S'holder Deriv. Litig.*,
    No. C11-133-MJP, 2011 WL 5553778 (W.D. Wash. Nov. 14, 2011) ......... 3, 6

*In re Intel Corp. Deriv. Litig.*,
    621 F. Supp. 2d 165 (D. Del. 2009) ................................................... 2, 8, 10

*In re Massey Energy Co. Deriv. & Class Action Litig.*,
    C.A. No. 5430-VCS, 2011 WL 2176479 (Del. Ch. May 31, 2011) ........ 16, 17

*In re Maxim Integrated Products, Inc.*,
    No. C 06-0334 JW, 2007 WL 2745805 (N.D. Cal. July 25, 2007) .............. 14

*In re Merrill Lynch & Co., Research Reports Sec. Litig.*,
    No. 02 MDL 1484, 2008 WL 2594819 (S.D.N.Y. June 26, 2008) ............... 15

*In re Oracle Corp. Deriv. Litig.*,
    824 A.2d 917 (Del. Ch. 2003) ................................................................... 11

*In re Pfizer Inc. S'holder Deriv. Litig.*,
    722 F. Supp. 2d 453 (S.D.N.Y. 2010) ........................................... 6, 7, 8, 16

*In re Sagent Tech., Inc. Deriv. Litig.*,
    278 F. Supp. 2d 1079 (N.D. Cal. 2003) ............................................. *passim*

*In re SFBC Int'l, Inc. Sec. & Deriv. Litig.*,
    495 F. Supp. 2d 477 (D.N.J. 2007) ............................................................. 8

*In re Veeco Instruments, Inc. Sec. Litig.*,
    434 F. Supp. 2d 267 (S.D.N.Y. 2006) ........................................................ 8

*In re VeriSign, Inc., Deriv. Litig.*,
    531 F. Supp. 2d 1173 (N.D. Cal. 2007) ............................................. *passim*

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) ................................................................... 15

*Lynch v. Rawls*,
    429 F. App'x 641 (9th Cir. 2011) .............................................................. 12

*MacLary v. Pleasant Hills, Inc.*,
    109 A.2d 830 (Del. Ch. 1954) ................................................................... 14

*McCall v. Scott*,
  239 F.3d 808 (6th Cir.), *amended*, 250 F.3d 997 (6th Cir. 2001) ..........................................8

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Raines*,
  534 F.3d 779 (D.C. Cir. 2008) ..........................................................................................19

*Stone ex rel. AmSouth Bancorp. v. Ritter*,
  911 A.2d 362 (Del. 2006)................................................................................................3, 8

*Travis v. Mittelstaedt*,
  No. CV 06-2341 LEW GGH, 2008 WL 755842 (E.D. Cal. Mar. 19,
  2008) ...................................................................................................................................13

## STATUTES, RULES AND REGULATIONS

Del. Code Ann. tit. 8, §102(b)(7).....................................................................................8

Fed. R. Civ. P. 8 ........................................................................................................15, 17

Fed. R. Civ. P. 9(b) ..........................................................................................................15

Fed. R. Civ. P. 23.1 .....................................................................................................*passim*

Fed. R. Civ. P. 23.1(b)(1)...........................................................................................13, 15

## MISCELLANEOUS

7C Charles A. Wright *et al.*, Federal Practice and Procedure:  Civil
  (3d ed. 2007 & 2011 Supp.) .............................................................................................14

**INTRODUCTION**

Plaintiffs' Opposition to Defendants' Motion to Dismiss ("Opp.") is a boilerplate opposition that is disconnected to the allegations asserted in the Complaint. Time after time, the Opposition studiously ignores Defendants' Opening Brief ("DOB"). Defendants painstakingly reviewed each of the red flags and purported internal misconduct that plaintiffs allege show knowledge of wrongdoing. DOB11-16. Defendants showed that at most, plaintiffs' allegations singled out only two of nine directors with possible knowledge of improper practices concerning Canadian online pharmacy advertising. Plaintiffs, however, must show at least five directors, a board majority, face a substantial likelihood of liability. The purported knowledge of two directors cannot be imputed to any other director to show demand futility as to five directors. *Id.* at 15-16. Plaintiffs do not respond. Instead, their Opposition is rife with one unfounded conclusion after another, culminating in this spin:

> a majority of the Google Board knew of the illegal pharmacy ads, approved the continuation of the Canadian ads while stopping ads from other countries, and chose not to stop issuing the Canadian ads despite myriad warnings that they were illegal.

Opp. at 20-21. Plaintiffs' careless statements are built on a house of cards whose foundation is bereft of factual support. A comparison between the Opposition's conclusory assertions and the facts alleged in the Complaint leads inexorably to the conclusion that a majority of Google's Board did not participate in or have knowledge of the Canadian online pharmacy advertising practices, or consciously fail to prevent employee misconduct. That conclusion is unsurprising, given the revenues from this part of Google's business were a minute fraction of Google's overall advertising revenues during the time period. Plaintiffs have failed to excuse demand on the purported basis that a majority faces a substantial likelihood of liability. *See* Section IA, *infra*.

Recognizing their inability to meet this standard, plaintiffs suggest that demand futility turns on whether Google's Board is entitled to the protection of the business judgment rule. But that standard would only apply if Google's Board had made *a decision* with respect to the Canadian online pharmacy advertising practices. The Complaint does not show a board majority was even knowledgeable about the issue, much less that it made a decision about it. Courts, including this Court, have declined to apply the business judgment standard in similar contexts.

1 Plaintiffs do not even address this Court's decision on the topic. *See* Section IB, *infra*.

2 Plaintiffs similarly fail to excuse demand on the basis that a majority lacks independence.

3 Plaintiffs do not even respond to defendants' arguments on the supposedly suspect business

4 relationships and charitable donations alleged in the Complaint, or address why the outside

5 directors are supposedly beholden to the inside directors. *See* Section IC, *infra*.

6 Because plaintiffs have not met the stringent pleading burdens to excuse demand, the Court

7 need not reach the remaining arguments. Plaintiffs, however, also fail to plead the dates on which

8 they purchased Google stock. The Complaint thus does not satisfy the strict ownership

9 requirements of Federal Rule of Civil Procedure 23.1 and should also be dismissed for failure to

10 establish standing to pursue the asserted derivative claims. *See* Section II, *infra*. Finally, even if

11 the Court were to find that plaintiffs sufficiently pleaded standing, the Complaint should be

12 dismissed on the independent ground of failure to state a claim. *See* Section III, *infra*.

13 <center>**ARGUMENT**</center>

14 **I. THE COMPLAINT SHOULD BE DISMISSED BECAUSE DEMAND IS NOT EXCUSED**

15

16 **A. A Majority of the Board Does Not Face a Substantial Likelihood of Liability Based on Knowledge, Participation, or Failure of Oversight**

17

18 The Complaint fails to raise a reasonable doubt that a majority is disinterested where five

19 or more directors do not face a substantial likelihood of liability. The Complaint is conclusory,

20 contradictory, and inconsistent, alleging simultaneously that the directors "consciously endorsed

21 the Company's improper business strategy" while "failing to act," and asserting only conclusory

22 and deficient allegations of knowledge and participation. DOB9.[1] The allegations do not show

23 that a board majority had "'clear notice of wrongdoing.'" *VeriSign*, 531 F. Supp. 2d at 1195.

24 Plaintiffs' "response" is to ignore their own deficient allegations and defendants' arguments.

25 

26 [1] *See In re VeriSign, Inc., Deriv. Litig.*, 531 F. Supp. 2d 1173, 1195 (N.D. Cal. 2007) (noting pleading contradictions that board took no action while also alleging that the board authorized an

27 independent review of stock option grants); *In re Intel Corp. Deriv. Litig.*, 621 F. Supp. 2d 165, 172 (D. Del. 2009) (noting confusion in alleged failure of oversight and alleged decision not to

28 act).

**No Core Operations at Issue**.  The Opposition asserts that "the Director Defendants were subjected to a prolonged onslaught of warnings that the Company's *core operations* were breaking federal laws."  Opp. at 15 (emphasis added); *see id.* at 21.  This is false.[2]  The advertising by online Canadian pharmacies was not a "core operation" for Google.  The $500 million forfeiture, which accounted for both Google's revenues and those of the Canadian online pharmacies, represents ***just 0.61% of Google's $81 billion*** in advertising revenues during the relevant time period from 2003-2009.  ¶11; Ex. H at 74; Ex. I at 69; Ex. J at 65.  A board is not required to have "detailed information about all aspects of the operation of the enterprise."  *In re Caremark Int'l, Inc. Deriv. Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996); DOB15 & n.28.[3]  Plaintiffs ignore these facts.

**The NPA Makes No Reference to Any Individual Defendant**.  The Opposition erroneously asserts that "Google acknowledged the ***Individual Defendants'*** wrongdoing *by signing a non-prosecution agreement* ("NPA") with the DOJ" and that the "Company was forced to pay a $500 million fine in connection with the NPA because of the ***Individual Defendants'*** misconduct."  Opp. at 1, 5 (emphasis added).  The NPA, however, was entered with Google alone, and ***does not mention a single individual defendant***.  DOB5, 14-15.[4]  Plaintiffs ignore this fact.

**The Red Flags Were Not Communicated to a Board Majority**.  The Opposition asserts that "each of the Director Defendants was continuously inundated with information about the illegal Canadian pharmacy advertisements."  Opp. at 1, 4, 13, 16.  This contention is belied by the Complaint.  Defendants addressed each red flag, including the letters from the National Association of Boards of Pharmacy and its study;[5] Congressional testimony; a letter from Joseph

---

[2] The standard under Rule 23.1 to excuse demand is far more rigorous than that required to withstand a motion to dismiss under Rule 12(b)(6), and plaintiffs cannot rely on unvarnished conclusions.  DOB6.

[3] By the same token, courts repeatedly reject that directors should have known about matters relating to a company's core business.  *See In re Coinstar Inc. S'holder Deriv. Litig.*, No. C11-133-MJP, 2011 WL 5553778, at *4 (W.D. Wash. Nov. 14, 2011); *In re Accuray, Inc. S'holder Deriv. Litig.*, 757 F. Supp. 2d 919, 928 (N.D. Cal. 2010).

[4] *See Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 366 (Del. 2006) (affirming dismissal notwithstanding filing of one count information against bank and payment of over $50 million in fines; "In neither the Statement of Facts nor anywhere else did the [Deferred Prosecution Agreement] ascribe any blame to the Board or to any individual director.").

[5] Notably, the March 13, 2003 letter does not address or criticize Google's practices and the
(continued...)

A. Califano; an article in the Washington Post that made no mention of Canadian pharmacies; and a 2009 article by a California professor. DOB11-12. As shown, the Complaint alleged that only one of nine directors – Mr. Schmidt – received two letters in 2008; it did not allege that any of the other materials was communicated to him or to any of the other eight directors. *Id.* Plaintiffs do not respond.

**No Allegation that a Board Majority Knew of Alleged Deficiencies by Third Party Verification Providers**. As defendants showed, Google hired two third-party verification providers, SquareTrade and PharmacyChecker, to assist with compliance. DOB13-14. The Complaint alleges only that the three inside directors "necessarily played an active role in approving" these verification providers and their policies. ¶100. The Complaint alleges not a single fact to show that any other director, much less a board majority, played any role with these providers or were knowledgeable about their processes, policies, and alleged defects in their services. There are no facts that a board majority "knew that unlicensed online pharmacies *circumvented* the verification process." Opp. at 3 (emphasis altered).

The Complaint and Opposition (Opp. at 4) cite to two occasions where Google employees testified to Congress about Google's online pharmaceutical advertising. Even assuming *arguendo* that the directors knew about that testimony, *but see* ¶¶44, 51, 101(c), the testimony would show that Google had taken numerous measures to protect against unscrupulous pharmaceutical advertisements. Google policy required advertisers to adhere to its internal standards as a condition for using AdWords; required websites advertising prescription drugs to specify the prescription requirements from a licensed physician; and prohibited ads promoting controlled substances. Ex. L at 263-64, 266.[6] SquareTrade required pharmacies to comply with all applicable laws and industry standards, in the jurisdictions where the pharmacy and consumer are located. *Id.*

---

(...continued from previous page)
2008 study does not mention Google.

[6] Exhibits L and M are attached to the Supplemental Declaration of Cheryl W. Foung in Support of Reply re Motion to Dismiss. The Complaint expressly refers to Congressional testimony of Sheryl Sandberg and Andrew McLaughlin, ¶¶51, 101(c), and even quotes from the former. ¶101(c). The testimony in these exhibits may be considered on this Motion under the incorporation by reference doctrine, as set forth in Defendants' Request for Judicial Notice filed December 14, 2011 (Dkt. 29).

at 265.[7]  The pharmacies and their pharmacists had to be licensed by an appropriate governmental entity, which licenses SquareTrade monitored; had to require a receipt and verification of a prescription from the customer's healthcare practitioner; and guarantee signature of deliveries by an adult.  *Id.*  Google prohibited pharmacy advertisers without a SquareTrade I.D. from running ads in the U.S.  *Id.* at 267.  By the time Mr. McLaughlin testified on December 13, 2005, Google had rejected more than 30,000 pharmaceutical-related advertisements.  Ex. M at 196.  Nothing in the Congressional testimony suggests that Google was not appropriately responding to the dangers from improper advertising by online pharmacies.  *See* DOB13 & n.23.

**No Allegation that a Board Majority Assisted in Circumventing the Verification Process or Had Knowledge of Employee Misconduct**.  Having failed to demonstrate a majority of the Board even knew of SquareTrade and PharmacyChecker's procedures or alleged deficiencies, plaintiffs improperly leap to the conclusion that "the ***Director Defendants*** permitted Company employees to allow Canadian online pharmacies to evade the controls and, in turn, violate federal law."  Opp. at 17 (emphasis added).  Plaintiffs assert that "the ***Individual Defendants*** and other Google employees ***actively*** helped Canadian advertisers [circumvent the verification process]" by "'proactively adjusting creative and optimizing [a large Canadian pharmacy's ads] with Square[]Trade policy in mind.'"  *Id.* at 3-4 (emphasis added).  Plaintiffs' "example" quotes from the April 23, 2004 email from an unidentified employee located in Canada.  Defendants addressed this email (DOB14), together with each of the other four employee emails mentioned in the Complaint.  *Id.*  Neither the Complaint nor the NPA states that any of these emails was sent to any director.  *Id.*  Plaintiffs do not respond.

Rather than respond to defendants' detailed showing that none of the red flags or instances of employee misconduct is even alleged to have been brought to the attention of a board majority (Opp. at 12), plaintiffs resort to one inference upon another:

> Since the Code of Conduct obligated Schmidt and Page to inform the rest of the Board about the Company's wrongdoing . . . it can reasonably *be inferred* that they did so.  Opp. at 14-15 (emphasis added).

---

[7] SquareTrade's License Pharmacy Program had been reviewed and approved by the National Community Pharmacists Association (Ex. L at 265), an organization representing more than 23,000 independent community pharmacies across the U.S.

> *[T]he Board* was affirmatively on notice *because . . . Google knew in 2003* that online Canadian pharmacies were advertising prescription drugs through AdWords in violation of the Acts. *Id.* at 12 (emphasis added).

> *[E]ach director should have known* that Google's policy of soliciting Canadian pharmacy advertising was illegal, and if they somehow did not know, they were informed about the wrongdoing by those directors that did know. *Id.* at 13 (emphasis added).

*See also* ¶99 (relying on inference that Messrs. Schmidt and Page "would have informed the Board about the Canadian pharmacy problem"). These inferences are not consistent with Delaware law:

> Delaware law does not permit the wholesale imputation of one director's knowledge to every other for demand excusal purposes.

*Desimone v. Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007).[8] Nor can employee misconduct without more be imputed to a board majority.[9]

**Plaintiffs' Authorities Are Inapposite**. Plaintiffs' allegations do not show that there was a "flood of information [that] reached the Board." Opp. at 12. Thus, plaintiffs' extensive reliance (*id.* at 10-11, 15, 17, 27) on *In re Pfizer Inc. Shareholder Derivative Litigation*, 722 F. Supp. 2d 453 (S.D.N.Y. 2010), is misplaced, particularly where *Pfizer* involved "unique facts" not present here. *Id.* at 461. Pfizer paid $2.3 billion in criminal fines and penalties for illegal off-label marketing of certain drugs. Because of prior settlements of similar misconduct by subsidiaries prior to Pfizer's acquisition, Pfizer was "acutely aware of the need to prevent such illegal practices." *Id.* at 455. The settlements resulted in Pfizer's entry into successive and increasingly stringent corporate integrity agreements, ***approved by the board***, ***requiring the board*** to "create

---

[8] *See Coinstar*, 2011 WL 5553778, at *3 (no directorial liability for officers' actionable statements in absence of facts showing knowledge of those statements); *VeriSign*, 531 F. Supp. 2d at 1193-94 (allegation that board "'should have been aware'" of misdated grants was "wholly insufficient to support a claim of demand futility"); DOB16; *cf. In re Am. Int'l Group, Inc.*, 965 A.2d 763, 776-78 (Del. Ch. 2009) (where SLC had found insiders had disabling conflict following $3.5 billion restatement and shareholders pursued direct claims against high level officers, court rejected argument under Rule 12(b)(6) standard that company was not defrauded based on imputing knowledge *from* insiders *to the corporation*), *aff'd sub nom. Teachers' Ret. Sys. v. PriceWaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011).

[9] *See In re Autodesk, Inc., S'holder Deriv. Litig.*, No. C-06-7185-PJH, 2008 WL 5234264, at *10 (N.D. Cal. Dec. 15, 2008) ("plaintiffs plead no facts showing that anyone other than staff involved in the process knew how [stock options were] administered – and certainly not that any of the outside directors did"); *see* DOB15 nn.26, 27.

and implement a compliance mechanism that would bring information about illegal marketing activities ***to the board's attention***." *Id.* at 455, 461 (emphasis added). The complaint cited "a large number of reports made to members of the board" – of the earlier settlements, FDA violation notices and warning letters, reports given to compliance personnel about continuing kickbacks and off-label marketing, and allegations of *qui tam* lawsuits. *Id.* at 460. This occurred at "the same time that the board was obligated" under the corporate integrity agreements "to pay special attention to these very problems." *Id.* at 460-61. The "wrongdoing . . . was committed in the face of the board's repeated promises to closely monitor and prevent such misconduct," and not to rely on management:

> These [corporate integrity agreements] imposed affirmative obligations on Pfizer's board that went *well beyond the basic fiduciary duties required by Delaware law* . . . [T]his reporting requirement . . . *guarantee[d] that each member of the board was bombarded with allegations* of continuing misconduct of the very kind that the prior settlements looked to the board to prevent.

*Id.* at 461 (emphasis added).

The decision in *In re Abbott Laboratories Derivative Shareholders Litigation*, 325 F.3d 795 (7th Cir. 2001) (*see* Opp. at 9-12, 17, 27, 28 n.26, 29) is also markedly distinguishable. Abbott entered a consent decree with the FDA, paid a $100 million fine, and withdrew 125 types of medical diagnostic test kits from the market, following a six year period in which the FDA found repeated regulatory violations in Abbott's diagnostic division which ***represented 22% of Abbott's sales***. The FDA had conducted 13 separate inspections of two manufacturing facilities, sent Form 483s following discussion with company representatives, and issued four formal certified Warning Letters to the division president, three of which were also sent to Abbott's CEO/chairman and its successor CEO/successor chairman. The fourth Warning Letter was sent following a failed compliance plan between the FDA and Abbott, which plan the FDA terminated. The FDA met at least 10 times with company representatives, including the new CEO/chairman. Abbott also issued a press release reporting the FDA's continued disagreements with the company's compliance efforts. 325 F.3d at 799-800, 808. The Court concluded that demand was excused where the board knew of the violations of law and intentionally took no steps to prevent or remedy the situation. *Id.*

at 809.[10]  The intense board involvement evidenced in *Pfizer* and board knowledge evidenced in *Abbott* are markedly absent here.

Interestingly, as defendants predicted (DOB3, 8-9), plaintiffs argue that this is not a *Caremark* case because the directors allegedly "knew of the alleged wrongdoing" and were not "'blamelessly unaware.'"  Opp. at 19-20.  But plaintiffs have not pleaded knowledge of a board majority with any semblance of particularity.  And, plaintiffs misunderstand the holdings in *Caremark*.  A *Caremark* claim **requires knowledge to be actionable**.  The Delaware Supreme Court has held that "imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations."  *Stone*, 911 A.2d at 370.  A "scienter-based standard applies" to *Caremark* claims.  *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 123 n.47, 125 (Del. Ch. 2009); DOB10.[11]

Plaintiffs endeavor to sweep away dozens of defendants' relevant authorities excusing demand.  *Compare* Opp. at 21, *with* DOB7-8 & nn.8-12.  This Court should reject that effort. *Caremark* is indeed relevant here.  Moreover, plaintiffs have not shown that defendants' authorities are factually distinguishable.  The case at bar does not involve Google's "core operations," and a majority of Google's Board did not "receive[] numerous warnings" or "fail[] . . . to address the

---

[10] Notably, the court in *Intel* distinguished *Abbott* and plaintiffs' other authorities (Opp. at 7, 9-11) as turning on "a much more compelling collection of 'red flags'" and thus "not persuasive." 621 F. Supp. 2d at 176-78 & n.4.  *Cf. In re SFBC Int'l, Inc. Sec. & Deriv. Litig.*, 495 F. Supp. 2d 477, 485-86 (D.N.J. 2007) (demand not excused where "misconduct related to the core of" company's clinical drug testing, including over 80 citations for unsafe conditions of primary testing facility and ultimate condemnation of site, located at company headquarters); *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 272, 276-77 (S.D.N.Y. 2006) (demand excused where audit committee, despite meeting 27 times, slashed accounting staff instead of taking remedial action in response to significant acquisition, restated financials, admitted internal control deficiencies, and repeated export control violations); *McCall v. Scott*, 239 F.3d 808, 819-20, 822-24 (6th Cir.) (certain directors had managed the health care organizations acquired where violations had occurred; audit committee reports showed discrepancies from cost reports submitted to government; federal agents raided 35 facilities nationwide; New York Times investigated billing practices; SEC filings described *qui tam* complaint's allegations of illegal billing practices), *amended*, 250 F.3d 997 (6th Cir. 2001).

[11] Plaintiffs' failure to acknowledge that *Caremark* claims require scienter leads them to misinterpret defendants' argument under Del. Code Ann. tit. 8, §102(b)(7).  Defendants have not argued that §102(b)(7) requires **dismissal** here; rather, Google's Certificate of Incorporation **requires heightened pleading to overcome** those protections, which pleading requirements plaintiffs have not met.  *Compare* DOB18, *with* Opp. at 24.  *See Autodesk*, 2008 WL 5234264, at *10 (plaintiffs must meet "a scienter-based standard" under exculpatory clause).

misconduct despite their awareness." Opp. at 21. It is the plaintiffs, rather than defendants, who have "cite[d] inapposite authority." *Id.* at 19.

## B. There Was No Decision by a Board Majority and the Business Judgment Rule Is Inapplicable

As shown, there was no knowledge by a board majority about the advertising practices by Canadian pharmacies. Yet, the Opposition asserts that the "Individual Defendants made a conscious decision that the Company's ongoing business strategy was to sponsor ads from Canadian online pharmacies in violation of federal law." Opp. at 3.[12] Conspicuously absent are any facts that support there was such action by Google's Board. ***There is no citation to a Board meeting, Board resolution, or vote by the Board, as a whole or as a committee, at any time***. Plaintiffs never explain how the alleged failures to act[13] and absence of knowledge can be transmuted into an affirmative decision to "consciously permit[] Google . . . 'to break the law.'" *Id.* at 9.

Where no board decision is implicated, courts, including this Court, have rejected invocation of the business judgment rule and the corresponding two-prong *Aronson* test.[14] DOB6-7, 17-18. Plaintiffs assert that the *Rales* one-prong test cannot apply here because there is "a conscious decision to refrain from acting." Opp. at 6-7 & n.6, 9 n.8 (citing, *inter alia*, *Abbott*, 325 F.3d at 809). Plaintiffs completely ignore *VeriSign* despite similar contentions. *Compare* Opp. at 7 ("breaking the law . . . cannot be[] considered a valid exercise of business judgment"), *with* *VeriSign*, 531 F. Supp. 2d at 1188-89 (arguing that "the granting of backdated options can never be the product of a good faith exercise of business judgment"). This Court refused to apply *Aronson* where the claim was that directors "authorized, approved, [or] ratified" backdated stock option grants. *VeriSign*, 531 F. Supp. 2d at 1192-93. This Court stated:

---

[12] *See* Opp. at 16 ("in 2004 the Director Defendants caused Google to block pharmacy advertisements from foreign countries other than Canada but inexplicably continued to accept advertisements from Canadian pharmacies").

[13] *See* ¶63 ("defendants did nothing to prevent or monitor any changes to the online pharmacies' geo-targeting practices"), ¶¶97, 101, 103, 118; DOB8-9, 17.

[14] *See* *VeriSign*, 531 F. Supp. 2d at 1188-89; *In re Sagent Tech., Inc. Deriv. Litig.*, 278 F. Supp. 2d 1079, 1087 (N.D. Cal. 2003).

> [T]he facts as pled show that a majority of the Board members that would have considered the demand were not involved in any decision to backdate the option grants. Thus, the second prong of the *Aronson* test is inapplicable.

*Id.* at 1189.[15]

Similarly, in *In re Bidz.com, Inc. Derivative Litigation*, 773 F. Supp. 2d 844 (C.D. Cal. 2011), plaintiffs alleged that the company engaged in deceptive shill bidding to inflate the prices of the company's products in online auctions, and that the individual defendants knew about the practice but took no action to prevent it. The plaintiffs, represented by the same law firm as here, made a virtually identical assertion, that the *Bidz.com* board had "'actual knowledge of illegal wrongdoing' without any attempt to 'prevent or remedy the situation.'"[16] *Id.* at 852. The court held that Delaware law requires application of *Rales*:

> No matter how Plaintiffs frame their arguments . . . the Amended Complaint alleges demand futility based on the inaction of the Board of Directors and Delaware law requires that the Court apply the *Rales* test in the absence of a board decision or transaction to determine whether pre-suit demand would have been futile.

*Id.* at 853. The court also rejected *Abbott's* application of *Aronson* as "not faithful to existing Delaware law." *Id.* at 853 n.3 (citing cases); *id.* at 852. *See Intel*, 621 F. Supp. 2d at 170-71, 173 (rejecting *Abbott*; "'The Court cannot address the business judgment of an action not taken and, therefore, should concern itself with what is now known as the *Rales* test.'") (citation omitted). *See also* DOB17-18. The business judgment rule has no application in this case.

## C. The Complaint Fails to Raise a Reasonable Doubt that a Majority is Independent

Plaintiffs make only a half-hearted attempt to address the directors' supposed absence of independence, relying instead on boilerplate propositions.

**The Directors Do Not Lack Independence Based on Executive Roles and Voting Power**. Contrary to plaintiffs' claim, defendants do not concede that the three inside directors

---

[15] *See In re Allergan, Inc., S'holder Deriv. Litig.*, No. 10-01352-DOC, 2011 WL 1429626, at *6 (C.D. Cal. Apr. 12, 2011) (rejecting *Aronson* in absence of showing board decision to embrace policy supporting off-label marketing).

[16] *Cf.* Opp. at 9 ("the Director Defendants consciously permitted Google to engage in an 'ongoing and continuous scheme to break the law'" and "took no steps to prevent . . . the Company's illegal practices") (citation omitted).

"lack independence due to their executive roles." Opp. at 22 n.19.[17]   Courts, including this one,

have rejected that proposition, finding that otherwise, "every inside director would be disabled

from considering a pre-suit demand." *Sagent*, 278 F. Supp. 2d at 1089.[18]   Similarly, as to voting

power, a "stockholder's control of a corporation does not excuse presuit demand . . . without

particularized allegations . . . that the directors are beholden to the stockholder." *Beam ex rel.*

*Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1054 (Del. 2004) (failure to

show directors were beholden to Martha Stewart, who held 94% of voting power); *see* DOB22.

Here, plaintiffs simply recite the voting power held by Page, Brin, and Schmidt, but do not show

how a single outside director felt beholden to any or all of them.  Opp. at 22.[19]   Instead, plaintiffs

suggest that Google is beholden, for example, by using Schmidt's airplane. *Id.* at 22 n.20.  But

Google pays Schmidt only "at or below market rates for the charter of similar aircraft," which is

"less than the actual operation costs incurred by [Schmidt]" (Ex. G at 28),  belying that he controls

Google to his own advantage, and saying absolutely nothing about the six outside directors.

      **Directors Do Not Lack Independence Based on Business Relationships**.  Plaintiffs

argue that the mere "existence of [business] interests" is sufficient to challenge independence.

Opp. at 23.  The Delaware Supreme Court ***squarely rejected*** that proposition. *Beam*, 845 A.2d at

1050.  Plaintiffs must show the relationship is of a "bias-producing nature," such that "the non-

interested director would be more willing to risk his or her reputation than risk the relationship

with the interested director." *Id.* at 1050, 1052.  Plaintiffs have not done so.  None of the

Complaint's allegations about Google's investments with Kleiner Perkins assert the materiality of

---

[17] Insiders are not disqualified on the basis of distinctly different independence requirements under the New York Stock Exchange and NASDAQ rules. *Cf. In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 941 n.62 (Del. Ch. 2003) (stock exchange rules on independence are distinct from inquiries in derivative actions).

[18] *See Guitierrez v. Logan*, No. 02-1812-STL, 2005 WL 2121554, at *11 (S.D. Tex. Aug. 31, 2005) (same); *Fosbre v. Matthews*, No. 3:09-CV-0467-ECR, 2010 WL 2696615, at *7 (D. Nev. July 2, 2010) ("Demonstrating that a director is principally employed by a corporation, however, is not enough to establish that director is incapable of impartially considering a demand on that corporation.") (citations omitted).

[19] Notably, *Beam* rejects plaintiffs' suggestion that demand is excused where an officer with voting power elects other directors. *Compare* Opp. at 22, *with Beam*, 845 A.2d at 1054 n.37 ("control of a corporation by a majority stockholder who nominates or elects the directors is not sufficient to raise a reasonable doubt about a director's independence") (citation omitted).

those investments to Kleiner or John Doerr, its general partner. The Complaint does not address the roles, if any, that Messrs. Page, Brin, or Schmidt have had in those investments at any point in time. DOB20. Plaintiffs do not respond.

**Plaintiffs Do Not Show That Any Director Is Beholden Based on University Donations**. Defendants pointed out the same wholesale failure to describe the materiality of Google's donations to Stanford and Mr. Schmidt's donation to Princeton, or the impact on President Hennessy, President Tilghman, and Mr. Shriram. DOB20-22. Notably, plaintiffs recognize their burden to show the challenged directors are "beholden" – that they are "'so dependent'" because the benefit has "'such subjective material importance'" to them. Opp. at 23 n.21 (citation omitted). Yet, the Opposition is conspicuously silent on this salient requirement.[20] Plaintiffs fail to respond to defendants' other points. The Complaint does not explain why ***the Company*** would cease making donations to Stanford if Messrs. ***Page*** or ***Brin*** are sued. The Complaint does not explain how Mr. Schmidt, no longer a trustee, has any impact on President Tilghman's ***current*** role at Princeton. In sum, none of the allegations singularly or collectively raises a reasonable doubt of a majority's disinterestedness or independence. *See Lynch v. Rawls*, 429 F. App'x 641, 644 (9th Cir. 2011) (court must analyze allegations collectively).

## II. PLAINTIFFS FAIL TO ALLEGE SUFFICIENTLY THAT THEY HAVE STANDING

As shown in the Opening Brief, plaintiffs' vague ownership allegations fail to satisfy the requirements of Rule 23.1. DOB23-24. The dates on which plaintiffs purchased their Google shares – which are essential to establishing contemporaneous ownership – should not be difficult to provide. Notably, the Opposition fails to offer any explanation as to why the verifications signed by the plaintiffs do not identify the dates of purchase. Instead, plaintiffs simply point to a vague assertion in the Complaint containing the years in which the purchases allegedly were made, arguing that the actual dates of purchase are irrelevant. Opp. at 31. Plaintiffs are incorrect.

---

[20] Similarly, the Opposition repeats the erroneous calculation of charitable donations to Stanford by including $2.3 million that Google was contractually required to pay to Stanford for license amounts. *Compare* Opp. at 23 n.21, *with* DOB20 n.35.

The dates of purchase are critical to determining whether plaintiffs were shareholders "at the time of the transaction complained of" (Fed. R. Civ. P. 23.1(b)(1)), and thus whether they have standing to pursue the asserted derivative claims. DOB23-24. Although plaintiffs purport to challenge conduct dating back to 2003, Google did not even become a publicly-traded company until August 2004. DOB23 n.39. Moreover, plaintiffs concede that the earliest date of purchase was an unspecified date in 2005. Opp. at 31; ¶19. Accordingly, it is clear that plaintiffs cannot allege that they have continuously held Google stock since 2003. DOB23-24.

Apparently conceding that they cannot technically plead contemporaneous ownership, plaintiffs instead attempt to: (1) distinguish the wealth of authority requiring plaintiffs to plead their dates of purchase; and (2) invoke a purported "exception" to the contemporaneous ownership requirement that has been rejected by most courts. Both attempts fail.

Plaintiffs seek to distinguish defendants' cases (DOB23-24) by implying that the cases are somehow unusual. Opp. at 31. They are not. Numerous courts, including this Court, have held in a variety of contexts that derivative plaintiffs must plead their dates of purchase. *See*, *e.g.*, *VeriSign*, 531 F. Supp. 2d at 1202 ("plaintiffs must **unambiguously** indicate in any amended complaint **the dates** they purchased VeriSign stock") (emphasis added); *Accuray*, 757 F. Supp. 2d at 926 (finding that plaintiffs lacked standing to pursue derivative claims because plaintiffs failed to "identify when they purchased Accuray shares"); *Hawaii Laborers Pension Fund v. Farrell*, No. CV 06-06935 ODW, 2007 WL 5255035, at *8-9 (C.D. Cal. Aug. 23, 2007) ("Plaintiff is advised to **plead with particularity** when it first purchased stock, if and whether it maintained its ownership throughout the complained of events[.]") (emphasis added); *see also* DOB23-24.[21] Thus, despite plaintiffs' assertions to the contrary (Opp. at 32), merely alleging the purported **years** of purchase is not enough.

---

[21] Plaintiffs' suggestion that courts have not granted motions to dismiss on contemporaneous ownership grounds (Opp. at 31) is also erroneous. *See Accuray*, 757 F. Supp. 2d at 926 (granting motion to dismiss on, among other grounds, failure to satisfy ownership requirements of Rule 23.1); *Travis v. Mittelstaedt*, No. CV 06-2341 LEW GGH, 2008 WL 755842, at *2 (E.D. Cal. Mar. 19, 2008) (granting motion to dismiss for failure to plead dates of purchase with particularity and finding that, "[b]ecause this was filed as a shareholder derivative action, **no part of it can proceed** without the proper showing of contemporaneous stock ownership") (emphasis added).

Nor does plaintiffs' attempt to rely on a purported "continuing wrong exception" somehow relieve them of their obligation to satisfy Rule 23.1. Numerous courts have rejected similar attempts to invoke this purported exception to the contemporaneous ownership requirement. *See* 7C Charles A. Wright *et al.*, FEDERAL PRACTICE AND PROCEDURE: Civil § 1828, at 73 (3d ed. 2007 & 2011 Supp.) ("The federal courts generally have rejected the . . . so-called 'continuing wrong' notion[.]"); *see also, e.g.*, *Cadle v. Hicks*, 272 F. App'x 676, 677-79 (10th Cir. 2008) (affirming dismissal for failure to satisfy ownership requirements of Rule 23.1 and rejecting attempt to invoke continuing wrong exception); *Hawaii Laborers*, 2007 WL 5255035, at *9 (rejecting attempt to invoke continuing harm exception).

Indeed, although plaintiffs cite *In re Bank of New York Derivative Litigation*, 320 F.3d 291 (2d Cir. 2003), in support of such an exception, the Second Circuit actually rejected the continuing wrong doctrine in that case. *Id.* at 298. As noted by the Second Circuit, "'the continuing wrong doctrine is less an exception to the contemporaneous ownership rule than an expansive definition of what constitutes a "transaction" as that term is used in Rule 23.1.'" *Id.* (citation omitted). The Second Circuit declined to adopt this "expansive definition of the term 'transaction,'" holding that "in order to invoke derivative standing . . . a plaintiff must have owned stock in the corporation ***throughout*** the course of the activities that constitute the ***primary basis*** of the complaint." *Id.*[22]

---

[22] Nor do plaintiffs' other cases support application of a continuing wrong exception here. *Cf. Bateson v. Magna Oil Corp.*, 414 F.2d 128, 129, 131 (5th Cir. 1969) (plaintiff who had been a shareholder for more than eleven years had a brief (and inadvertent) interruption of a matter of months and thus his ownership was contemporaneous, but not strictly continuous); *In re Maxim Integrated Products, Inc.*, No. C 06-0334 JW, 2007 WL 2745805, at *3 (N.D. Cal. July 25, 2007) (granting dismissal and declining to apply a continuing wrong exception).

Plaintiffs' reliance on *Bilunka v. Sanders*, No. C 93-20737 JW, 1994 WL 447156 (N.D. Cal. Mar. 1, 1994), is also misplaced. There, the court permitted the plaintiff to invoke a "continuing wrong exception," finding that alleged misrepresentations regarding a particular chip were connected. *Id.* at *2 (citing *Brambles U.S.A. Inc. v. Blocker*, 731 F. Supp. 643 (D. Del. 1990)). The holding in *Bilunka*, however, appears to misapply the Delaware approach to this limited exception. As Delaware courts have stated in discussing potential application of a "continuing wrong" doctrine, it "is a narrow [doctrine] that typically is applied only in unusual situations, such as where a plaintiff acquires his stock after a particular transaction has begun but before it is completed." *Desimone*, 924 A.2d at 924-25. Such a situation is not presented here, unlike *MacLary v. Pleasant Hills, Inc.*, 109 A.2d 830 (Del. Ch. 1954), Opp. at 32, in which the challenged transaction involved an issuance of shares for which certificates were not immediately issued (*i.e.*, a transaction that had begun but was not completed).

The Complaint makes no such showing. Plaintiffs' refusal to provide this basic – but essential – piece of information should not be countenanced; the Complaint should be dismissed for failure to satisfy Rule 23.1(b)(1).

## III. THE AMENDED COMPLAINT FAILS TO STATE A CLAIM

As shown, the conclusory allegations offered in support of plaintiffs' individual claims fail to satisfy the requirements of both Rule 8 and Rule 9(b). DOB24-32. Plaintiffs make only a passing attempt to argue that Rule 9(b) does not apply, stating merely that satisfying the heightened pleading standards of Rule 9(b) is "not required here." Opp. at 25 n.23. Plaintiffs proceed, however, to argue that they have nevertheless satisfied Rule 9(b) because they have satisfied the "heightened pleading requirements of Rule 23.1." *Id.* That is not the case. *See* Section I, *supra.* Plaintiffs have not satisfied Rule 23.1, nor have they pleaded particularized facts detailing the "who, what, when, where and how" required by Rule 9(b). DOB24-25; *see also Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124-27 (9th Cir. 2009) (allegations that sound in fraud must satisfy Rule 9(b)); *In re Merrill Lynch & Co., Research Reports Sec. Litig.*, No. 02 MDL 1484, 2008 WL 2594819, at *8 (S.D.N.Y. June 26, 2008) (applying Rule 9(b) to breach of fiduciary duty claim). In any event, plaintiffs' allegations are insufficient even under Rule 8. As the Supreme Court has emphasized, "labels and conclusions" – which is all that plaintiffs offer in the Complaint – are not enough. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

### A. Plaintiffs' Breach of Fiduciary Duty Claim Fails

Plaintiffs' suggestion that they have adequately pleaded their individual claims because they have sufficiently shown a substantial likelihood of liability (Opp. at 25-26) is readily disposed of: plaintiffs fail to make any such showing. Section I, *supra.* Nor is a recitation of the elements of a breach of fiduciary duty claim sufficient to state a claim. Opp. at 26. As shown, the absence of individualized allegations in the Complaint regarding ***each defendant*** is fatal to their breach of fiduciary duty claim. DOB24-30.

#### 1. Plaintiffs Fail to State a Claim Against the Outside Directors.

Noticeably absent in the Complaint are facts showing: (1) how each director allegedly became aware of the cited "unlawful acts," (2) when each director allegedly became aware, and

most importantly, (3) either participation in misconduct, or a conscious failure to exercise oversight or deliberate failure to act in the face of known deficiencies. DOB25-29.[23] Plaintiffs' Opposition – like the Complaint – makes no attempt to identify conduct by each of the Outside Director Defendants that would give rise to a breach of fiduciary duty claim. Indeed, excluding footnotes identifying the defendants and directors, the only individual references to the outside directors in the Opposition are as follows:

- Mr. Otellini: ***none***;

- Mr. Hennessy and Ms. Tilghman: description of alleged relationships (Opp. at 23);

- Messrs. Shriram and Doerr: allegations of Audit Committee membership (*id.* at 18-19) and description of alleged relationships (*id.* at 23).

Thus, for three of the outside directors, plaintiffs do not identify ***any*** alleged misconduct, and for the other two, they point only to Audit Committee membership. It is well-settled that mere board and/or committee membership is not enough. DOB28.[24]

Lacking facts to support a breach of fiduciary duty claim against each director, plaintiffs ask the Court to ignore the absence of supporting allegations and to look instead at other actions, namely *Abbott*, *Pfizer*, and *Massey*. Opp. at 27. As shown *supra* at 6-8, however, plaintiffs' strained attempt to suggest that the instant action is the same as the *Abbott* and *Pfizer* actions fails.

Plaintiffs' reliance on *Massey* is equally unavailing. The cited decision involved a motion for preliminary injunction seeking to prevent Alpha Natural Resources from acquiring Massey

---

[23] Plaintiffs' contention that they need not allege the "scienter" of the individual defendants (Opp. at 27 n.25) is refuted by their own authority. *Cf. In re Massey Energy Co. Deriv. & Class Action Litig.*, C.A. No. 5430-VCS, 2011 WL 2176479, at *22 (Del. Ch. May 31, 2011) ("The Massey charter also includes an exculpatory charter provision . . . As a result, in order to receive a monetary judgment against the Massey directors and officers, the plaintiffs will have to prove that the directors and officers acted with ***scienter***. That reality also exists because of the *Caremark* decision itself" which "requires proof that a director acted inconsistent with his fiduciary duties and, most importantly, that the director *knew* he was so acting.") (emphasis added); *see also supra* at 8 (discussing *Caremark*); DOB26-29.

[24] Apparently conceding that they have failed to plead individualized allegations as to each outside director, plaintiffs urge the Court to look at the "totality" of the allegations. Not only do plaintiffs ignore decisions by this Court requiring specifics as to each defendant (*see* DOB28-29 (citing *Sagent*, 278 F. Supp. 2d at 1094-95)), the totality of the allegations also fail to plead a breach of fiduciary claim as to any of the outside directors. *See* Section I, *supra*.

Energy Company, "a coal mining corporation with a controversial reputation." 2011 WL 2176479, at *1-2. Among other arguments, the plaintiffs contended that the merger was unfair due to the manner in which previously pending derivative claims were being handled. The prior derivative claims arose following a 2010 explosion at Massey's Upper Big Branch mine in West Virginia in which 29 miners died. *Id.* Notably, in his decision denying the preliminary injunction, Chancellor Strine emphasized that it "would be hazardous and imprudent to make any broad pronouncements on the ultimate fate of the plaintiffs' Derivative Claims." *Id.* at *20; *see also id.* at *3 (similar). To the extent, however, that Chancellor Strine opined in *dicta* that "the ***myriad of particularized facts***" appeared likely to survive a motion to dismiss, the facts were starkly different from those presented here, and included, among others:

- multiple mining incidents and major safety violations, including deaths and serious injuries, prior to the 2010 mining disaster;

- a $2 million jury award of punitive damages in a whistleblower's suit involving an in-house safety inspector who allegedly was fired for reporting safety violations;

- ***in 2008***, as part of a court-approved settlement, "***Massey had to form a new Board committee,*** the Safety and Environmental Committee, ***that was required to,*** among other things, ***give quarterly reports and safety updates to the Board on Massey's compliance with all applicable mine safety laws and regulations***;"

- the number of safety citations increased every year from 2005 to 2009, with an all-time high of ***10,653*** citations and orders against Massey ***in 2009***;

- Massey's "dominant" and controversial CEO continued to maintain an adversarial and combative relationship with regulators.

*Id.* at *1, 5-9, 19-21 (emphasis added). In sharp contrast to the egregious red flags in *Massey*, plaintiffs plead no facts showing that the Outside Director Defendants were aware of violations of law, much less that they deliberately failed to act in the face of known violations. DOB27-29.

In sum, plaintiffs' failure to specify each director's alleged misconduct renders the breach of fiduciary duty allegations insufficient under both Rules 8 and 9(b). *Id.* at 25-29; *see Sagent*, 278 F. Supp. 2d at 1094-95 (finding breach of fiduciary duty claims to be insufficient under Rule 8, where plaintiffs failed to "indicate which individual defendant or defendants were responsible for which alleged wrongful act").

**2.      Plaintiffs Fail to State a Claim Against the Director/Officer Defendants.**

Plaintiffs' only response with respect to Mr. Page is to repeat allegations regarding comments made by the Rhode Island U.S. Attorney in 2011.  Opp. at 5, 13, 14, 17 n.15.  Simply repeating comments made in a 2011 news article, however, does not cure the absence of facts in the Complaint alleging what Mr. Page knew, when he knew it, and what actions he may have taken.  DOB29.  Nor does the news article provide a substitute for pleaded facts showing that Mr. Page acted with an intent to violate law or intentionally failed to act.  *Id.*  Likewise, plaintiffs attempt to argue that they have pleaded a breach of fiduciary duty claim as to Mr. Schmidt by repeatedly referencing two letters addressed to him in 2008.  Opp. at 13, 14, 28-29 n.27.  As previously shown, these letters do not suffice to plead a breach of the duty of loyalty.  DOB29.  The Complaint does not contain any allegations regarding what Mr. Schmidt may or may not have known prior to 2008, nor does it contain any allegations regarding any actions Mr. Schmidt may have taken thereafter.  Moreover, as with each of the other Defendants, plaintiffs fail to plead facts indicating that Mr. Schmidt acted in bad faith.

As shown, the Complaint does not contain any individualized allegations identifying acts of disloyal or bad faith conduct by Mr. Brin.  DOB29-30.  The Opposition only serves to highlight the absence of such allegations.  In a footnote purportedly singling out Mr. Brin, plaintiffs are unable to point to any allegations regarding Mr. Brin in the Complaint, and thus resort to a conclusory assertion lumping Mr. Brin in with all of the other directors.  Opp. at 18 n.17.  "Lump[ing]" directors together does not plead a breach of fiduciary duty claim.  *See Sagent*, 278 F. Supp. 2d at 1094-95.

**3.      Plaintiffs Concede the Failure to State a Claim Against the Officer Defendants.**

As in the Complaint, plaintiffs ignore Messrs. Arora and Pichette completely in the Opposition.  Having conceded that they cannot state a claim against the Officer Defendants, plaintiffs' claims against them should be dismissed with prejudice.  *See* DOB30.[25]

_____

[25] Also apparently conceding that there is no basis for the assertion of a separate "abuse of control" claim (DOB26 n.44), plaintiffs make no mention of this claim in the Opposition.  The abuse of control claim (Count II) should thus be dismissed with prejudice as to all Defendants.

**B.     Plaintiffs Fail to Satisfy the Requirements for Pleading Waste**

Plaintiffs do not dispute that the standard for waste claims is rigorous.  DOB30; Opp. at 29.  Indeed, plaintiffs agree that they must show that the defendants "'irrationally squander[ed] or [gave] away corporate assets.'"  Opp. at 29 (citation omitted).  This is an exceptionally difficult test to satisfy, particularly in the area of executive compensation where directors have "wide discretion."  *Brehm v. Eisner*, 746 A.2d 244, 262 n.56 (Del. 2000).[26]

The Complaint fails to clearly identify which conduct purportedly constitutes waste.  DOB31; *see* ¶124 (alleging only – and in boilerplate language – that "defendants have caused Google to waste valuable corporate assets").  The Opposition argues that "the Individual Defendants wasted Google's corporate assets by causing or allowing the Company to pay compensation and bonuses *to its executive officers* while those officers were mismanaging the Company based on an illegal business model."  Opp. at 29-30 (emphasis added).  In addition to failing to plead facts supporting the assertion that "officers were mismanaging the Company based on an illegal business model," however, plaintiffs fail to explain how valuable Google assets were squandered when Messrs. Page, Brin, and Schmidt received salaries of just $1 per year, annual bonuses of $0, and no stock options from 2005-2010.  DOB32 n.48.  Instead, plaintiffs simply argue that "*any* amount [of compensation] paid to the Individual Defendants" constitutes waste.  Opp. at 30 n.30.  Plaintiffs' attempt to build a waste claim based apparently on "compensation and bonuses to its executive officers" thus fails as plaintiffs fail to show that defendants "irrationally squander[ed]" corporate assets.  *Id.* at 30.  Plaintiffs' allegations fail to satisfy the rigorous test for waste.  DOB30-32.[27]

**C.     The Unjust Enrichment Claim Should Be Dismissed**

In the Opposition – as in the Complaint – plaintiffs simply parrot the elements of an unjust

---

[26] *See also Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Raines*, 534 F.3d 779, 791 (D.C. Cir. 2008) ("[C]ourts rarely second-guess directors' compensation and severance decisions because the 'size and structure of executive compensation are inherently matters of judgment.'") (quoting *Brehm*, 746 A.2d at 263).

[27] Plaintiffs do not dispute that they cannot assert a waste claim against Messrs. Arora and Pichette, who were not members of the Board.  Opp. at 29-30.  Accordingly, the waste claim as to these individuals should be dismissed with prejudice.

enrichment claim, without making any attempt to explain how those elements have been satisfied. Opp. at 30. Plaintiffs' boilerplate allegations of unjust enrichment thus fail to state a claim. As the Supreme Court has emphasized, "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl.*, 550 U.S. at 555. The Complaint refers only to unspecified "salar[ies], fees, stock options and other payments." ¶127. Plaintiffs fail, however, to explain how ***each*** of the individual defendants was ***unjustly*** enriched by virtue of the unidentified "'salary, fees, stock options and other payments'" ***at the expense of Google***. DOB32-33. Nor does the Opposition elucidate further. Opp. at 30. Moreover, to the extent that plaintiffs contend that Messrs. Page, Schmidt, and Brin were unjustly enriched as a result of executive compensation received, plaintiffs fail to explain how this is so, given that they received salaries of just $1 per year and no annual bonuses or stock options from 2005-2010. DOB32 n.48. Nor do plaintiffs plead any facts explaining how any of the other individual defendants was unjustly enriched at the expense of Google. *Id*. at 32-33. Merely reciting the elements of an unjust enrichment claim does not satisfy plaintiffs' pleading burden. *Id.*

### CONCLUSION

For the reasons stated, the Complaint should be dismissed.

Dated: March 15, 2012                                    Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050


By: /s/ Boris Feldman
    Boris Feldman
    Attorneys for Defendants
    Larry Page, Sergey Brin,
    Eric E. Schmidt, L. John Doerr, John L.
    Hennessy, Paul S. Otellini, K. Ram Shriram,
    Shirley M. Tilghman, Nikesh Arora, Patrick
    Pichette, and Nominal Party Google Inc.