UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: GOOGLE, INC. SHAREHOLDER
DERIVATIVE LITIGATION

_____/

This Action Relates To:

ALL ACTIONS

_____/

No. 11-4248 PJH

**ORDER GRANTING MOTION
TO DISMISS**

Defendants' motion to dismiss plaintiffs' verified consolidated shareholder derivative complaint came on for hearing before this court on April 11, 2012. Plaintiffs Patricia M. McKenna ("McKenna"), Avrohom Gallas ("Gallas"), and James Clem ("Clem")(collectively "plaintiffs") appeared through their counsel, Benny Goodman, Erik Luedeke, and Shane Sanders. Individual defendants and nominal party Google, Inc. (collectively "defendants) appeared through their counsel, Boris Feldman and Elizabeth Peterson. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS defendants' motion in part, and DENIES it in part, for the reasons stated at the hearing, and as follows.

**BACKGROUND**

This is a shareholder derivative action on behalf of nominal defendant Google, Inc. ("Google" or the "Company"), against certain current and former Google directors and officers: specifically, eight members of Google's Board of Directors and two executive officers.[1] Named plaintiffs Patricia M. McKenna ("McKenna"), Avrohom Gallas ("Gallas"),

_____

[1]      The specific named individual defendants who form a part of Google's Board of Directors are: Larry Page ("Page"); Sergey Brin ("Brin"); Eric E. Schmidt ("Schmidt"); L. John Doerr ("Doerr"); John L. Hennessy ("Hennessy"); Paul S. Otellini ("Otellini"); K. Ram Shriram ("Shriram"); and Shirley M. Tilghman ("Tilghman")(collectively "Google Board"). The named individual defendants who form a part of Google's executive officers are:  Nikesh Arora

and James Clem ("Clem")(collectively "plaintiffs") allege that defendants allowed certain Canadian pharmacies to advertise via Google's search engine for the sale of prescription medications to be imported to the United States, which advertisements were unlawful, and which resulted in the entry of a non-prosecution agreement ("NPA") between Google and the United States Department of Justice ("DOJ"), and the payment by Google of a $500 million fine. See generally Verified Consolidated Shareholder Derivative Complaint ("Complaint").

Plaintiffs allege that Google, who is best known for its widely used Internet search engine, has advertising as one of its primary revenue drivers. See Complaint, ¶ 5. Google's advertising services are closely linked to its search technology in that customers submit their advertisements and relevant contact information to Google, and Google displays those advertisements above and next to search results that are based on queries relevant to the advertiser. See id. Plaintiffs further allege that displaying the ads near search results relevant to the advertiser provides Google with an effective way to target consumers most likely to be interested in the products being advertised. Id.

Plaintiffs allege that the Food, Drug and Cosmetic Act ("FDCA") prohibits pharmacies outside the United States from introducing or delivering for introduction any prescription drug into interstate commerce. Similarly, plaintiffs allege that the Controlled Substances Act prohibits such conduct with regard to controlled substances. Plaintiffs further allege that compliance with both Acts is both mandatory, and a legal duty generally known to sophisticated executives of U.S. companies who conduct business internationally. Complaint, ¶ 6.

Plaintiffs allege that, as corporate directors and officers of the Company, defendants owe Google certain fiduciary duties: specifically, the duty of loyalty, and the duties of candor and good faith. Complaint, ¶ 7. Notwithstanding these duties, however, plaintiffs

_____

("Arora"); and Patrick Pichette ("Pichette")(collectively "Google Officers")(all collectively "defendants").

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   allege that Google's directors and officers caused Google to facilitate the illegal importation

2   of prescription drugs by Canadian pharmacies for at least six years, and until Google

3   became aware of an investigation by the DOJ into such practices.  Complaint, ¶ 8.

4   Plaintiffs assert that, although facilitating improper advertisements temporarily helped

5   Google secure millions in profits, the Company violated the aforementioned Acts by doing

6   so and has now been exposed to significant damages.  Id.

7        Plaintiffs further allege that even though Google purposely used third party

8   verification services – like Square One and PharmacyChecker – ostensibly in order to

9   prevent the unlawful solicitation of consumers for illegal pharmacy mailings, such third party

10  verification services were essentially a sham.  Plaintiffs allege that Google's directors were

11  aware that these services were ineffectual.

12       Specifically, and on August 24, 2011, plaintiffs allege that it was announced that

13  Google had settled with the DOJ and entered into a non-prosecution agreement in which

14  the Company agreed to forfeit $500 million as a fine for facilitating the placement of

15  advertisements from online Canadian pharmacies that resulted in the unlawful importation

16  of controlled and non-controlled prescription drugs into the United States.  Complaint, ¶ 9.

17  Plaintiffs allege that the $500 million fine is one of the largest fines ever levied against a

18  United States company.  Id.

19       Plaintiffs allege that, had defendants complied with the Acts as their fiduciary duties

20  required, they would not have allowed the improper advertisements to occur in the first

21  place, and the unlawful activity would not have continued for almost six years.  Complaint,

22  ¶ 10.  Ultimately, although the unlawful advertising increased Google's total revenues,

23  plaintiffs allege that Google was damaged in a far greater amount.  In addition to including

24  the illicit profit Google received from Canadian pharmacies, the $500 million settlement

25  includes the revenue the pharmacies gained from their sales through Google.  Plaintiffs

26  further allege that Google has been exposed to millions of dollars in investigative costs and

27  expenses, and will likely incur additional legal and professional fees and expenses related

28

3

United States District Court

For the Northern District of California

1  to implementation of remedial measures designed to correct the problems arising from the

2  Google Board's failure to prohibit illegal advertising by Canadian pharmacies.  Complaint, ¶

3  11.

4      Although the Company has been injured, plaintiffs allege that defendants have not

5  fared nearly so badly.  Complaint, ¶ 12.  During the relevant time period, plaintiffs allege

6  that defendants collectively pocketed millions in salary, fees, stock options, and other

7  payments that were not justified in light of the violations of federal law that had occurred.

8  Id.  Plaintiffs further allege that these payments wasted valuable corporate assets and

9  unjustly enriched defendants to Google's detriment.  Id.

10     In response to the foregoing conduct, plaintiffs filed the original complaint in this

11  action on August 29, 2011.  The operative consolidated complaint was filed on October 24,

12  2011.

13     The complaint alleges four causes of action (labeled "counts") against defendants:

14  (1) breach of fiduciary duty of loyalty (including duties of candor and good faith); (2) abuse

15  of control; (3) corporate waste; and (4) unjust enrichment.

16     Nominal defendant Google, together with the individual defendants, now seek an

17  order dismissing the complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and

18  23.1 for failure to plead facts demonstrating demand futility, and for failure to state a claim.

19                                  **DISCUSSION**

20  A.    Legal Standard

21     A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims

22  alleged in the complaint.  Ileto v. Glock, Inc., 349 F.3d 1191, 1199-1200 (9th Cir. 2003).

23  Review is limited to the contents of the complaint.  Allarcom Pay Television, Ltd. v. Gen.

24  Instrument Corp., 69 F.3d 381, 385 (9th Cir. 1995). To survive a motion to dismiss for

25  failure to state a claim, a complaint generally must satisfy only the minimal notice pleading

26  requirements of Federal Rule of Civil Procedure 8.

27

28

4

United States District Court

For the Northern District of California

Rule 8(a)(2) requires only that the complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Specific facts are unnecessary – the statement need only give the defendant "fair notice of the claim and the grounds upon which it rests. Erickson v. Pardus, 551 U.S. 89, 93 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  All allegations of material fact are taken as true. Id. at 94.  However, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations and quotations omitted).  Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level. Id.

A motion to dismiss should be granted if the complaint does not proffer enough facts to state a claim for relief that is plausible on its face. See id. at 558-59. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] – that  the pleader is entitled to relief. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).

In addition, when resolving a motion to dismiss for failure to state a claim, the court may not generally consider materials outside the pleadings. Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001).  There are several exceptions to this rule.  The court may consider a matter that is properly the subject of judicial notice, such as matters of public record. Id. at 689; see also  Mack v. South Bay Beer Distributors, Inc., 798 F.2d 1279, 1282 (9th Cir. 1986) (on a motion to dismiss, a court may properly look beyond the complaint to matters of public record and doing so does not convert a Rule 12(b)(6) motion to one for summary judgment).  Additionally, the court may consider exhibits attached to the complaint, see Hal Roach Studios, Inc. V. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989), and documents referenced by the complaint and accepted by all parties as authentic. See Van Buskirk v. Cable News Network, Inc., 284 F.3d 977, 980 (9th Cir. 2002).

1    Finally, in actions alleging fraud, "the circumstances constituting fraud or mistake

2    shall be stated with particularity."  Fed. R. Civ. P. 9(b).  Under Rule 9(b), the complaint

3    must allege specific facts regarding the fraudulent activity, such as the time, date, place,

4    and content of the alleged fraudulent representation, how or why the representation was

5    false or misleading, and in some cases, the identity of the person engaged in the fraud.  In

6    re GlenFed Sec. Litig., 42 F.3d 1541, 1547-49 (9th Cir.1994).

7    B.    Legal Analysis

8    Resolution of defendants' motion requires determination of the following:  (1)

9    whether plaintiffs have adequately alleged demand futility, such that a shareholder

10    derivative action may be maintained; (2) whether plaintiffs have standing pursuant to Rule

11    23.1; and (3) whether the complaint otherwise adequately alleges individual claims against

12    the defendants.

13    1.    Demand Futility Allegations

14    Defendants seek to dismiss plaintiffs' shareholder derivative action on behalf of

15    nominal party Google, on grounds that plaintiffs failed to make a demand on Google's

16    Board of Directors prior to commencing this action on August 29, 2011, and that the

17    Complaint fails to allege demand futility with particularity, as required by Rule 23.1.

18    Federal Rule of Civil Procedure 23.1 provides the procedural vehicle through which

19    a shareholder derivative action may be pursued, as it applies where shareholders seek to

20    "enforce a right of a corporation" when the corporation itself has failed to enforce a right

21    which could properly be asserted by it in court.  Rule 23.1 requires that a shareholder

22    seeking to file a derivative action allege that he or she made a pre-suit demand on the

23    corporation's board of directors, or allege facts showing why such a demand would have

24    been futile.  The complaint must "allege with particularity" the efforts made by the plaintiff to

25    obtain the action the plaintiff desires from the directors or comparable authority, or the

26    reasons for the plaintiff's failure to obtain the action or for not making the effort.  Fed. R.

27    Civ. P. 23.1.

28

6

**United States District Court**
For the Northern District of California

1    It is undisputed here that plaintiffs failed to make a demand on Google's Board prior

2  to commencing the instant lawsuit.  Thus, the question is simply whether plaintiffs have

3  adequately pled in their complaint that demand was excused.

4    Substantively, shareholder derivative claims involve the legal relationship between a

5  corporation and its shareholders, directors, and officers, which are considered "internal

6  affairs" of the corporation that are governed by the law of the state of incorporation.  See

7  First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 621

8  (1983).  Because Google is a Delaware corporation, Delaware law thus establishes the

9  circumstances under which plaintiffs' failure to make a pre-suit demand on its Board of

10  Directors is excused.  In re Silicon Graphics Sec. Litig., 183 F.3d 970, 989-90 (9th Cir.

11  1999)(Delaware law applied to issue of demand); see Rales v. Blasband, 634 A.2d 927,

12  932 (Del. 1993)(right of stockholder to prosecute derivative suit limited to situations where

13  stockholder has demanded that directors pursue corporate claim and they wrongfully

14  refused to do so or where directors are incapable of making impartial decision regarding

15  such litigation).

16    In general, Delaware law provides two demand-futility tests, as set forth in Aronson

17  v. Lewis, 473 A.2d 805 (Del. 1984), overruled on other grounds by Brehm v. Eisner, 746

18  A.2d 244 (Del. 2000); and Rales v. Blasband, 634 A.2d 927 (Del. 1993).  When the alleged

19  wrong is the result of a business decision by the whole board of directors, a court should

20  employ the Aronson test, which evaluates whether, under the particularized facts alleged, a

21  reasonable doubt is created 1) that the directors are disinterested and independent, or 2)

22  that the challenged transaction was otherwise the product of a valid exercise of business

23  judgment.  Aronson, 473 A.2d at 812.  When, however, the board members who approved

24  the challenged act have since changed, or when the challenged act does *not* constitute a

25  business decision by the board, a court should employ the Rales test, which determines

26  whether the particularized factual allegations create a reasonable doubt that, as of the time

27  the complaint was filed, a majority of the board as constituted at that time could have

28

7

United States District Court

For the Northern District of California

1  properly exercised its independent and disinterested business judgment in responding to a

2  demand.  See Rales, 634 A.2d at 934.

3         As a preliminary matter, although the parties dispute which test applies, the court

4  determines that it is the Rales test that should apply.  Defendants' citation to In re Bidz on

5  this point is compelling.  In In re Bidz, as here, the complaint was "replete with allegations

6  that the Individual Defendants knew of the Company's illegal behavior but consciously

7  chose to take no action to fix the problems."  See In re Bidz.com, Inc. Derivative Litig., F.

8  Supp. 2d 844, 852 (C.D. Cal. 2011).  The court looked to Delaware law, and noted that

9  "Delaware courts have explained that '[w]here the complaint does not address an action

10 taken by the board ... or alleges that the board failed to act, the inquiry narrows' " because

11 a court "cannot address the business judgment of an action not taken and, therefore,

12 should concern itself with what is now known as the Rales test."  Thus, and because this

13 reasoning is persuasive as applied here, the court concludes that plaintiffs' allegations of

14 defendants' "conscious" knowledge and inaction vis-a-vis the purportedly unlawful

15 advertising scheme should be analyzed under the Rales test.

16        Having so found, defendants raise one other preliminary matter for resolution:

17 whether plaintiffs have alleged a Caremark claim.  A Caremark claims refers to a claim in

18 which plaintiffs allege that defendants are liable for a failure of oversight in connection with

19 a reporting or information system that defendants consciously failed to monitor.  See In re

20 Caremark Int'l Inc. Derivative Litig., 698 A.2d 959 (Del. Ch. 1996)("only a sustained or

21 systematic failure of the board to exercise oversight—such as an utter failure to attempt to

22 assure a reasonable information and reporting system exists—will establish the lack of

23 good faith that is a necessary condition to liability").

24        The court is unpersuaded that plaintiffs – who maintain they do not assert a

25 Caremark claim against defendants – in fact press such a claim.  Caremark claims

26 fundamentally implicate the directors' obligation to supervise or monitor corporate

27 performance via supervision and monitoring of internal reporting systems.  Here, although

28

8

United States District Court

For the Northern District of California

1  plaintiffs' complaint does allege that the director defendants were aware that third party

2  verification systems were not adequately preventing the unlawful selling of prescription

3  drugs from Canadian pharmacies (and that defendants were therefore knowledgeable

4  about Google's unlawful activity), the gravamen of plaintiffs' complaint is not that the

5  director defendants were negligent in supervising and monitoring internal reporting systems

6  or controls.  The gravamen of the complaint, fairly read, is – as plaintiffs posit – that the

7  director defendants consciously permitted Google to engage in an unlawful scheme to

8  break the law by soliciting advertising from Canadian pharmacies.  See, e.g., Complaint, ¶¶

9  5, 8, 47-67, 97-98.  Thus, and contrary to defendants' position, no Caremark claims are

10  implicated.

11       With these preliminary considerations now out of the way, the court proceeds to

12  examine the true issue at the heart of the parties' demand futility arguments: i.e., whether,

13  pursuant to Rales, plaintiffs have adequately alleged that, as of the time the complaint was

14  filed, a majority of the Google Board was (a) not disinterested; and/or (b) lacked

15  independence.  See Rales, 634 A.2d at 934.

16            a.    disinterestedness

17       Directorial interest exists whenever divided loyalties are present, or where the

18  director will receive a personal financial benefit from a transaction that is not equally shared

19  by the stockholders, or when a corporate decision will have a "materially detrimental

20  impact" on a director but not the corporation or its stockholders.  Rales, 634 A.2d at 936;

21  Aronson, 473 A.2d at 812.  As is particularly relevant here, a reasonable doubt as to a

22  director's disinterestedness also exists where a director faces a "substantial likelihood" of

23  liability for breaching his fiduciary duty of loyalty (and good faith).  See Rales, 634 A.2d at

24  936 (where the potential for a director's liability is not "a mere threat" but instead rises to "a

25  substantial likelihood," disinterestedness may be stated).

26       Plaintiffs assert that a majority of the eight Google Board members faced precisely

27  such a "substantial likelihood" of liability, that they were not disinterested.  In order to

28

9

**United States District Court**
For the Northern District of California

1    establish this ground for demand futility – and overcome the otherwise applicable

2    presumption of director disinterestedness – plaintiffs must allege particularized facts

3    "detailing the precise roles that the[] directors played at the company, the information that

4    would have come to their attention in these roles, and any indication as to why they would

5    have perceived the [wrongdoing]."  See Guttman v. Huang, 823 A.2d 492, 503 (Del. Ch.

6    2003); In re Silicon Graphics, 183 F.3d at 990 (quoting Aronson, 473 A. 2d at 805).

7         Plaintiffs point to the following allegations that purportedly meet this requirement:

8    •    in 2003, as found by the US Attorney's Office in Rhode Island
         and the FDA/OCI Rhode Island Task Force, Google knew that
9        online Canadian pharmacies were advertising prescription
         drugs to Google users in the United States through Google's
10       AdWords advertising program, in violation of federal law;

11   •    prior to March 13, 2003, Google contacted the National
         Association of Boards of Pharmacy ("NABP") regarding the
12       "ability of rogue pharmacy-related Web sites to advertise their
         services on Internet search engines," to which the NABP
13       responded by warning Google about the dangers of illegal
         online pharmacies, the misleading nature of Google's
14       sponsored links, and the federal laws Google may be
         violating;
15
     •    employees at Google knew that US consumers were making
16       online purchases of prescription drugs from Canadian
         pharmacies, as indicated by 2003 employee emails;
17
     •    on December 1, 2003, the FDA's associate commissioner for
18       external affairs stated that the FDA was "literally placing calls
         to the search engines trying to get a meeting going"
19       concerning their business dealings with online pharmacies;

20   •    also in December 2003, Google announced it would begin
         using a third-party company to screen out ads from rogue
21       pharmacies that do not require prescriptions;

22   •     Defendants knew as early as 2004 that accepting ads from
         illegal online pharmacies was unlawful, since in 2004, Google
23       began to actively block pharmacies in countries other than
         Canada from advertising prescription drugs online to Google
24       users in the U.S.;

25   •    on July 22, 2004, Google's then vice president for global
         online sales and operations, Mr. Sandberg, testified before a
26       congressional committee, and admitted that Google
         "recognizes that there are bad actors on the Internet, including
27       unlicensed online pharmacies that peddle unsafe and
         counterfeit products;"

28

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- on July 7, 2008, the chairman and president of the National Center on Addiction and Substance Abuse at Columbia University ("CASA") warned director Schmidt via letter that it had been able to find prominent displays of ads for rogue internet pharmacies in a Google search for controlled drugs..." even though Google was using a company called PharmacyCHecker to screen rogue pharmacies;

- on December 23, 2008, the NABP sent Schmidt a letter stating that a third party verification service used by Google to screen prescription drug websites had certified several pharmacies that were circumventing federal law; and

- Peter Neronha, the Rhode Island US Attorney who led the probe into Google, stated in an interview that defendant Page "knew what was going on"

See Complaint, ¶¶ 40, 42-46, 79, 100-01.  Plaintiffs also allege that, despite knowing the illegality of online Canadian pharmacies selling prescription drugs to U.S. customers, all the director defendants approved the use of Square Trade and Pharmacy Checker as third party verification services, and those parties allowed pharmacies to violate the law to advertise on Google's search engine.  Id. at ¶ 102.  In addition, plaintiffs allege that the two executive officer defendants – Doerr and Shriram – were members of Google's Audit Committee, and because of their position, directly or indirectly controlled the wrongful acts set forth in plaintiffs' complaint.

Defendants are correct that these allegations are insufficiently particularized to establish demand futility on grounds that a majority of directors faced a "substantial likelihood" of liability.  Plaintiffs' allegations are in many parts stated against all defendants in a collective and general fashion, and contain no particularized allegations stating which particular director or directors had knowledge of unlawful advertising by Canadian pharmacies on Google's search engine.  At best, plaintiffs' allegations state that director Schmidt had knowledge of unlawful advertisements being placed on Google's web site, via letters sent to Schmidt by independent organizations in July and December 2008.  However, plaintiffs do not allege that Schmidt in fact conveyed this information to any other director.  Plaintiffs' counsel argued at the hearing that Schmidt was legally bound to tell the

United States District Court

For the Northern District of California

other directors, but counsel did not identify any sufficiently particularized legal duty that would require Schmidt to convey his knowledge of the foregoing letters to other directors, nor do plaintiffs' allegations state that Schmidt actually did so.  To the extent plaintiffs also allege that Larry Page "knew what was going on," there are no supporting facts establishing precisely "what" Page understood *was* going on.  More importantly, however, even if plaintiffs' complaint could be read to state particularized allegations of notice of wrongdoing with respect to Schmidt and Page, there are no allegations demonstrating that other individual directors had express notice of wrongdoing, nor – as just indicated – is plaintiffs' reliance on general code of conduct and/or corporate governance maxims sufficient for the court to impute notice to these defendants.  All of which precludes plaintiffs from demonstrating that disinterestedness is lacking as to a majority of the Board directors.[2]

In sum, therefore, plaintiffs have not met their burden to establish demand futility under the "disinterested" prong of the Rales test.

b.    independence

"Independence" exists when a director's decision is based on "the corporate merits of the subject before the board" rather than on "extraneous considerations or influences." Aronson, 473 A.2d at 816.  When lack of independence is charged, the plaintiff must allege particularized facts "show[ing] that the Board is either dominated by an officer or director who is the proponent of the challenged transaction or that the Board is so under his influence that its discretion is 'sterilize[d].'"  Levine v. Smith, 591 A.2d 194, 205 (Del. 1991), overruled on other grounds, 746 A.2d 244 (Del. 2000).  If a director is considered "controlled" by another, he or she is lacking in the independence necessary to consider the challenged transaction objectively.

A "controlled" director is one who is dominated by another party, whether through close personal or familial relationship or through force of will.  A director may also be

---

[2]    The court also notes that plaintiffs' allegations with respect to the two remaining executive officers, Doerr and Shriram, are also devoid of any particularized allegations setting forth any knowledge of wrongdoing that either individual had in their possession.

**United States District Court**
For the Northern District of California

1    considered "controlled" if he or she is beholden to the allegedly controlling entity, as when

2    the entity has the direct or indirect unilateral power to decide whether the director continues

3    to receive a benefit upon which the director is so dependent or is of such subjective

4    material importance that its threatened loss might create a reason to question whether the

5    director is able to consider the corporate merits of the challenged transaction objectively.

6    See Telxon Corp. v. Meyerson, 802 A.2d 257, 264 (Del. 2002).

7         Plaintiffs' complaint alleges that:

8    •    directors Page, Brin, and Schmidt dominated and controlled the
          remaining Board members, based on (a) the fact that they
9         collectively controlled two-thirds of the shareholder vote; and (b) the
          Company's own April 2011 proxy statement conceded that all
10        directors "other than [Page, Brin, and Schmidt]" were independent;
          and
11
     •    Page, Brin, and Schmidt's "domination" allows them to engage in
12        the following self-dealing transactions: (a) Schmidt forces Google to
          pay for the use of Schmidt's personal aircraft when flying
13        executives around, to the tune of $2.9 million so far; (b) Google has
          invested $10 million into a company co-founded by Brin's wife; and
14        (c) Google sponsored a $30 million competition to land a robot on
          the moon, which competition is administered through a Foundation
15        to which Google has made donations, and for which defendant
          Page sits on the Board of Trustees.
16

17        See Complaint, ¶¶ 104-05.

18        In addition to the control that the foregoing three directors asserted over the

19   remaining Board members, plaintiffs allege the various ways in which remaining directors

20   Tilghman, Shriram, Hennessy and Doerr, lack independence from Page, Brin, or Schmidt:

21   •    Director Hennessy is President of Stanford University, and Director
          Shriram serves on the Stanford Board of Trustees.  Google has
22        donated over $14.4 million to Stanford since 2006, which means
          that neither Hennessy nor Shriram would vote to initiate litigation
23        against Page and Brin, since Google would stop making its
          donation or stop supporting Stanford;
24
     •    Director Tilghman is President of Princeton University, a university
25        that Director Schmidt donates substantial sums to, including a $25
          million endowment fund.  Schmidt also used to be a trustee of
26        Princeton at the same time as Tilgham served as trustee (from
          2004 to 2008), and plaintiffs allege that Tilghman would not vote to
27        initiate litigation against Schmidt out of loyalty for Schmidt's past
          financial acts in connection with Tilghman and Princeton University,
28

United States District Court

For the Northern District of California

1    and because it would ensure a lack of future donations to Princeton
     from Schmidt; and

2
•    Director Doerr is a general partner at Kleiner Perkins Caufield &
3         Byers, a venture capital firm.  Doerr has sought substantial
          investments from Google in private companies in which Kleiner
4         Perkins is a major investor, including one company that was bought
          by Google in 2007 and that resulted in a $5 million profit for Kleiner
5         Perkins.  If Doerr were to vote in favor of initiating litigation against
          Page, Brin or Schmidt, he would risk Google's financial support for
6         his venture firm.

7    See id. at ¶ 106.

8         Defendants, for their part, contend that the foregoing allegations fail because

9    business relationships such as those alleged by plaintiffs are insufficient to overcome the

10   presumption of independence, and that insofar as Doerr is concerned, the mere existence

11   of a contractual relationship between a company and companies that directors are affiliated

12   with does not "sterilize" the Board's ability to decide matters.  With specific regard to the

13   University-affiliated directors, defendants contend that plaintiffs have failed to allege the

14   materiality of any sums donated to the Universities, nor do plaintiffs allege why Google

15   would cease making donations if Brin or Page, for example, were to be sued.  Finally, with

16   respect to the voting power that plaintiffs allege that Brin, Page, and Schmidt collectively

17   possess, plaintiffs contend that mere majority ownership, without more, cannot rebut the

18   presumption of independence.

19        Plaintiffs, in response,[3] point out that the existence of entangling business,

20   professional, and social relationships, as well as the alleged financial alliances between

21   Brin, Page, and Schmidt, and the remaining Board directors, are sufficient at this stage to

22   defeat dismissal.  The mere allegation that such relationships exist, say plaintiffs, is

23   sufficient to withstand dismissal.

24        Generally, an allegation that an interested director and other directors move in the

25

26        [3]    At the hearing on defendants' motion, plaintiffs' counsel failed to meaningfully
     address defendants' argument that plaintiffs have not alleged that a majority of the Google
27   Board lacked independence, and instead focused primarily on the 'disinterested' inquiry.
     Accordingly, the court addresses the arguments that are more substantively addressed in the
28   parties' briefing.

14

United States District Court

For the Northern District of California

1    same business circles is not enough to negate a director's independence for pre-suit

2    demand purposes.  See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,

3    845 A.2d 1040, 1051–52 (Del. 2004).  Nor is the naked assertion of a previous business

4    relationship sufficient to overcome the presumption of a director's independence.  Orman v.

5    Cullman, 794 A.2d 5, 27 (Del. Ch. 2002).  Instead, the court must review the complaint on a

6    case-by-case basis to determine whether it states with particularity facts indicating "that a

7    relationship ... is so close that the director's independence may reasonably be doubted.

8    This doubt might arise either because of financial ties, familial affinity, a particularly close or

9    intimate personal or business affinity or because of evidence that in the past the

10   relationship caused the director to act non-independently vis à vis an interested director."

11   Beam, 845 A.2d at 1052.

12        Here, plaintiffs have done an adequate job of setting forth actual financial ties and

13   motivations that go beyond the mere existence of a naked business relationship, with

14   respect to certain defendants.  Plaintiffs have alleged, for example: that Hennessy and

15   Shriram have executive positions at Stanford University and that Stanford has received

16   over $14.4 million from Google since 2006; that Brin and Page are Stanford alumni; that

17   Tilghman is the President of Princeton University; that Schmidt is a Princeton alumnus who

18   created a $25 million endowment fund, and was a former trustee who exercised control

19   over Tilghman's compensation and employment; and that Doerr has obtained investments

20   from Google for private companies in which his own venture capital firm is a major investor,

21   which relationship has resulted in actual profits for Doerr's venture capital firm.  Given the

22   factual nature of the independence inquiry, and in view of the concrete financial motivations

23   that plaintiffs have alleged, such allegations are sufficient in the court's view – when

24   combined with the majority stockholder control that Brin, Page, and Schmidt have over the

25   Board – to allege that neither Hennessy, Shriram, Doerr, nor Tilghman were truly

26   "independent" directors capable of considering a demand.

27        However, this is sufficient only to establish that four of the eight member Google

28

15

**United States District Court**
For the Northern District of California

1    Board lacked the requisite independence. This is insufficient to establish that a *majority* of

2    the Google Board lacked independence. The court admits to being somewhat unclear

3    whether plaintiffs' allegations are intended to also establish a predicate for arguing that

4    Page, Brin and Schmidt themselves lack independence (thus achieving the necessary

5    'majority'). The court understand plaintiffs' argument to be that Page, Brin, and Schmidt

6    were the controllers, not the controllees. However, in the absence of targeted clarification

7    from plaintiffs' counsel as to this inquiry at the hearing on the matter, the court declines to

8    make such an inference based on its current reading of the complaint.

9            Accordingly, the court concludes that plaintiffs have also fallen short of their burden

10   to establish demand futility under the "independence" prong of the <u>Rales</u> test.

11           2.        <u>Standing Allegations</u>

12           Defendants also argue that plaintiffs lack standing to bring this derivative suit, as

13   they have not adequately alleged ownership of Google stock. Under Rule 23.1, a plaintiff

14   must allege that he/she/it "was a shareholder or member at the time of the transaction of

15   which the plaintiff complains." Fed.R.Civ.P. 23.1. A derivative plaintiff has no standing to

16   challenge conduct that occurred prior to the time that plaintiff owned company stock. <u>See</u>

17   <u>In re Computer Science Corp. Derivative Litig.</u>, 244 F.R.D. 580, 591 (C.D. Cal. 2007); <u>see</u>

18   <u>also Desimone v. Barrows</u>, 924 A.2d 908, 924–27 (Del. Ch. 2007) (under Delaware law,

19   "continuing wrong" doctrine does not afford shareholder standing to challenge earlier

20   wrongs that pre-date his/her stock ownership).

21           Plaintiffs McKenna, Gallis and Clem allege that they "are Google shareholders and

22   have been continuously since 2005, 2005 and 2007, respectively." <u>See</u> Complaint, ¶ 19.

23   The court agrees with defendants, however, that in order to set forth the date of their stock

24   ownership unambiguously and clearly, plaintiffs must set forth the actual "date" of stock

25   ownership, as well as the fact that they have owned the stock continuously, and continue to

26

27

28

16

1   do so now.[4]

2       Accordingly, the court concludes that plaintiffs have not adequately alleged their

3   standing to sue.

4       3.    Individual Defendants' Claims

5       Finally, the individual defendants seek an order dismissing all claims asserted

6   against them.  They contend that plaintiffs have failed to adequately plead claims for

7   breach of the fiduciary duty of loyalty; waste; and/or unjust enrichment.[5]

8           a.    fiduciary duty

9       Under Delaware law, a corporate fiduciary fails to act in good faith and therefore

10  breaches the duty of loyalty by "intentionally act[ing] with a purpose other than that of

11  advancing the best interests of the corporation ... act[ing] with the intent to violate

12  applicable positive law ... [or] intentionally fail[ing] to act in the face of a known duty to act,

13  demonstrating a conscious disregard for their responsibilities."  In re Walt Disney Co.

14  Derivative Litig., 906 A.2d 27, 67 (Del. 2006).  Corporate fiduciaries fail to act in good faith

15  where they display a lack of diligence that "is more culpable than simple inattention or

16  failure to be informed of all facts material to the decision," such that it is "qualitatively more

17  culpable than gross negligence."  Id., 906 A.2d at 66.

18

---

19      [4]    As discussed at the hearing on defendants' motion, to the extent that plaintiffs
20  rely on the "continuing wrongs" doctrine as a means of alleging actionable conduct that pre-
    dates the date of plaintiffs' stock ownership, this is an extremely narrow judicial doctrine that
21  does not apply here.  As stated in Desimone v. Barrows, 924 A.2d 908, 924 (Del. Ch. 2007),
    the "continuing wrongs doctrine" is "applied only in unusual situations, such as where a plaintiff
22  acquires his stock after a particular transaction has begun but before it is completed."  See id.
    ("the fact that other wrongs have later occurred does not afford a plaintiff standing to challenge
23  earlier wrongs that pre-date his stock ownership, even though they may be similar or related").

24      [5]    Plaintiffs' complaint also asserts a claim for abuse of control, a claim that
25  defendants – without substantive argument – contend is a re-labeled claim for breach of
    fiduciary duty, which thus fails for the same reasons as does the fiduciary breach claim.  To
26  the extent defendants are correct and plaintiffs' abuse of control claim rests upon the same
    allegations as the fiduciary breach claim, the court's reasoning in connection with the fiduciary
27  breach claim controls.  However, to the extent the abuse of control claim is premised on
    differing allegations and/or distinct legal authorities, its viability has not been independently
28  placed at issue, and the court does not address the claim's merits.

17

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1    Here, plaintiffs rest on the same general allegations discussed above in connection

2  with their derivative demand futility allegations, in proceeding against the individual

3  defendants for fiduciary breach.  In sum, plaintiffs allege that defendants breached their

4  duty of loyalty by "consciously failing to prevent the Company from engaging in the unlawful

5  acts" complained of in the Complaint regarding the illegal advertising of prescription drugs

6  by Canadian pharmacies.  However, as already discussed, plaintiffs' allegations fail to state

7  claims against the majority of directors (inside and outside) insofar as plaintiffs fail to allege

8  particularized knowledge on the part of the nearly all directors.

9    Moreover, the allegations as to the only two directors who are alleged to have some

10  knowledge – Schmidt and Page – are insufficient to state a claim for fiduciary breach.  With

11  respect to Page, plaintiffs allege that Peter Neronha, the Rhode Island U.S. Attorney,

12  stated that Page "knew what was going on."  But plaintiffs include no allegations identifying

13  what, exactly, Page was supposed to know, when he knew it, or what actions he did or did

14  not take in response thereto.  Similarly, although Schmidt is alleged to have received a

15  letter notifying him that certain online pharmacies were circumventing third party verification

16  services and allowing for the unlawful sale of prescription drugs to U.S. consumers,

17  plaintiffs have no supporting allegations establishing Schmidt's response to this

18  information, or anything that would suggest that Schmidt's individual conduct was unlawful

19  and in violation of his duty of loyalty to Google.

20    Finally, with respect to the two non-director executive officers of Google –

21  defendants Arora and Pichette – the allegations as to these two individuals is completely

22  conclusory and devoid of sufficient facts.  See Complaint, ¶¶ 29-30.

23    Accordingly, the court concludes that plaintiffs have not stated a claim for breach of

24  fiduciary duty.

25        b.    waste

26    To recover on a claim of corporate waste, the plaintiffs must shoulder the burden of

27  proving that the exchange was "so one sided that no business person of ordinary, sound

28

18

United States District Court

For the Northern District of California

1  judgment could conclude that the corporation has received adequate consideration." In re

2  Walt Disney, 906 A.2d at 73-74.  A claim of waste will arise only in the rare,

3  "unconscionable case where directors irrationally squander or give away corporate assets."

4  See id.  This onerous standard for waste is a corollary of the proposition that where

5  business judgment presumptions are applicable, the board's decision will be upheld unless

6  it cannot be "attributed to any rational business purpose."  Id.

7       As defendants correctly contend, plaintiffs here have not alleged facts that rise to the

8  level of establishing an exchange that is "unconscionable."  There are no allegations as to

9  the amounts that constitute corporate waste specifically, and more fundamentally – no

10  allegations that the alleged waste amounts cannot be attributed to any rational business

11  purpose.

12       Accordingly, the court concludes that plaintiffs have not stated a claim for corporate

13  waste.

14            c.     unjust enrichment

15       Finally, under Delaware law, a claim for unjust enrichment has five elements: (1) an

16  enrichment; (2) an impoverishment; (3) a relation between the enrichment and the

17  impoverishment; (4) the absence of justification; and (5) the absence of a remedy provided

18  by law.  See Jackson Nat'l Life Ins. Co. v. Kennedy, 741 A.2d 377, 393 (Del.Ch.1999).

19  "[N]o action for unjust enrichment lies where a contract governs the parties' relationship to

20  each other." McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc., 339 F.3d 1087,

21  1091 (9th Cir.2003) (applying Delaware law).

22       Again, plaintiffs fail to plead the essential facts of their claim.  Specifically, they fail to

23  plead any facts that would establish how each individual defendant was enriched, to the

24  direct "impoverishment" of Google, or the lack of any justification, if so.

25       Accordingly, the court concludes that plaintiffs have not stated a claim for unjust

26  enrichment.

27

28

C.    Conclusion

For all the foregoing reasons, defendants' motion to dismiss is GRANTED.  Leave to amend is also granted, with respect to the deficiencies specifically enumerated herein.  No new claims or parties may be added without leave of court.  Plaintiffs' amended complaint shall be filed no later than June 8, 2012, and defendants' response thereto shall be filed no more than 28 days thereafter.

Defendants' corresponding request for judicial notice is also GRANTED.

**IT IS SO ORDERED.**

Dated: May 8, 2012

_____
PHYLLIS J. HAMILTON
United States District Judge

United States District Court
For the Northern District of California