ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
  – and –
TRAVIS E. DOWNS III (148274)
BENNY C. GOODMAN III (211302)
ERIK W. LUEDEKE (249211)
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)
travisd@rgrdlaw.com
bennyg@rgrdlaw.com
eluedeke@rgrdlaw.com

POMERANTZ GROSSMAN HUFFORD
  DAHLSTROM & GROSS LLP
MARC I. GROSS
JEREMY A. LIEBERMAN
JASON S. COWART
600 Third Avenue
New York, NY 10016
Telephone: 212/661-1100
212/661-8665 (fax)
migross@pomlaw.com
jalieberman@pomlaw.com
jscowart@pomlaw.com

Co-Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re GOOGLE INC. SHAREHOLDER DERIVATIVE LITIGATION | ) ) ) |
| | ) |
| This Document Relates To: | ) ) ) |
| ALL ACTIONS. | ) ) ) |

Master File No. CV-11-04248-PJH

SECOND AMENDED VERIFIED
CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT

DEMAND FOR JURY TRIAL

1.      This is a shareholder derivative action on behalf of nominal party Google, Inc. ("Google" or the "Company") for damages and other relief.  Defendants are Google's controlling shareholders and senior most executives – defendants Eric E. Schmidt, Larry Page and Sergey Brin – and directors – defendants John L. Hennessy, K. Ram Shriram, Shirley M. Tilghman, L. John Doerr and Paul S. Otellini (together, the "defendants").

2.      As corporate fiduciaries, defendants, individually and collectively, owe Google a duty of loyalty (and good faith) to conduct the Company's business and operations in accordance with the applicable federal laws.  Under Delaware law, directors who breach their duty of loyalty may be held liable to the corporation for damages arising from their faithless acts and/or omissions.

3.      The Second Amended Complaint alleges that defendants, individually and collectively, breached their fiduciary duty of loyalty by allowing Canadian online pharmacies to place ads for the sale of prescription drugs without a prescription on Google's website in violation of the Federal Food, Drug, and Cosmetic Act ("FD&C Act") and other laws.  And, as a result of defendants' disloyalty, in August 2011, Google paid $500 million, as well as admitted to and accepted responsibility for violating 21 U.S.C. §331(a) and (d) and 21 U.S.C. §952, to resolve claims brought by the United States Department of Justice ("DOJ").

4.      On September 26, 2013, the Court granted defendants' motion to dismiss (the "Order") because the previous complaint did not adequately allege futility of demand.  More particularly, the Court concluded that the previous complaint only alleged "that one director (Schmidt) is 'interested,' and one director (Tilghman) lacks independence."  Order at 14. Reasonable doubt as to defendant Schmidt's disinterestedness existed because he admitted that he became aware of the illegal Canadian ads on Google's website in around 2004.  *Id.* at 10. Reasonable doubt that defendant Tilghman was independent from interested director Schmidt existed because of Tilghman's "position as president of Princeton University, where Schmidt is an alumnus 'who created a $25 million endowment fund, and was a former trustee who exercised control over Tilghman's compensation and employment.'"  *Id.* at 13.

5. As to defendants Page and Brin, on the issue of disinterestedness, the Court concluded that the previous complaint did not "identify any specific action or knowledge on the part of either" of these defendants, *id*. at 9, and, "in order to raise a reasonable doubt that Page [or Brin] was 'disinterested,'" plaintiffs "must provide actual factual allegations that Page [or Brin] was aware of the illegal ads." *Id.* at 11. The Second Amended Complaint cures this defect by pleading, with particularity, facts demonstrating that Page and Brin received emails from, and participated in conversations with other top Google officials regarding Google's advertising policy for online pharmacies that gave them personal knowledge that online pharmacies were selling prescription drugs without a prescription via Google's website. *See* ¶¶6, 28-70, *infra*. Indeed, defendant Schmidt received many of the same emails as defendants Page and Brin received and, understandably as a result, had to admit his personal knowledge of the illegal Canadian ads during his September 21, 2011 testimony before the United States Senate Judiciary Committee.

6. For example, ¶¶49 and 60, allege that on October 21, 2003, defendants Page and Brin received an email forwarding a copy of Drugstore.com's press release. The Drugstore.com press release described the dangers of Canadian pharmacies, stating:

> While the problem of enforcing our existing laws against illegal pharmacies is complicated, an immediate solution to the problem is very simple. ***Illegal pharmacies rely on the incredible amount of traffic generated by their advertisements on major Internet search engines, such as Google***, MSN, and Yahoo. The first step in protecting public health and safety, drugstore.com management states, is for the search engines to voluntarily stop accepting rogue pharmacy ads. Until then, or until Congress forces search engines to stop accepting such advertising, consumers are warned to be very cautious about ads for prescription medications that sound too good to be true.

> "It's unfortunate that major search engines, which are trusted by the public, are enabling rogue pharmacies to trick the public," continued Neupert. "While technology has effectively helped streamline the delivery of prescription drugs and substantially lowered the cost of drugs, our public policy to safeguard the transactions has not kept pace. ***We sincerely hope that Yahoo, MSN, Google, and other search engines do the right thing and refuse to carry these ads***. If not, then Congress needs to protect the public by making it unlawful to sell advertising space to companies that provide illegal pharmacy services, such as re-importation, shipping without a legitimate prescription, and misrepresentation."

7. Taken together, the Second Amended Complaint's factual allegations are sufficient to raise a reasonable doubt as to Page and Brin's disinterestedness, because, as the evidence shows, by October 2003, each of them was aware of the illegal Canadian ads. Yet, when faced with this

illegality, they continued Google's advertising policy regarding online pharmacies in a manner that allowed Canadian online pharmacies to continue to sell prescription drugs illegally via Google's website. As a result, defendants Page and Brin, individually and collectively, breached their fiduciary duty of loyalty by failing to conduct Google's business in accordance with the applicable laws. Thus, defendants Page and Brin are each "interested" because they each face a substantial likelihood of liability for breaching their fiduciary duty of loyalty (and good faith). Order at 8-9.

8. Moreover, as a byproduct of the interestedness of Page, Brin and/or Page and Brin, defendants Hennessy and Shriram lack independence for purposes of demand futility. A reasonable doubt that defendants Hennessy and Shriram were independent from "interested" director Page or "interested" director Brin exists because Hennessy and Shriram "'have executive positions at Stanford University,' where Page and Brin are alumni, and because 'Stanford has received over $14.4 million from Google since 2006.'" *Id.* at 12.

9. In sum, the Second Amended Complaint cures the pleading defects identified in the Court's September 26, 2013 Order. The factual allegations of the Second Amended Complaint, when taken as true, raise a reasonable doubt the three directors (Schmidt, Page and Brin) are "interested," because each of them had personal knowledge of the illegal Canadian ads. *Id.* at 11, 14. The Second Amended Complaint's allegations also raise a reasonable doubt that three directors (Tilghman, Hennessy and Shriram) lack independence from one or more "interested" directors. *Id.*

10. Accordingly, a majority of the Google nine person Board of Directors ("Board") is not disinterested and/or independent. And, even if Page or Brin (but not both) are somehow deemed disinterested for purposes of demand futility, a majority of the nine person Google Board still will not be disinterested and/or independent. Therefore, a pre-suit demand upon the Google Board to bring, let alone vigorously prosecute the derivative claims is futile and excused as a matter of law.

**INTRADISTRICT ASSIGNMENT**

11. A substantial portion of the misconduct challenged in this Second Amended Complaint occurred in Santa Clara County. However, pursuant to the Court's Related Case Order, dated September 19, 2011, the case was transferred to the Oakland Division.

SECOND AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT - CV-11-04248-PJH                                                      - 3 -

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the actions brought by plaintiffs Patricia H. McKenna (Case No. CV-11-04248-PJH) and Avrohom Gallis (Case No. CV-11-04270-LHK) under 28 U.S.C. §1332(a)(1), because plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  These actions are not collusive actions designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     This Court has jurisdiction over the action brought by plaintiff James Clem (Case No. CV-11-04249-RMW) under Article III of the United States Constitution and 28 U.S.C. §1331 because the underlying wrongdoing results from violations of the FD&C Act, 21 U.S.C. §331(a) and (d), and the Controlled Substances Act, 21 U.S.C. §952.  This Court has supplemental jurisdiction under 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this Court under 28 U.S.C. §1391(a) because: (i) Google maintains its executive offices and principal place of business in this District; (ii) one or more of the defendants either resides in or maintains offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting in violation of fiduciary duties owed to Google, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

16.     Plaintiffs McKenna, Gallis and Clem purchased Google shares on May 18, 2005, November 5, 2007, and June 29, 2007, respectively.  Each plaintiff has continuously held their Google shares since purchase and each plaintiff continues to own their Google shares.  Plaintiffs McKenna, Gallis and Clem are citizens of the States of Pennsylvania, New York and California, respectively.

17.     Nominal party Google is a Delaware corporation, with its executive offices located at 1600 Amphitheatre Parkway, Mountain View, CA 94043.  Google is the world's largest Internet search engine and generates revenue primarily by delivering relevant, cost-effective online advertising.  Google is a citizen of the State of California.

18.     Defendant Page, a Google founder, has been a Google Director since September 1998.  He has also served as the Company's Chief Executive Officer ("CEO") since April 4, 2011.  Page previously served as Google's President, Products, from 2001 to April 3, 2011, CEO from 1998 to 2001, and Chief Financial Officer ("CFO") from 1998 to 2002.  Page is a citizen of the State of California.

19.     Defendant Brin, a Google founder, has been a Google Director since September 1998.  Brin previously served as Google's President, Technology, from 2001 to April 3, 2011, and as the Company's President and Chairman from 1998 to 2001.  Brin is a citizen of the State of California.

20.     Defendant Schmidt has been a Google Director since 2001.  He has also been the Executive Chairman of the Google Board since April 4, 2011.  Schmidt previously served as Google's CEO from 2001 to 2011, and Chairman of the Google Board from 2001 to 2004 and 2007 to April 2011.  The Court held that defendant Schmidt is "interested" because he was aware of the illegal Canadian ads.  *See* Order at 10.  Schmidt is a citizen of the State of California.

21.     Defendant Hennessy has been a Google Director since 2004.  Hennessy also serves or served as the President of Stanford University, where "interested" directors Page and Brin are alumni and Google has donated more than $14.4 million since 2006.  Hennessy is a citizen of the State of California.

SECOND AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT - CV-11-04248-PJH                                                                                          - 5 -

22. Defendant Shriram has been a Google Director since 1998. Shriram is also on the board of trustees of Stanford University, where "interested" directors Page and Brin are alumni and Google has donated more than $14.4 million since 2006. Shriram is a citizen of the State of California.

23. Defendant Tilghman has been a Google Director since 2005. Tilghman also serves or served as the President of Princeton University, where "interested" director Schmidt, an alumnus of Princeton University, created a $25 million endowment fund and, as a former Trustee, exercised control over Tilghman's compensation and employment. This Court held that defendant Tilghman lacks independence from "interested" director Schmidt. *See* Order at 13. Tilghman is a citizen of the State of New Jersey.

24. Defendant Doerr has been a Google Director since 1999. Doerr also served on the board of directors of Drugstore.com, when Drugstore.com's CEO was urging Google to clamp down on illegal online pharmacy ads that were appearing on its website. ¶52, *infra*. Doerr is a citizen of the State of California.

25. Defendant Otellini has been a Google Director since 2004. Otellini is a citizen of the State of California.

## AIDING AND ABETTING AND CONCERTED ACTION

26. In committing the wrongful acts particularized herein, defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design. In addition to the wrongful conduct particularized herein as giving rise to primary liability, defendants further aided and abetted and/or assisted each other in breach of their respective duties.

27. Each of the defendants aided and abetted and rendered substantial assistance in the wrongs detailed herein. In taking such actions to substantially assist the commission of the wrongdoing detailed herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his, her, or its overall contribution to and furtherance of the wrongdoing.

28.     At all relevant times, defendants Schmidt, Page and Brin served as Google's top three executive officers.  By virtue of their Class B share ownership, they also are Google's controlling shareholders.

29.     As detailed below, the evidence shows that defendants Schmidt, Page and Brin became aware of the illegal Canadian ads by no later than October 2003, and when faced with this illegality, continued Google's advertising policy for online pharmacies in a manner that allowed Canadian online pharmacies to continue to sell prescription drugs without a prescription via Google's website.

30.     As a result, defendants Schmidt, Page and Brin, who, as directors, owe Google a duty of loyalty to conduct the Company's business in accordance with federal law, face a substantial likelihood of liability to Google for damages arising from the illegal pharmacy ads.  Thus, a reasonable doubt as to the disinterestedness of defendants Schmidt, Page and/or Brin, exists; and a pre-suit demand on them, individually or collectively, to bring the derivative claims is excused as a matter of law.

**Defendant Schmidt Is Interested Because**
**He Knew About the Illegal Canadian Ads**

31.     Defendant Schmidt admitted on September 21, 2011, while testifying before the United States Senate Judiciary Committee, that he was aware of the illegal Canadian ads on Google's website, and that he acquired this knowledge around 2004.  Specifically, when asked whether the online Canadian pharmacy ads that ultimately forced Google to enter into a Non-Prosecution Agreement with the DOJ, in which Google paid $500 million and specifically admitted and accepted responsibility for violating 21 U.S.C. §§331(a) and (d) and 21 U.S.C. §952 "was the result of oversight or inadvertence, or were there some employees in the company that were doing this without your knowledge," defendant Schmidt answered, "well, certainly not without my knowledge."  Defendant Schmidt also testified that he "first learned of the issue," *i.e.*, the illegal Canadian ads issue, around 2004.

32.     Among other things, defendant Schmidt's admission was based on emails that he received from other top ranking Google officials about the Company's advertising policy regarding online pharmacies. Defendant Schmidt received the first of these emails in August 2003, and the emails show that, although defendant Schmidt was aware of the illegal Canadian ads and that U.S. consumers could purchase prescription drugs without a prescription on Google's website, he continued Google's advertising policy for online pharmacies in a manner that allowed Canadian online pharmacies to continue to illegally sell prescription drugs via Google's website. Defendants Page and Brin received many of the same emails as defendant Schmidt received.

33.     For example, on August 22, 2003, defendant Schmidt received an email from Regan Hurley, Google's then Director of Northwest Region. The email summarized Hurley's conversation with Drugstore.com during which Drugstore.com alerted Google to the illegality and risks associated with permitting rogue pharmacies to advertise prescription drugs on Google's website. The email stated, in relevant part, as follows:

Goal: Educate Google executives on the risks associated with the continued paid sponsorship of rogue pharmacies

Multiple national agencies have declared the Importation process illegal and a risk to US consumers. The key takeaways are:

*__Importation of medication is illegal__

*Risk of counterfeit product

*Risk of contaminated product

*Risk of expired or duplicative therapy

*Unregulated by both US and Canadian/Mexican Authorities (FDA and FDA equivalent) as no consistent safety and quality controls exist for purchasing and receipt of prescription medications

Agencies include:

*FDA· Federal Drug Administration

*__Violation of Food, Drug, and Cosmetic Act to import prescription product__.

*Foreign product may not meet all the requirement [sic] for US approval, and thus qualifies as an unapproved product

*Medications are frequently labeled incorrectly

*Extremely unlikely that a pharmacy could ensure all applicable legal requirements are met

*Individuals and business that cause those shipments also violate the act and are therefore civilly and criminally liable. (RX Depot store front issue cease and desist)

34. On August 22, 2003, in response to Hurley's email regarding Drugstore.com's critique of Google's policy regarding online pharmacy advertisers, defendant Schmidt emailed to defendant Brin (and others), stating:

This is a request to not accept advertisers who are advertising items like viagra from online pharmacies that may or may not be properly licensed. Please review the request and let me know your thoughts.

Thanks eric

35. On October 21, 2003, defendant Schmidt received a copy of an email from Sheryl Sandberg, Google's then Vice President of Global Online Sales & Operations to Alana Karen and other top Google insiders, that further alerted him to the problems with Google's advertising policy for online pharmacies. The email stated, in relevant part, as follows:

As I believe everyone is aware, there is a lot of concern about pharma policy [Google's Internet pharmacy advertising policies]. I think we need the following info pulled together. Please send to Alana and to me:

*Revenue breakdown (Betsy, Eric) – what do we know about how much revenue comes from pharma? How much is online vs. direct?

*Who are our direct pharma customers (Maryann [Belliveau])? Are they approved by the NABP? (Is prescriptiondrugs.com approved?)

*What is the complete list of pharma companies that are approved by the NABP (Alana [Karen])?

*If we wanted to tighten up but not go all the way to approved by NABP what are the options (Alana [Karen])?

*Alana [Karen] – please check with legal and if they are ok, *please have someone go to a good sample of our online advertisers and try to buy vicodin or something similar that you need a prescription for. Have them take notes on their experience and see if they ask for prescription*. Not sure if you have to go all the way to purchase to answer the question. Better not to.

36. On October 21, 2003, defendant Schmidt received another email from Sandberg forwarding to Schmidt a description of Google's purported current advertising policy for online

pharmacies (the "pharma" policy) and a potential future pharma policy. The email stated, in relevant part, as follows:

> Current Pharma Policy
>
> We allow the advertisement of online pharmacies ONLY IF they require a prescription or a doctor's consultation. If advertiser will sell prescription drugs without prescription or doctor's consultation, we disapprove.
>
> *This includes foreign pharmacies
>
> *Pharmaceutical comparison or finder Sites are judged by same criteria
>
> We will not allow the advertisement of pharmaceutical drugs that are not yet approved by FDA such as Cialis and Levitra.
>
> We do not allow pharmaceutical advertising to target the UK. Also stricter policies in Japan.
>
> Potential Pharma Policy
>
> We will not allow the advertisement of online pharmacies unless approved by Verified Internet Pharmacy Practice Sites (VIPPS) program of NABP (National Association of Boards of Pharmacy). If there are reciprocal approval boards for Internet sites in other countries, we will approve sites approved by those boards as well.
>
> *There are few International boards that have approved Internet sites as of yet
>
> *Note: Current best way to do this is to block all keywords which effectively blocks non-pharma related ads and pharmaceutical companies themselves until we have technical fix.
>
> Unlicensed question
>
> To be VIPPS certified, a pharmacy must comply with the licensing and inspection requirements of their state and each state to which they dispense pharmaceuticals.
>
> Backing into this question, 'unlicensed pharmacies' are not necessarily complying with the licensing and inspection requirement of their state and each state to which they dispense pharmaceuticals.
>
> I think it is safe to say that we have been accepting sites that do not necessarily meet those requirements.
>
> Former Data Pull info
>
> REDACTED
>
> REDACTED

37. On October 22, 2003, defendant Schmidt received an email from Mary Ann Belliveau, Google's then Vertical Market Manager for Healthcare, pointing out that Google's current "pharma" policy allows online pharmacies advertising with Google to sell prescription drugs without a prescription. The email stated, in relevant part, as follows:

> Just to avoid any confusion – Sheryl (Sandberg) is talking about "Online Pharmacies" not pharmaceutical companies (which we subcategorized as "pharma"). So we're talking about online pharmacies like www.fastestrx.com not drug manufacturers like Pfizer and Novartis.
>
> "Rogue" online pharmacies generally fall into two categories –
>
> A) Canadian Pharmacies selling discounted drugs into the US market. Some press is positive i.e. senior citizens who have no drug coverage and can save money buying these drugs from Canada. Some press is negative (counterfeit drugs, safety issues)
>
> B) US online pharmacies charging high prices for prescription drugs (mostly diet pills, pain killers and erectile dysfunction medication). Most press on US online pharmacies is negative and escalating quickly.
>
> I'll try to address most of Sheryl's questions. This is obviously a thorny subject and the inability of our government to police the rogue pharmacies puts us in an awkward position.
>
> 1) Betsy and Eric N started this project when Eric, Regan and I met with drugstore.com – REDACTED
>
> 2) Eric N can send ·you a full list of direct and online pharmacy clients (there are many and the names and urls change constantly). Most of these advertisers are not VIPPS approved (see VIPPS approved list below). We do work with several VIPPS approved clients currently – i.e. drugstore.com, medcohealth.com – but they currently advertise other areas of their business (over the counter products, content). Currently, the VIPPS approved clients like drugstore.com cannot compete with the CPCs of the "rogue pharmacies" who sell drugs directly online and have a totally different back end metric (CPCs are too high – shutting out the VIPPS pharmacies).
>
> 3) VIPPS approved list http://www.nabp.net/vipps/consumerllistall.asp
>
> Detail Web Business Name Website Address
>
> accuratepharmacy.com www.accuratepharmacy.com
>
> AdvanceRx.com www.AdvanceRx.com
>
> Anthem Prescription www.anthemprescription.com
>
> Caremark Inc. www.rxrequest.com
>
> ellckpharmacy.com www.clickpharmacy.com
>
> CVS Washington, Inc., dba CVS.com www.cvs.com

1    drugstore.com WWW.drugstore.com

2    Express Pharmacy Services/Eckerd.com www.Eckerd.com

3    Familymeds.com www.Familymeds.com

4    Medco Health Solutions, Inc. www.medcohealth.com

5    NCS Healthcare dba Care For Life www.careforlife.com

6    RxWEST Pharmacy www.rxwest.com

7    Tel-Drug, Inc./CIGNA www.teldrug.com

8    walgreens.com, Inc. www.walgreens.com

9    4) If we wanted to tighten up but not go all the way we could refuse advertising for
10   controlled substances (the online sale of narcotics is obviously causing the most
     problems). However, this would be very difficult to monitor as the list is long and
11   would have to include the generic names of these drugs. It also would address only
     part of this issue and we would still face potential criticism in other areas – i.e.
12   counterfeit drugs, watered down drugs, etc.

13   5) *You absolutely can buy vicodin, valium, xanax from these advertisers without
     seeing a live doctor. It's very easy and it's been done by numerous reporters. Most
     of these advertisers are not shy about what they're doing http://www. google.com/*
14   *search?sourceid=navclient&ie=UTF-8&oe=UTF-8&q=pain+klllers.*

15   Please. call me if you have any questions

16   Thanks, Mary Ann

17          38.    As result of the October 21 and 22, 2003 emails, defendant Schmidt knew, among

18   other things, that online pharmacies advertising on Google were selling prescription drugs without a

19   prescription, and that Google users could buy Vicodin, Valium and Xanax from Google advertisers

20   without a prescription and without even seeing a doctor.

21          39.    A few days later, on October 27, 2003, defendant Schmidt received yet another email

22   discussing the fact that Google's official policy of not allowing pharmacies to advertise on Google if

23   they sold prescription drugs without a prescription was a sham and that the only requirement that

24   Google imposed on Internet pharmacies was that they claim to require a prescription. The

25   October 27, 2003 email from Sandberg, Google's then Vice President of Global Online Sales &

Operations, sent via emg@google.com, the email listserv for the Google executive management group that includes Schmidt, Page and Brin, stated, in relevant part, as follows:

> I believe pharma policy may be a topic in today's EMG meeting.

> Our current policy is that we allow the advertisement of online pharmacies, both domestic and foreign, only if the site claims to require a prescription. Pharmaceutical comparison or finder sites are judged by same criteria. We do not allow the advertisement of pharmaceutical drugs that are not yet approved by FDA such as Cialis and Levitra. We do not allow pharmaceutical advertising to target the UK and have stricter policies in Japan. ***As with all of our policies, we do not verify what these sites actually do, only what they claim to do***.

> Public awareness of the ability of people to get drugs through online pharmacies is increasing and as we all know, drugstore.com is using the press to try to force us and others to change their policies. Overture/Yahoo, who has long had the same policy we have, is likely to change their policy to be more restrictive this week. We may get a heads up before they announce a policy change.

> Our options are:

> 1) Keep policy the same. Good for consumers overall as it increases availability of pharmaceuticals but means that the bad stories will continue.

> 2) Classify pharma ads as nonfamily. This means that anyone with a safe search filter on will not see them. I think we should do this regardless of any other steps we chose to take.

> 3) Mark pharma ads. The idea would be to mark pharma ads with a Pharma-specific label. If you clicked on the label, we would take you to a page which would have a carefully worded warning on pharma practices. (Larry – this is Salar's idea of what you were suggesting. Is this what you had in mind?)

> 4) Only accept pharmas that have been approved by Verified Internet Pharmacy Practice Sites (VIPPS) program of NABP (National Association of Boards of Pharmacy). If there are reciprocal approval boards for Internet sites in other countries, we' will approve sites approved by those boards as well. This would be a very restrictive policy as fewer than 20 pharmas have been approved by this board (Drugstore.com is of course one of them). Interestingly enough, one of the pharmas with questionable practices highlighted in the NYTimes article had actually been approved by them, but the Board claims that this was a mistake they will not repeat. Despite this, this is our most conservative option.

> 5) Involve a third-party verifier. Based on my conversation with Overture, this seems to be what they are considering. They do it for wine sellers now. The way it works for wine sellers on Overture is that in order to advertise wine on Overture, you first have to register with a company called Square Trade. The advertiser pays Square Trade $50 to be certified that they are adhering to all local and national laws. Square Trade mystery shops its customers to make sure they do what they claim to do. Overture is considering extending this to pharma. eBay also uses third-party verifiers for some categories. We have never done this so it would be a real policy shift for us. We have long held that we can't police the web; if we do this, we will be

taking a much more active posture towards controlling what our advertisers do then we ever have before.

We do not make these decisions based on revenue, but as background, ·REDACTED

I am flying this afternoon but Alana Karen is in the office to answer any questions.

Sheryl

40.     Two days later, on October 29, 2003, defendant Schmidt received another email from Sandberg, via emg@google.com, describing a conversation she had with Drugstore.com regarding, among other things, Google's advertising policy for online pharmacies.  The email stated, in relevant part, as follows:

Regan, Maryann, Alex, and I spoke to our friends at Drugstore.com today.

Their points were the following:

- They argue that they are doing this to save the world.

- They claim that all non-VIPPS approved online pharmacies are illegal (which we do not believe to be the case).

- They will continue to push us and all others to restrict online advertising for online pharma.

- They believe others will announce changes and are therefore "leaders" and we are killing people.  (No joke – Kal said this.)

- They said they will give us a heads up if they are putting out press releases with our name, but I am not sure I believe them.

The points we made were:

- We listened and made sure they knew we heard all of their policy concerns.

- We asked if they were concerned that they had a commercial interest in this policy change.  Their response was that they care only for consumers.

- We asked them to not send out meeting agendas or mock press releases with our name in it without our approval.

- We told them that we were thinking through the policy concerns and that if we had any changes to announce, we would let them know.  We would not, however, be participating in their suggested announcement (attached).

Frosty call at best.  Their tactics are outrageous.  I felt like I was back in Washington on a really bad day . . . .

1   Omid – If you need an email that can be forwarded to BC and JD, draft below.

2   EMAIL THAT CAN BE FORWARDED:

3   POLICY ISSUE

4   Our current policy is that we allow the advertisement of online pharmacies, both
    domestic and foreign, only if the site claims to require a prescription.
5   Pharmaceutical comparison or finder sites are judged by same criteria.  We do not
    allow the advertisement of pharmaceutical drugs that are not yet approved by FDA
6   such as Cialis and Levitra.  We do not allow pharmaceutical advertising to target the
    UK and have stricter policies in Japan.  As with all of our policies, we do not verify
7   what these sites actually do, only what they claim to do.

8   There is much discussion about the practices some online pharmacies follow.  While
    we do not allow pharmacies who claim not to require prescriptions to run, it is
9   possible that some of the pharmacies we approve do not follow their own stated
    policies carefully.  We are considering not showing these ads to children by ceasing
10  to show ads to users with a safe-search (family safe) filter on.  We are also
    considering finding some other way to mark online pharma ads.  A final decision on
11  these steps has not been made.

12  We are not prepared to adopt a more restrictive stance, such as only approving
    pharmas approved by the Verified Internet Pharmacy Practice Sites (VIPPS) program
13  of NABP (National Association of Boards of Pharmacy).  Our policy is designed to
    provide maximum information and choice to users and being this restrictive is in
14  conflict with that goal.

15  This is an area where the law is still developing.  We are planning on watching any
    legislative changes very closely and will react appropriately.

16  DRUGSTORE.COM

17
    Over the past two weeks, Drugstore.com has been using very aggressive tactics to get
18  us, Yahoo, MSN, Overture, and others to only accept ads from pharmas approved by
    VIPPS.  They have sent out press releases, tried to call a meeting of all of these
19  players, and tried to put public and private pressure on us to change our policy.
    Yesterday they sent a mock press release to us and other search players which
20  included sample quotes from us without our knowledge or acquiescence (attached).
    They also state the case much more broadly than we believe to be true; e.g., calling
21  all non-VIPPS approved pharmacies "illegal" which they are not.

22  We take their concerns very seriously and many members of our exec team have
    spoken with them in the past week.  Most recently, we spoke with their CEO today.
23  We listened to their policy concerns and made sure that they knew we heard them.
    We did not agree to any policy changes but said that we will let them know if we
24  were making any changes.  They made it clear that they will continue to fight this in
    the public realm.

25
    41.     On November 17, 2003, defendant Schmidt received an email from Sandberg via
26

27  emg@google.com noting that Google faced a serious public relations issue as the only remaining

28

search engine still accepting ads from online pharmacies without attempting to verify their practices. The email stated, in relevant part, as follows:

> Please forgive my bringing up an issue we have already discussed, but I think this is worth at least one more email, and potentially more discussion. Given that Overture moved so aggressively and they supply ads to Yahoo and MSN, and given that AOL is blocking all of these ads, we are the only player in our industry still accepting these ads. I continue to think that although there is some commercial harm to shutting down these ads, the PR/brand risk we are taking by being out there on our own may not be worth it. I thought this was worth bringing up again as the actions of our competitors this week has increased our PR/brand risk significantly.
>
> (Of course, feel free to ignore this email if no one thinks this decision is worth revisiting.)
>
> Sheryl

42. On November 18, 2003, defendant Schmidt received an email from Cindy McCaffrey, Google's then Vice President of Corporate Marketing via emg@google.com echoing Sandberg's concerns about Google's advertising policy for online pharmacies. The email stated, in relevant part, as follows:

> I definitely think it's worth revisiting. This is a very serious matter and needs to be addressed quickly. I understand that Sheryl had a very tough interview this morning with the same Washington Post reporter Larry talked to a few weeks ago (David K. will be sending a summary). She did a great job, but we do not have a good response to this issue and it is not going to go away. The industry is moving fast to remove most pharma ads; our gesture to address this will be perceived as just not enough compared with what the other companies are doing. I understand that we should not let other companies, press, etc. influence our decision-making around policy, but I think you should understand that this has become a big, big issue and the potential of serious harm to our brand among our users is very real. The Post plans to run with a story next week. We'll be cast as the only company not moving quickly enough to address this issue.
>
> If we can make something happen quickly, we can get back to reporter this week and save ourselves from disaster in the media. We just don't need this.

43. On November 18, 2003, defendant Schmidt received an email via emg@google.com echoing Sandberg and McCaffrey's concerns and providing more details about the *Washington Post* article. The email stated, in relevant part, as follows:

> Here's the scoop on the Washington Post call:
>
> *A story is scheduled to run in next week's paper; I expect it will be very negative for Google and will position us in an unfavorable light.

*The reporter will devote this article to the role search engines and portals play between illegal online pharmacies and consumers. As all of Google's competitors have recently adapted their policies to restrict these ads, we'll be criticized for holding out and not reacting quickly.

*The article will also challenge our interpretation of the law. The reporter and reps. from the FDA (who will be quoted) believe that Google AdWords is facilitating the illegal distribution of pharm. drugs online. They have analyzed our pharm. advertisers extensively and have determined that a majority of these businesses are illegal.

*And as Cindy noted below . . . as much as we push the message that we are currently reviewing our policies and will ultimately do the right thing, our efforts are not perceived as aggressive enough – this is amplified by the recent changes by OVER (Overture).

*The message we also use about providing the broadest range of choices to our users also doesn't hold water in this case, as most of these questionable online pharmacies charge a 3x premium over sites like walgreens.com.

*Lastly, the story of the 15 year-old who became addicted to Hydrocodone will also be reflected in this article – and as we all know, the father blames Google AdWords for connecting his son to an online pharm. that sold him these pills sans prescription. Sheryl has recently spoken to the father and further explained our point of view, but he's of the opinion that we should remove these ads entirely.

It would be great to be finalize [sic] any changes we might make this week, so we can brief the Washington Post before this article goes to print.

David

44. Based on the emails, and conversations contained therein, defendant Schmidt became aware of the illegal Canadian ads by no later than October 2003, and, when faced with this illegality, continued Google's advertising policy for online pharmacies in a manner that allowed Canadian online pharmacies to continue to sell prescription drugs without a prescription via Google's website.

45. By doing so, defendant Schmidt breached his fiduciary duty of loyalty (and good faith) owed to Google and, under Delaware law, is liable to the corporation for the damages arising from his breach of fiduciary duty. Thus, the foregoing evidence, taken as true, is sufficient to raise a reasonable doubt as to defendant Schmidt's disinterestedness, as defined in the Court's Order at 8-9 ("As is particularly relevant here, a reasonable doubt as to a director's disinterestedness also exists where a director faces a 'substantial likelihood' of liability for breaching his fiduciary duty of loyalty (and good faith)."). Therefore, because defendant Schmidt is interested in the outcome of this

litigation, a pre-suit demand for him to bring, let alone vigorously prosecute the derivative claims is futile and excused as a matter of law.

**Defendant Page Is Interested Because**
**He Knew About the Illegal Canadian Ads**

46.     Defendant Page became aware of the illegal Canadian ads on Google's website in October 2003.  Just as defendant Schmidt, defendant Page received emails from, and participated in conversations with other top ranking Google officials regarding the Company's advertising policy for online pharmacies.  Although Google's so-called "pharma" policy purportedly did not allow the sale of prescription drugs without a prescription, defendant Page knew that Canadian online pharmacies could, and did, sell prescription drugs without a prescription on Google's website, and when confronted with this illegality, defendant Page continued Google's policy, with disastrous consequences for the Company.

47.     For example, on October 21, 2003, defendant Page received an email from Sandberg, Google's then Vice President of Global Online Sales & Operations, forwarding a description of Google's purported current advertising policy for online pharmacies and a potential future pharma policy.  The email stated, in relevant part, as follows:

Current Pharma Policy

We allow the advertisement of online pharmacies ONLY IF they require a prescription or a doctor's consultation.  If advertiser will sell prescription drugs without prescription or doctor's consultation, we disapprove.

*This includes foreign pharmacies

*Pharmaceutical comparison or finder Sites are judged by same criteria

We will not allow the advertisement of pharmaceutical drugs that are not yet approved by FDA such as Cialis and Levitra.

We do not allow pharmaceutical advertising to target the UK.  Also stricter policies in Japan.

Potential Pharma Policy

We will not allow the advertisement of online pharmacies unless approved by Verified Internet Pharmacy Practice Sites (VIPPS) program of NABP (National Association of Boards of Pharmacy).  If there are reciprocal approval boards for Internet sites in other countries, we will approve sites approved by those boards as well.

*There are few International boards that have approved Internet sites as of yet

*Note: Current best way to do this is to block all keywords which effectively blocks non-pharma related ads and pharmaceutical companies themselves until we have technical fix.

Unlicensed question

To be VIPPS certified, a pharmacy must comply with the licensing and inspection requirements of their state and each state to which they dispense pharmaceuticals.

Backing into this question, 'unlicensed pharmacies' are not necessarily complying with the licensing and inspection requirement of their state and each state to which they dispense pharmaceuticals.

I think it is safe to say that we have been accepting sites that do not necessarily meet those requirements.

Former Data Pull info

REDACTED

REDACTED

48.     On October 21, 2003, defendant Page also received an email from Tim Armstrong, Google's then President of Americas Operation, describing a troubling conversation with Drugstore.com regarding Google's online pharmacies advertising policy, which Drugstore.com viewed as overly permissive because it allowed the pharmacies to sell prescription drugs without a prescription.  The email stated, in relevant part, as follows:

I just spoke with their [Drugstore.com's] CEO – Kal and our RSM Regan.  He had the following things to say –

He will be sending the press release to us as soon as it is done

We will be in the release regardless of how we feel about because this is his chance to protect his vertical

AOL is handling this correctly in his mind, so they will not be in the press release

Drugstore.com is making a full assault on Washington, DC.  Peter Neupert, their chairman, is spending the next few weeks in DC to lobby and do press interviews – Drugstore also hired a PR/Lobby group to help them out

We discussed Google's reaction to issues like these – we·look at the user experience, we look at the clarity of the situation, precedent for Google of taking actions or filtering – all of these issues

His take on the situation: This is his shot to clean out the black market players and to protect his vertical

My message back to him was: We understand his passion for the subject, but we would rather work this out together instead of in the press. We would like to not be in the release and being in the release may cause us to strongly word our message about open information and user choice – and that Drugstore may have self-serving reasons that are not connected to users health issues (in a smoother manner). I did mention the press release may backfire with us because it would force us to be vocal about self-serving nature of the press release.

The net-net is this – he is set on doing this and he sees this as his opportunistic chance to get Washington on his side.

Look for the release and if it is really damaging, we can call him back and discuss it with him. I told him to expect a call from us after we have a copy of the release – TA

49.     On October 21, 2003, defendant Page received an email forwarding a copy of Drugstore.com's press release. The Drugstore.com press release described the dangers of Canadian pharmacies, the Verified Internet Pharmacy Practice Sites ("VIPPS") certification program of the National Association of Boards of Pharmacy ("NABP") and that only a handful of pharmacies had earned VIPPS certification. The Drugstore.com press release also singled out Google for their role, along with a few other search engines, in driving traffic to rogue pharmacies by permitting them to advertise on Google's website. More specifically, the Drugstore.com press release that defendant Page received on October 21, 2003, stated, in relevant part, as follows:

While the problem of enforcing our existing laws against illegal pharmacies is complicated, an immediate solution to the problem is very simple. **Illegal pharmacies rely on the incredible amount of traffic generated by their advertisements on major Internet search engines, such as Google**, MSN, and Yahoo. The first step in protecting public health and safety, drugstore.com management states, is for the search engines to voluntarily stop accepting rogue pharmacy ads. Until then, or until Congress forces search engines to stop accepting such advertising, consumers are warned to be very cautious about ads for prescription medications that sound too good to be true.

"It's unfortunate that major search engines, which are trusted by the public, are enabling rogue pharmacies to trick the public," continued Neupert. "While technology has effectively helped streamline the delivery of prescription drugs and substantially lowered the cost of drugs, our public policy to safeguard the transactions has not kept pace. **We sincerely hope that Yahoo, MSN, Google, and other search engines do the right thing and refuse to carry these ads**. If not, then Congress needs to protect the public by making it unlawful to sell advertising space to companies that provide illegal pharmacy services, such as re-importation, shipping without a legitimate prescription, and misrepresentation."

50.     A few days later, on October 27, 2003, defendant Page received yet another email discussing the fact that Google's official policy of not allowing pharmacies to advertise on Google if they sold prescription drugs without a prescription was a sham and that the only requirement that Google imposed on Internet pharmacies was that they clam to require a prescription.  The October 27, 2003 email from Sandberg, Google's then Vice President of Global Online Sales & Operations, to Page, sent via emg@google.com, the e-mail listserv for Google's executive management that includes Page, Schmidt and Brin, stated, in relevant part, as follows:

I believe pharma policy may be a topic in today's EMG meeting.

Our current policy is that we allow the advertisement of online pharmacies, both domestic and foreign, only if the site claims to require a prescription. Pharmaceutical comparison or finder sites are judged by same criteria.  We do not allow the advertisement of pharmaceutical drugs that are not yet approved by FDA such as Cialis and Levitra.  We do not allow pharmaceutical advertising to target the UK and have stricter policies in Japan.  As with all of our policies, we do not verify what these sites actually do, only what they claim to do.

Public awareness of the ability of people to get drugs through online pharmacies is increasing and as we all know, drugstore.com is using the press to try to force us and others to change their policies.  Overture/Yahoo, who has long had the same policy we have, is likely to change their policy to be more restrictive this week.  We may get a heads up before they announce a policy change.

Our options are:

1) Keep policy the same.  Good for consumers overall as it increases availability of pharmaceuticals but means that the bad stories will continue.

2) Classify pharma ads as nonfamily.  This means that anyone with a safe search filter on will not see them.  I think we should do this regardless of any other steps we chose to take.

3) Mark pharma ads.  The idea would be to mark pharma ads with a Pharma-specific label.  If you clicked on the label, we would take you to a page which would have a carefully worded warning on pharma practices.  (Larry – this is Salar's idea of what you were suggesting.  Is this what you had in mind?)

4) Only accept pharmas that have been approved by Verified Internet Pharmacy Practice Sites (VIPPS) program of NABP (National Association of Boards of Pharmacy).  If there are reciprocal approval boards for Internet sites in other countries, we' will approve sites approved by those boards as well.  This would be a very restrictive policy as fewer than 20 pharmas have been approved by this board (Drugstore.com is of course one of them).  Interestingly enough, one of the pharmas with questionable practices highlighted in the NYTimes article had actually been approved by them, but the Board claims that this was a mistake they will not repeat. Despite this, this is our most conservative option.

5) Involve a third-party verifier. Based on my conversation with Overture, this seems to be what they are considering. They do it for wine sellers now. The way it works for wine sellers on Overture is that in order to advertise wine on Overture, you first have to register with a company called Square Trade. The advertiser pays Square Trade $50 to be certified that they are adhering to all local and national laws. Square Trade mystery shops its customers to make sure they do what they claim to do. Overture is considering extending this to pharma. eBay also uses third-party verifiers for some categories. We have never done this so it would be a real policy shift for us. We have long held that we can't police the web; if we do this, we will be taking a much more active posture towards controlling what our advertisers do then we ever have before.

We do not make these decisions based on revenue, but as background, REDACTED

I am flying this afternoon but Alana Karen is in the office to answer any questions.

Sheryl

51. Two days later, on October 29, 2003, defendant Page received an email from Sandberg via emg@google.com describing a conversation she had with Drugstore.com regarding, among other things, Google's advertising policy for online pharmacies. The email stated, in relevant part, as follows:

Regan, Maryann, Alex, and I spoke to our friends at Drugstore.com today.

Their points were the following:

- They argue that they are doing this to save the world.

- They claim that all non-VIPPS approved online pharmacies are illegal (which we do not believe to be the case).

- They will continue to push us and all others to restrict online advertising for online pharma.

- They believe others will announce changes and are therefore "leaders" and we are killing people. (No joke – Kal said this.)

- They said they will give us a heads up if they are putting out press releases with our name, but I am not sure I believe them.

The points we made were:

- We listened and made sure they knew we heard all of their policy concerns.

- We asked if they were concerned that they had a commercial interest in this policy change. Their response was that they care only for consumers.

- •      We asked them to not send out meeting agendas or mock press releases with our name in it without our approval.

- •      We told them that we were thinking through the policy concerns and that if we had any changes to announce, we would let them know. We would not, however, be participating in their suggested announcement (attached).

Frosty call at best. Their tactics are outrageous. I felt like I was back in Washington on a really bad day . . . .

Omid – If you need an email that can be forwarded to BC and JD, draft below.

EMAIL THAT CAN BE FORWARDED:

POLICY ISSUE

Our current policy is that we allow the advertisement of online pharmacies, both domestic and foreign, only if the site claims to require a prescription. Pharmaceutical comparison or finder sites are judged by same criteria. We do not allow the advertisement of pharmaceutical drugs that are not yet approved by FDA such as Cialis and Levitra. We do not allow pharmaceutical advertising to target the UK and have stricter policies in Japan. As with all of our policies, we do not verify what these sites actually do, only what they claim to do.

There is much discussion about the practices some online pharmacies follow. While we do not allow pharmacies who claim not to require prescriptions to run, it is possible that some of the pharmacies we approve do not follow their own stated policies carefully. We are considering not showing these ads to children by ceasing to show ads to users with a safe-search (family safe) filter on. We are also considering finding some other way to mark online pharma ads. A final decision on these steps has not been made.

We are not prepared to adopt a more restrictive stance, such as only approving pharmas approved by the Verified Internet Pharmacy Practice Sites (VIPPS) program of NABP (National Association of Boards of Pharmacy). Our policy is designed to provide maximum information and choice to users and being this restrictive is in conflict with that goal.

This is an area where the law is still developing. We are planning on watching any legislative changes very closely and will react appropriately.

DRUGSTORE.COM

Over the past two weeks, Drugstore.com has been using very aggressive tactics to get us, Yahoo, MSN, Overture, and others to only accept ads from pharmas approved by VIPPS. They have sent out press releases, tried to call a meeting of all of these players, and tried to put public and private pressure on us to change our policy. Yesterday they sent a mock press release to us and other search players which included sample quotes from us without our knowledge or acquiescence (attached). They also state the case much more broadly than we believe to be true; e.g., calling all non-VIPPS approved pharmacies "illegal" which they are not.

We take their concerns very seriously and many members of our exec team have spoken with them in the past week. Most recently, we spoke with their CEO today.

We listened to their policy concerns and made sure that they knew we heard them. We did not agree to any policy changes but said that we will let them know if we were making any changes. They made it clear that they will continue to fight this in the public realm.

52. On October 29, 2003, defendant Page emailed Sandberg and asked her to send the above meeting summary to defendant Doerr, who at that time also sat on the board of directors of Drugstore.com. On October 30, 2003, Sandberg forwarded her meeting summary to Doerr. Based on Doerr's simultaneous service on both the Drugstore.com board of directors and the Google Board, it may be inferred that Doerr also became aware of the illegal Canadian ads by October 2003.

53. On November 17, 2003, defendant Page received an email from Sandberg via emg@google.com noting that Google faced a serious public relations issue as the only remaining search engine still accepting ads from online pharmacies without attempting to verify their practices. The email stated, in relevant part, as follows:

Please forgive my bringing up an issue we have already discussed, but I think this is worth at least one more email, and potentially more discussion. Given that Overture moved so aggressively and they supply ads to Yahoo and MSN, and given that AOL is blocking all of these ads, we are the only player in our industry still accepting these ads. I continue to think that although there is some commercial harm to shutting down these ads, the PR/brand risk we are taking by being out there on our own may not be worth it. I thought this was worth bringing up again as the actions of our competitors this week has increased our PR/brand risk significantly.

(Of course, feel free to ignore this email if no one thinks this decision is worth revisiting.)

Sheryl

54. On November 18, 2003, defendant Page received an email from McCaffrey, Google's then Vice President of Corporate Marketing, via emg@google.com echoing Sandberg's concerns about Google's advertising policy for online pharmacies. The email stated, in relevant part, as follows:

I definitely think it's worth revisiting. This is a very serious matter and needs to be addressed quickly. I understand that Sheryl had a very tough interview this morning with the same Washington Post reporter Larry talked to a few weeks ago (David K. will be sending a summary). She did a great job, but we do not have a good response to this issue and it is not going to go away. The industry is moving fast to remove most pharma ads; our gesture to address this will be perceived as just not enough

compared with what the other companies are doing. I understand that we should not let other companies, press, etc. influence our decision-making around policy, but I think you should understand that this has become a big, big issue and the potential of serious harm to our brand among our users is very real. The Post plans to run with a story next week. We'll be cast as the only company not moving quickly enough to address this issue.

If we can make something happen quickly, we can get back to reporter this week and save ourselves from disaster in the media. We just don't need this.

55. On the same date, November 18, 2003, defendant Page received an email via emg@google.com echoing Sandberg and McCaffrey's concerns and providing more details about the *Washington Post* article. The email stated, in relevant part, as follows:

Here's the scoop on the Washington Post call:

*A story is scheduled to run in next week's paper; I expect it will be very negative for Google and will position us in an unfavorable light.

*The reporter will devote this article to the role search engines and portals play between illegal online pharmacies and consumers. As all of Google's competitors have recently adapted their policies to restrict these ads, we'll be criticized for holding out and not reacting quickly.

*The article will also challenge our interpretation of the law. The reporter and reps. from the FDA (who will be quoted) believe that Google AdWords is facilitating the illegal distribution of pharm. drugs online. They have analyzed our pharm. advertisers extensively and have determined that a majority of these businesses are illegal.

*And as Cindy noted below . . . as much as we push the message that we are currently reviewing our policies and will ultimately do the right thing, our efforts are not perceived as aggressive enough – this is amplified by the recent changes by OVER (Overture).

*The message we also use about providing the broadest range of choices to our users also doesn't hold water in this case, as most of these questionable online pharmacies charge a 3x premium over sites like walgreens.com.

*Lastly, the story of the 15 year-old who became addicted to Hydrocodone will also be reflected in this article – and as we all know, the father blames Google AdWords for connecting his son to an online pharm. that sold him these pills sans prescription. Sheryl has recently spoken to the father and further explained our point of view, but he's of the opinion that we should remove these ads entirely.

It would be great to be finalize [sic] any changes we might make this week, so we can brief the Washington Post before this article goes to print.

David

56. Based on the emails, and the conversations contained therein, defendant Page became aware of the illegal Canadian ads by no later than October 2003, and, when faced with this illegality, continued Google's advertising policy for online pharmacies in a manner that allowed Canadian online pharmacies to continue to sell prescription drugs without a prescription on Google's website.

57. By doing so, defendant Page breached his fiduciary duty of loyalty (and good faith) owed to Google and, under Delaware law, is liable to the corporation for the damages arising from his breach of fiduciary duty. Thus, the foregoing evidence, taken as true, is sufficient to raise a reasonable doubt as to defendant Page's disinterestedness. This is especially true since defendant Page's knowledge of the illegal Canadian ads mirrors almost exactly defendant Schmidt's knowledge of the illegal Canadian ads. Therefore, because defendant Page is "interested" in the outcome of this litigation, a pre-suit demand for him to bring, let alone vigorously prosecute the derivative claims is futile and excused as a matter of law.

**Defendant Brin Is Interested Because**
**He Knew About the Illegal Canadian Ads**

58. Defendant Brin became aware of the illegal Canadian ads on Google's website in late 2003 through emails from, and conversations with other top ranking Google officials regarding Google's advertising policy regarding online pharmacies – including an August 2003 email from defendant Schmidt explaining that Drugstore.com had requested that Google "not accept advertisers who are advertising items like viagra from online pharmacies that may or may not be properly licensed." However, when confronted with this illegality, Brin continued Google's advertising policy for online pharmacies in a manner that permitted Canadian online pharmacies to continue to sell prescription drugs without a prescription on Google's website.

59. For example, defendant Brin received an August 22, 2003 email summarizing Hurley's conversation with Drugstore.com alerting Google to rogue online pharmacies violating U.S. law by selling prescription drugs without a prescription via search engines like Google's website. The email stated, in relevant part, as follows:

> Goal: Educate Google executives on the risks associated with the continued paid sponsorship of rogue pharmacies

Multiple national agencies have declared the Importation process illegal and a risk to US consumers. The key takeaways are:

*__Importation of medication is illegal__

*Risk of counterfeit product

*Risk of contaminated product

*Risk of expired or duplicative therapy

*Unregulated by both US and Canadian/Mexican Authorities (FDA and FDA equivalent) as no consistent safety and quality controls exist for purchasing and receipt of prescription medications

Agencies include:

*FDA· Federal Drug Administration

*__Violation of Food, Drug, and Cosmetic Act to import prescription product__.

*Foreign product may not meet all the requirement [sic] for US approval, and thus qualifies as an unapproved product

*Medications are frequently labeled incorrectly

*Extremely unlikely that a pharmacy could ensure all applicable legal requirements are met

*Individuals and business that cause those shipments also violate the act and are therefore civilly and criminally liable. (RX Depot store front issue cease and desist)

60.     On October 21, 2003, defendant Brin received an email forwarding a copy of Drugstore.com's press release. The Drugstore.com press release described the dangers of Canadian pharmacies, the VIPPS certification program of the NABP and that only 14 pharmacies had earned VIPPS certification. The Drugstore.com press release also singled out Google for their role, along with a few other search engines, in driving traffic to rogue pharmacies by permitting them to advertise on Google's website. More specifically, the Drugstore.com press release that defendant Page received on October 21, 2003, stated, in relevant part, as follows:

While the problem of enforcing our existing laws against illegal pharmacies is complicated, an immediate solution to the problem is very simple. Illegal pharmacies rely on the incredible amount of traffic generated by their advertisements on major Internet search engines, such as Google, MSN, and Yahoo. The first step in protecting public health and safety, drugstore.com management states, is for the search engines to voluntarily stop accepting rogue pharmacy ads. Until then, or until

Congress forces search engines to stop accepting such advertising, consumers are warned to be very cautious about ads for prescription medications that sound too good to be true.

"It's unfortunate that major search engines, which are trusted by the public, are enabling rogue pharmacies to trick the public," continued Neupert. "While technology has effectively helped streamline the delivery of prescription drugs and substantially lowered the cost of drugs, our public policy to safeguard the transactions has not kept pace. We sincerely hope that Yahoo, MSN, Google, and other search engines do the right thing and refuse to carry these ads. If not, then Congress needs to protect the public by making it unlawful to sell advertising space to companies that provide illegal pharmacy services, such as re-importation, shipping without a legitimate prescription, and misrepresentation."

61.     A few days later, on October 27, 2003, defendant Brin received yet another email discussing the fact that Google's official policy of not allowing pharmacies to advertise on Google if they sold prescription drugs without a prescription was a sham and that the only requirement that Google imposed on Internet pharmacies was that they clam to require a prescription. The October 27, 2003 email from Sandberg, Google's then Vice President of Global Online Sales & Operations, to Brin, via emg@google.com, the email listserv for Google's executive management group that included Brin, Schmidt and Page, stated, in relevant part, as follows:

I believe pharma policy may be a topic in today's EMG meeting.

Our current policy is that we allow the advertisement of online pharmacies, both domestic and foreign, only if the site claims to require a prescription. Pharmaceutical comparison or finder sites are judged by same criteria. We do not allow the advertisement of pharmaceutical drugs that are not yet approved by FDA such as Cialis and Levitra. We do not allow pharmaceutical advertising to target the UK and have stricter policies in Japan. As with all of our policies, we do not verify what these sites actually do, only what they claim to do.

Public awareness of the ability of people to get drugs through online pharmacies is increasing and as we all know, drugstore.com is using· the press to try to force us and others to change their policies. Overture/Yahoo, who has long had the same policy we have, is likely to change their policy to be more restrictive this week. We may get a heads up before they announce a policy change.

Our options are:

1) Keep policy the same. Good for consumers overall as it increases availability of pharmaceuticals but means that the bad stories will continue.

2) Classify pharma ads as nonfamily. This means that anyone with a safe search filter on will not see them. I think we should do this regardless of any other steps we chose to take.

3) Mark pharma ads. The idea would be to mark pharma ads with a Pharma-specific label. If you clicked on the label, we would take you to a page which would have a carefully worded warning on pharma practices. (Larry – this is Salar's idea of what you were suggesting. Is this what you had in mind?)

4) Only accept pharmas that have been approved by Verified Internet Pharmacy Practice Sites (VIPPS) program of NABP (National Association of Boards of Pharmacy). If there are reciprocal approval boards for Internet sites in other countries, we' will approve sites approved by those boards as well. This would be a very restrictive policy as fewer than 20 pharmas have been approved by this board (Drugstore.com is of course one of them). Interestingly enough, one of the pharmas with questionable practices highlighted in the NYTimes article had actually been approved by them, but the Board claims that this was a mistake they will not repeat. Despite this, this is our most conservative option.

5) Involve a third-party verifier. Based on my conversation with Overture, this seems to be what they are considering. They do it for wine sellers now. The way it works for wine sellers on Overture is that in order to advertise wine on Overture, you first have to register with a company called Square Trade. The advertiser pays Square Trade $50 to be certified that they are adhering to all local and national laws. Square Trade mystery shops its customers to make sure they do what they claim to do. Overture is considering extending this to pharma. eBay also uses third-party verifiers for some categories. We have never done this so it would be a real policy shift for us. We have long held that we can't police the web; if we do this, we will be taking a much more active posture towards controlling what our advertisers do then we ever have before.

We do not make these decisions based on revenue, but as background,·REDACTED

I am flying this afternoon but Alana Karen is in the office to answer any questions.

Sheryl

62.     Two days later, on October 29, 2003, defendant Brin received an email from Sandberg via emg@google.com describing a conversation she had with Drugstore.com regarding, among other things, Google's advertising policy for online pharmacies. The email stated, in relevant part, as follows:

Regan, Maryann, Alex, and I spoke to our friends at Drugstore.com today.

Their points were the following:

- They argue that they are doing this to save the world.

- They claim that all non-VIPPS approved online pharmacies are illegal (which we do not believe to be the case).

- They will continue to push us and all others to restrict online advertising for online pharma.

- They believe others will announce changes and are therefore "leaders" and we are killing people. (No joke – Kal said this.)

- They said they will give us a heads up if they are putting out press releases with our name, but I am not sure I believe them.

The points we made were:

- We listened and made sure they knew we heard all of their policy concerns.

- We asked if they were concerned that they had a commercial interest in this policy change. Their response was that they care only for consumers.

- We asked them to not send out meeting agendas or mock press releases with our name in it without our approval.

- We told them that we were thinking through the policy concerns and that if we had any changes to announce, we would let them know. We would not, however, be participating in their suggested announcement (attached).

Frosty call at best. Their tactics are outrageous. I felt like I was back in Washington on a really bad day . . . .

Omid – If you need an email that can be forwarded to BC and JD, draft below.

EMAIL THAT CAN BE FORWARDED:

POLICY ISSUE

Our current policy is that we allow the advertisement of online pharmacies, both domestic and foreign, only if the site claims to require a prescription. Pharmaceutical comparison or finder sites are judged by same criteria. We do not allow the advertisement of pharmaceutical drugs that are not yet approved by FDA such as Cialis and Levitra. We do not allow pharmaceutical advertising to target the UK and have stricter policies in Japan. As with all of our policies, we do not verify what these sites actually do, only what they claim to do.

There is much discussion about the practices some online pharmacies follow. While we do not allow pharmacies who claim not to require prescriptions to run, it is possible that some of the pharmacies we approve do not follow their own stated policies carefully. We are considering not showing these ads to children by ceasing to show ads to users with a safe-search (family safe) filter on. We are also considering finding some other way to mark online pharma ads. A final decision on these steps has not been made.

We are not prepared to adopt a more restrictive stance, such as only approving pharmas approved by the Verified Internet Pharmacy Practice Sites (VIPPS) program of NABP (National Association of Boards of Pharmacy). Our policy is designed to provide maximum information and choice to users and being this restrictive is in conflict with that goal.

This is an area where the law is still developing. We are planning on watching any legislative changes very closely and will react appropriately.

DRUGSTORE.COM

Over the past two weeks, Drugstore.com has been using very aggressive tactics to get us, Yahoo, MSN, Overture, and others to only accept ads from pharmas approved by VIPPS. They have sent out press releases, tried to call a meeting of all of these players, and tried to put public and private pressure on us to change our policy. Yesterday they sent a mock press release to us and other search players which included sample quotes from us without our knowledge or acquiescence (attached). They also state the case much more broadly than we believe to be true; e.g., calling all non-VIPPS approved pharmacies "illegal" which they are not.

We take their concerns very seriously and many members of our exec team have spoken with them in the past week. Most recently, we spoke with their CEO today. We listened to their policy concerns and made sure that they knew we heard them. We did not agree to any policy changes but said that we will let them know if we were making any changes. They made it clear that they will continue to fight this in the public realm.

63. On November 17, 2003, defendant Brin received an email from Sandberg via emg@google.com noting that Google faced a serious public relations issue as the only remaining search engine still accepting ads from online pharmacies without attempting to verify their practices. The email stated, in relevant part, as follows:

Please forgive my bringing up an issue we have already discussed, but I think this is worth at least one more email, and potentially more discussion. Given that Overture moved so aggressively and they supply ads to Yahoo and MSN, and given that AOL is blocking all of these ads, we are the only player in our industry still accepting these ads. I continue to think that although there is some commercial harm to shutting down these ads, the PR/brand risk we are taking by being out there on our own may not be worth it. I thought this was worth bringing up again as the actions of our competitors this week has increased our PR/brand risk significantly.

(Of course, feel free to ignore this email if no one thinks this decision is worth revisiting.)

Sheryl

64. On November 18, 2003, defendant Brin received an email from McCaffrey, Google's then Vice President of Corporate Marketing, via emg@google.com echoing Sandberg's concerns about Google's advertising policy for online pharmacies. The email stated, in relevant part, as follows:

I definitely think it's worth revisiting. This is a very serious matter and needs to be addressed quickly. I understand that Sheryl had a very tough interview this morning with the same Washington Post reporter Larry talked to a few weeks ago (David K. will be sending a summary). She did a great job, but we do not have a good response to this issue and it is not going to go away. The industry is moving fast to remove

most pharma ads; our gesture to address this will be perceived as just not enough compared with what the other companies are doing. I understand that we should not let other companies, press, etc. influence our decision-making around policy, but I think you should understand that this has become a big, big issue and the potential of serious harm to our brand among our users is very real. The Post plans to run with a story next week. We'll be cast as the only company not moving quickly enough to address this issue.

If we can make something happen quickly, we can get back to reporter this week and save ourselves from disaster in the media. We just don't need this.

65. On November 18, 2003, defendant Brin received an email via emg@google.com echoing Sandberg and McCaffrey's concerns and providing more details about the *Washington Post* article. The email stated, in relevant part, as follows:

Here's the scoop on the Washington Post call:

*A story is scheduled to run in next week's paper; I expect it will be very negative for Google and will position us in an unfavorable light.

*The reporter will devote this article to the role search engines and portals play between illegal online pharmacies and consumers. As all of Google's competitors have recently adapted their policies to restrict these ads, we'll be criticized for holding out and not reacting quickly.

*The article will also challenge our interpretation of the law. The reporter and reps. from the FDA (who will be quoted) believe that Google AdWords is facilitating the illegal distribution of pharm. drugs online. They have analyzed our pharm. advertisers extensively and have determined that a majority of these businesses are illegal.

*And as Cindy noted below . . . as much as we push the message that we are currently reviewing our policies and will ultimately do the right thing, our efforts are not perceived as aggressive enough – this is amplified by the recent changes by OVER (Overture).

*The message we also use about providing the broadest range of choices to our users also doesn't hold water in this case, as most of these questionable online pharmacies charge a 3x premium over sites like walgreens.com.

*Lastly, the story of the 15 year-old who became addicted to Hydrocodone will also be reflected in this article – and as we all know, the father blames Google AdWords for connecting his son to an online pharm. that sold him these pills sans prescription. Sheryl has recently spoken to the father and further explained our point of view, but he's of the opinion that we should remove these ads entirely.

It would be great to be finalize [sic] any changes we might make this week, so we can brief the Washington Post before this article goes to print.

David

SECOND AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT - CV-11-04248-PJH

66.     Based on the emails and conversations contained therein, defendant Brin became aware of the illegal Canadian ads around August 2003, and, when faced with this illegality, continued Google's advertising policy for online pharmacies in a manner that allowed Canadian online pharmacies to continue to sell prescription drugs without a prescription via Google's website.

67.     By doing so, defendant Brin breached his fiduciary duty of loyalty (and good faith) owed to Google and, under Delaware law, is liable to the corporation for the damages arising from his breach of fiduciary duty.  Thus, the foregoing evidence, taken as true, is sufficient to raise a reasonable doubt as to defendant Brin's disinterestedness.  This is especially true since defendant Brin's knowledge of the illegal Canadian ads is essentially the same as defendant Schmidt and Page's knowledge of the illegal ads.   Therefore, because defendant Brin is "interested" in the outcome of this litigation, a pre-suit demand for him to bring, let alone vigorously prosecute the derivative claims is futile and excused as a matter of law.

68.     In sum, by October 2003 at the latest, defendants Schmidt, Page and Brin, and each of them, had personal knowledge of the fact that Google's purported advertising policy for online pharmacies allowed Canadian online pharmacies to sell prescription drugs without a prescription on Google's website.  However, when confronted with the illegal Canadian ads, defendant Schmidt, Page and Brin, and each of them, continued Google's so-called "pharma" policy in a manner that allowed Canadian online pharmacies to continue to illegally sale prescription drugs via Google's website.

69.     As Google's directors and most senior executive officers, defendants Schmidt, Page and Brin owed Google a fiduciary duty of loyalty (and good faith) to conduct the Company's business and affairs in accordance with the federal laws prohibiting the illegal sale of prescription drugs.  However, despite their knowledge of the illegal Canadian ads, defendants Schmidt, Page and Brin, and each of them, failed to do so.  And, as a result, in August 2011, Google was forced to pay $500 million to the DOJ for violating 21 U.S.C. §331(a) and (d) and 21 U.S.C. §952.

70.     Under Delaware law, directors who breach their fiduciary duty may be held liable to the corporation for damages.  Here, the emails and other documentary evidence, taken as true, show that defendants Schmidt, Page and Brin, and each of them, is "interested" in the outcome of this

litigation, as each faces a substantial likelihood of liability for the damages Google suffered as a result of the illegal Canadian ads. Further, because they are each an "interested" director, a pre-suit demand for defendant Schmidt, Page and Brin, individually and collectively, to bring, let alone vigorously prosecute the derivative claims is excused as a matter of law.

## DEFENDANTS' WRONGFUL ACTS AND OMISSIONS

71. Google is the world's largest Internet search and technology corporation. The Company offers various advertising services that permit online pharmacy advertisers in Canada, and elsewhere, to post their advertising message and a link to their website above and next to search results in response to search queries relevant to the advertiser.

72. Online pharmacies advertise through various Google services including the Company's largest advertising program, AdWords. AdWords displays sponsored advertisements in response to queries by the Company's search engine users. In addition, advertisers are able to "geo-target" their advertising campaigns by selecting the countries where the advertisements will display. In return for these services, advertisers pay fees to Google for each advertisement. Most advertisers pay Google on a cost-per-click basis, meaning the more a person (or people) clicks on an ad, the more Google is paid. Google does, however, also offer a cost-per-impression basis, where an advertiser will pay Google based on the number of times its ads appear on Google's websites. In order to place an ad with Google, advertisers bid, in an auction-like format, on keywords in order to have their advertisements appear when the user enters the selected keywords into the Company's search engine. A keyword is a specific word or phrase selected by the advertiser that the Company uses to trigger the display of advertisements in response to a user's query. When Google first began accepting advertising, the Company prohibited certain ads – such as ads for tobacco products or ads that contain potentially misleading content – but did not attempt to stop advertising for controlled prescription drugs, or filter out ads by "rogue" pharmacies that engaged in illegal practices.

73. As a U.S. company, Google is subject to the FD&C Act, which prohibits foreign pharmacies from introducing or delivering prescription drugs into interstate commerce. The FD&C Act also prohibits the shipment of prescription drugs from pharmacies outside the United States.

Similarly, the Controlled Substances Act of 1970 prohibits the shipment of controlled prescription drugs into the U.S. from overseas pharmacies.[1]

74. The U.S. government uses these laws to ensure the safety of drugs that are sold in the U.S. If the drugs do not come from U.S. pharmacies, the Food and Drug Administration ("FDA") has no way to ensure they meet its labeling, manufacturing, storage and distribution requirements. Often, drugs originating from foreign sources are not dispensed to patients pursuant to a valid prescription. Instead, many times an online user does not even need to see a doctor, and instead simply has to fill out an online form. This allows dangerous and addictive drugs to get into the hands of users without proper oversight by the FDA or a healthcare provider.

75. Although Canada has its own regulatory regime for prescription drugs, Canadian pharmacies that ship prescription drugs to U.S. residents are not subject to Canadian regulatory authority. Further, many online Canadian pharmacies sell drugs obtained from countries other than Canada, where pharmacy regulations are lacking.

76. By 2003, Google in general, and defendants Schmidt, Page and Brin in particular, had become aware of the risks of sponsoring ads by pharmacies outside the U.S. Nevertheless, when faced with illegal Canadian pharmacy ads, defendants resisted internal and external efforts to develop a more restrictive policy for Canadian online pharmacy ads, and/or made superficial changes to the policy so that Canadian online pharmacies could continue to illegally sell drugs via Google's website.

77. For example, in March 2003, the NABP, the preeminent professional organization in the U.S. that supports the state boards of pharmacy in protecting public health, warned Google's then Healthcare Vertical Market Manager, Belliveau, about the dangers of illegal online pharmacies, the

---

[1] Not all prescription drugs are listed as controlled prescription drugs in the Controlled Substances Act. Many prescription drugs are listed in Schedules II through V of the Controlled Substances Act because of their high potential for abuse or addiction. Schedule II through V prescription drugs primarily are narcotic pain relievers and central nervous system depressants and stimulants. A complete list of controlled prescription drugs, by schedule, is available on the DEA Office of Diversion Control Internet site (http://www.deadiversion.usdoj.gov/schedules/index.html).

misleading nature of Google's "sponsored links" for these sites, and the U.S. federal laws which Google may be violating. The NABP also warned that it was "deeply concerned that these rogue Internet [pharmacy] sites could be a front for criminals seeking to introduce adulterated medications, counterfeit drugs, or worse, to the American market."

78.     To protect its business and consumers, the NABP recommended to Google that it limit sponsored links to only pharmacies certified by the VIPPS program. VIPPS is the leading pharmacy accreditation service in the country. It was created by a coalition of state and federal regulatory associations, professional associations, and consumer advocacy groups who developed the criteria which VIPPS uses to accredit pharmacies. VIPPS conducts on-site inspections of pharmacies, has a stringent standard against the issuance of prescriptions based on an online consultation without a physical examination and, importantly, does not certify Canadian online pharmacies that ship to U.S. patients. However, Google rejected NABP's recommendations.

79.     Similarly, on or about December 1, 2003, Peter J. Pitts, the FDA's Associate Commissioner for External Affairs, stated that the FDA was "literally placing calls to the search engines trying to get a meeting going" concerning their business dealings with online pharmacies. Around the same time, Google was also contacted by the father of a teenage boy who was hospitalized after he used the Company's search engine to locate and order Vicodin[2], which the Company said it took "very seriously."

80.     Mounting public and private pressure forced defendants to make minor improvements to Google's advertising policy but they refused to use a robust system like the one offered by VIPPS or to prevent Canadian pharmacies from advertising altogether. On December 1, 2003, Google announced it would use a third-party company to screen out ads from rogue pharmacies that do not require prescriptions. The release never mentioned how Google would treat Canadian pharmacies in the new plan. Google's decision only came several weeks after rival companies, Yahoo and Microsoft, began banning similar advertising. Furthermore, the FDA began publicly pressuring

---

[2]      Vicodin is a trademark name for commercially available hydrocodone, a controlled substance and a synthetic opiate.

search engines to accept drug ads from only licensed Internet pharmacies, and the Senate Permanent Subcommittee on Investigations began probing the role of companies that advertise illegal prescription drugs – before which Google's Vice President of Global Online Sales & Operations, Sandberg, soon testified. *See infra.*

**Defendants Permitted Company Employees to Assist Canadian**
**Online Pharmacies in Evading Google's Controls**

81. Despite knowing that it was illegal for pharmacies to ship prescription drugs to the United States from Canada, and that U.S. consumers were purchasing prescription drugs online that were advertised through Google's AdWords, defendants consciously endorsed the Company's improper business strategy of permitting Canadian pharmacies to advertise through AdWords and direct their advertisements at U.S. customers. Specifically, the verification service providers selected to screen pharmacies certified Canadian pharmacies instead of filtering them out. In addition, defendants permitted Google employees to assist Canadian online pharmacy advertisers in creating advertisements that were designed to evade the internal controls put in place to detect and prevent foreign pharmaceutical companies from advertising on Google. It is well established that causing a company to operate in violation of the law is a breach of a fiduciary's duty of loyalty. The Individual Defendants' instruction that the Company break the law in order to maximize short term profits is a breach of their duty of loyalty.

82. In 2004, despite knowing that Canadian pharmacies were illegally advertising and the NABP's warnings and widespread criticisms, Google announced that its policy was to permit Canadian pharmacies to advertise through AdWords, and actively block ads only from pharmacies in other countries. Google put this policy into practice through its retention of a third-party verification service, SquareTrade, Inc. ("SquareTrade"), to verify that online pharmacy advertisers were licensed in at least one state in the United States or Canada. SquareTrade, which offers its seal of approval for a wide range of online businesses ranging from cars to realtors, had a very low standard for approval of pharmacies. But SquareTrade was nothing more than window dressing.

83. Unlike VIPPS, SquareTrade did not conduct on-site inspections and simply required pharmacies seeking to advertise through AdWords to self-certify that they would act in accordance

with applicable U.S. laws and regulations. Moreover, SquareTrade certified online pharmacies as long as they were licensed in one state in the United States or in Canada. Consequently, Canadian online pharmacies could advertise prescriptions through AdWords to U.S. customers. Indeed, defendant Schmidt admitted in his correspondence with Senator Cornyn that, despite knowing about the illegal pharmacy advertisements since 2004, defendants made a conscious decision to allow Canadian pharmacies to post the illegal advertisements based on "a continuing discussion involving a variety of policy and implementation questions over several years." These duplicitous decisions reflect defendants' knowledge that it was illegal for pharmacies to ship prescription drugs to the United States from outside the country.

84. Google's sponsorship of Canadian pharmacy ads brought widespread criticism. On June 9, 2004, the *Wall Street Journal* ("WSJ") reported that Google's decision to continue to carry Canadian ads drew criticism from U.S. regulators and angered U.S. druggists. Pitts, an FDA official, explained he was "disappointed" in Google's decision, criticizing its pursuit of illegal profit: "You can't make value judgments based on what is or is not in your financial interests . . . ." Likewise, state pharmacy boards disapproved of the Company's decision, calling on Google and other search providers to use VIPPS to screen out Canadian pharmacies – just as the NABP advised Google to do in March 2003, described *supra*.

85. The need to resist sponsoring ads by rogue pharmacies was well-known to the Company and defendants. Not just one, but two high-level Google officials appeared before congressional committees claiming that Google guarded against such advertisements. Sandberg, then Google's Vice President of Global Online Sales & Operations, attempted to tout Google's "proactive" use of SquareTrade in her testimony to the Senate's Permanent Subcommittee on Investigations on July 22, 2004. Despite Sandberg's characterization of SquareTrade as using a "rigorous" verification process, defendants knew that it still allowed Canadian pharmacies to post illegal advertisements via Google. On December 13, 2005, a second high-ranking Company official, Andrew McLaughlin, then Google's Director of Global Public Policy, again hyped SquareTrade's verification process in similar testimony to the House Subcommittee on Oversight and Investigations.

86.     Although SquareTrade-certified pharmacies were supposedly in compliance with pharmacy laws and practices, the Company knew that many Canadian online pharmacies were committing rampant violations.  Many of these pharmacies distributed prescription drugs, including controlled prescription drugs, based on an online consultation, rather than a valid prescription from a treating medical practitioner despite SquareTrade's purported dispensing requirements.  As the DOJ non-prosecution agreement makes clear, the Company was also on notice that many of these pharmacies charged a premium for doing so, because individuals seeking to obtain prescription drugs without a valid prescription were willing to pay higher prices for the drugs.

87.     For example, in July 2004, defendants learned that online pharmacies were circumventing SquareTrade's certification process by intentionally avoiding the use of pharmaceutical terms in the text of their AdWords advertisements, while using the same terms as advertising "keyword" terms.  A keyword is a specific word or phrase used by an advertiser that Google uses to trigger the display of advertisements in response to a user's query.  Advertisers bid, in an auction-like format, on keywords in order to have their advertisements appear when the user enters the selected keywords into the Company's search engine.  Once Google began using SquareTrade, it conducted a manual review of non-certified online pharmacy advertisements only if a pharmaceutical term appeared in the text of the advertisement.  Defendants knew, however, that some pharmacy advertisers, including some from Canada, avoided this review by using the prescription drug terms as keywords only and not in advertising text.

88.     Google also knew that SquareTrade-certified Canadian pharmacies broke their "promise" not to target U.S. consumers.  From 2003 through 2009, Google provided customer support to a number of these Canadian online pharmacy advertisers, including assisting them in placing and optimizing their AdWords advertisements, despite knowing that these advertisers were attempting to actively violate U.S. federal drug laws.  For example, on or about April 23, 2004, a Google employee based in Canada stated that, in connection with the advertisements of a large Canadian pharmacy, "the Google team is proactively adjusting creative and optimizing with Square Trade policy in mind."  About a month later, on or about June 4, 2004, the same employee emailed a member of the Company's policy group and stated "[t]he Max team and [customer support] are sort

of furiously working on creative to appease our new policy before approvals gets to them and disapproves."

89.     Moreover, Google permitted Canadian pharmacy advertisers to intentionally geo-target the United States in their AdWords campaigns.  Google was aware of this practice, according to an August 23, 2005 e-mail by an employee in the Company's policy group that stated "the majority of Canadian Pharmacies are in business to drive pharmacy traffic from the United States to Canada" and "target the US in their geo-targeting."

90.     When Google changed third-party verification providers in 2006, the Company continued to receive reports that online Canadian pharmacies were breaking U.S. law with Google's assistance.     PharmacyChecker.com LLC ("PharmacyChecker"), Google's new third-party verification provider, also certified Canadian pharmacies, and was intended to screen out advertisers of controlled prescription drugs.  Defendants, however, knew that PharmacyChecker did not prevent Canadian pharmacies from advertising on AdWords and was otherwise ineffective, and that VIPPS was still the only viable option.

91.     On July 7, 2008, Joseph A. Califano, Jr., head of the National Center on Addiction and Substance Abuse at Columbia University ("CASA"), described PharmacyChecker's faults and warned defendant Schmidt, then Google's Chairman and CEO, about Google's illicit revenue:

> Although Google reports using a company called PharmacyChecker to screen out rogue pharmacies, CASA was able to find prominent displays of ads for rogue Internet pharmacies in a Google search for controlled drugs included in our analysis.  This suggests that Google is profiting from advertisements for illegal sales of controlled prescription drugs online.

Califano, a former U.S. Secretary of Health, Education, and Welfare, advised Google to take immediate action to "[b]lock all advertisements . . . that do not come from licensed or certified online pharmacies;" "[s]creen such sites from Internet searches;" and "[p]rovide warnings that sale and purchase of controlled drugs over the Internet from unlicensed pharmacies and physicians without valid prescriptions are illegal."  Califano enclosed CASA's 2008 report entitled "You've Got Drugs! V: Prescription Drug Pushers on the Internet," which highlighted the fact that approximately 85% of websites selling controlled prescription drugs did not require a legitimate prescription in 2007 and 2008.  The CASA report also mentioned various verification programs:

VIPPS employed a "rigorous" program, whereas PharmacyChecker's process was "far from perfect."

92. Likewise, in a December 23, 2008 letter to defendant Schmidt, the NABP again recommended replacing Google's third-party verification service with one that actually adheres to pharmacy laws and practice standards. Principal among PharmacyChecker's flaws were that it certified sites that did not require a valid prescription and sourced their prescriptions from outside the U.S in contravention of U.S. law. Moreover, the NABP warned defendant Schmidt that "your sponsorship of these search results, and your third-party verification service's certification of these Web sites, aids in a business practice that is contrary to US law, unsafe, and deceptive to US patients."

93. The NABP explained that Canadian pharmacists selling drugs to the United States online can skirt Canadian regulation. Furthermore, the NABP also explained that many of the prescription drugs originate in third-world countries, "a practice that would not be considered lawful or safe were the final customer within Canada, or if a US pharmacy were dispensing prescription drugs to a US resident."

94. A report published in 2009 by Bryan A. Liang, a California Western School of Law Professor, roundly criticized PharmacyChecker, finding that although PharmacyChecker purportedly "verifies" the legitimacy of online pharmacies, "little verification of potential advertisers actually takes place." As a result, Google and other search engines were profiting from the online ads of illegal drug sellers, while at the same time "exert[ing] very little effort to ensure that online drug sellers from which they obtain advertisement revenue are legitimate." Professor Liang stated in the WSJ on May 21, 2011 that "[o]n the basis of our analysis, I think [Google and other search providers] were turning a blind-eye . . . . They were making a lot of money on this."

**Google Sponsors Rogue Sites that Circumvent Verification**

95. As early as July 2004, the Company was on notice that online pharmacies were circumventing the SquareTrade and PharmacyChecker certification process by intentionally avoiding the use of certain pharmaceutical terms in the text of their AdWords advertisements, while using these same terms as advertising "keyword" terms, explained *supra*. Once the Company began using

SquareTrade, and continuing throughout the period during which the Company used PharmacyChecker, the Company conducted a manual review of non-certified online pharmacy advertisements only if a pharmaceutical term appeared in the text of the advertisement.

96.     Additionally, defendants knew or recklessly disregarded that the Canadian online pharmacies, with the assistance of Google employees, were continuing to employ the same tricks to circumvent PharmacyChecker's certification process as they had when the Company used SquareTrade's services, including avoiding manual review of the advertisements by using pharmaceutical terms as keywords only and not in advertising text.  For example, in a February 13, 2008 e-mail, a member of the Company's policy group stated, "[t]he only ads that are getting blocked are those with explicit pharma terms in the ad texts; the shady, fraudulent advertisers know not to do this."  After it became aware of the Government's investigation, the Company made changes to its systems in order to flag for review all ads that had prescription drug terms as keywords.

97.     Some pharmacy advertisers that did not qualify for certification were also able to advertise through AdWords by changing their geographic targets and avoiding the certification process altogether.  These online pharmacy advertisers initially prevented their AdWords advertisements from being run in the U.S., so that they would not be required to obtain a SquareTrade or PharmacyChecker certification.  Once the advertisements began to run on the Company's search engine, however, the pharmacies would change the geo-targeting of the advertisements so that they would appear in the United States in response to queries by U.S. users of the Company's search engine.  Although defendants knew that some online pharmacies later changed the geo-targeting of their AdWords advertising in order to avoid the certification requirements, defendants did nothing to prevent or monitor any changes to the online pharmacies' geo-targeting practices until after becoming aware of the DOJ's investigation.

98.     In 2008, CASA published a report that found that 85% of the online pharmacies advertising controlled drugs on search engines did not require a valid prescription.  Also in 2008, a NABP study estimated that 96% of internet drug outlets appeared to be in violation of pharmacy-related laws or standards.  In December 2008, the NABP wrote a letter to Google urging it to drop

PharmacyChecker as its third-party verification service, noting that the Company had let through several advertisers "that source their prescription drugs from various locations outside of the United States . . . which is contrary to US law." The NABP also specifically advised Google that the importation of prescription drugs from foreign countries is illegal.

99. Despite these multiple warnings, and the fact that defendant Schmidt admitted to Senator Cornyn in testimony before a Senate subcommittee that he knew as early as 2004 that pharmacies were advertising illegally via AdWords and that Google was not blocking ads from Canadian pharmacies at all, defendants continued to allow Canadian online pharmacies to use AdWords until 2009. Defendants also permitted Google to continue using PharmacyChecker until 2009, despite the existence of superior VIPPS service.

100. The U.S. Government and Google estimate that the total proceeds to the Company and Canadian online pharmacy advertisers generated from the advertising and sale of controlled prescription drugs by Canadian online pharmacies that advertised through the Company's AdWords program was approximately $500 million.

**Google Belatedly Changes Its Advertising Policies After Various Government Entities Begin Investigating Google**

101. It was only after defendants learned in May 2009 that the DOJ, the Rhode Island U.S. Attorney's Office, and the FDA/OCI, were investigating Google that the Company took any significant steps to prevent the unlawful sale of prescription drugs by online Canadian pharmacies to U.S. consumers. Google's quick response after learning about the investigation shows that defendants could have, at any time of the six-year long scheme, stopped the Company from assisting online pharmacies in violating U.S. federal law but consciously chose not to.

102. Among other things, on February 9, 2010, Google finally updated its Pharmacy Policy in the United States and Canada to require online pharmacy advertisers to be certified by VIPPS. The updated Pharmacy Policy went into effect on February 23, 2010. The updated Pharmacy Policy stated the following, in relevant part:

> **Only VIPPS and CIPA certified pharmacies will be allowed to advertise**
> We've made the decision to further restrict the ads we accept for online pharmacy sites in the U.S. and Canada. Starting at the end of this month, Google AdWords will only accept ads from online pharmacies in the U.S. that are accredited by the

National Association Boards of Pharmacy VIPPS program, and from online pharmacies in Canada that are accredited by the Canadian International Pharmacy Association (CIPA).

**Pharmacies can only target ads within their country**
These pharmacies may only target ads to users in the country in which they are accredited. This policy change does not affect our online pharmacy policy for countries outside the U.S. and Canada.

Accordingly, we'll no longer be using any 3rd party verifier of online pharmacies other than VIPPS and CIPA. AdWords advertisers who aren't accredited by VIPPS and CIPA will no longer see their online pharmacy ads displayed once this policy change comes into effect.

103.    In addition, Google retained an independent company to enhance its back-end sweeps, which were designed to detect pharmacy advertisers exploiting flaws in the Company's screening systems. Finally, Google began suing pharmacy advertisers that violated the Company's terms of use and reporting suspected illegal pharmacies to the FDA.

104.    However, Google's eleventh hour policy changes were too little, too late. And, on August 19, 2011, as a direct result of defendants' disloyalty, Google was forced to pay $500 million as well as admit and accept responsibility for violating federal drug and cosmetic laws by allowing Canadian online pharmacy advertisers to illegally sell prescription drugs via Google's website.

105.    The Non-Prosecution Agreement accompanying Google's settlement with the DOJ confirms that Google, at the highest levels, was aware of the illegal Canadian ads and the risks of loss they presented to Google.   For example, the Non-Prosecution Agreement states:

(f)    As early as 2003, the Company was aware that in most circumstances it was illegal for pharmacies to ship controlled and non-controlled prescription drugs into the United States from Canada. For example, in March 2003 and again in December 2008, the National Association of Boards of Pharmacy advised the Company that the importation of prescription drugs from foreign countries is illegal.

106.    The Non-Prosecution Agreement further states:

(g)    The Company was aware that importation of prescription drugs to consumers in the United States is almost always unlawful because the United States Food and Drug Administration ("FDA") cannot ensure the safety and effectiveness of foreign prescription drugs that are not FDA-approved and because the drugs may not meet FDA's labeling requirements, may not have been manufactured, stored, and distributed under proper conditions, and may not have been dispensed pursuant to a valid prescription. While Canada had its own regulatory regime for prescription drugs, Canadian pharmacies that ship prescription drugs to U.S. residents are not subject to Canadian regulatory authority, and many sell drugs obtained from countries other than Canada, which lack adequate pharmacy regulations.

107. Further still, the Non-Prosecution Agreement states:

(h)     As early as 2003, the Company was on notice that online Canadian pharmacies were advertising prescription drugs to the Company's users in the United States through the Company's AdWords advertising program.  Although the Company took steps to block pharmacies in countries other than Canada from advertising in the United States through AdWords, the Company continued to allow Canadian pharmacy advertisers to geo-target the United States in their AdWords advertising campaigns.  The Company knew that U.S. consumers were making online purchases of prescription drugs from these Canadian online pharmacies.  For example, in a November 18, 2003 email, a Company employee discussed the advertising budgets of several Canadian online pharmacy advertisers and noted that "[a]ll ship from Canada into the US via Express Mail."  In an August 23, 2005 email, an employee in the Company's policy group stated, "the majority of Canadian Pharmacies are in business to drive pharmacy traffic from the United States to Canada" and "target the US in their geo-targeting."

108. Moreover, the Non-Prosecution Agreement states:

(k)     From 2003 through 2009, the Company provided customer support to some of these Canadian online pharmacy advertisers to assist them in placing and optimizing their AdWords advertisements and in improving the effectiveness of their websites.  For example, on or about April 23, 2004, a Google employee based in Canada reported in an email concerning the advertisements of a large Canadian pharmacy advertiser that "the Google team is proactively adjusting creative and optimizing with Square Trade policy in mind."  On or about June 4, 2004, the same employee emailed a member of the Company's policy group and stated, "The Max team and [customer support] are sort of furiously working on creative to appease our new policy before approvals gets to them and disapproves."

109. On August 24, 2011, the DOJ issued a press release entitled "Google Forfeits $500 million Generated by Online Ads & Prescription Drug Sales by Canadian Online Pharmacies." Among other things, the press release emphasized that the amount forfeited by Google included the gross revenues made by online Canadian pharmacies from their sales to U.S. consumers, stating:

Online search engine Google Inc. has agreed to forfeit $500 million for allowing online Canadian pharmacies to place advertisements through its AdWords program targeting consumers in the United States, resulting in the unlawful importation of controlled and non-controlled prescription drugs into the United States, announced Deputy Attorney General James M. Cole; Peter F. Neronha, U.S. Attorney for the District of Rhode Island; and Kathleen Martin-Weis, Acting Director of the U.S. Food and Drug Administration's Office of Criminal Investigations (FDA/OCI). The forfeiture, one of the largest ever in the United States, represents the gross revenue received by Google as a result of Canadian pharmacies advertising through Google's AdWords program, plus gross revenue made by Canadian pharmacies from their sales to U.S. consumers.

The shipment of prescription drugs from pharmacies outside the United States to customers in the United States typically violates the Federal Food, Drug and Cosmetic Act and in the case of controlled prescription drugs, the Controlled Substances Act.  Google was aware as early as 2003, that generally, it was illegal for

pharmacies to ship controlled and non-controlled prescription drugs into the United States from Canada.

The importation of prescription drugs to consumers in the United States is almost always unlawful because the FDA cannot ensure the safety and effectiveness of foreign prescription drugs that are not FDA-approved because the drugs may not meet FDA's labeling requirements; may not have been manufactured, stored and distributed under proper conditions; and may not have been dispensed in accordance with a valid prescription. While Canada has its own regulatory rules for prescription drugs, Canadian pharmacies that ship prescription drugs to U.S. residents are not subject to Canadian regulatory authority, and many sell drugs obtained from countries other than Canada which lack adequate pharmacy regulations.

"The Department of Justice will continue to hold accountable companies who in their bid for profits violate federal law and put at risk the health and safety of American consumers," said Deputy Attorney General Cole. "This settlement ensures that Google will reform its improper advertising practices with regard to these pharmacies while paying one of the largest financial forfeiture penalties in history."

"This investigation is about the patently unsafe, unlawful, importation of prescription drugs by Canadian on-line pharmacies, with Google's knowledge and assistance, into the United States, directly to U.S. consumers," said U.S. Attorney Neronha. "It is about taking a significant step forward in limiting the ability of rogue on-line pharmacies from reaching U.S. consumers, by compelling Google to change its behavior. It is about holding Google responsible for its conduct by imposing a $500 million forfeiture, the kind of forfeiture that will not only get Google's attention, but the attention of all those who contribute to America's pill problem."

"Today's agreement demonstrates the commitment of the Food and Drug Administration to protect the US consumer and hold all contributing parties accountable for conduct that results in vast profits at the expense of the public health," said FDA/OCI Acting Director Martin-Weis. "The result of this investigation has been a fundamental transformation of Internet pharmacy advertising practices, significantly limiting promotion to US consumers by rogue online pharmacies. This accomplishment could not have been possible without the resourceful commitment of the Rhode Island United States Attorney's Office, as well as the tireless efforts of our law enforcement partners detailed to the OCI Rhode Island Task Force."

An investigation by the U.S. Attorney's Office in Rhode Island and the FDA/OCI Rhode Island Task Force revealed that as early as 2003, Google was on notice that online Canadian pharmacies were advertising prescription drugs to Google users in the United States through Google's AdWords advertising program. Although Google took steps to block pharmacies in countries other than Canada from advertising in the U.S. through AdWords, they continued to allow Canadian pharmacy advertisers to target consumers in the United States. Google was aware that U.S. consumers were making online purchases of prescription drugs from these Canadian online pharmacies, and that many of the pharmacies distributed prescription drugs, including controlled prescription drugs, based on an online consultation rather than a valid prescription from a treating medical practitioner. Google was also on notice that many pharmacies accepting an online consultation rather than a prescription charged a premium for doing so because individuals seeking to obtain prescription drugs without a valid prescription were willing to pay higher prices for the drugs.

SECOND AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT - CV-11-04248-PJH

Further, from 2003 through 2009, Google provided customer support to some of these Canadian online pharmacy advertisers to assist them in placing and optimizing their AdWords advertisements, and in improving the effectiveness of their websites.

In 2009, after Google became aware of the investigation by the Rhode Island U.S. Attorney's Office and the FDA/OCI Rhode Island Task Force of its advertising practices in the online pharmacy area, and as a result of that investigation, Google took a number of steps to prevent the unlawful sale of prescription drugs by online pharmacies to U.S. consumers. Among other things, Google began requiring online pharmacy advertisers to be certified by the National Association of Boards of Pharmacy's *Verified Internet Pharmacy Practices Sites* program, which conducts site visits; has a stringent standard against the issuance of prescriptions based on online consultations; and, most significantly, does not certify Canadian online pharmacies. In addition, Google retained an independent company to enhance detection of pharmacy advertisers exploiting flaws in the Google's screening systems.

Under the terms of an agreement signed by Google and the government, Google acknowledges that it improperly assisted Canadian online pharmacy advertisers to run advertisements that targeted the United States through AdWords, and the company accepts responsibility for this conduct. In addition to requiring Google to forfeit $500 million, the agreement also sets forth a number of compliance and reporting measures which must be taken by Google in order to insure that the conduct described in the agreement does not occur in the future.

The investigation of Google had its origins in a separate, multimillion dollar financial fraud investigation unrelated to Google, the main target of which fled to Mexico. While a fugitive, he began to advertise the unlawful sale of drugs through Google's AdWords program. After being apprehended in Mexico and returned to the United States by the U.S. Secret Service, he began cooperating with law enforcement and provided information about his use of the AdWords program. During the ensuing investigation of Google, the government established a number of undercover websites for the purpose of advertising the unlawful sale of controlled and non-controlled substances through Google's AdWords program.

110. Later on the same date, Google acknowledged that it should not have allowed illegal Canadian drug ads, stating:

We banned the advertising of prescription drugs in the U.S. by Canadian pharmacies some time ago. However, it's obvious with hindsight that we shouldn't have allowed these ads on Google in the first place. Given the extensive coverage this settlement has already received, we won't be commenting further.

111. Jason Helfstein, an Internet research analyst at Oppenheimer & Co., said that while the penalty imposed by the DOJ was large, what is more distressing for Google is the blow to its reputation. "The most surprising thing isn't the amount of money, it is that Google made a mistake with its ads, and Google doesn't usually make mistakes," he said.

112. According to an article by the Associated Press entitled, "Google settles Pharmacy ad probe for $500 million," the settlement "delivered a stinging rebuke for Google, whose motto is 'don't be evil.'" The article further stated the following:

In announcing the settlement, authorities left little doubt that Google had misbehaved. From its vantage point, Google crossed into a shady area of prescription-drug advertising in pursuit of higher profits, which have boosted its stock price and enriched its employees since the company's initial public offering in 2004.

In that sense, the potential damage to Google's reputation may be more troubling to the company than the amount of money it's paying to sweep the problem under the rug. The $500 million is a sum Google can easily afford; it had $39 billion in cash at the end of June.

\*       \*       \*

A separate U.S. Food and Drug Administration investigation into drugs that claimed to be manufactured in Canada found that 85 percent of the drugs examined came from 27 different countries, including some that were found to be counterfeit, said Kathleen Martin-Weis, acting director of the FDA's Office of Criminal Investigations.

Investigators noted that Google did not allow online pharmacies from any other country aside from Canada to advertise to American consumers.

The probe did not touch the overseas online pharmacies, Neronha said, because American officials did not have the authority to bring charges. He said the case raised some "novel legal theories," given that if it had gone to trial, prosecutors would have to prove an Internet search engine helped pharmacies violate federal law.

Investigators snared Google's ad system by creating seven undercover websites offering prescription drugs to be sold without a prescription or the completion of an online medical questionnaire, Martin-Weis said. An undercover investigator informed Google employees creating the advertising for the products that they were manufactured overseas and did not require customers to have a valid prescription, she said.

"In each instance, despite this knowledge, Google employees created a full advertising campaign for each of the undercover websites," Martin-Weis said.

Investigators said they quickly spent the money they had set aside for the ad buys and then pored over 4 million pages of e-mails and financial records to make their case. The undercover websites were live for four months, investigators said.

113. On August 27, 2011, the WSJ published an article entitled, *New Heat for Google CEO*. The article emphasized that defendant Page, as the "public face of Google" "knew of, and allowed, the ads for years." Further, the article stated, in relevant part:

Sorting through more than four million documents, prosecutors found internal emails and documents that, they say, show Mr. Page was aware of the allegedly illicit

SECOND AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT - CV-11-04248-PJH

ad sales. Under this week's $500 million settlement, those emails won't be released, avoiding the possibility of disclosure at trial.

"Larry Page knew what was going on," Peter Neronha, the Rhode Island U.S. Attorney who led the probe, said in an interview. "We know it from the investigation. We simply know it from the documents we reviewed, witnesses that we interviewed, that Larry Page knew what was going on."

\* \* \*

Mr. Neronha didn't say when the Justice Department believes Mr. Page learned of the matter, though people familiar with the investigation allege it was several years ago. He declined to discuss the content of the emails, citing grand jury secrecy.

\* \* \*

Mr. Page, 38 years old, five months ago assumed direct leadership of Google as chief executive. Mr. Page has increasingly become the public face of Google as it navigates a thicket of government investigations.

The Justice Department contends that Google knew it was potentially violating U.S. law since at least 2003, but didn't take effective action to ban the ads until it mounted an undercover sting operation against the Internet search giant in 2009.

In the years leading up to the investigation, senior Google executives testified repeatedly in Congress that the company had "rigorous" controls to stop unlawful advertisements. Those included retaining a series of third-party services to screen out sites that didn't comply with U.S. law.

But Mr. Neronha said those efforts amounted to "window-dressing," allowing Google to continue earning revenues from the allegedly illicit ad sales even as it professed to be taking action against them.

Google employees helped undercover Justice Department agents in the sting operation evade controls designed to stop companies from advertising illegally, he said.

"Suffice it to say that this is not two or three rogue employees at the customer service level doing this on their own," Mr. Neronha said in an interview. "This was a corporate decision to engage in this conduct."

U.S. state pharmacy regulators warned Google in 2003 and 2008 that the importation of drugs from abroad was illegal, according to letters reviewed by The Wall Street Journal. Google allowed ads from Canadian online pharmacies to target U.S. consumers until 2009, when it became aware of the government investigation, the Justice Department contends.

114. In fact, defendant Schmidt admits that he knew about and sanctioned Google's illegal ad strategy since 2004, stating in testimony before the U.S. Senate, "I believe I first learned of this issue around [2004] through meetings and internal discussions." As Schmidt also stated in his later

SECOND AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT - CV-11-04248-PJH

written responses to inquiries from Senator Cornyn, "not blocking licensed Canadian pharmacies certified by SquareTrade and PharmacyChecker from advertising in the United States was the result of a continuing discussion involving a variety of policy and implementation questions over several years, and involved many employees in the company beyond those on the policy team."

## DAMAGE TO GOOGLE

115.     Google has been, and will continue to be, severely damaged and injured by defendants' misconduct.  Further, as a direct and proximate result of defendants' breach of loyalty, Google has expended and will continue to expend significant sums of money.  These expenditures include, but are not limited to: (i) costs incurred from the investigations into the Company's acceptance of advertisements placed by online pharmacy advertisers that violated federal law; (ii) costs incurred from the compensation and benefits paid to the defendants that breached their fiduciary duties to the Company; (iii) the $500 million revenue forfeiture, fines, penalties and disgorgement resulting from the Company's violations of the federal law; and (iv) the cost of implementing the settlement with the DOJ.

116.     In addition, Google's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  Moreover, Google's corporate motto, "Don't be evil," is now in question and the Company's hard earned reputation as a good corporate citizen has been rendered meaningless by defendants' fiduciary breaches.  For at least the foreseeable future, Google will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that Google's ability to raise equity capital or debt on favorable terms in the future is now impaired.

117.     Nevertheless, the Google Board has taken no action against the directors and officers responsible for the damage and injury to the Company, including themselves.  By this action, plaintiffs seek redress for and vindication of Google's rights against its wayward fiduciaries.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

118.     Plaintiffs incorporate ¶¶1-117.

119.     Pursuant to Rule 23.1 of the Federal Rules of Civil Procedures, plaintiffs bring this action for the benefit of Google to redress injuries suffered, and to be suffered, by Google as a result of the defendants' breaches of fiduciary duty, abuse of control, corporate waste and unjust enrichment.  Google is named as a nominal party in this action solely in a derivative capacity.

120.     Plaintiffs will adequately and fairly represent the interests of Google and its shareholders in enforcing and prosecuting the derivative claims.

121.     At the time of the filing of this action the Google Board consists of the following nine individuals: Page, Brin, Schmidt, Doerr, Hennessy, Otellini, Shriram, Tilghman and non-defendant Ann Mather.

122.     Plaintiffs did not make a pre-suit demand on the Google Board, because such a demand would have been a useless and futile act, and, therefore, is excused.  More particularly, a majority of the Google Board is not disinterested or independent, because three directors – Schmidt, Page and Brin are not disinterested as they face a substantial likelihood for breach of loyalty.  These defendants were aware of the illegal Canadian ads by October 2003.  However, when faced with this illegality, they continued Google's policy for pharmacy advertisers in a manner that allowed Canadian online pharmacies to illegally sell prescription drugs via Google's website.  *See* ¶¶6, 28-70, *infra*.  Similarly, three directors –Tilghman, Hennessy and Shriram – lack independence from one or more "interested" directors Schmidt, Page and/or Brin, because they are executives and/or trustees of Princeton and/or Stanford Universities, where Schmidt, Page and Brin are alumni, and because the Universities have received tens of millions of dollars from Schmidt or Google.  *See* ¶¶8, 124-127.

**Demand Is Excused Because Defendants Page, Brin and Schmidt Dominate and Control the Board by Virtue of Their Majority Shareholder Voting Power**

123.     Google's Board is dominated and controlled by defendants Page and Brin, co-founders of Google, and defendant Schmidt, the Company's long time CEO, by way of their majority shareholder voting power.  Page controls 28.4% of shareholder voting power, Brin controls 28% of shareholder voting power, and Schmidt controls 9.5% of shareholder voting power.  Combined, Page, Brin and Schmidt control two-thirds of the shareholder vote.  As disclosed in the

Company's Form S-1 filed with the SEC on April 29, 2004, defendants Schmidt, Page and Brin "operate the company collectively and . . . consult extensively with each other before significant decisions are made."

**Defendants Hennessy, Shriram, Tilghman and Doerr**
**Are Not Independent from Interested Directors**
**Schmidt, Page and Brin**

124.    Due to their interrelated business, professional and personal relationships, certain defendants have developed debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of the Company as requested herein.  For example, demand is futile and thus excused because defendants Tilghman, Shriram, Hennessy and Doerr are not independent of Page, Brin and Schmidt.

**Defendants Hennessy and Shiriam Are Not Independent from Interested**
**Directors Page, Brin and/or Page and Brin**

125.    Defendant Hennessy is the President of Stanford University and defendant Shriram serves on the Stanford board of trustees.  Google, at the direction of defendants Page and Brin, Stanford graduates, donates millions of dollars every year to Stanford University.  Since 2006, Google has donated over $14.4 million to Stanford University.  If Hennessy or Shriram voted to initiate litigation against Page and Brin, they would effectively cause Google to stop making its multi-million dollar yearly donation to Stanford University.  This outcome would be particularly disastrous to defendant Hennessy, because one of his principle duties as President of Stanford University is ensure continued alumni support.  Hennessy and Shriram will not risk their prestigious positions at Stanford University or Google's continued support of the University by voting to initiate litigation against Page or Brin.  Accordingly, defendants Hennessy and Shriram lack independence from Page, Brin and/or Page and Brin, rendering a pre-suit demand on them futile.

**Defendant Tilghman Is Not Independent from Interested Director Schmidt**

126.    Defendant Tilghman is the President of Princeton University. Prior to becoming President, Tilghman was a Professor of Life Sciences at Princeton. Defendant Schmidt has donated tens of millions of dollars to Princeton University. For instance, on October 13, 2009, Princeton University announced that Schmidt created a $25 million endowment fund at Princeton University.

Tilghman heaped praise on Schmidt for providing Princeton University with this generous gift, stating "This fund will allow Princeton's scientists and engineers to explore truly innovative ideas that need the creation or application of new technologies, including the kinds of technological breakthroughs that most funding sources are too risk-averse to support." Tilghman continued, "We are deeply grateful to Eric and Wendy [defendant Schmidt's wife] not only for providing this support, but for providing the capacity and flexibility to make investments that are likely to have the broadest and most transformative impact." Schmidt is a graduate of Princeton University and served as a trustee of the university from 2004 to 2008, at the same time as Tilghman served as a trustee of the university. During that time, Schmidt, as a trustee, exercised substantial control over Tilghman's compensation and continued employment. Tilghman will not vote to initiate litigation against Schmidt out of loyalty for his past acts to her and Princeton University and because it would all but ensure that Schmidt would not provide any future donations to Princeton University. Accordingly, as the Court's Order holds, defendant Tilghman lacks independence from interested defendant Schmidt, rendering a pre-suit demand on her futile.

**Defendant Doerr Is Not Independent from Interested Directors Schmidt, Brin and/or Page**

127. Defendant Doerr is a general partner at Kleiner Perkins Caufield & Byers, a venture capital firm. Doerr has sought and obtained substantial investments from Google in private companies that Kleiner Perkins Caufield & Byers is a major investor in through certain of its funds. Doerr is the managing director of these investment funds. In 2007, Google bought Peakstream, Inc. for $20.3 million. Kleiner Perkins Caufield & Byers, as part owner of Peakstream, received 24.5% of that amount (approximately $5 million). Since that time, Google has continued to invest in companies in which Kleiner Perkins Caufield & Byers also had major investments. Since 2008, Google has invested $47.5 million in companies Kleiner Perkins Caufield & Byers also invested in. In 2010 alone, Google, at the direction of defendants Page, Brin and Schmidt, invested over $21 million in companies in which Kleiner Perkins Caufield & Byers has a substantial interest. If Doerr voted in favor of initiating litigation against Page, Brin or Schmidt, he would risk Google's continued financial support in companies he has as major investments. Doerr will not take such a

1  risk. Accordingly, defendant Doerr is not independent from "interested" directors Schmidt, Page

2  and Brin, whether viewed collectively or individually. As such, a pre-suit demand on Doerr is futile.

3  **Demand Is Excused Because Schmidt, Page and Brin**
   **Are Interested Because Each Faces a Substantial**

4  **Likelihood of Liability for Breach of Loyalty Arising**
   **from Their Knowledge of and Faithless Response to**

5  **the Illegal Canadian Ads**

6      128.    As detailed in ¶¶6, 28-70, defendants Schmidt, Page and Brin knew Google was

7  facilitating the sale of Canadian prescription drugs to U.S. consumers and that such sales were

8  illegal. The Google Board received a blizzard of warnings that did or would have alerted them to the

9  wrongdoing occurring at Google if these defendants had not recklessly been performing their duties.

10

11     129.    At all relevant times, defendants Schmidt, Page and Brin were the three top level

12 executives at Google, and thus necessarily played an active role in approving the verification service

13 the Company used to screen ads. Further, as key executives at Google, defendants Schmidt, Page

14 and Brin were at least reckless if they did not know about the illegal online pharmaceutical

15 advertising, considering the significant source of revenue Google received from the illegal

16 advertisements, and that illegal ads were blatantly being issued with the aid of Google employees.

17 Furthermore, as directors at the time, defendants Schmidt, Page and Brin knew the ad policy

18 constituted a violation of federal law.

19

20     130.    Plaintiffs have not made any demand on shareholders of Google to institute this

21 action since such demand would be a futile and useless act for the following reasons:

22          (a)     Google is a publicly traded Company with approximately 323 million shares

23 outstanding, and thousands of shareholders;

24          (b)     Making demand on such a number of shareholders would be impossible for

25 plaintiffs who have no way of finding out the names, addresses or phone numbers of shareholders;

26 and

27     131.    Making demand on all shareholders would force plaintiffs to incur huge expenses,

28 assuming all shareholders could be individually identified.

# COUNT I

## Against All Defendants for Breach of Fiduciary Duty of Loyalty
### (and Candor and Good Faith)

132.    Plaintiffs incorporate ¶¶1-131.

133.    Defendants owed Google and its shareholders a fiduciary duty of loyalty (and candor and good faith).  Under this duty, defendants, when faced with a known duty to act, here Google's legal duty to comply with the federal laws related to the importation of prescription drugs, were duty bound to proactively maintain controls and policies designed to ensure Google's compliance with these laws.

134.    However, defendants breached their duty of loyalty by consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

135.    As a result of defendants' disloyalty, Google has been injured.  Accordingly, Google is entitled to damages.

# COUNT II

## Against Defendants Schmidt, Page and Brin for Corporate Waste

136.    Plaintiffs incorporate ¶¶1-131.

137.    As a result of the foregoing misconduct, defendants have caused Google to waste valuable corporate assets.

138.    As a direct and proximate result of defendants' corporate waste, Google has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

# COUNT III

## Against Defendants Schmidt, Page and Brin for Unjust Enrichment

139.    Plaintiffs incorporate ¶¶1-131.

140.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Google.  Defendants were unjustly enriched as a result of the salary, fees, stock options and other payments they received while breaching their fiduciary duty owed to Google.

141.     Plaintiffs, as shareholders of Google, seek restitution from defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other improper payments obtained by defendants, and each of them, from their wrongful conduct and fiduciary breaches.

142.     As a result of defendants' unjust enrichment, Google has been injured and is entitled to damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment in the Company's favor against all defendants as follows:

A.     Declaring that plaintiffs may maintain this action on behalf of Google and that plaintiffs are adequate representatives of the Company;

B.     Declaring that the defendants have breached and/or aided and abetted the breach of their fiduciary duties to Google;

C.     Determining and awarding to Google the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

D.     Determining and awarding to Google exemplary damages in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

E.     Awarding Google restitution from defendants, and each of them;

F.     Awarding plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs and expenses; and

G.     Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: November 1, 2013

ROBBINS GELLER RUDMAN
  & DOWD LLP
TRAVIS E. DOWNS III
BENNY C. GOODMAN III
ERIK W. LUEDEKE


_____s/ Benny C. Goodman III_____
BENNY C. GOODMAN III

655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

POMERANTZ GROSSMAN HUFFORD
  DAHLSTROM & GROSS LLP
MARC I. GROSS
JEREMY A. LIEBERMAN
JASON S. COWART
600 Third Avenue
New York, NY  10016
Telephone:  212/661-1100
212/661-8665 (fax)

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO
SHANE P. SANDERS
GINA STASSI
600 B Street, Suite 1900
San Diego, CA  92101
Telephone:  619/525-3990
619/525-3991 (fax)

Co-Lead Counsel for Plaintiffs

LAW OFFICE OF ALFRED G.
    YATES, JR., P.C.
GERALD L. RUTLEDGE
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA  15219
Telephone:  412/391-5164
412/471-1033 (fax)

Counsel for Plaintiff

**VERIFICATION**

I, Patricia M. McKenna, hereby declare as follows:

I am a shareholder of Google Inc. I was a shareholder at the time of the wrongdoing complained of and I remain a shareholder. I have retained competent counsel and I am ready, willing and able to pursue this action vigorously on behalf of Google Inc. I have reviewed the Second Amended Verified Consolidated Shareholder Derivative Complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: October _30_, 2013

_Patricia H McKenna_
Patricia M. McKenna

[TITLE] - 4:11-cv-04248-PJH

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2013, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 1, 2013.

s/ Benny C. Goodman III
BENNY C. GOODMAN III

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: bennyg@rgrdlaw.com

## Mailing Information for a Case 4:11-cv-04248-PJH

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Felipe Javier Arroyo**
  farroyo@robbinsarroyo.com,notice@robbinsarroyo.com

- **Jason S. Cowart**
  jscowart@pomlaw.com

- **Patrick V. Dahlstrom**
  pdahlstrom@pomlaw.com

- **Marshall Pierce Dees**
  mdees@holzerlaw.com

- **Travis E. Downs , III**
  travisd@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Michael I. Fistel , Jr**
  mfistel@holzerlaw.com

- **Benny Copeline Goodman , III**
  bennyg@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Kathleen Ann Herkenhoff**
  kah@weiserlawfirm.com,jmf@weiserlawfirm.com,hl@weiserlawfirm.com

- **Darren T. Kaplan**
  dkaplan@chitwoodlaw.com

- **Peter John Koenig**
  peter@whk-law.com,serena@whk-law.com,beau@whk-law.com

- **Nicole Catherine Lavallee**
  nlavallee@bermandevalerio.com,ysoboleva@bermandevalerio.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com

- **Erik William Luedeke**
  eluedeke@rgrdlaw.com

- **Elizabeth Catherine Peterson**
  epeterson@wsgr.com,vshreve@wsgr.com,cfoung@wsgr.com,bbahns@wsgr.com,dgavril@wsgr.com,ncarvalho@wsgr.com,dwalters@wsgr.com,bsantaguida@wsgr.com

- **Anthony David Phillips**
  aphillips@bermandevalerio.com,ysoboleva@bermandevalerio.com

- **Brian J. Robbins**
  notice@robbinsarroyo.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **Shane Palmesano Sanders**
  ssanders@robbinsarroyo.com,notice@robbinsarroyo.com

- **Bryson Scott Santaguida**
  bsantaguida@wsgr.com

- **Gina Stassi**
  gstassi@robbinsarroyo.com,notice@robbinsarroyo.com

- **Joseph J. Tabacco , Jr**
  jtabacco@bermandevalerio.com,ysoboleva@bermandevalerio.com

- **Diane Marie Walters**
  dwalters@wsgr.com,vshreve@wsgr.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,khuang@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Boris          Feldman
Wilson Sonsini Goodrich & Rosati
A Professional Corporation
650 Page Mill Road
```

Palo Alto, CA 94304-1050

**Marc          L Gross**
Pomerantz Haudek Block Grossman & Gross LLP
100 Park Avenue
26th Floor
New York, NY 10017

**R.          James Hogdson**
Pomerantz Haudek Block Grossman & Gross LLP
100 Park Avenue
16th Floor
New York, NY 10017

**Fei-Lu          Qian**
Pomerantz Haudek Grossman & Gross LLP
100 Park Avenue
16th Floor
New York, NY 10017