BORIS FELDMAN, State Bar No. 128838
Email:  boris.feldman@wsgr.com
ELIZABETH C. PETERSON, State Bar No. 194561
Email:  epeterson@wsgr.com
GIDEON A. SCHOR, NY State Bar No. 2337251 (admitted *pro hac vice*)
Email:  gschor@wsgr.com
CHERYL W. FOUNG, State Bar No. 108868
Email:  cfoung@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:  (650) 493-9300
Facsimile:   (650) 565-5100

Attorneys for Defendants
Larry Page, Sergey Brin,
Eric E. Schmidt, L. John Doerr, John L.
Hennessy, Paul S. Otellini, K. Ram Shriram,
Shirley M. Tilghman,
and Nominal Defendant Google Inc.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| In re GOOGLE INC. SHAREHOLDER DERIVATIVE LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Master File No. CV-11-04248-PJH<br><br>DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT<br><br>DATE:       March 26, 2014<br>TIME:        9:00 a.m.<br>JUDGE:     Hon. Phyllis J. Hamilton |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ............................................................1

ISSUES TO BE DECIDED (Local Rule 7-4(a)(3)) ........................................1

MEMORANDUM OF POINTS AND AUTHORITIES ....................................2

INTRODUCTION ............................................................................................2

    A.   As the Delaware Court Has Already Held, the Second Amended Complaint's New Allegations Fail to Establish a Substantial Likelihood of Liability ....................................................................2

    B.   The Second Amended Complaint Fails to Establish that Any Outside Director Is Beholden to Any Inside Director ..........................5

FACTUAL BACKGROUND ...........................................................................6

    A.   The Original Problem: Rogue Online Pharmacies Located World-Wide Run Google Ads Linking to Sites Through Which U.S. Consumers Purchase and Import Prescription Drugs ...............................7

        1.   Google's Business ..................................................................7

        2.   Roguery by Certain Online Pharmacies as of 2003 .................7

        3.   Google Considers Revising Its Policy .....................................9

    B.   Google's Solution to the Original Problem: In 2003-2004, Google Implements a New Policy to Address the Roguery and, in 2004-2005, Details the New Policy in Congressional Testimony ...............................10

        1.   Google's Internal Debates Balance Complex Issues ..................10

        2.   Google's New Policy ..............................................................11

        3.   Google Details New Policy in Congressional Testimony ..........14

    C.   Assessment of Google's Solution to the Original Problem: How the New Policy Fared .............................................................15

    D.   The Second Amended Complaint Fails to Allege the Requisite Knowledge ........15

    E.   The Instant Litigation and the *DeKalb* Litigation ....................................16

ARGUMENT ..................................................................................................18

I.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS' DEMAND FUTILITY ALLEGATIONS DO NOT ESTABLISH THAT THE INSIDE DIRECTORS FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY ........18

    A.   General Legal Standards Concerning Pleading of Demand Futility ......................18

B.   Specific Legal Standards Defining When a Director Is "Interested" ......................19

C.   This Court Should Adopt the Delaware Chancery Court's Ruling That the Second Amended Complaint's New Allegations Fail to Establish Knowledge on the Part of Any Inside Director ...........................................22

D.   In Any Event, the Second Amended Complaint Does Not Allege that Any Inside Director Knew Google's *Hosting* of the Canadian Pharmacy Ads to Be Illegal ...................................................................................................26

II.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS' DEMAND FUTILITY ALLEGATIONS DO NOT ESTABLISH THAT THE OUTSIDE DIRECTORS LACK INDEPENDENCE .........................................................30

A.   Specific Legal Standards Defining When a Director Lacks Independence ............30

B.   Because No Director Is Alleged to Be Interested, No Director Can Lack Independence ................................................................................................31

C.   Having Resigned from the Princeton Presidency, Shirley Tilghman Does Not Lack Independence from Eric Schmidt .....................................................32

(i)  Ms. Tilghman's Service as President ....................................................32

(ii)  Mr. Schmidt's Service as Trustee .........................................................33

(iii)  Mr. Schmidt's Donation ........................................................................34

III.   THE COMPLAINT FAILS TO STATE A CLAIM .........................................................35

No Claim For Breach of Fiduciary Duty .........................................................35

No Claim For Waste .........................................................................................36

No Claim For Unjust Enrichment ....................................................................36

CONCLUSION ..............................................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Baca ex rel. Insight Enters., Inc. v. Crown*, No. 09-1283-PHX, 2010 WL
2812697 (D. Ariz. Jan. 8, 2010) .......................................................................... 18

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d
1040 (Del. 2004) .................................................................................................. 18

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................ 35

*Braddock v. Zimmerman*, 906 A.2d 776 (Del. 2006) ................................................... 18

*Cede & Co. v. Technicolor*, 634 A.2d 345 (Del. 1993) ................................................ 20

*Citron ex rel. United Techs. Corp. v. Daniell*, 796 F. Supp. 649 (D. Conn.
1992) ................................................................................................................... 19

*David B. Shaev Profit Sharing Account v. Armstrong*, No. 1449-N, 2006
WL 391931 (Del. Ch. Feb. 13), *aff'd*, 911 A.2d 802 (Del. 2006)........................ 19

*Dichter-Mad Family Partners, LLP v. United States*, 709 F.3d 749 (9th Cir.
2013) ................................................................................................................... 11

*DiLorenzo v. Norton*, No. 07-144 RJL, 2009 U.S. Dist. LEXIS 66862
(D.D.C. July 31, 2009) ....................................................................................... 21

*Guttman v. Huang*, 823 A.2d 492 (Del. Ch. 2003) ..................................................... 20

*Hartsel v. Vanguard Group, Inc.*, No. 5394-VCP, 2011 WL 2421003 (Del.
Ch. June 15, 2011), *aff'd*, 38 A.3d 1254 (Del. 2012) .............................. 21, 22, 28

*In re Allergan, Inc.*, No. 10-01352 DOC, 2011 WL 1429626 (C.D. Cal. Apr.
12, 2011) ............................................................................................................. 19

*In re Autodesk, Inc., S'holder Deriv. Litig.*, No. C-06-7185-PJH, 2008 WL
5234264 (N.D. Cal. Dec. 15, 2008) ............................................................... 19, 20

*In re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2d 1268 (Del. Ch. 1995) .................. 19, 20

*In re Bidz.com, Inc., Deriv. Litig.*, 773 F. Supp. 2d 844 (C.D. Cal. 2011)........................ 34

*In re Computer Sciences Corp. Deriv. Litig.*, No. 06-05288-MRP, 2007 WL
1321715 (C.D. Cal. Mar. 26, 2007), *aff'd*, 310 F. App'x 128 (9th
Cir. 2009) ........................................................................................................... 18

*In re Dow Chem. Co. Deriv. Litig.*, No. 4349-CC, 2010 WL 66769 (Del.
Ch. Jan. 11, 2010) .............................................................................................. 19

*In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808 (Del. Ch.
2005), *aff'd*, 906 A.2d 766 (Del. 2006)........................................................ 33, 34

*In re The Goldman Sachs Group, Inc., S'holder Litig.*, No. 5215-VCG,
   2011 WL 4826104 (Del. Ch. Oct. 12, 2011) .......................................................33, 34

*In re VeriSign, Inc., Deriv. Litig.*, 531 F. Supp. 2d 1173 (N.D. Cal. 2007) .......................11, 31

*Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377 (Del. Ch. 1999) .............................36

*Jacobs v. Yang*, No. 206-N, 2004 WL 1728521 (Del. Ch. Aug. 2, 2004),
   *aff'd mem.*, 867 A.2d 902 (Del. 2005) .......................................................34

*King v. Baldino*, 648 F. Supp. 2d 609 (D. Del. 2009), *aff'd*, 409 F. App'x
   535 (3d Cir. 2010) .......................................................19

*La. Mun. Police Emps. Ret. Sys. v. Hesse*, No. 12-cv-4017 ALC, 2013 U.S.
   Dist. LEXIS 123338 (S.D.N.Y. July 26, 2013) .......................................................22, 28

*La. Mun. Police Emps. Ret. Sys. v. Wynn*, No. 12-cv-509 JCM, 2013 U.S.
   Dist. LEXIS 14013 (D. Nev. Feb. 1, 2013) .......................................................22, 28

*Midwestern Teamsters Pension Trust Fund v. Deaton*, No. H-08-1809, 2009
   U.S. Dist. LEXIS 50521 (S.D. Tex. May 7, 2009) *adopted by*
   *Midwestern Teamsters Pension Trust Fund v. Deaton*, No. H-08-
   1809, 2009 U.S. Dist. LEXIS 129701 (S.D. Tex. May 26, 2009). .......................................26

*Orman v. Cullman*, 794 A.2d 5 (Del. Ch. 2002) .......................................................31

*Rales v. Blasband*, 634 A.2d 927 (Del. 1993) .......................................................18, 19

*Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362 (Del. 2006) .......................19, 20

*Wood v. Baum*, 953 A.2d 136 (Del. 2008) .......................................................21, 28

*Zepeda v. PayPal, Inc.*, 777 F. Supp. 2d 1215 (N.D. Cal. 2011) .......................................11

## STATUTES, RULES, AND REGULATIONS

18 U.S.C. § 1955 .......................................................22

21 U.S.C. § 331 .......................................................27

21 U.S.C. § 952 .......................................................27

Del. Code Ann. tit. 8, § 102(b)(7) .......................................................20

Del. Gen. Corp. Law § 220 .......................................................17

Fed. R. Civ. P. 8 .......................................................1

Fed. R. Civ. P. 9(b) .......................................................1, 35

Fed. R. Civ. P. 12(b)(6) .......................................................1, 18

Fed. R. Civ. P. 23.1 .......................................................1, 18

Civil L.R. 7-4(a)(3) .......................................................1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

NOTICE IS HEREBY GIVEN that, on March 26, 2014, at 9 a.m., or as soon thereafter as ordered by the Court, before the Honorable Phyllis J. Hamilton, located at the United States District Court, 1301 Clay Street, Oakland, California, Nominal Defendant Google Inc. ("Google" or the "Company") and Individual Defendants Larry Page, Sergey Brin, Eric E. Schmidt, L. John Doerr, John L. Hennessy, Paul S. Otellini, K. Ram Shriram, and Shirley M. Tilghman (collectively "Defendants") will move to dismiss the Second Amended Verified Consolidated Shareholder Derivative Complaint ("Second Amended Complaint" or "SAC") with prejudice under Federal Rules of Civil Procedure 12(b)(6), 9(b), 8, and 23.1, and applicable state law.  This Motion is based on Plaintiffs' failure to make a demand on Google's Board of Directors or plead particularized facts showing why such demand is excused, and their failure to properly plead any claims upon which relief may be granted.  This Motion is based on this Notice and Motion; the Memorandum of Points and Authorities; the Declaration of Gideon A. Schor and exhibits; the Request for Judicial Notice; all papers filed herein; oral argument of counsel; and the record in this action.

**ISSUES TO BE DECIDED (Civil L.R. 7-4(a)(3))**

Whether Plaintiffs have cured their earlier deficient allegations and now adequately plead demand futility with sufficient particularity?

Whether Plaintiffs have cured their earlier deficient allegations and now adequately plead their state law claims?[1]

---

[1] The Court need not reach this issue if it grants the Motion to Dismiss for failure to plead demand excusal.

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

<u>**INTRODUCTION**</u>

3

     Plaintiffs' Second Amended Complaint,[2] which is Plaintiffs' *third* complaint in this action,

4

fails to cure the defects that doomed both of the previous complaints.  Accordingly, the Second

5

Amended Complaint should be dismissed with prejudice.

6

     Plaintiffs' latest pleading is fatally flawed in two respects.[3]

7

**A.**    <u>**As the Delaware Court Has Already Held, the Second Amended Complaint's New**</u>
<u>**Allegations Fail to Establish a Substantial Likelihood of Liability**</u>

8

9

     As the Delaware Chancery Court has already held, the allegations regarding the inside

10

directors' knowledge that are now included in the Second Amended Complaint concern the *wrong*

11

time period and hence are irrelevant.[4]  This Court should follow the Delaware court's reasoning

12

and dismiss the Second Amended Complaint.

13

     The substance of these new allegations in the Second Amended Complaint, consisting

14

mostly of long quotations from emails among Google employees, is copied from the complaint

15

unsealed earlier this year in the *DeKalb* action pending in Delaware Chancery Court.[5]  In granting

16

17

    [2] Plaintiffs' Second Amended Complaint is abbreviated herein for citational purposes as

18

"SAC."  Plaintiffs' Amended Complaint (i.e., the immediate predecessor of the Second Amended Complaint) is abbreviated herein for citational purposes as "AC."

19

    [3] The Second Amended Complaint's new allegations – i.e., those allegations that did not

20

appear in Plaintiffs' Amended Complaint – are identified in a redline version comparing the Second Amended Complaint and the Amended Complaint that is submitted herewith.  *See*

21

Declaration of Gideon A. Schor dated December 6, 2013, submitted herewith ("Schor Decl.") Ex. 1.

22

    [4] The inside directors are defendants Larry Page, Sergey Brin, and Eric Schmidt.  SAC ¶¶ 28,

23

30.  The only directors alleged by the Second Amended Complaint to face a substantial likelihood of liability are the inside directors.  SAC ¶ 122.  The Second Amended Complaint makes no allegation that the outside directors face a substantial likelihood of liability.

24

    [5] *See infra* at 3 n.7.  During oral argument on Defendants' motion to dismiss the Amended

25

Complaint, Plaintiffs asked for "leave to amend one more time" because a complaint in Delaware Chancery Court had been recently "unsealed" and contained lines from supposedly relevant emails

26

and other documents.  Transcript of oral argument on July 3, 2013, Schor Decl. Ex. 2 ("7/3/13 Tr.") 33-34.  The "unsealed" Delaware complaint to which Plaintiffs were referring was the

27

*DeKalb* complaint (although, to be precise, the "unsealed" complaint still contains a small number of redactions).  For the Court's convenience, a copy of the unsealed *DeKalb* complaint is attached

28

to the Schor Declaration as Exhibit 3.

1   the stay motion filed by the *DeKalb* defendants,[6] Chancellor Leo Strine reviewed those precise

2   allegations and compared them to the allegations in Plaintiffs' (now dismissed) Amended

3   Complaint,[7] for the purpose of determining whether the *DeKalb* complaint was any better than the

4   Amended Complaint, and thus whether *DeKalb* should be allowed to proceed simultaneously with

5   the instant action.  In ordering that *DeKalb* be stayed, the Chancellor ruled that the *DeKalb*

6   allegations were no better than, or even different from, those in the Amended Complaint.  1/29/13

7   Tr. 27 ("I don't see the Delaware [i.e., *DeKalb*] complaint as being any better positioned with

8   respect to arguing the key issues."); 1/29/13 Tr. 16 ("[U]ltimately you haven't come up with

9   anything that's really different."); 1/29/13 Tr. 25 ("I invested an awful lot of time in reading the

10   pleadings and I don't see a material improvement.").

11        The Chancellor's ruling turned on what the inside directors knew before and after a

12   particular chronological point – namely, Google officials' congressional testimony in 2004 and

13   2005 regarding the details of Google's new policy and how the new policy would address, among

14   other things, the problem of ads by Canadian pharmacies.[8]  Thus, for the Chancellor, the *DeKalb*

15   allegations regarding what the directors knew in 2003 and 2004 – i.e., *before* Google officials

16   disclosed the new policy to Congress – shed no light whatsoever on whether any directors faced a

17   substantial likelihood of liability.  As the Chancellor tartly put it, "[T]he problem with the

18   obsession with 2003 and 2004 is it's not translated by you all into a cogent theory."[9]  The reason

19   for this holding was that, given Google's creation of a new policy and disclosure of that new policy

20   to Congress, the issue of whether there was a substantial likelihood of liability depended on

21   _____

22        [6] All Defendants in the instant action were and are defendants in the *DeKalb* action.

        [7] The Amended Complaint was submitted to and reviewed by Chancellor Strine in connection
23   with the motion to stay the *DeKalb* action.  Transcript of oral argument on January 29, 2013, Schor
     Decl. Ex. 4 ("1/29/13 Tr.") 23 ("I have a diligent staff who went through and we compared the
24   allegations . . . ."); 1/29/13 Tr. 25 ("I invested an awful lot time in reading the pleadings and I don't
     see a material improvement.").  The allegations in SAC ¶¶ 33-65 are drawn from the *DeKalb*
25   complaint ¶¶ 102-33.  *Compare* Schor Decl. Ex. 3 ¶¶ 102, 105, 107, 108, 110, 112, 116, 119, 121,
     129, 132, 133, *with* SAC ¶¶ 33-65.

26        [8] 1/29/13 Tr. 26 (Google "got called to Congress in 2004 and 2005" and "Google told Congress
     what it was doing."); 1/29/13 Tr. 28 ("Again, to me, the problem I have is – call me ridiculous in
27   the sense that I actually focus on chronological time.").

28        [9] 1/29/13 Tr. 25-26.

1   whether any inside directors knew the *new* policy – *not* the old policy – to be ineffective.

2        As the Chancellor observed, only allegations concerning 2005-2007 – when the new policy

3   had a sufficient track record to permit review and assessment by Google – could shed light on

4   whether the new policy was effective.[10]  The Chancellor explained that the critical issue in the case

5   is what the inside directors knew *after* the congressional testimony and *after* Google's two third-

6   party verifiers had been hired:  "The real issue is, what was done *after* it went to Congress, *after*

7   they put in place these two programs with these two things?  Were those attended to?  *Were there*

8   *insiders who actually knew they were deficient* and were just a beard?  What I mean by as a beard,

9   just something that's covering up, that's making it look like there's compliance when knowing that

10  there isn't."[11]  The Chancellor reviewed the Amended Complaint as well and concluded that the

11  key issue in the instant action is the same as that in *DeKalb*:  "[Plaintiffs in the California federal

12  action] basically say Page, Brin and Schmidt knowingly did this in order to pump up profits,

13  *despite knowing that what they had done to supposedly address the concerns was inadequate to*

14  *actually address the concerns that people were – that Canadian pharmacies were using Google to*

15  *find American customers and to make illegal sales*."[12]  In concluding, the Chancellor again

16  explained that what the inside directors knew *after* the congressional testimony was the issue "that

17  both the California and the Delaware plaintiffs have to address.  I don't think anybody's addressed

18  them better or worse."[13]  Because the *DeKalb* allegations that Plaintiffs have now imported into the

19  Second Amended Complaint all concerned events in 2003 and hence did not address this issue any

20  better than did the Amended Complaint, the Chancellor stayed the *DeKalb* case in favor of the

21  instant action.[14]

22

23      [10] 1/29/13 Tr. 9 ("[T]he key really is that, when they did what they told Congress they were

24  doing to address the problems that you pointed out existed, *that what they did they knew to be*
    *ineffective.  And that really is stuff that we'd be talking about in 2005, 2006, and 2007*." (emphasis

25  added)).

        [11] 1/29/13 Tr. 29 (emphasis added).
26
        [12] 1/29/13 Tr. 23 (emphasis added).
27
        [13] 1/29/13 Tr. 30.
28
        [14] 1/29/13 Tr. 9, 25, 31.

In engrafting the *DeKalb* allegations onto the Amended Complaint to create the Second Amended Complaint, Plaintiffs are simply relying on allegations that the Chancellor has already ruled added nothing to the (now-dismissed) Amended Complaint. Those allegations, the Chancellor held, fail to address the key issue, which is whether any inside directors face a substantial likelihood of liability – that is, whether any inside directors, *after* the congressional testimony in 2004 and 2005, knew the new policy to be ineffective. In short, the Second Amended Complaint's new allegations, which all concern pre-testimony events in 2003, were dead-on-arrival. Defendants respectfully request that this Court adopt Chancellor Strine's conclusion and hold that the Second Amended Complaint's new allegations of purported knowledge do not cure the inadequacies of the Amended Complaint's knowledge allegations.[15]

**B.   The Second Amended Complaint Fails to Establish that Any Outside Director Is Beholden to Any Inside Director**

The Second Amended Complaint's allegations regarding independence do not establish that any of the outside director defendants is beholden to any of the inside director defendants. In fact, the Second Amended Complaint's allegations do the *opposite*: the Second Amended Complaint admits – albeit with coy obliqueness – that defendant Tilghman stepped down as President of Princeton University.[16] Thus, the basis for the Court's prior conclusion that defendant Tilghman was beholden to defendant Schmidt is now absent from the case: defendant Tilghman's

---

[15] Even if this Court were not to adopt Chancellor Strine's conclusion, the Court would still be compelled to hold that Plaintiffs fail to allege a substantial likelihood of liability and thus fail to allege interestedness on the part of any director. Where, as here, a plaintiff alleges breach of the duty of loyalty based on bad faith and purports to allege that a director faces a substantial likelihood of liability for having failed to prevent certain conduct, the allegation of a substantial likelihood of liability cannot succeed unless the plaintiff alleges that the director *knew the conduct at issue to be illegal*. As explained *infra* in Point I.D., the Second Amended Complaint fails to allege that any inside director knew that Google's *hosting* of the advertisements in question was illegal. For this reason alone, the Second Amended Complaint should be dismissed for failure to plead demand futility.

[16] SAC ¶ 23 (Tilghman "serves *or served* as President of Princeton" (emphasis added)); *see also* "Christopher L. Eisgruber named 20th president of Princeton University," available at http://www.princeton.edu/main/news/archive/S36/65/54C75 (Schor Decl. Ex. 5) (noting end of Tilghman's term as President effective July 1, 2013); "Eisgruber installed as president of Princeton; upholds ideal of liberal arts," available at http://www.princeton.edu/main/news/archive/S37/98/69Q43 (Schor Decl. Ex. 23) (referring to "former president[] Shirley M. Tilghman").

1   resignation from the Princeton presidency has terminated both her fundraising responsibility at

2   Princeton and Princeton's control over the terms (whether performance-based or otherwise) of her

3   employment as President.  Accordingly, there is no reason to believe that a decision by her to

4   authorize litigation against Schmidt could result in adverse consequences for her personally.

5          In sum, the Second Amended Complaint's new allegations do not raise a reasonable doubt

6   as to the disinterestedness or independence of a majority of Google's directors.  Accordingly, the

7   Second Amended Complaint should be dismissed for failure to allege demand futility.  Because

8   Plaintiffs have had sufficient opportunities to amend,[17] the dismissal of the Second Amended

9   Complaint should be with prejudice.

10                              **FACTUAL BACKGROUND**

11         This shareholder derivative action was filed following an announcement on August 24,

12  2011, that Google had entered into a non-prosecution agreement ("NPA") with the Department of

13  Justice ("DOJ") on August 19, 2011.[18]  In the NPA, Google agreed to civil forfeiture of $500

14  million following the government's investigation of Google's acceptance of ads placed by online

15  Canadian pharmacies that did not comply with U.S. law restricting the importing and dispensing of

16  prescription drugs.[19]  The DOJ entered into the NPA with Google alone; the NPA does not name,

17  let alone impugn, any of the individual defendants in this action.[20]

18         Plaintiffs, who have sued certain of Google's directors on Google's behalf, have never

19  made a demand on Google's Board of Directors to investigate potential wrongdoers and decide

20  whether and how to pursue legal action.[21]   Nor have Plaintiffs excused their admitted failure to

21  make a demand.  This Court dismissed both Plaintiffs' original complaint and their Amended

22  Complaint for failure to plead demand futility.[22]  As explained below, the Second Amended

23  _____

24         [17] *See* 7/3/13 Tr. 33-34 (Plaintiffs' counsel asking for leave to amend "one more time").

           [18] The NPA is attached to the Schor Declaration as Exhibit 6.

25         [19] NPA ¶¶ 1, 4-6; SAC ¶ 109.

           [20] NPA *passim*.

26         [21] SAC ¶ 122.

27         [22] Order dated May 8, 2012, Schor Decl. Ex. 7 ("2012 Order") at 20; Order dated September
    26, 2013, Schor Decl. Ex. 8 ("2013 Order") at 14.

28

1   Complaint likewise fails to plead demand futility and should be similarly dismissed.

2   **A.      The Original Problem:  Rogue Online Pharmacies Located World-Wide Run Google Ads Linking to Sites Through Which U.S. Consumers Purchase and Import**

3   **Prescription Drugs**

4          **1.      Google's Business**

5          Google is the world's leading Internet search engine.[23]  It "generates revenue primarily by

6   delivering relevant, cost-effective online advertising."[24]  Google's largest advertising program,

7   AdWords, displays advertisements in response to queries by Google's search engine users.[25]

8          Advertisers pay fees to Google for each advertisement.[26]  When users enter queries into

9   Google's search window and hit enter, the search engine responds by filling the screen with a list

10  of links constituting the search results.[27]  In many instances, one or more links appearing near the

11  top of the page (sometimes under the heading "sponsored" or "ads") are advertisements; the

12  company or entity to which any advertisement in this separate group relates paid Google a fee to

13  place its advertisement in proximity to the search results.[28]  More specifically, these advertisers bid

14  on keywords to have their advertisements appear when the user enters a query that matches the

15  selected keywords.[29]  Advertisers can also select the countries where their advertisements will

16  display; the selection is known as "geotargeting."[30]

17         **2.      Roguery by Certain Online Pharmacies as of 2003**

18         By 2003, pharmacies, like many other businesses, had established online presences.[31]  A

19

20      [23] SAC ¶ 17.  Google is a Delaware corporation with its principal executive offices in Mountain View, California.  SAC ¶ 17.

21      [24] SAC ¶ 17.

22      [25] SAC ¶ 72.

        [26] SAC ¶ 72.

23      [27] SAC ¶¶ 71, 72.

24      [28] SAC ¶¶ 71, 72; *Buyer Beware: The Danger of Purchasing Pharmaceuticals over the Internet: Hearing before the Permanent Subcomm. on Investigations of the Committee on*

25  *Governmental Affairs*, 108th Cong. 684 (2004) (Statement of Sheryl Sandberg, Vice President, Global Online Sales and Operations, Google Inc.) (Schor Decl. Ex. 9) ("Sandberg") at 262.

26      [29] SAC ¶ 72; Sandberg at 262.

27      [30] SAC ¶ 72.

28      [31] *See, e.g.*, SAC ¶¶ 35, 37, 39, 49.

1  number of these were termed "rogue pharmacies" because they perpetrated, or enabled, drug

2  transactions with U.S. consumers that violated U.S. law.[32]

3      The rogue pharmacies were located not just in Canada, but world-wide – including the

4  U.S.[33] Indeed, while Plaintiffs reference a Washington Post article that mentioned a teenager who

5  obtained painkillers from an online rogue pharmacy, Plaintiffs omit to mention that the rogue

6  pharmacy was located in *Florida*.[34] Thus, the article is irrelevant to Plaintiffs' claims, which

7  concern online pharmacies located in *Canada*.[35]

8      The roguery of both foreign and domestic pharmacies included duping U.S. consumers into

9  purchase of substandard drugs and enabling U.S. consumers to purchase prescription drugs sans

10  prescription.[36] But the roguery of foreign pharmacies also consisted of enabling U.S. consumers to

11  make online purchases of prescription drugs from foreign countries (including but not limited to

12  Canada) and to import them into the U.S., regardless of whether the drugs were substandard or the

13  purchase was without a prescription.[37] Importing prescription drugs from a foreign country is itself

14  a violation of U.S. law.[38]

15      Google's mission was and is to "organize the world's information" – that is, to make the

16  greatest amount of information and consumer choice available to its users.[39] The sheer size of the

17

18  [32] SAC ¶ 33.

[33] SAC ¶¶ 33, 37, 98; *see also* SAC ¶¶ 74, 75, 82, 93, 112.

19  [34] SAC ¶¶ 55, 79 (referencing Gilbert M. Gaul & Mary Pat Flaherty, *Google to Limit Some Drug Ads*, Washington Post, Dec. 1, 2003, at A01, Schor Decl. Ex. 10 ("Washington Post 2003")

20  (cited in SAC ¶ 55) (noting that Google's decision to create a new more restrictive policy toward online pharmaceutical advertisers "comes after the company was contacted by the father of a

21  teenage boy in suburban Chicago who said his son had used Google's search engine to locate and later order Vicodin from a Web site in *Florida*.") (emphasis added)).

22  [35] *See, e.g.*, SAC ¶ 3.

23  [36] *See, e.g.*, SAC ¶¶ 33, 37, 43, 49; Sandberg at 264.

24  [37] SAC ¶¶ 73, 74, 81, 98, 101, 104-06; NPA ¶¶ 2(f), 2(g); Sandberg at 265 n.5; *see also* SAC ¶¶ 7, 29, 33.

25  [38] Sandberg 265 n.5.

26  [39] SAC ¶¶ 40, 48, 51, 62; Sandberg at 262; *Safety of Imported Pharmaceuticals: Strengthening Efforts to Combat the Sales of Controlled Substances Over the Internet: Hearing Before the

27  Subcomm. on Oversight and Investigations of the Committee on Energy and Commerce*, 109th Cong. 46 (2005) (Statement of Andrew McLaughlin, Senior Policy Counsel, Google Inc.) (Schor

28  Decl. Ex. 11) ("McLaughlin") at 191, 198.

1   Internet makes that undertaking staggering:  a Google search covers over four billion webpages.[40]

2   Thus, Google had long taken the position that it could not police the web.[41]  Nonetheless, until late

3   2003, Google did have a policy restricting advertisements by online pharmacies (including foreign

4   pharmacies[42]):  it allowed such advertisements only for FDA-approved drugs and only where the

5   pharmacies' websites stated that a prescription was required.[43]

6          ### 3.      Google Considers Revising Its Policy

7          By 2003, numerous developments led Google to consider revising its policy concerning ads

8   by online pharmacies.  For example, Google's users needed protection from rogue pharmacies that

9   were selling counterfeit and unsafe products online.[44]  Governmental authorities were proving

10  unable to prosecute rogue online pharmacies and law-breaking consumers.[45]  In addition,

11  Drugstore.com, a large non-rogue online pharmacy, saw its market share threatened by rogue

12  online pharmacies and began aggressively pressuring large search engines – Google, Yahoo!, and

13  MSN/Overture – to bar advertising by online pharmacies that were not certified by the VIPPS[46]

14  program of the National Association of Boards of Pharmacy ("NABP").[47]  In 2003, only 14 online

15

16  _____

17    [40] Sandberg at 262.

      [41] SAC ¶ 39; McLaughlin at 198 ("[W]e are not a law enforcement agency").

18    [42] The policy also barred online pharmacies from targeting the United Kingdom and applied
     more stringent restrictions in Japan.  SAC ¶ 36.

19    [43] SAC ¶ 40.

20    [44] Sandberg at 264.

21    [45] SAC ¶ 37.  *See also* Washington Post 2003 (noting that Rep. John D. Dingell "expressed
     frustration with the slow pace of federal regulators in attacking the Internet problem"); *id.* (noting
22   that Rep. James C. Greenwood attributes problem to fact that "Internet pharmacies are regulated by
     the states and the laws are often inconsistent or confusing"); SAC ¶ 33 (noting that importation of
23   drugs into the U.S. violates law, and that law-breakers include not just businesses but also
     individual consumers who obtain drugs through foreign online pharmacies).

24    [46] "VIPPS" stands for Verified Internet Pharmacy Practice Sites.  SAC ¶ 36.  To be VIPPS-
     certified, an online pharmacy had to comply with the licensing and inspection requirements of its
25   own state and every state to which it dispensed pharmaceuticals.  *Id.*  Canadian pharmacies were
     ineligible for VIPPS certification.  NPA ¶ 2(q).

26    [47] SAC ¶¶ 48, 49; *see also* SAC ¶¶ 36, 37, 39, 40.  Among Drugstore.com's tactics:  issuing
27   mock press releases with fabricated quotes falsely attributed to Google; calling *all* VIPPS-
     uncertified pharmacies "illegal," an assertion that Google flatly disputed; and accusing Google of
28   "killing" consumers by permitting ads from VIPPS-uncertified pharmacies.  SAC ¶ 40.

pharmacies were VIPPS-certified.[48]  Drugstore.com informed Google and other search engines

that, if they did not voluntarily bar advertisements by online pharmacies that were not VIPPS-

certified, then Congress would have to outlaw the search engines' hosting of such

advertisements.[49]  Thus, according to Drugstore.com, the hosting of advertisements by pharmacies

not certified by VIPPS was not illegal at the time and would not be illegal absent future

congressional enactment.[50]

**B.** **Google's Solution to the Original Problem:  In 2003-2004, Google Implements a New Policy to Address the Roguery and, in 2004-2005, Details the New Policy in Congressional Testimony**

**1.** **Google's Internal Debates Balance Complex Issues**

Google personnel internally debated possible solutions to the problems presented by rogue

online pharmacies.[51]  In particular, much thought was given to how to restrict the roguery without

limiting Google's ability to provide maximum information and consumer choice to its users.[52]

Among the various approaches discussed were accepting advertisements only from (i) VIPPS-

certified online pharmacies or (ii) online pharmacies certified by another third-party verifier.[53]

VIPPS-certification was the most restrictive option available, as it would bar ads from all

but a small number of online pharmacies, would exclude pharmacies that were not VIPPS-certified

but were still law-abiding, and thus would severely limit consumer choice.[54]  Moreover, VIPPS

---

[48] SAC ¶ 60.

[49] SAC ¶¶ 48, 49.  Drugstore.com also made clear that it was lobbying Washington to take action against the search engines.  SAC ¶ 48.

[50] *See* SAC ¶ 49.

[51] SAC ¶¶ 35-42, 47-55, 61-65.

[52] SAC ¶ 36 (Google employee warning against overinclusive solutions:  "to block all keywords" – e.g., codeine – "effectively blocks non-pharma related ads and pharmaceutical companies themselves"), 39, 40, 48; McLaughlin at 198 (noting overbreadth problem).

[53] *See* SAC ¶ 39.

[54] SAC ¶¶ 39, 40 ("Our policy is designed to provide maximum information and choice to users and being this restrictive [i.e., approving ads only from VIPPS-certified pharmacies] is in conflict with that goal."); *see also* SAC ¶ 37 (noting that Canadian pharmacies sell discounted drugs to U.S. senior citizens); Shan Li & Tiffany Hsu, *Google to Ppay penalty for ads*, L.A. TIMES, Aug. 25, 2011 (Schor Decl. Ex. 12) (quoted in SAC ¶ 111) (noting that foreign internet pharmacies discount drugs by "as much as 85% compared with drugstore prices in the United States").

1   was hardly foolproof:  an online pharmacy that a New York Times article had described as having

2   questionable practices was itself erroneously certified by VIPPS.[55]

3          **2.      Google's New Policy**

4          Far from failing to act in the face of online pharmacies' conduct, Google formulated a new

5   policy, announced on December 1, 2003, that directly addressed the conduct.  Principally, the new

6   policy required any online pharmacy located in the U.S. or Canada to be certified by SquareTrade,

7   Inc. ("SquareTrade"), a third-party verifier,[56] before that pharmacy could run an advertisement on

8   Google.  As a pre-condition for certification, SquareTrade verified that the pharmacy was licensed

9   in at least one state in the U.S. or Canada.[57]  Since SquareTrade did not and would not certify any

10  online pharmacy located outside of the U.S. and Canada, the new policy effectively barred *all*

11  advertisements from *all* online pharmacies located outside of the U.S. and Canada.[58]

12         For several reasons, Plaintiffs' conclusory assertion that SquareTrade was "window

13  dressing" is refuted by Plaintiffs' own substantive allegations and by the documents incorporated

14  therein.[59]

15         First, the demonstrable goal of SquareTrade's guidelines was to weed out, not shield,

16  
17         [55] SAC ¶ 39.  Google's task was made even more complex by the fact that rogue pharmacies
    were evading efforts to restrict their roguery, constantly reforming under new names and playing a
18  cat-and-mouse game with regulators and search engines.  SAC ¶ 37 ("the names and urls change
    constantly"); *The Power of Google: Serving Consumers or Threatening Competition?: Hearing*
19  *Before the Subcomm. on Antitrust, Competition Policy, and Consumer Rights of the Comm. of the*
    *Judiciary,* 112th Cong. 16 (2011) (Statement and Response of Eric Schmidt, Executive Chairman,
20  Google Inc.) (Schor Decl. Ex. 13) ("Schmidt") at 120; McLaughlin at 198-99; *see also* Schmidt at
    113, 117, 130, 137.

21         [56] In 2006, Google replaced SquareTrade with PharmacyChecker.com LLC
    ("PharmacyChecker") as its third-party verifier.  SAC ¶ 90.
22
           [57] SAC ¶¶ 82, 83.
23
           [58] *See* Sandberg at 265 ("[O]nline pharmacy advertisers must be members in good standing of
24  the Square Trade Licensed Pharmacy Program . . . .  The Square Trade Program is only open to
    online pharmacies based in the U.S. or Canada."); *see also* SAC ¶¶ 82, 107, 109, 112.
25         [59] SAC ¶ 82.  *See Dichter-Mad Family Partners, LLP v. United States*, 709 F.3d 749, 784 (9th
    Cir. 2013) (affirming dismissal where conclusory assertions were "plainly contradict[ed]" by other
26  factual assertions in complaint); *accord In re VeriSign, Inc., Deriv. Litig.*, 531 F. Supp. 2d 1173,
    1195 (N.D. Cal. 2007) (granting motion to dismiss derivative action where conclusory assertion of
27  board inaction was contradicted by other complaint allegations); *Zepeda v. PayPal, Inc.*, 777 F.
    Supp. 2d 1215, 1222 (N.D. Cal. 2011) (granting motion to dismiss where conclusory allegations
28  were contradicted by other facts pleaded in complaint).

1    wrongdoers.  The Wall Street Journal reported that just as VIPPS guidelines were under the

2    auspices of the NABP, so SquareTrade's guidelines were under the auspices of the National

3    Community Pharmacists Association ("NCPA"), which represented 24,000 independent U.S.

4    pharmacies.[60]  Those NCPA pharmacies had a clear motivation to establish guidelines that would

5    bar advertisements from rogue pharmacies, with which the NCPA pharmacies were competing.

6         Second, Plaintiffs' insinuation that the paucity of VIPPS-certified pharmacies was due to

7    the alleged stringency of the VIPPS certification criteria is misleading.[61]  The paucity was due in

8    part to the steep $4,375 fee that each online pharmacy had to pay for VIPPS certification.[62]  For

9    small but law-abiding pharmacies, that fee was prohibitive.[63]  By contrast, the fee paid for

10   SquareTrade certification was only $200 plus $50 per month for three months.[64]  By keeping its fee

11   low, SquareTrade broadened the array of SquareTrade-certified pharmacies and thus benefited

12   consumers with broader online choices.[65]  The low fee also ended the unfair (i.e., wealth-based

13   rather than merit-based) exclusion of smaller legitimate pharmacies from online commerce.[66]

14        Third, SquareTrade was already in use by Google's competitors and other large internet

15   companies, and thus was the industry standard at the time.  For example, Yahoo! – which was

16   Google's main search-engine competitor, along with MSN – was already using SquareTrade to

17   verify online pharmacy advertisers.[67]  Overture, which was a subsidiary of Yahoo! and a supplier

18   of advertisements to both Yahoo! and MSN, was using SquareTrade for online wine

19   advertisements and informed Google that it was considering using SquareTrade for online

20

---

21        [60] Carl Bialik, *Web Engine Ads for Pharmacies In Canada Rile Some in the U.S.*, Wall Street
     Journal Online, June 2004 (Schor Decl. Ex. 14) ("WSJ 2004") (cited in SAC ¶ 84) at 2.

22        [61] As noted above at 10-11, the VIPPS criteria and certification process were hardly foolproof
     and had themselves been successfully gamed by at least one rogue online pharmacy that had
23   obtained VIPPS certification but was still engaging in misconduct.

24        [62] WSJ 2004 at 2.

25        [63] WSJ 2004 at 2.

     [64] WSJ 2004 at 2.

26        [65] *See* WSJ 2004 at 2.

27        [66] *See* WSJ 2004 at 2.

28        [67] WSJ 2004 at 1-2; SAC ¶¶ 6, 40.

1  pharmacy advertisements.[68]  eBay already used SquareTrade to verify products sold on its

2  website.[69]  Even Drugstore.com, the great advocate of VIPPS certification, had obtained

3  certification by SquareTrade.[70]  It bears noting that when Google began using VIPPS in 2009, it

4  became the *first* major search engine to use VIPPS.[71]

5          Fourth, as explained in Google's congressional testimony of 2004, SquareTrade's

6  verification process was substantive and meaningful.  SquareTrade undertook to confirm that each

7  of its certified online pharmacies: was licensed and was employing only licensed pharmacists, with

8  SquareTrade reverifying licensure with licensing bodies every three months; was the true owner of

9  the website running the advertisement at issue; would agree not to sell prescription drugs without a

10  prescription obtained from the buyer's personal doctor after an in-person visit, rather than by a

11  phone or online consultation; would perform an age verification for all prescriptions; would

12  commit to complying with all laws applicable both where the pharmacy was located and where the

13  buyer was located; and would verify the DEA number of anyone prescribing a controlled

14  substance.[72]

15          Canadian online pharmacies had to satisfy *additional* obligations for certification.  As

16  Google official Sheryl Sandberg testified to Congress in 2004 (*see infra* at Factual Background,

17  Part B.3.):

18          While licensed Canadian pharmacies are permitted to obtain SquareTrade
            certification, they are also required to agree that they will not target US consumers,
19          whether by providing shipping rates and information, by comparing the efficacy of
            Canadian drugs to FDA-approved drugs, or by any other means that would lead a US
20          consumer to believe that s/he can purchase pharmaceutical drugs from [the]
            Company's website.  Canadian pharmacies must also put a disclaimer on the home
21          page of their website that states:  "The FDA, due to the current state of their
            regulations, has taken the position that virtually all shipments of prescription drugs
22          imported from a Canadian pharmacy by a U.S. consumer will violate the law."[73]

23

24    _____
      [68] SAC ¶¶ 39, 41.

25    [69] SAC ¶ 39.

      [70] WSJ 2004 at 2.
26
      [71] SAC ¶ 109; NPA ¶ 2(q).
27
      [72] Sandberg at 264-65.
28
      [73] Sandberg at 265 n.5.

Fifth, the website of every certified pharmacy had to display an electronic certification seal, which, when clicked by the user, revealed the pharmacy's member profile, including the basis for believing the pharmacy to be legitimate.[74]

Sixth, as further explained in Google's congressional testimony of December 2005 (*see infra* at Factual Background, Part B.3.), the new policy clearly had "teeth."[75]  In the almost two years following the launch of Google's SquareTrade program, Google rejected an average of more than 1,500 pharmaceutical advertisements per month, and more than 30,000 in total.[76]

Finally, nothing in the Second Amended Complaint suggests that, when the new policy was begun, the emphasis placed by SquareTrade and Google on verification of licensure was misplaced.  Plaintiffs' allegations offer no reason why, at that point in time, licensure of a Canadian online pharmacy by a Canadian authority was not a reasonable basis for expecting that pharmacy to engage only in law-abiding conduct.  Certainly, the FDA considered Canada's drug-regulation system to be reliable.  Plaintiffs rely on part of an article quoting an FDA commissioner, but omit mentioning that another part of the same article quotes the same commissioner as stating "clearly Canada has a very strong regulatory system," notwithstanding wrongdoers who seek to evade regulatory scrutiny.[77]

### 3.     Google Details New Policy in Congressional Testimony

On July 22, 2004, Sheryl Sandberg, Google's Vice President of Global Online Sales and Operations, gave testimony in Congress detailing the specific elements of Google's new policy, including the details of certification by SquareTrade.[78]  On December 13, 2005, Andrew McLaughlin, Google's Senior Policy Counsel, gave similar congressional testimony, adding an

---

[74] Sandberg at 265-66.  Separate from its hiring of SquareTrade, Google also would not permit advertisements from websites advertising prescription drugs (or using prescription drug names as keywords) unless the website clearly stated that a prescription was required.  Sandberg at 266.  Further, Google continued to reject advertisements of FDA-unapproved drugs.  Sandberg at 266.

[75] McLaughlin at 197.

[76] McLaughlin at 196-97.

[77] WSJ 2004 at 1; SAC ¶ 84.

[78] The Sandberg testimony is attached to the Schor Declaration as Exhibit 9.

1  assessment of the new policy's performance since its adoption.[79]

2  **C.**    **Assessment of Google's Solution to the Original Problem:  How the New Policy Fared**

3          Except as discussed below, Plaintiffs' allegations do not dispute that Google's new policy

4  successfully restricted rogue online pharmacies throughout the world from running advertisements

5  linking to sites by which U.S. consumers purchase and import prescription drugs.  Plaintiffs'

6  claims challenge only the Canadian portion of the new policy.

7          Specifically, Plaintiffs allege that Canadian online pharmacies certified by SquareTrade

8  and PharmacyChecker were targeting U.S. consumers in violation of the new policy, and that some

9  Google employees assertedly assisted in the claimed violation.[80]  Plaintiffs also allege that,

10  notwithstanding the new policy, uncertified pharmacies had learned to advertise in the U.S. (i) by

11  running advertisements in countries where certification was not required, and then later changing

12  the targeting to the U.S.,[81] and (ii) by omitting drug terms from ad text but not from keyword lists

13  (thereby evading Google's own manual review of uncertified pharmacy advertisements),[82] with

14  some Google employees assisting in this evasion of manual review.[83]  Plaintiffs further allege that,

15  after the new policy was in effect, online Canadian pharmacies were selling prescription drugs

16  without a prescription and, in any event, were running advertisements linking to sites through

17  which U.S. consumers were purchasing and importing prescription drugs (regardless of whether

18  the purchases were without a prescription).[84]  Finally, Plaintiffs allege that Canadian law did not

19  bind Canadian online pharmacies insofar as they sold drugs to U.S. consumers.[85]

20  **D.**    **The Second Amended Complaint Fails to Allege the Requisite Knowledge**

21          In several respects, the Second Amended Complaint fails to allege the requisite knowledge

22

23      [79] The McLaughlin testimony is attached to the Schor Declaration as Exhibit 11.

24      [80] SAC ¶¶ 88, 89; NPA ¶¶ 2(k), 2(l), 3.

        [81] SAC ¶ 97; NPA ¶ 2(m).

25      [82] SAC ¶¶ 87, 95, 96.

26      [83] SAC ¶ 96.  This allegation does not appear in the NPA.  The Second Amended Complaint
does not particularize the basis for this allegation.

27      [84] SAC ¶¶ 81, 83, 86, 88, 90; NPA ¶¶ 2(j), 2(k), 2(l).

28      [85] SAC ¶ 106; NPA ¶ 2(g).

1    on the part of Google's directors.

2         To describe the most fundamental failure, one must first assume *arguendo* that the Second

3    Amended Complaint contains particularized allegations that it was illegal for search engines to

4    host online Canadian pharmacies' advertisements linking to sites through which U.S. consumers

5    purchase and import prescription drugs.[86]  *The Second Amended Complaint still does not allege*

6    *that any of Google's directors, including Eric Schmidt, **knew** such hosting to be illegal*.

7         Furthermore, the Second Amended Complaint contains no particularized allegations that

8    any director knew of the new policy's inability to prevent online Canadian pharmacies from

9    advertising prescription drugs for sale to U.S. consumers.  Thus, the Second Amended Complaint

10   contains no particularized allegations that any director knew *any* of the new policy's alleged

11   shortcomings described above (*see* Factual Background, Part C.).  Nor did the NPA assert any such

12   knowledge by any Google director; the NPA does not even name any Google director.  In other

13   words, the Second Amended Complaint does not allege that any director knew that licensed,

14   certified Canadian pharmacies could and would still "go rogue" – i.e., would breach their

15   agreement with SquareTrade to abide by the laws of the place of their purchasers and to refrain

16   from targeting U.S. consumers.[87]

17   **E.    The Instant Litigation and the *DeKalb* Litigation**

18        Plaintiffs filed their original consolidated complaint herein on October 24, 2011.  On May

19   8, 2012, this Court granted Defendants motion to dismiss, with leave to amend.

20        Plaintiffs filed the Amended Complaint on June 8, 2012.  Notably, the only directors now

21   alleged to face a substantial likelihood of liability were the three inside directors, Messrs. Page,

22   Brin, and Schmidt.  Defendants moved to dismiss, and the briefing on the motion was completed

23   ───────────────────────
     [86] As explained *infra* in Point I.D., Defendants contend that the Second Amended Complaint
24   does not actually contain such allegations.

25   [87] In its decision dated September 26, 2013, this Court made a ruling concerning Eric
     Schmidt's knowledge.  Notwithstanding that ruling, however, the Second Amended Complaint
26   fatally fails to allege that Mr. Schmidt knew that it was illegal for Google to host the
     advertisements in question.  *See supra* at preceding paragraph; *infra* at Point I.D.  Moreover,
27   nothing in the Second Amended Complaint's allegations, including those specifically about Mr.
     Schmidt, demonstrates that Mr. Schmidt, after the new policy had developed a track record (*see
28   supra* at 4), knew the new policy to be ineffective.

1   on September 5, 2012.

2        On January 29, 2013, Chancellor Strine granted the motion to stay the *DeKalb* action in

3   favor of the instant action.  The relevant portions of the Chancellor's ruling are quoted and

4   discussed above (*see* Introduction, Part A.).  In particular, the Chancellor ruled that the *DeKalb*

5   allegations – which were based on internal Google documents and emails obtained by the *DeKalb*

6   plaintiff pre-litigation under Section 220 of the Delaware General Corporation Law[88] – did not

7   make the *DeKalb* complaint any better than, or even different from, the Amended Complaint

8   herein.[89]

9         On July 3, 2013, this Court heard oral argument on Defendants' motion to dismiss the

10   Amended Complaint.  During the argument, Plaintiffs asked the Court for leave to amend "one

11   more time" should the Court grant the motion to dismiss.[90]  The basis of the request was that the

12   *DeKalb* complaint – whose allegations the Chancellor had already found wanting for purposes of

13   establishing demand futility – had recently been unsealed.[91]  Thus, Plaintiffs sought leave to amend

14   based on already rejected, albeit newly unsealed, allegations.[92]

15        On September 26, 2013, this Court granted Defendants' motion to dismiss the Amended

16   Complaint, holding that only Eric Schmidt was alleged to face a substantial likelihood of liability

17   (and thus was alleged to be interested) and that only Shirley Tilghman was alleged to be beholden

18   to an interested director (and thus was alleged to lack independence).[93]  Thus, because the

19   Amended Complaint alleged that there was a reasonable doubt as to the disinterestedness and

20   independence of only two directors, the Court dismissed the Amended Complaint for failure to

21   plead demand futility.[94]  The Court granted leave to amend, this time in order to permit Plaintiffs

22

23      [88] Section 220 authorizes shareholders of any Delaware corporation to examine the corporation's books and records.

24      [89] *See supra* at 3-4.

25      [90] *See* 7/3/13 Tr. 33-34.

      [91] 7/3/13 Tr. 34.

26      [92] 7/3/13 Tr. 34.

27      [93] 2013 Order at 9-10, 13.

28      [94] 2013 Order at 14.

1    the opportunity to add allegations from the *DeKalb* complaint.[95]

2        The Second Amended Complaint was filed on November 1, 2013.  Again, the only

3    directors alleged to face a substantial likelihood of liability were the three inside directors.

4                                    **ARGUMENT**

5    **I.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS'
           DEMAND FUTILITY ALLEGATIONS DO NOT ESTABLISH THAT THE INSIDE**

6    **DIRECTORS FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

7          **A.    General Legal Standards Concerning Pleading of Demand Futility**

8          Plaintiffs admit that they have not made a pre-suit demand on Google's board of

9    directors.[96]  Thus, Plaintiffs must "'allege with particularity'" the facts showing why demand

10   would have been futile.[97]  The particularity requirement renders Plaintiffs' burden of pleading

11   demand futility "'more onerous than that required to withstand a Rule 12(b)(6) motion.'"[98]  In

12   assessing whether Plaintiffs have met their burden, the Court "must determine whether the

13   particularized factual allegations create a reasonable doubt that, as of the time the complaint was

14   filed, a majority of the board as constituted at that time could have properly exercised its

15   independent and disinterested business judgment in responding to the demand."[99]  Where an

16   *amended* complaint makes a demand futility allegation, the court must determine the

17   disinterestedness and independence of the board as constituted when the *amended* (not the

18   *original*) complaint was filed.[100]

19

20   _____

     [95] 2013 Order at 14.

     [96] SAC ¶ 122.

21   [97] 2013 Order at 7 (quoting Fed. R. Civ. P. 23.1).

22   [98] *Baca ex rel. Insight Enters., Inc. v. Crown*, No. 09-1283-PHX, 2010 WL 2812697, at *5 (D.
     Ariz. Jan. 8, 2010) (citation omitted); *In re Computer Sciences Corp. Deriv. Litig.*, No. 06-05288-

23   MRP, 2007 WL 1321715, at *4 (C.D. Cal. Mar. 26, 2007) (noting that Nevada law follows
     Delaware law), *aff'd*, 310 F. App'x 128 (9th Cir. 2009).

24   [99] 2013 Order at 7 (citing *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993)).

25   [100] *Braddock v. Zimmerman*, 906 A.2d 776, 786 (Del. 2006).  When the Second Amended
     Complaint was filed on November 1, 2013, Google's board had ten directors:  Larry Page, Sergey

26   Brin, Eric Schmidt, John Doerr, John Hennessy, Ram Shriram, Shirley Tilghman, Paul Otellini,
     Ann Mather, and Diane Greene.  Schor Decl. Ex. 15.  Where, as here, a board has an even number

27   of directors, the plaintiff must establish demand futility with respect to half of the directors
     (because only half are needed to block a board vote to authorize litigation on behalf of the

28   company).  *See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040,

                                                        (continued...)

At the pleading stage, each director's good faith and independence are presumed; Plaintiffs must allege particularized facts rebutting that presumption.[101]  Because demand futility concerns the board's *present* objectivity rather than the company's *past* conduct, courts have dismissed complaints on demand-futility grounds in cases where genuinely illegal (and not just improper) conduct occurred in the past, including cases involving criminal convictions and fines for violation of federal drug laws,[102] violation of the Bank Secrecy Act,[103] and bribery and government procurement violations.[104]

## B.   Specific Legal Standards Defining When a Director Is "Interested"

A reasonable doubt as to a director's disinterestedness arises where the director "faces a 'substantial likelihood' of liability for breaching his fiduciary duty of loyalty (and good faith)."[105] Because Google's certificate of incorporation eliminates director liability for breach of the duty of

---

(...continued from previous page)
1046 n.8 (Del. 2004).

[101] 2012 Order at 10, 14, 15; *In re Autodesk, Inc., S'holder Deriv. Litig.*, No. C-06-7185-PJH, 2008 WL 5234264, at *6-7 (N.D. Cal. Dec. 15, 2008) ("Directors are presumed to be faithful to the corporation and able objectively to consider a demand").

[102] *See In re Allergan, Inc.*, No. 10-01352 DOC, 2011 WL 1429626, at *1 (C.D. Cal. Apr. 12, 2011) ($600 million sanction to resolve civil and criminal cases with FDA, including guilty plea and criminal fine of $375 million, for illegal marketing and promotion scheme of Botox); *King v. Baldino*, 648 F. Supp. 2d 609, 614 (D. Del. 2009) (federal misdemeanor violation of Federal Food, Drug and Cosmetic Act, payment of $425 million for off-label marketing practices), *aff'd*, 409 F. App'x 535 (3d Cir. 2010).

[103] *See Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 365-66 (Del. 2006) (criminal investigation of bank resulted in entry of deferred prosecution agreement with federal government imposing, *inter alia*, $40 million fine and $10 million payment to Federal Reserve for violation of Bank Secrecy Act); *David B. Shaev Profit Sharing Account v. Armstrong*, No. 1449-N, 2006 WL 391931, at *2-3 (Del. Ch. Feb. 13, 2006) (Citigroup paid $5 billion in civil settlements and fines to SEC and New York State arising from helping structure Enron's special purpose entities and issuing falsely positive reports on Enron and WorldCom), *aff'd*, 911 A.2d 802 (Del. 2006).

[104] *See Citron ex rel. United Techs. Corp. v. Daniell*, 796 F. Supp. 649, 651 (D. Conn. 1992) (overcharging government on defense-related contracts resulting in government investigations and conviction of company executives for role in obtaining classified information during bid for government contract); *In re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2d 1268, 1269 (Del. Ch. 1995) (scheme to systematically overcharge Veterans Administration resulting in government investigation and debarment of two defendant-officers from being awarded government contracts); *In re Dow Chem. Co. Deriv. Litig.*, No. 4349-CC, 2010 WL 66769, at *12 (Del. Ch. Jan. 11, 2010) (member of Kuwaiti Parliament charging joint venture with bribery).

[105] 2013 Order at 8-9 (quoting *Rales*, 634 A.2d at 936).

care (i.e., the duty to be adequately informed),[106] Plaintiffs are limited to claims for breach of the duty of loyalty[107] based on bad faith.[108]  Good faith is a subsidiary element of the duty of loyalty. To establish that a defendant breached the duty to act in good faith, Plaintiffs must plead particularized facts demonstrating that the defendant "[1] intentionally acts with a purpose other than that of advancing the best interests of the corporation, . . . [2] acts with the intent to violate applicable positive law, or . . . [3] intentionally fails to act in the face of a known duty to act . . . ."[109]

Here, Plaintiffs' allegations seek to establish the third category of bad faith – "intentional[] fail[ure] to act in the *face* of a *known duty to act*."[110]  In claiming that the inside directors had a duty of good faith, the Second Amended Complaint alleges that the inside directors: "*faced* . . . a *known duty to act*, here Google's legal duty to comply with the federal laws related to the importation of prescription drugs"; had a duty to "maintain controls and policies designed to ensure Google's compliance with these [federal] laws"; and breached their duties by "*consciously failing to prevent the Company from engaging in the unlawful acts complained of herein*."[111]

---

[106] *See* Del. Code Ann. tit. 8, § 102(b)(7) (authorizing Delaware corporations to adopt charter provisions that eliminate director liability for breach of duty of care); Ex. 16 at 10, § VII (providing that, "[t]o the fullest extent" possible under Delaware General Corporation Law, "a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director"); *Baxter Int'l*, 654 A.2d at 1270 (holding that, under Section 102(b)(7), corporation can eliminate personal liability for every claim of breach of fiduciary duty except breach of duty of loyalty, such as acts in bad faith, including but not limited to fraud and other illegality); *Autodesk*, 2008 WL 5234264, at *10 (same); *Cede & Co. v. Technicolor*, 634 A.2d 345, 367 (Del. 1993) (defining duty of care as duty to be adequately informed).

[107] To establish breach of the duty of loyalty, a plaintiff must plead particularized facts showing that the defendant placed his own interests ahead of those of the company and its shareholders. *Stone*, 911 A.2d at 370.

[108] *See* 2012 Order at 9-10 (requiring particularized allegations that director faces substantial likelihood of liability for breach of duty of good faith); *Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003) ("a serious threat of liability may only be found to exist if the plaintiff pleads a *non-exculpated* claim against the directors based on particularized facts"); *Autodesk*, 2008 WL 5234264, at *10 (plaintiffs must meet "a scienter-based standard" under exculpatory clause).

[109] *Stone*, 911 A.2d at 369-70 (citation omitted, brackets added).

[110] *Id.* (emphasis added).

[111] SAC ¶¶ 133-34 (emphasis added).  Similarly, the Second Amended Complaint alleges that the inside directors:  had a duty of good faith requiring them to "conduct the Company's business and affairs in accordance with the federal laws prohibiting the illegal sale of prescription drugs,"

(continued...)

1    The words "conscious" and "intentional" each require Plaintiffs to particularly allege

2    knowledge on the part of the inside directors.[112]  Pursuant to this requirement, it is necessary but

3    not sufficient for Plaintiffs to allege that:  online Canadian pharmacies were running Google

4    advertisements linking to sites through which U.S. consumers purchased and imported prescription

5    drugs; Google's inside directors knew that the pharmacies were running those advertisements; and

6    Google's inside directors knew that it was illegal for those pharmacies to run those advertisements.

7    *Rather, Plaintiffs must **<u>also</u>** allege that each inside director knew that it was illegal for Google to*

8    ***<u>host</u>*** *such advertisements.*  Thus, in dismissing an action on demand-futility grounds, the Delaware

9    Supreme Court held that "the Complaint alleges many violations of federal securities and tax laws

10   but does not plead with particularity the specific conduct in which each defendant 'knowingly'

11   engaged, *or that the defendants knew that such conduct was illegal.*"[113]

12        In shareholder derivative actions, Delaware courts decline to infer knowledge that

13   particular conduct is illegal where the legal provisions alleged to have been violated *had never*

14   *been interpreted to apply to corporations such as the nominal corporate defendant.*  Thus, in a

15   case where the plaintiffs charged that Trustees caused their Funds to purchase certain securities and

16   "consciously decided to continue to own them despite reports of a U.S. crackdown on offshore

17   illegal betting enterprises," the Delaware Chancery Court rejected the plaintiffs' argument "that

18   because Trustees failed to act to sell the securities once they were apprised of the step up in

19   enforcement actions in the mid-2000s, they face a substantial likelihood of liability."[114]  Although

20

---

21        (...continued from previous page)

22   SAC ¶ 69; had knowledge "of the illegal Canadian ads," SAC ¶¶ 69 and 122; and both "failed" to run Google's business and affairs in accordance with these federal laws and "allowed Canadian online pharmacies to illegally sell prescription drugs via Google's website," SAC ¶¶ 69, 122.

23   [112] We assume *arguendo* that Plaintiffs' allegation of "conscious fail[ure]" sufficiently satisfies

24   the case law's requirement of an allegation of "intentional[] fail[ure]."

25   [113] *Wood v. Baum*, 953 A.2d 136, 141-42 (Del. 2008)  (particularized allegations must demonstrate that directors acted with scienter "[w]here, as here, directors are exculpated from

26   liability except for claims based on 'fraudulent,' 'illegal' or 'bad faith' conduct") (emphasis added); *DiLorenzo v. Norton*, No. 07-144 RJL, 2009 U.S. Dist. LEXIS 66862, at *20 (D.D.C. July 31, 2009) (same).

27   [114] *Hartsel v. Vanguard Group, Inc.*, No. 5394-VCP, 2011 WL 2421003, at *26 (Del. Ch. June

28   15, 2011), *aff'd*, 38 A.3d 1254 (Del. 2012).

1   the plaintiffs relied on "media reports and other news of prosecutions and the like under § 1955 in

2   the mid-2000s,"[115] "these reports and prosecutions did not involve owners of securities in illegal

3   gambling enterprises.  As such, *they did not make clear that passive stock ownership was also*

4   *illegal.*"[116]  Here, not only do Plaintiffs allege no prosecutions of Canadian (or any other foreign)

5   pharmacies for *running* the advertisements in question; Plaintiffs also allege no prosecutions of any

6   search engine for *hosting* such advertisements.[117]

7       **C.   This Court Should Adopt the Delaware Chancery Court's Ruling That the**
           **Second Amended Complaint's New Allegations Fail to Establish Knowledge**
8          **on the Part of Any Inside Director**

9          This Court should adopt Chancellor Strine's ruling and hold that the new allegations of the

10   Second Amended Complaint fail to establish knowledge on the part of any inside director.

11         *All* of the Second Amended Complaint's new allegations of director knowledge concern

12   events in 2003 *prior* to the implementation of Google's new policy regarding rogue pharmacy

13   advertisements.  As explained above (*see* Introduction, Part A.), Chancellor Strine ruled, in staying

14

15       [115] Under 18 U.S.C. § 1955, it is a crime to "own" any part of an illegal gambling business.
     *Hartsel*, 2011 WL 2421003, at *1, *26.

16       [116] *Hartsel*, 2011 WL 2421003, at *26 (emphasis added); *see also La. Mun. Police Emps. Ret.*
     *Sys. v. Hesse*, No. 12-cv-4017 ALC, 2013 U.S. Dist. LEXIS 123338, at *23-24, *28 (S.D.N.Y.
17   July 26, 2013) (in response to plaintiffs' claim that suit by New York Attorney General, SEC
     investigation, and *qui tam* action demonstrated company's tax strategy to be illegal, court rejected
18   claim, and under Delaware law, noted that no court had held strategy illegal: "Aside from the fact
     that some of these allegations are not in the Complaint, there is no explanation as to how they
19   demonstrate Defendants knew the company was pursuing an 'illegal' tax strategy, as opposed to a
     'risky' tax strategy. . . . [T]*here are no claims Defendants agreed the company's tax strategy*
20   *contravened the law but condoned its implementation anyway, constituting bad faith.*  Knowledge
     of the tax strategy alone, which only implies Sprint differed in its interpretation of the tax code
21   from the New York authorities, does not lead to a reasonable inference the Directors intentionally
     engaged in misconduct." (emphasis added)); *La. Mun. Police Emps. Ret. Sys. v. Wynn*, No. 12-cv-
22   509 JCM, 2013 U.S. Dist. LEXIS 14013, at *30-31 (D. Nev. Feb. 1, 2013) (although SEC
     commenced informal inquiry into donation/bribe to Macau authorities that had been approved by
23   board, court held that complaint failed to allege that directors knew donation to be illegal:  "The
     complaint lacks particular allegations that defendants knew they were engaged in wrongdoing in
24   approving the Macau donation.  At most, the complaint alleges that defendants knew the donation
     was made in an effort to obtain the land concession and recites the obligations of the company
25   under the FCPA; however, this does not demonstrate bad faith on behalf of the directors in
     approving the Macau donation.").
26

27       [117] To whatever extent such prosecutions would *establish* that hosting the advertisements was
     illegal, such prosecutions would be necessary but not sufficient:  Plaintiffs would still have to
28   allege *knowledge* that such hosting was illegal.

1   the *DeKalb* action, that knowledge allegations concerning 2003 – i.e., concerning events occurring

2   *prior* to the start of the new policy – are irrelevant to the *DeKalb* action.  Although non-binding

3   here (as noted *infra* at 23), the Chancellor's view was that such allegations are irrelevant to the

4   instant action as well.  Significantly, the Chancellor was considering the exact allegations added to

5   the Second Amended Complaint and found them to be no better than the allegations in the now-

6   dismissed Amended Complaint.[118]

7        Further, the Chancellor ruled, what *are* relevant are allegations regarding whether – after

8   the new policy was implemented and had a track record – any inside director had knowledge of the

9   new policy's inability to prevent Canadian online pharmacies from running the ads in question.

10  None of the Second Amended Complaint's new allegations, however, concern any inside director's

11  knowledge regarding the new policy after its implementation.  Thus, if this Court adopts

12  Chancellor Strine's ruling, then this Court must conclude that the Second Amended Complaint's

13  new allegations fail to allege the requisite knowledge on the part of any inside director, and thus

14  fail to allege that any inside director faces a substantial likelihood of liability.  At a minimum, the

15  Court must conclude that the new allegations of the Second Amended Complaint do not *increase*

16  the number of inside directors facing a substantial likelihood of liability beyond the number found

17  in this Court's decision dismissing the Amended Complaint.[119]

18       For several reasons, Defendants respectfully submit that this Court should adopt Chancellor

19  Strine's ruling.

20       First, although Defendants do not contend that the Chancellor's ruling is binding on this

21  Court – the Delaware Chancery Court has no appellate or supervisory authority here – Defendants

22  do contend that his ruling is highly persuasive authority.  It is a decision by an (arguably *the*)

23  authority on Delaware law, and it is based on the *same* (not just similar) facts.

---

24       [118] *See supra* at Introduction, Part A.

25       [119] *See* 2013 Order at 11, 14 (holding that Larry Page and Sergey Brin do not, and that Eric
26  Schmidt does, face a substantial likelihood of liability and dismissing Amended Complaint for
    failure to plead demand futility); *supra* at Factual Background, Part D.  As discussed *infra* in Point
27  I.D., the allegations of the Second Amended Complaint – in combination with Chancellor Strine's
    ruling and the case law requiring that a director be alleged to have knowledge of illegality –
28  actually *decrease* that number, from one (i.e., Eric Schmidt) to zero.

1    Second, because of the risk of inconsistent decisions, principles of comity militate in favor

2    of this Court's adopting the Chancellor's holding.  Indeed, it was because of principles of comity

3    that Chancellor Strine stayed the *DeKalb* action in favor of the instant action.  If this Court adopts

4    the Chancellor's ruling, this Court will not be according any more deference to Delaware than it

5    has already received from Delaware.

6    Third, even apart from the Chancery Court's authoritative voice regarding Delaware law,

7    and even apart from principles of comity, Chancellor Strine's ruling should be adopted by this

8    Court because it simply makes sense.  Plaintiffs' core allegation here is that the inside directors

9    *failed to act* – i.e., that, despite having a duty "to conduct the Company's business and affairs in

10   accordance with federal laws prohibiting illegal sale of prescription drugs," the inside directors

11   each "*failed to do so*."[120]  Yet, as the Chancellor recognized, Plaintiffs' substantive allegations

12   indisputably assert that the inside directors *did act*, by implementing the new policy of third-party

13   verification.[121]  As the allegations make clear, the new policy was announced in December 2003;

14   third-party verifier SquareTrade was promptly selected in January 2004 and formally hired in April

15   2004; and the new policy was detailed in congressional testimony in July 2004 and December

16   2005.[122]  In sum, the implementation and disclosure to Congress of the new policy clearly

17   constitute *action* rather than *failure to act*.

18   Consequently, Plaintiffs' only possible failure-to-act theory – or, as Chancellor Strine put

19   it, Plaintiffs' only "cogent theory" – is that one aspect of the new policy was flawed (i.e., it was

20

21   [120] SAC ¶ 69 (emphasis added); *see also* SAC ¶ 134 (alleging "fail[ure] to prevent the
     Company from engaging in the unlawful acts complained of herein").

22
23   [121] In calling the new policy and Square Trade "minor improvements," Plaintiffs concede that
     action was indeed taken against the *original* problem, which was rogue pharmacy advertisements
24   *globally* (and not just in *Canada*):  "Mounting public and private pressure *forced defendants to
     make minor improvements to Google's advertising policy* but they refused to use a robust system
25   like the one offered by VIPPS or to prevent Canadian pharmacies from advertising altogether.  On
     December 1, 2003, Google announced that it would use a third-party company to screen out ads
26   from rogue pharmacies that do not require prescriptions."  SAC ¶ 80 (emphasis added); *see also*
     SAC ¶ 99 ("Defendants also permitted Google to continue using PharmacyChecker until 2009,
27   despite the existence of superior VIPPS service."); *see generally supra* at Factual Background, Part
     A. ("The Original Problem") and Part B. ("Google's Solution to the Original Problem").

28   [122] SAC ¶¶ 80, 82, 85; Sandberg at 264-67; McLaughlin at 193-96.

1    still allowing Canadian online pharmacies to run the ads in question), and that the inside directors

2    failed to act *with respect to that flaw*.  But, under that theory, Plaintiffs had to allege that the inside

3    directors *knew of the new policy's flaw.* More specifically, under the case law applicable to

4    Plaintiffs' claim of breach of the duty of good faith (*see supra* at 20-22), Plaintiffs must allege that

5    the inside directors knew that (i) the new policy was not preventing Canadian online pharmacies

6    from running the ads in question, (ii) it was illegal for those pharmacies to continue running those

7    ads, and (iii) it was illegal for Google to continue hosting those ads.  As the Chancellor recognized,

8    the allegations unsealed in *DeKalb*, and hence the new allegations in the Second Amended

9    Complaint herein, fail to allege any such knowledge.  The new allegations concern events

10   *predating* implementation of the new policy[123] and thus cannot logically allege any of the three

11   required kinds of knowledge, which all concern events *postdating* implementation of the new

12   policy.  For this reason, Plaintiffs' new demand-futility allegations fail with respect to the inside

13   directors.

14          Any suggestion by Plaintiffs that the new policy, particularly SquareTrade, was "window

15   dressing" (SAC ¶ 82) should not long detain this Court.  Plaintiffs' claims, which focus on

16   *Canadian* pharmacies, do not genuinely challenge the new policy's success at restricting rogue

17   pharmacies in the rest of the world.[124]  The congressional testimony given in December 2005

18   demonstrates beyond dispute that the new policy had "teeth":  because of the new policy, over

19   30,000 ads by rogue pharmacies were rejected.[125]  Finally, even with respect to Canadian

20   pharmacies, the new policy and Square Trade were hardly "window dressing."  As a condition of

21   certification, SquareTrade undertook to verify each Canadian pharmacy's licensure; required each

22   Canadian pharmacy agree to follow the law of their purchaser's locale and not to advertise to U.S.

23

24   _____
      [123] The Second Amended Complaint's new allegations concerning director knowledge all

25   relate to events occurring in March through November 2003 – before the start of the new policy,
     and well before SquareTrade had developed any track record.  SAC ¶¶ 33-66; *see also* SAC ¶ 77.

26       [124] *See, e.g.*, NPA ¶ 2(h) (acknowledging that Google "took steps to block pharmacies in

27   countries other than Canada from advertising in the United States through AdWords"); Sandberg at
     265 (noting that SquareTrade certification was available only to pharmacies in U.S. and Canada).

28       [125] McLaughlin at 196-97.

1  consumers; and further required each Canadian pharmacy to warn U.S. consumers that "'[t]he

2  FDA, due to the current state of their regulations, has taken the position that virtually all shipments

3  of prescription drugs imported from a Canadian pharmacy by a U.S. consumer will violate the

4  law.'"[126]  None of the Defendants is alleged to have known at the time that a Canadian pharmacy's

5  certification by SquareTrade, as part of SquareTrade's licensure-agreement-and-warning regime,

6  would not provide a reasonable basis to expect that pharmacy to be purely law-abiding.[127]

7      **D.**    **In Any Event, the Second Amended Complaint Does Not Allege that Any**
   **Inside Director Knew Google's _Hosting_ of the Canadian Pharmacy Ads to Be**
8      **Illegal**

9      Neither the new, nor the old, allegations of the Second Amended Complaint allege that any

10  inside director knew that it was illegal for Google to *host* the ads in question.  Thus, even if the

11  Court does not adopt Chancellor Strine's ruling, the Court must still dismiss the Second Amended

12  Complaint for failing to plead that any inside director had the requisite knowledge and hence faces

13  a substantial likelihood of liability.  Because the Second Amended Complaint does not even

14  purport to allege that any *outside* director faces a substantial likelihood of liability, the fact that *no*

15  director at all is alleged to face a substantial likelihood of liability means that no director is alleged

16  to be interested.  The Second Amended Complaint must accordingly be dismissed.[128]

17      Nothing in the new allegations of the Second Amended Complaint alleges that any inside

18  director knew Google's hosting of the ads in question to be illegal.  To the contrary, the

19  Drugstore.com press release, which in Plaintiffs' telling is what started the ball rolling, put

20  Google's inside directors on notice that Google's hosting of these ads was *not* illegal.  The press

21

22  [126] Sandberg at 265 n.5 (quoting text of warning).  *See Midwestern Teamsters Pension Trust
   Fund v. Deaton*, No. H-08-1809, 2009 U.S. Dist. LEXIS 50521, at *13, *28-30 (S.D. Tex. May 7,

23  2009) (holding that company's adoption of revised policies, which included self-certification of
   compliance with legal requirements, was good-faith solution to earlier violations of federal law that

24  court could not deem inadequate), *adopted by Midwestern Teamsters Pension Trust Fund v.
   Deaton*, No. H-08-1809, 2009 U.S. Dist. LEXIS 129701 (S.D. Tex. May 26, 2009).

25  [127] Certainly, the detail with which Google officials' congressional testimony described the
   particulars of the new policy, including its application to Canadian pharmacies (*see supra* at 13-

26  15), refutes any assertion that the officials contemporaneously knew any aspect of the new policy
   to be ineffective.

27  [128] *See* 2013 Order at 8 (holding that, absent allegation of interestedness, Court need not reach
   independence analysis).

28

1    release stated that if search engines like Google did not voluntarily cease hosting the ads, then

2    Congress would have to enact legislation outlawing such hosting – the clear implication being that

3    unless and until Congress enacted such legislation, Google's hosting of the ads broke no law.[129]

4          Even the NPA, while expressly stating that it was "unlawful" for Canadian pharmacies to

5    advertise and sell prescription drugs to U.S. consumers,[130] said simply that Google "improperly

6    assisted" those pharmacies and that Google "accepts responsibility for [its] conduct."[131]   In this

7    regard, Plaintiffs make egregiously incorrect statements when they say:  that the $500 million paid

8    by Google as part of the NPA constituted "fines" and "penalties";[132] and that in the NPA Google

9    accepted responsibility for "violating" 21 U.S.C. § 331 and 21 U.S.C. § 952.[133]   In fact, the

10   payment was *not* a fine or penalty.  There was no criminal action at all, as evidenced by the fact

11   that the NPA is a "*non*-prosecution agreement."  Rather, the payment was part of a *civil*

12   forfeiture.[134]  Even the contemplated civil forfeiture proceeding was to be brought against the

13   funds, not Google.[135]  Moreover, Google accepted responsibility not for "violati[on]" of Title 21

14   but for its "conduct."[136]

15         In short, Plaintiffs do not allege that there were ever any prosecutions of search engines for

16

17   _____

18   [129] SAC ¶ 49 ("We sincerely hope that Yahoo, MSN, Google, and other search engines do the
     right thing and refuse to carry these ads.  *If not, then Congress needs to protect the public by
     making it unlawful to sell advertising space to companies that provide illegal pharmacy services,*

19   such as re-importation, shipping without a legitimate prescription, and misrepresentation."
     (emphasis added)); *supra* at Factual Background, Part A.3.

20   [130] *See* NPA ¶ 2(a) ("[I]t is *unlawful for pharmacies* outside the United States to ship
     prescription drugs to customers in the United States." (emphasis added)); NPA ¶ 2(f) ("[T]he

21   Company was aware that in most circumstances it was *illegal for pharmacies* to ship controlled
     and non-controlled prescription drugs into the United States from Canada." (emphasis added));

22   NPA ¶ 2(q) (referring to "the unlawful sale of prescription drugs by online pharmacies to U.S.
     consumers"); NPA ¶ 8(a) (referring to "pharmacy advertisers that import or dispense prescription

23   drugs in violation of United States law").

24   [131] NPA ¶ 3.

25   [132] SAC ¶ 115.

     [133] SAC ¶¶ 3, 31, 69, 104.

26   [134] NPA ¶¶ 4-5.

27   [135] NPA ¶ 6.

     [136] NPA ¶ 3.

28

1  hosting the ads in question,[137] or that there was ever case or statutory law expressly prohibiting

2  such hosting.[138]  Even Google's nemesis, Drugstore.com, informed Google that hosting such ads

3  was not illegal.  Consequently, if hosting had not then been established to be illegal, then Plaintiffs

4  could not possibly allege that the inside directors knew hosting to be illegal.

5       As for the "old"[139] allegations in the Second Amended Complaint, the only inside director

6  as to whom these even arguably allege knowledge is Eric Schmidt – yet these allegations do not

7  allege that Mr. Schmidt *knew Google's hosting of the ads in question to be illegal*.  In his

8  testimony to Congress in 2011, Mr. Schmidt stated that Google employees' conduct addressed in

9  the NPA was "not without [his] knowledge."  In response to his questioner's follow-up request for

10  clarification, Mr. Schmidt stated that, in 2004, he became aware "that there were some potential

11  issues to consider regarding pharmacies advertising via AdWords, in violation of Google's

12  policies."[140]  While Plaintiffs allege that, in these statements, Schmidt admitted to knowledge of

13  the "illegal Canadian ads,"[141] the allegation is legally inadequate for two reasons.

14       First, the phrase "illegal Canadian ads" is so misleading as to violate the requirement of

15  particularized pleading.  If a plaintiff alleges that a director has knowledge of "illegal Canadian

16  ads," it is wholly unclear whether the plaintiff means that the director (a) has knowledge of the

17  existence of the Canadian ads, which *the plaintiff, not the director,* is describing as illegal; (b) has

18  knowledge that it was illegal for the Canadian pharmacies to run such ads; or (c) has knowledge

19  that it was illegal for Google to host such ads.  By repeatedly using the unclear phase "illegal

20

---

21       [137] *See supra* at Point I.B.

22       [138] *See supra* at Point I.B. (citing *Wood*, 953 A.2d at 141-42; *Hartsel*, 2011 WL 2421003, at
    *26; *La. Mun. Police Emps. Ret. Sys.*, 2013 U.S. Dist. LEXIS 123338, at *23-24, *28; *La. Mun.*
23  *Police Emps. Ret. Sys.*, 2013 U.S. Dist. LEXIS 14013, at *30-31).

24       [139] By "old" allegations, we mean allegations that are not meaningfully different from those in
    the Amended Complaint.

25       [140] 2013 Order at 10 (quoting Schmidt Response clarifying testimony of Sept. 21, 2011).

26       [141] *See, e.g.*, SAC ¶ 4 (Schmidt "admitted that he became aware of the *illegal Canadian ads* on
    Google's website in around 2004" (emphasis added) (citing 2013 Order at 10)); SAC ¶ 5 (Schmidt
27  "had to admit his personal knowledge of the illegal Canadian ads during his September 21, 2011
    testimony"); SAC ¶ 20 (this Court "held that defendant Schmidt is 'interested' because he was
28  aware of the illegal Canadian ads).

1    Canadian ads," Plaintiffs studiedly blur the crucially important distinctions among the three

2    different kinds of knowledge that must be alleged here. The consequences of Plaintiffs' blurred

3    sweep-them-all-together pleading are not minor: such unacceptably loose language could mean

4    that individual directors could be held personally liable for $500 million in damages without ever

5    having the requisite knowledge. Accordingly, the Court should enforce the particularized pleading

6    requirement and hold that such pleading fails to allege knowledge that Google's hosting was

7    illegal.

8         Second, Mr. Schmidt's questioner never asked when he became aware of the "illegal

9    Canadian ads."[142] That phrase was coined by Plaintiffs, not by Mr. Schmidt or his questioner.

10    Rather, Mr. Schmidt simply referred to "conduct" – without referring to or commenting on its

11    legality – and stated that it had nothing to do with Google's current practices.[143] In his written

12    follow-up query, the questioner referred only to "conduct" and never once referred to or described

13    it as "illegal":

14

15
16
17
18
> Your answer would seem to suggest that you did indeed have knowledge of the *conduct* set forth in paragraph 2 of the NPA. a. Did you know that Canadian online pharmacies were advertising prescription drugs for sale in the U.S. using Google's AdWords or other Company advertising platforms between 2003 and 2009? b. When did you learn of this *conduct*? c. How did you learn of this *conduct*? d. Did you alert others in the company about this *conduct*? Who did you alert? When did you do so? What did you say or write in alerting others in the company regarding this *conduct*?"[144]

19    Thus, whether the "conduct" referred to was the pharmacies' running of the ads, or Google's

20    hosting of the ads, or Google employees' assistance to advertisers,[145] *nothing in the questions or*

21    *the answers referred to or described the conduct as "illegal."* Given that the NPA itself did not

22    call Google's conduct "illegal" (*see supra* at 27), it is hard to see how questions about conduct

23    described in the NPA can be understood to be a description of the conduct as "illegal."

24

25        [142] *Cf.* 2013 Order at 10 ("defendants concede that the questioner eventually clarified his question to specifically ask when Schmidt became aware of the illegal Canadian pharmacy ads").

26        [143] Schmidt at 16.

27        [144] Schmidt at 118-19 (emphasis added).

28        [145] *See supra* at 15.

1   As a result, Mr. Schmidt's testimony, to whatever extent it admitted knowledge of conduct

2   (e.g., running ads, hosting ads, or assisting advertisers), most certainly did not admit knowledge

3   that Google's hosting of the ads was illegal.  Because Mr. Schmidt's testimony did not admit

4   knowledge of illegality, the Second Amended Complaint's "old" allegations do not allege that Mr.

5   Schmidt faces a substantial likelihood of liability.  Accordingly, the Second Amended Complaint

6   should be dismissed for failure to plead interestedness on the part of any director and thus failure to

7   plead demand futility.

8   **II.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS'**
        **DEMAND FUTILITY ALLEGATIONS DO NOT ESTABLISH THAT THE**
9       **OUTSIDE DIRECTORS LACK INDEPENDENCE**

10      **A.   Specific Legal Standards Defining When a Director Lacks Independence**

11  "A director is independent when his or her decision is based on the corporate merits of the

12  subject before the board rather than on extraneous considerations or influences."[146]  A plaintiff

13  charging lack of independence "must allege particularized facts show[ing] that the Board is either

14  dominated by an officer or director who is the proponent of the challenged transaction or that the

15  Board is so under his influence that its discretion is sterilize[d]."[147]  A director is "controlled" if the

16  director "is beholden to the allegedly controlling entity, as when the entity has the direct or indirect

17  unilateral power to decide whether the director *continues* to receive a benefit upon which the

18  director is so dependent or is of such subjective material importance that its threatened loss might

19  create a reason to question whether the director is able to consider the corporate merits of the

20  challenged transaction objectively."[148]  Note the word "continues" in the previous sentence.

21  Without more, the *past* receipt of a benefit does not establish a *present* lack of independence; only

22  if a director is threatened with the loss of a *continuing* benefit can there arise a doubt as to the

23  _____

24      [146] 2013 Order at 11 (citation and internal quotation marks omitted).

        [147] 2013 Order at 11 (citation and internal quotation marks omitted).

25      [148] 2013 Order at 12 (citation and internal quotation marks omitted) (emphasis added).  A
26  director can also be "controlled" if the director's domination by the other party is "through close
    personal or familial relationship or through force of will."  2013 Order at 12 (citation and internal
27  quotation marks omitted).  But this alternative definition is irrelevant here, as Plaintiffs' allegations
    concern only the financial and business relationship between Mr. Schmidt and Ms. Tilghman and
28  say nothing of any "personal or familial relationship" or "force of will."  *See* SAC ¶ 126.

1   director's independence.[149]  "Nor is the naked assertion of a *previous* business relationship

2   sufficient to overcome the presumption of a director's independence."[150]  In short, what matters is

3   not whether there *was* a benefit or business relationship in the *past* but rather whether there *is* a

4   benefit or business relationship in the *present and continuing into the future*.

5          Plaintiffs do not even purport to challenge the independence of outside directors Ann

6   Mather, Diane Greene, and Paul Otellini.  Moreover, Plaintiffs' challenge to the independence of

7   outside directors Shirley Tilghman, Ram Shriram, John Hennessy, and John Doerr is substantively

8   the same in the Second Amended Complaint as it was in the Amended Complaint.[151]  Because the

9   Court has already rejected the Amended Complaint's challenge to the independence of Messrs.

10  Shriram, Hennessy, and Doerr,[152] the Court should once again reject Plaintiffs' challenge as to

11  these three directors.  Plaintiffs' challenge to the independence of Shirley Tilghman in the

12  Amended Complaint – which challenge was upheld in the 2013 Order[153] – is substantively the

13  same as in the Second Amended Complaint, but for reasons explained below has become baseless.

14          **B.      Because No Director Is Alleged to Be Interested, No Director Can Lack**
                      **Independence**
15

16          This Court held in the 2013 Order that a director's independence is relevant only if

17  Plaintiffs' allegations identify an interested person and assert that such director lacks independence

18  from that interested person.[154]  Here, the Second Amended Complaint identifies only the inside

19  directors as interested persons.[155]  For the reasons discussed above, however, the Second Amended

---

20          [149] *Orman v. Cullman*, 794 A.2d 5, 27 (Del. Ch. 2002) ("The naked assertion of a previous
21  business relationship is not enough to overcome the presumption of a director's independence.
    The law in Delaware is well-settled on this point."); *accord VeriSign*, 531 F. Supp. 2d at 1198; *see*
22  *also Orman*, 794 A.2d at 25 n.50 ("A director may be considered beholden to (and thus controlled
    by) another when the allegedly controlling entity has the unilateral power (whether direct or
23  indirect through control over other decision makers), to decide whether the challenged director
    *continues* to receive a [material] benefit . . . .") (emphasis added)).

24          [150] 2012 Order at 15 (emphasis added) (citation omitted).

25          [151] *Compare* SAC ¶¶ 124-27, *with* AC ¶ 101.

26          [152] 2013 Order at 12-13.

27          [153] 2013 Order at 13.

        [154] 2013 Order at 8.
28
        [155] SAC ¶ 122.

Complaint fails to allege that the inside directors are interested.[156]  Thus, there is no occasion for the Court to decide whether any director lacks independence; once the Court concludes that no one is alleged to be interested, the Court's inquiry is at an end, and the case should be dismissed for failure to allege demand futility.

### C.   Having Resigned from the Princeton Presidency, Shirley Tilghman Does Not Lack Independence from Eric Schmidt

In any event, the Court should now hold that Shirley Tilghman does not lack independence from Eric Schmidt.

Prior to the filing of the Second Amended Complaint, Ms. Tilghman resigned from the Princeton Presidency.[157]  This fact is acknowledged (albeit coyly) by the Second Amended Complaint.[158]  As a result, Ms. Tilghman is not beholden to, and does not lack independence from, Eric Schmidt.  Thus, even assuming *arguendo* that Mr. Schmidt is interested (which he is *not*, *see supra* at Point I.D.), the basis for the holding in the 2013 Order that Ms. Tilghman lacks independence from Mr. Schmidt is now absent from the case.

As indicated in the 2013 Order, the only articulated bases for holding that Ms. Tilghman lacks independence from Mr. Schmidt are (a) Ms. Tilghman's service as Princeton President, (b) Mr. Schmidt's service as a Princeton Trustee from 2004 to 2008, and (c) Mr. Schmidt's donation of $25 million to Princeton in 2009.[159]  As explained below, *each* of these purported bases fails to allege any ground for concluding that Ms. Tilghman – as of the filing of the Second Amended Complaint on November 1, 2013 – was beholden to, or lacked independence from, Mr. Schmidt.

**(i) Ms. Tilghman's Service as President:**  As noted, by November 1, 2013, Ms. Tilghman was no longer President of Princeton.  Thus, even assuming *arguendo* that her salary as

---

[156] *See supra* at Point I.C. and I.D.

[157] *See supra* at 5 & n.16.

[158] SAC ¶ 23 (alleging that Ms. Tilghman "serves *or served*" as Princeton's President (emphasis added)); *see supra* at 5 & n.16.

[159] 2013 Order at 13; SAC ¶ 126.

1  Princeton's President had depended on her ability to fundraise,[160] her resignation from her position

2  as President severed any possible causal relationship between her fundraising success and her

3  salary:  her resignation ended not only any fundraising responsibility that the Princeton Presidency

4  imposed on her, but also any control that Princeton's Trustees had over her salary.  Thus, a vote by

5  her to initiate litigation against Mr. Schmidt could not possibly have adverse financial

6  consequences for her personally.[161]

7  　　　　**(ii)  Mr. Schmidt's Service as Trustee:**  Mr. Schmidt was last a Princeton Trustee in *2008*

8  *– years* before the commencement of this action, let alone the filing of the Second Amended

9  Complaint.  Moreover, the Second Amended Complaint does not even allege that Mr. Schmidt

10  *currently* has control over Ms. Tilghman's compensation and continued employment, only that he

11  had such control *until 2008*.[162]  Thus, even if Ms. Tilghman had *not* resigned from the Princeton

12  Presidency, Mr. Schmidt's *past* service as Trustee would still not be sufficient to allege that Ms.

13  Tilghman *is currently* beholden to Mr. Schmidt.  Because the Second Amended Complaint does

14  not even purport to allege that Mr. Schmidt had any control over her compensation and

15  employment *after* his term as Trustee ended in 2008, the Second Amended Complaint fails to

16  allege that Mr. Schmidt's service as a Princeton Trustee renders Ms. Tilghman beholden to Mr.

17  Schmidt.

18  　　　　[160] An allegation that a failure to fundraise effectively would have adversely affected Ms.
19  Tilghman's terms of employment as Princeton's President is absent from the Second Amended
   Complaint but is required in order to allege lack of independence under Delaware law.  *See In re The*
20  *Goldman Sachs Group, Inc., S'holder Litig.*, No. 5215-VCG, 2011 WL 4826104, at *10 (Del. Ch.
   Oct. 12, 2011) (holding that plaintiffs failed to raise reasonable doubt that president of Brown
21  University was independent:  "Plaintiffs' allegations do not provide information that [Brown's
   president Ruth Simmons] actively solicited this amount or *how this or potential future donations*
22  *would affect Simmons*." (emphasis added)).

23  　　　　[161] *Cf. In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 824 (Del. Ch. 2005)
   (holding that director was independent from CEO that had *formerly* served as treasurer of charity
24  led by director; CEO's company had made donations totaling $18 million to that charity), *aff'd*,
   906 A.2d 766 (Del. 2006).  The Second Amended Complaint also fails to allege that Ms.
25  Tilghman's salary was a "benefit upon which the director is so dependent or is of such subjective
   material importance that its threatened loss might create a reason to question" the director's
   objectivity.  2013 Order at 12.

26  　　　　[162] SAC ¶ 126 ("Schmidt is a graduate of Princeton University and served as a trustee of the
27  university from *2004 to 2008*, at the same time as Tilghman served as a trustee of the university.
   *During that time,* Schmidt, as a Trustee, *exercised substantial control over Tilghman's*
28  *compensation and continued employment*." (emphasis added)).

1        Now that Ms. Tilghman is no longer the President *and* Mr. Schmidt is no longer a Trustee,

2   the assertion that Mr. Tilghman is currently beholden to Mr. Schmidt is *doubly* baseless.  A vote by

3   her to initiate litigation against Mr. Schmidt could not possibly have adverse financial

4   consequences for her in the future.[163]

5        **(iii)  Mr. Schmidt's Donation:**  Mr. Schmidt's donation to Princeton occurred in 2009.

6   Plaintiffs do not allege that Mr. Schmidt ever made any more donations during the more than four

7   years that have elapsed between the 2009 donation and the filing of the Second Amended

8   Complaint.  The lapse of time without a second gift accordingly indicates that any failure by Mr.

9   Schmidt to make future donations will result not from any vote by Ms. Tilghman to authorize

10  litigation against Mr. Schmidt, but rather from Mr. Schmidt's own decision to make no donation

11  beyond the one in 2009.  Nor does the Second Amended Complaint allege that the amount of the

12  donation in 2009 was material to Princeton University; an allegation of materiality – including the

13  percentage of Princeton's total fundraising that Mr. Schmidt's donation represented – is

14  mandatory, not optional.[164]

15       For all of these reasons, the Second Amended Complaint's discussion of Ms. Tilghman and

16

17  _____

    [163] *See In re Bidz.com, Inc., Deriv. Litig.*, 773 F. Supp. 2d 844, 854 (C.D. Cal. 2011) (even if directors "were beholden to [CEO] in 2004 – the time of the stock option award – there is no particularized allegation suggesting that [CEO's] undue influence continued to [the year] when this case was filed"); *Jacobs v. Yang*, No. 206-N, 2004 WL 1728521, at *4-5 (Del. Ch. Aug. 2, 2004), *aff'd mem.*, 867 A.2d 902 (Del. 2005) (where Yahoo!'s founder does not control current employment of CEO, the latter's independence is not sufficiently challenged).

18

19

20  [164] *See Goldman Sachs Group*, 2011 WL 4826104, at *9-10 ("The Plaintiffs do not provide the ratios of the amounts donated by [the company], or [the company's foundation] to overall donations, or any other information demonstrating that the amount would be material to the charity. . . . *The Plaintiffs provide the amount donated to Brown University, but do not give any additional information showing the materiality of the donation to Brown University.  The Plaintiffs do not provide the percentage this amount represented of the total amount raised by Brown*, or even how this amount was material to the Swearer Center." (emphasis added)); *J.P. Morgan Chase*, 906 A.2d at 822, 824 (bank's donations of $18 million to the United Negro College Fund did not disqualify that organization's CEO and President from considering demand where "plaintiffs provide only the dollar value, not the representative percentage, of [bank's] contributions"; "plaintiffs do not even go so far as to indicate what percentage of the museum's overall contributions are made by" bank and "never state how [bank's] contributions could, or did, affect the decision-making process of the president of one of the largest museums in the nation"); *see also id.* at 822 (holding that, where bank made donation to American Museum of Natural History of which outside director Futter was president and trustee, complaint failed to identify donations' percentage of museum's overall contributions, or explain what influences donations have on "decision-making process of the president of one of the largest museums in the nation").

21

22

23

24

25

26

27

28

1   Mr. Schmidt is insufficient to allege that Ms. Tilghman lacks independence from Mr. Schmidt or to

2   overcome the presumption that Ms. Tilghman will consider a demand objectively.

3   **III.   THE COMPLAINT FAILS TO STATE A CLAIM**

4            Because the Second Amended Complaint does not cure the defects as required by this

5   Court,[165] no claims are stated against any Defendant.  As the Court noted, a complaint "'requires

6   more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will

7   not do.'"[166]  Where allegations sound in fraud (*see, e.g.*, SAC ¶¶ 81, 83), the complaint must allege

8   "specific facts" under Federal Rule of Civil Procedure 9(b).[167]

9            **No Claim for Breach of Fiduciary Duty:**  Plaintiffs allege that all eight "defendants

10  breached their duty of loyalty by consciously failing to prevent the Company from engaging in the

11  unlawful acts complain of herein."[168]  As the Court held, this claim requires pleading that defendants

12  "'intentionally act[ed] with a purpose other than that of advancing the best interests of the

13  corporation . . . [and] act[ing] with the intent to violate applicable positive law."[169]

14           As was explained above with respect to the inside directors,[170] the Second Amended

15  Complaint fails to allege that any director, inside or outside, knew that it was illegal for Google to

16  *host* the ads in question.  Absent such an allegation, Plaintiffs cannot allege an "intent to violate

17  applicable positive law."  Thus, the fiduciary-duty claims must be dismissed.[171]

18           Furthermore, the new allegations in the Second Amended Complaint concerning events in

19  2003 – *prior to* the implementation of the new policy – are necessarily irrelevant to Plaintiffs'

20  case.[172]  Plaintiffs' case is premised on a theory of failure to act.[173]  Because implementation of the

21

22           [165] 2012 Order at 17-19.

     [166] 2012 Order at 5 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

23           [167] 2012 Order at 6.

24           [168] SAC ¶ 134.

25           [169] 2012 Order at 17 (citation omitted).

     [170] *See supra* at Point I.D.; Factual Background, Part D.

26           [171] Plaintiffs' boilerplate "aiding and abetting" allegations (SAC ¶¶ 26-27) add nothing.

27           [172] *See supra* at Point I.C.

28           [173] *See supra* at Point I.C.

1   new policy constituted action rather than failure to act, the only viable failure-to-act theory available

2   to Plaintiffs is that Defendants failed to correct the flaw in the new policy (i.e., the inability to

3   prevent the Canadian ads at issue).[174]  As all of the new allegations concern the period *predating* the

4   new policy, the new allegations are beside the point.[175]

5          The continued naming of Mr. Otellini as a defendant remains a mystery.  The Second

6   Amended Complaint does not include a single allegation regarding any action that he did or did not

7   take.

8          **No Claim for Waste:**  The Second Amended Complaint alleges claims for waste against

9   Messrs. Schmidt, Page, and Brin.[176]  The Court reiterated that the pleading burden for waste is

10  particularly steep, requiring an exchange that is "'so one sided that no business person of ordinary,

11  sound judgment could conclude that the corporation has received adequate consideration.'"[177]

12  Plaintiffs previously failed to allege facts indicating that there was an "'unconscionable'" exchange

13  or even the more basic "amounts that constitute corporate waste."[178]  The Second Amended

14  Complaint fails to plead anything new to cure these basic defects.

15         **No Claim for Unjust Enrichment:**  The Second Amended Complaint reiterates a purported

16  claim against Messrs. Schmidt, Page, and Brin for unjust enrichment.[179]  An unjust enrichment claim

17  requires plaintiffs to plead "(1) an enrichment; (2) an impoverishment; (3) a relation between the

18  enrichment and the impoverishment; (4) the absence of justification; and (5) the absence of a remedy

19  provided by law."[180]  Plaintiffs' original complaint failed because there were no facts "establish[ing]

20  how each individual defendant was enriched" or how Google was impoverished as a result, or the

---

[174] *See supra* at Point I.C.

[175] *See supra* at Point I.C.

[176] SAC ¶¶ 136-38.

[177] 2012 Order at 18-19 (citation omitted).

[178] 2012 Order at 19.

[179] SAC ¶¶ 139-42.

[180] 2012 Order at 19 (citing *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999)).

lack of justification.[181]  Defendants argued that the Amended Complaint had the same failings (although the Court did not reach the issue[182]).  The Second Amended Complaint similarly fails to provide this missing information.[183]  This failure is fatal to the unjust enrichment claim.

## CONCLUSION

For the reasons stated, the Second Amended Complaint should be dismissed with prejudice.

Dated:  December 6, 2013                    Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA  94304-1050


By: /s/ Boris Feldman
       Boris Feldman

Attorneys for Defendants
Larry Page, Sergey Brin,
Eric E. Schmidt, L. John Doerr, John L.
Hennessy, Paul S. Otellini, K. Ram Shriram,
Shirley M. Tilghman,
and Nominal Defendant Google Inc.

---

[181] 2012 Order at 19.

[182] 2013 Order at 14.

[183] Plaintiffs have steadfastly failed to reconcile their allegations with the fact that Messrs. Schmidt, Page, and Brin received – per their request – *salaries of just $1 per year* from 2005 through 2010.  Schor Decl. Ex. 17 at 31; Ex. 18 at 47; Ex. 19 at 49; Ex. 20 at 54; Ex. 21 at 59; Ex. 22 at 45.  With the exception of a nominal holiday bonus, they did not receive cash bonus payments or stock awards during that same period. *Id.*